IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SWOOZIE'S, INC.,[1] | ) Case No. 10-66316-CRM |
| | ) |
| Debtor. | ) |

**EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS
(1) AUTHORIZING DEBTOR IN POSSESSION TO OBTAIN FINANCING,
GRANT SECURITY INTERESTS AND ACCORD PRIORITY STATUS
PURSUANT TO 11 U.S.C. §§ 361, 364(c) AND 364(d); (2) GIVING
NOTICE OF FINAL HEARING PURSUANT TO BANKRUPTCY
RULE 4001(b)(2) AND (c)(2); AND (3) MODIFYING AUTOMATIC STAY**

Swoozie's, Inc., a Delaware corporation ("**Debtor**"), as debtor and debtor in possession herein, hereby submits this emergency motion (the "**Motion**") for entry of interim and final orders (1) authorizing debtor in possession to obtain financing, grant security interests and accord priority status pursuant to 11 U.S.C. §§ 361, 364(c) and 364(d); (2) giving notice of final hearing pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2); and (3) modifying automatic stay. In support of this Motion, Debtor relies on the Declaration of Kelly Plank-Dworkin in Support of the Chapter 11 Petition and First Day Motions filed contemporaneously herewith (the "**Plank-Dworkin Declaration**"). In further support of this Motion, Debtor respectfully represents as follows:

**PRELIMINARY STATEMENT**

1.      Debtor intends to finance the expedited sale or liquidation and wind-down of its estate through the use of the $3.5 million postpetition financing facility contemplated by this Motion (the "**DIP Credit Facility**"). The DIP Credit Facility is proposed to be provided by

---

[1] The last four digits of Debtor's tax identification number are 5738 and Debtor's mailing address is 80 W. Wieuca Road, Suite 302, Atlanta, GA 30342.

Wells Fargo Bank, National Association (in such capacity, "**DIP Lender**"), which is Debtor's principal and senior prepetition lender. The Proposed DIP Credit Facility neither primes the prepetition indebtedness owed to Wells Fargo (though it does prime Crane (defined below), which has preconsented to the priming through the Intercreditor Agreement (defined below)), nor does it seek to pay down the prepetition indebtedness. The reasons supporting Debtor's need to incur postpetition financing are compelling. Debtor's assets are fully encumbered and there is little to no unencumbered cash for Debtor to fund a postpetition sale or wind-down of its operations, especially the extra expenses resulting from the Chapter 11 filing. Debtor believes that a sale and orderly liquidation of its business through Chapter 11 will maximize the value of its assets for all of its stakeholders. Given its prepetition capital structure, such a sale and orderly liquidation will not be possible if Debtor does not have access to additional financing. Consequently, postpetition financing will be necessary to fund Debtor's cash needs during the pendency of this Chapter 11 case. Accordingly, to ensure Debtor has sufficient liquidity to fund an orderly sale or wind-down and liquidation of its assets, this Court should approve the Motion and the DIP Loan Documents (as defined below), and authorize Debtor to obtain postpetition financing.

## RELIEF REQUESTED

2.      By this Motion and pursuant to Sections 105, 361, 362, 363 and 364 of the United States Bankruptcy Code (the "**Bankruptcy Code**"), as supplemented by Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Debtor seeks entry of the following orders:

> (a)     A scheduling and notice order, substantially in the form of order annexed hereto as Exhibit "A" (the "**Scheduling and Notice Order**"), scheduling a final hearing to consider the Motion and prescribing and approving the form and manner of service of notice of the Motion and any interim hearing on the Motion.

(b) An order, approving on an interim basis (pending a final hearing) the terms and conditions of the DIP Credit Facility set forth in the interim order (1) authorizing debtor in possession to obtain financing, grant security interests and accord priority status pursuant to 11 U.S.C. §§ 361, 364(c) and 364(d); (2) giving notice of final hearing pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2); and (3) modifying automatic stay (the "**Interim DIP Order**"), a copy of which is annexed hereto as Exhibit "B," subject to modifications, if any, disclosed at the Interim Hearing (as defined below).

3. For the reasons set forth herein and in the Plank-Dworkin Declaration, Debtor requests that the Court schedule an interim hearing (the "**Interim Hearing**") on the Motion as soon as possible. Finally, Debtor requests that the Court schedule a final hearing (the "**Final Hearing**") on the Motion, consistent with Bankruptcy Rule 4001, as soon as possible but no sooner than fifteen (15) days after the date of service of this Motion.

## JURISDICTION

4. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

5. The statutory predicates for the relief requested herein are Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 4001 and 9014.

## FACTS

6. On March 2, 2010 (the "**Petition Date**"), Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "**Chapter 11 Case**").

7. Debtor continues to operate its business and manage its properties as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No creditors' committee, trustee or examiner has been appointed in this case.

**DEBTOR'S BUSINESS**

8.   Debtor is a specialty retailer focusing on the art of giving, home entertaining and life celebrations. Debtor offers a broad combination of products and services ranging from invitations and custom printing to housewares and party goods. Founded in 1999 and based in Atlanta, Georgia, Debtor has 350 employees in 43 stores and a corporate headquarters. Debtor opened its first store in February 2001 and now operates stores in 14 states across the Southeast, Northeast, Texas and California.

**EVENTS LEADING TO CHAPTER 11**

9.   There are three major contributing factors to Debtor's lowered sales results. First, in February 2009, Debtor entered the Northeast market through its purchase of 13 Blue Tulip stores, a chain of stores specializing in similar gift and social stationery consumer segments, out of bankruptcy. The impact of Blue Tulip's liquidation sale and the stores going "dark" for one month prior to the grand opening of the Swoozie's brand in the previous Blue Tulip locations had a deeper impact on customer retention than was anticipated. The assumptions for Debtor's 2009 sales plan predicted that sales in the Northeast would reach an estimated $12.8 Million, however, actual resulting sales figures were approximately $8.5 Million, missing the target numbers by over $4 Million.

10.   Second, around the same time as Debtor's purchase of the Blue Tulip stores, there was a seismic shift in the economy which was especially felt in Debtor's industry. Consumer behavior drastically changed as consumers pulled back on spending associated with paper, invitations, party goods, life celebrations and home accessories. Debtor's industry as a whole has been affected by the changing economic climate and resulting changes in consumer behavior. By way of example, as of December 2009, sales for manufacturers of paper and invitations were

off target by approximately 28 percent nationwide, and approximately 35 percent in the Northeast.

11. Finally, in the second quarter of 2009, Debtor had the opportunity to improve its sales figures as new categories of products were tested to offset the decline in consumer desire for paper and invitations, and those new products performed exceptionally well. However, to realize the opportunity for growth, Debtor required capital and, accordingly, sought a loan from a number of sources, including Wells Fargo, the proposed lender herein.

12. Debtor and Wells Fargo were in the process of closing the loan in the third quarter of 2009 when a number of negative converging factors, the most notable of which was the loss of Debtor's Chief Financial Officer and Chief Operating Officer (the "**CFO/COO**"), delayed the closing of the loan. Due to this delay and the loss of Debtor's CFO/COO, Debtor operated without a CFO/COO from July 2009 through November 2009 and was not able to properly keep control of its inventory and related business finances. Furthermore, during the fall of 2009, Debtor was unable to purchase new inventory or timely pay its vendors for delivered product. As a result, Debtor's sales missed targets by $2.2 Million.

13. While Debtor did eventually close the loan with Wells Fargo in October 2009, Debtor's inability to react to trend, aging inventory and a delayed holiday set-up of over four weeks resulted in Debtor's worst performance in its history.

14. Given its losses in the third and fourth quarters of 2009, combined with the uncertainty facing the U.S. economy and the lack of consumer spending, Debtor cannot sustain further projected losses. In order to maximize return to all creditors through a sale, whether as a going-concern or through an orderly liquidation, Debtor decided to file the instant Chapter 11 case.

## RELEVANT BACKGROUND

A. **The Prepetition Credit Facility**

15. Debtor is a party to a Credit and Security Agreement (the "**Prepetition Credit Agreement**"), dated as of October 19, 2009 between Debtor and Wells Fargo Bank, National Association (in such capacity, "**Prepetition Lender**"), pursuant to which Prepetition Lender extended a line of credit for working capital purposes to Debtor (the Prepetition Credit Agreement and all documents and instruments executed in connection therewith are collectively referred to herein as the "**Prepetition Loan Documents**"). Debtor's principal, Kelly Plank-Dworkin, issued a guaranty of Debtor's obligations under the Prepetition Credit Agreement (the "**Plank-Dworkin Guaranty**").

16. The Prepetition Loan Documents provide and Prepetition Lender asserts, among other things, that:

(a) The Indebtedness of Debtor pursuant to the Prepetition Loan Documents is secured by substantially all of Debtor's personal property, including all of Debtor's accounts, chattel paper (including, without limitation, tangible chattel paper and electronic chattel paper), deposit accounts, documents, equipment, general intangibles (including, without limitation, all intellectual property rights), goods, instruments, inventory, investment property, letter-of-credit rights, letters of credit, and books and records (all such personal property, as the same existed on or at any time prior to the Petition Date, together with all cash and non-cash proceeds thereof, being hereinafter referred to as the "**Prepetition Collateral**"). The Prepetition Collateral includes all of Debtor's "cash collateral" as that term is defined in Section 363(a) of the Bankruptcy Code.

(b) As of the Petition Date, the principal outstanding amount owed by Debtor to Prepetition Lender was approximately $3.1 million, plus interest accrued and accruing, costs,

fees and professional fees and expenses, and all other "Indebtedness" as defined in the Prepetition Credit Agreement, including the rights of Prepetition Lender to indemnification under the Prepetition Credit Agreement (collectively, hereinafter the "**Prepetition Obligations**"). The approximate amount of the Prepetition Obligations does not include attorneys' fees but does include an early termination fee in the amount of $150,000.

(c) All of the Prepetition Obligations are secured by the Prepetition Collateral. Prepetition Lender has a valid and first priority security interest in all of the Prepetition Collateral. To the best of Debtor's knowledge, the only other parties that may assert claims against the Prepetition Collateral are set forth immediately below.

B. **Other Secured Debt.**

17. Debtor is a party to a Secured Promissory Note with Crane & Co., Inc. ("**Crane**") dated February 25, 2009, as amended and restated on October 15, 2009 (the "**Junior Creditor Note**" and together with all other documents executed in connection with the Junior Creditor Note, the "**Junior Creditor Documents**"). The Junior Creditor Note is secured by a lien on and pledge of all of Debtor's rights to all inventory, goods, merchandise, and other tangible property that is held by Debtor for sale.

18. Crane and Prepetition Lender are parties to an Intercreditor Agreement dated October 19, 2009 (the "**Intercreditor Agreement**"). A true and correct copy of the Intercreditor Agreement is attached to this Motion as Exhibit "C." Pursuant to the Intercreditor Agreement, Crane agreed that Prepetition Lender's liens in the Prepetition Collateral constitute first priority liens that are superior to all liens of Crane. Additionally, pursuant to the Intercreditor Agreement, Crane waived any right it had to object to any financing proposed to be provided by Prepetition Lender to Debtor, including from and after the filing of a bankruptcy case by Debtor.

19. In addition to Crane, Debtor has other creditors that assert security interests in individual pieces of Debtor's equipment (collectively, these parties are the "**Equipment Creditors**"). Set forth in Exhibit "D" to this Motion is a chart listing each of the Equipment Creditors, the collateral in which these parties assert a security interest, and the nature of Debtor's obligation to each of the Equipment Creditors. Debtor estimates that the Equipment Creditors are owed, collectively, approximately $65,000. The proposed DIP Credit Agreement (defined below) does not seek to prime any valid and perfected security interests held by the Equipment Creditors and the Equipment Creditors will retain the same priority in their security interests as they presently hold if this Motion is granted.

## THE DIP CREDIT FACILITY

20. As a result of arm's length negotiations, DIP Lender has agreed to provide Debtor with a postpetition DIP Credit Facility in the maximum amount of $3.5 million. A true and correct copy of a substantially final draft of the Debtor-in-Possession Credit Agreement (the "**DIP Credit Agreement**") is attached hereto as Exhibit "E."

21. Debtor believes that the DIP Credit Facility will provide it with sufficient liquidity to sell or wind-down and liquidate its assets during the Chapter 11 Case in order to maximize the value of its assets for the benefit of its creditors. Without the DIP Credit Facility, Debtor will have little to no available cash and will be unable to effectuate a quick conclusion to this Chapter 11 Case, be unable to maximize the value of its assets, and be unable to minimize the adverse effects of the commencement of the Chapter 11 Case on its business. Consequently, this Court should approve the DIP Credit Agreement and the documents related thereto (collectively, the "**DIP Loan Documents**") and authorize Debtor to obtain the postpetition financing contemplated therein.

A.  **Terms of the DIP Credit Facility**

22.  The terms of the DIP Credit Facility are more specifically set forth in the DIP Credit Agreement attached hereto as Exhibit "E."[2] The key provisions of the DIP Credit Facility are as follows:[3]

(a)  Borrower:  Swoozie's, Inc.

(b)  Facility Amount:  $3,500,000.

(c)  Type of Facility:  Senior secured superpriority debtor-in-possession credit facility comprised of a $3,500,000 revolving credit facility.

(d)  Purpose:  To finance working capital and other general corporate purposes while under Chapter 11 protection, including the payment of expenses associated with the Chapter 11 Case and the sale or wind-down and liquidation of Debtor's estate.

(e)  Lender:  Wells Fargo Bank, N.A.

(f)  Maturity Date:  April 15, 2010.

(g)  Collateral:  All of Debtor's assets, real and personal, including, without limitation, all accounts, chattel paper (including, without limitation, tangible chattel paper and electronic chattel paper), deposit accounts, documents, equipment, general intangibles (including, without limitation, all intellectual property rights), goods, instruments, inventory, investment property, letter-of-credit rights, letters of credit, contract rights, rights under or pursuant to leases of real property, all sums on deposit in any collection account, and any items in any lockbox and all other "Collateral" as that term is defined in the DIP Loan Documents.  The "Collateral" does ***not*** include any of Debtor's or its estate's rights under 11 U.S.C. §§ 544, 546, 547, 548, 549, 550 or 553.

(h)  Priority and Security:

- Liens:  DIP Lender is granted, pursuant to the DIP Loan Documents and the Interim DIP Order, valid, binding, enforceable and perfected lien in and to the Collateral.

---

[2] The form of DIP Credit Agreement attached hereto as Exhibit "E" is in substantially final form, but is still being reviewed and edited by Debtor and DIP Lender.  Any material modifications will be identified for the Court at or prior to the hearing on the Motion.

[3] To the extent that the terms set forth herein differ from the terms in the attached proposed Interim DIP Order and the DIP Credit Agreement, the Interim DIP Order and the DIP Credit Agreement shall govern.

- 9 -

- <u>Priming of Crane Liens.</u>  The DIP Liens are senior in priority to the liens of Crane and the Crane Replacement Lien.

- <u>No Priming of Equipment Creditors.</u>  The DIP Liens do not prime and will be subordinate to the valid and perfected liens of the Equipment Creditors.

- <u>DIP Super Priority Claim</u>.  The DIP Credit Agreement provides that the Indebtedness (as defined in the DIP Credit Agreement) shall be an allowed super priority administrative expense claim (the "**Super Priority Claim**") having priority in payment over all other administrative expenses and unsecured claims against Debtor of any kind or nature, whether now existing or hereafter arising, including all administrative expenses of the kind specified in or arising or ordered under Sections 105, 326, 328, 503(b), 506(e), 507(a), 507(b), 546(c) and 1114 of the Bankruptcy Code, subject to the Carve-Out.

- <u>Guaranty Reaffirmation Agreement.</u>  Kelly Plank-Dworkin will execute the Guaranty Reaffirmation Agreement pursuant to which she will ratify and reaffirm the Plank-Dworkin Guaranty, as well as Indebtedness incurred under the DIP Credit Agreement.

- <u>Replacement Lien for Wells Fargo for Continued Use of Cash Collateral</u>.  As adequate protection, pursuant to Sections 361 and 363 of the Bankruptcy Code, for the diminution of value arising out of Debtor's use, sale or disposition of the Prepetition Collateral including cash collateral and Debtor's granting of the Liens in the Prepetition Collateral, Prepetition Lender has agreed to accept (and the proposed Order granting this Motion contemplates) that Prepetition Lender be granted replacement liens in and to all of the Collateral (the "**Wells Fargo Replacement Liens**") as partial adequate protection to Prepetition Lender to the extent of any diminution in value of the Prepetition Collateral caused by Debtor's use, consumption, sale, collection or other disposition of any Prepetition Collateral.  The Wells Fargo Replacement Liens will be senior in priority to the DIP Liens, the liens of Crane and the Crane Replacement Liens (defined below), though subject to the Carve-Out.

- <u>Replacement Lien for Crane for Continued Use of Cash Collateral</u>.  As adequate protection, pursuant to Sections 361 and 363 of the Bankruptcy Code, for the diminution and value arising out of Debtor's use, sale or disposition of the collateral securing Debtor's obligations to Crane, including cash collateral and the granting of Debtor of the Liens in such collateral, by operation of the Intercreditor Agreement, Crane has agreed to accept (and the proposed Order granting this Motion contemplates) that Crane be granted replacement liens (the "**Crane Replacement Liens**") in and to all inventory acquired by Debtor after the Petition Date (the "**Postpetition Inventory**") as partial adequate protection to Crane to the extent of any diminution in value of Crane's interest in the inventory

- 10 -

that existed and was owned by Debtor on the Petition Date (the "**Prepetition Inventory**") caused by Debtor's use, consumption, sale, collection or other disposition of any Prepetition Inventory. The Crane Replacement Liens are junior in priority to the DIP Liens and the Wells Fargo Replacement Liens.

(i) <u>Interest Rates and Interest Periods</u>: Advances under the DIP Credit Facility will bear interest at the Floating Rate (as defined in the DIP Credit Agreement). The Floating Rate is the sum of (a) the Daily Three Month LIBOR and (b) the Margin (as defined in the DIP Credit Agreement). The Margin for Floating Rate Loans (as defined in the DIP Credit Agreement) is eight (8%) percent.

(j) <u>Default Rate</u>: Upon the occurrence and during the continuance of any Event of Default, the applicable interest rate will increase by 3.00% per annum.

(k) <u>Origination Fee</u>: Debtor will pay a closing fee of $50,000.

(l) <u>Unused Line Fee</u>: Debtor will pay an annual unused line fee of one quarter of one percent (0.25%) of the daily average of the Maximum Line Amount reduced by the aggregate outstanding Advances (as defined in the DIP Credit Agreement), from the date of the DIP Credit Agreement to and including the Termination Date (as defined in the DIP Credit Agreement), which unused line fee shall be payable monthly in arrears on the first day of each month and on the Termination Date.

(m) <u>Collateral Exam Fees:</u> Debtor will pay fees in connection with any collateral exams, surveys, audits or inspections conducted by or on behalf of Wells Fargo at the current rates established from time to time by Wells Fargo as its collateral exam fees (which fees are currently $125 per hour per collateral examiner), together with all actual out-of-pocket costs and expenses incurred in conducting any collateral examination, survey, audit or inspection.

(n) <u>Advances</u>: Advances will be available on same day notice if notice is made before 11:00 a.m.

(o) <u>Availability of Advances</u>: Subject to the terms and conditions of the DIP Interim Order and the Final Order, Advances will be available from the Closing Date to the Termination Date and Debtror may borrow, prepay in whole or in part, and reborrow. The aggregate amount of all Advances will not exceed the lesser of (i) the Maximum Line Amount, and (ii) the Borrowing Base.

(p) <u>Borrowing Base</u>: Borrowings under the DIP Credit Facility shall be limited to a Borrowing Base (as defined in the DIP Credit Agreement). The Borrowing Base calculation is defined in the DIP Loan Documents.

(q) <u>Carve-Out</u>: The DIP Liens and Superpriority Claim conferred upon DIP Lender, and all liens in favor of the Prepetition Lender, shall be subject and subordinate to the payment of the following to the extent that there are not sufficient unencumbered funds in Debtor's estate (and, in the case of all Professionals, sufficient retainers) to pay

- 11 -

such amounts: (i) Professional Expenses of Debtor Professionals that are approved for payment by final order of the Court and do not exceed $370,000 in the aggregate; (ii) Professional Expenses of Committee Professionals that are approved for payment by final order of the Court and do not exceed $30,000 in the aggregate; (iii) fees required to be paid to the Clerk of the Court; and (iv) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6).

(r)     <u>Conditions Precedent to the initial Advances</u>: Customary for facilities of this nature, as set forth in the DIP Credit Agreement attached hereto.

(s)     <u>Covenants</u>: The DIP Credit Facility contains affirmative, negative and financial reporting covenants customary for facilities of this nature and otherwise satisfactory to DIP Lender.

(t)     <u>Events of Default</u>: The DIP Credit Facility and the DIP Loan Documents contain events of default related to the Plank-Dworkin Guaranty. For example, a bankruptcy filing by or against Kelly Plank-Dworkin is an event of default under the DIP Loan Documents. Additionally, the DIP Credit Facility and the DIP Loan Documents contain certain other customary events of default. By way of example, and as more fully set forth in Article 6 of the DIP Credit Agreement, "Events of Default" include, but are not limited to, the following: (a) failure to pay Indebtedness on the date that it becomes due and payable; (b) failure to observe or perform any covenant or agreement under the DIP Loan Documents, subject to certain cure periods; (c) false or misleading representations, warrantees, or certifications; (d) termination or invalidity of other DIP Loan Documents; (e) the Cessation of Business except in connection with Permitted Sales; (f) there is a Change in Control; (g) an uninsured loss of a material portion of the Collateral, (h) Debtor files a motion seeking appointment of a Chapter 11 trustee (or an examiner with enlarged powers) or an order appointing a Chapter 11 trustee (or an examiner with enlarged powers) is entered by the Court; (i) the Bankruptcy Case is converted to Chapter 7; and (j) the Bankruptcy Case is dismissed, among others.

23.     Debtor requests that this Court grant this Motion and permit Debtor to enter into the DIP Credit Facility. Debtor is in a precarious financial position, has no access to cash and is unable to find other financing. Absent the liquidity provided by the DIP Credit Facility, Debtor may be forced to convert this Chapter 11 Case to a case under chapter 7. Such a conversion would impair Debtor's ability to conduct a sale of its business or an orderly liquidation, which Debtor believes is the best mechanism to maximize the value of its assets for its creditors and protect the interests of all stakeholders.

24. The Court and other parties in interest are urged to review the terms and conditions of the DIP Credit Facility and the proposed Interim DIP Order carefully. Among other things, the DIP Credit Facility and the proposed Interim DIP Order provide for the following:

(a) DIP Lender and Debtor agree that Debtor should engage in an expedited sale of its business. Therefore, among other things, in the DIP Credit Agreement, Debtor has agreed that it shall request that the Court schedule a hearing for a date no later than March 26, 2010, to consider granting a sale of substantially all of its assets, as well as an agreement with a proposed stalking horse bidder and close a sale of all or substantially all of Company's assets and remit proceeds thereof to Wells Fargo no later than March 27, 2010. While these deadlines may be extended with the written consent of DIP Lender, there is no assurance that Debtor will not be in breach of the DIP Credit Agreement if these target dates are not met. *See* DIP Credit Agreement ¶ 5.16.

(b) The DIP Loan Documents contain certain Events of Default related to the Plank-Dworkin Guaranty. For example, if Kelly Plank-Dworkin repudiates the Plank-Dworkin Guaranty or files a bankruptcy petition, those actions will be an Event of Default under the DIP Loan Documents. *See* DIP Credit Agreement ¶¶ 6.1(l), (m).

(c) Debtor has agreed that neither Advances nor the Carve-Out may be used to pay Professional Expenses incurred in connection with the assertion of or joinder in any claim, counterclaim, action, contested matter, objection, defense or other proceeding, the purpose of which is to seek or the result of which would be to obtain any order, judgment, declaration, or similar relief (a) seeking damages from Wells Fargo on account of any alleged cause of action arising on, before or after the Petition Date;

(b) invalidating, setting aside, avoiding or subordinating, in whole or in part, (i) any of the Prepetition Debt or Indebtedness, or (ii) any of the Liens in any of the Collateral granted to Wells Fargo under the DIP Agreement or under any of the Prepetition Loan Documents; (c) declaring any of the Loan Documents or Prepetition Loan Documents to be invalid, not binding or unenforceable in any respect; (d) preventing, enjoining, hindering or otherwise delaying Wells Fargo's enforcement of any of the DIP Loan Documents or Prepetition Loan Documents, or any realization upon any Collateral; (e) declaring any Liens granted or purported to be granted under any of the DIP Loan Documents or Prepetition Loan Documents to have a priority other than the priority set forth therein; (f) objecting to the amount or method of calculation by Wells Fargo of the Prepetition Debt or any of the Indebtedness, or any accounting rendered by Wells Fargo with respect to any of those obligations; or (g) seeking to use the cash proceeds of any of the Collateral without the prior written consent of Wells Fargo. *See* DIP Credit Agreement ¶ 1.1(c).

(d)    DIP Lender is requiring that Debtor stipulate that the Prepetition Debt is due and owing to Prepetition Lender without any defense, offset, recoupment or counterclaim and waive its right to challenge the Prepetition Debt and the Prepetition Lender's liens in the Prepetition Collateral. Other parties in interest may challenge the Prepetition Debt and the Prepetition Lender's liens in the Prepetition Collateral, however, there is a 30 day deadline from entry of the Interim DIP Order to bring such a challenge. Similarly, any creditors' committee that is appointed in this case will not automatically be granted standing to bring such a challenge. If no challenge is brought during this period, the Prepetition Debt and the Prepetition Lender's liens in the Prepetition

- 14 -

Collateral will be deemed valid legal, valid, binding, enforceable, perfected, and unavoidable on all parties in interest in this case, including any chapter 7 trustee that may be appointed. *See* Interim DIP Order ¶ 18.

(e) Debtor and Lender have agreed that DIP Lender's and the Prepetition Lender's Liens in the Collateral and the Super Priority Claim are subject and subordinate to the Carve-Out, which will be: (i) Professional Expenses of Debtor Professionals that are approved for payment by final order of the Court and do not exceed $370,000 in the aggregate; (ii) Professional Expenses of Committee Professionals that are approved for payment by final order of the Court and do not exceed $30,000 in the aggregate; (iii) fees required to be paid to the Clerk of the Court; and (iv) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6). *See* Interim DIP Order ¶ 9(a).

(f) Subject to entry of a final order on this Motion, Debtor has agreed to waive its right to seek, among other things, a surcharge pursuant to Section 506(c) of the Bankruptcy Code. *See* Interim DIP Order ¶ 4(b).

(g) Debtor has agreed to an unused line fee for the unused portion of the total DIP facility. *See* DIP Credit Agreement ¶ 1.8(b).

B. **The Necessary Showings Under Section 364**

25. Section 364 of the Bankruptcy Code provides, in pertinent part, as follows:

(a) If the trustee is authorized to operate the business of the debtor under Section 721, 1108, 1203, 1204, or 1304 of this title, unless the court orders otherwise, the trustee may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense.

(b) The court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under section 503(b)(1) of this title as an administrative expense.

>    (c)    If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt --
>
>    (1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
>    (2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
>    (3)    secured by a junior lien on property of the estate that is subject to a lien.
>
>    (d)    (1)    The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if --
>
>    (A)    the trustee is unable to obtain such credit otherwise; and
>
>    (B)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior lien is proposed to be granted.

11 U.S.C. § 364(a)-(d).

26.    Generally, Section 364(c) of the Bankruptcy Code requires a debtor to demonstrate that alternative sources of credit are not available under the other provisions of Section 364. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990). Although there is "no duty to seek credit from every possible lender before concluding that such credit is unavailable," the statute obligates a debtor to show "by a good faith effort that credit was not available without the senior lien." *Bray v. Shenandoah Fed. Sav. & Loan Assoc. (In re Snowshoe Co., Inc.),* 789 F.2d 1085, 1088 (4th Cir. 1986).

27.    Against this statutory backdrop, courts will evaluate the facts and circumstances of a debtor's case, and will accord significant weight to the necessity for obtaining the financing. *See, e.g., In re Snowshoe*, 789 F.2d at 1088; *In re Ames,* 115 B.R. at 40. For example, the need

for a swift injection of cash to preserve a debtor's business satisfies the requirements of Section 364(d) when coupled with unsuccessful attempts to locate alternative financing. *See In re Ames Dep't Stores, Inc.*, 115 B.R. at 40. *See also In re Snowshoe*, 789 F.2d at 1088 (primary facts supporting priming liens included lack of alternative financing sources and need to obtain prompt cash infusion to preserve value of debtor's business).

C.  **The Search for the Best DIP Financing Available**

28. Debtor made a serious and good faith effort to obtain postpetition financing pursuant to Sections 364(a) and (b) of the Bankruptcy Code (*i.e.*, financing on terms that did not implicate the escalating series of inducements embodied in the DIP Credit Agreement).

29. Aside from DIP Lender, prior to filing the petition, Debtor sought and was unable to obtain financing from other sources. For example, Debtor had previously been able to obtain financing from Board members and vendors (including, for example, Crane) on either a secured or an unsecured basis. Debtor was unable to obtain such financing from any of these sources and the only remaining source of funding was from DIP Lender pursuant to the DIP Credit Agreement. Based upon these efforts, as well as the short timeframe in which Debtor needs to conclude a sale to maximize the value of its assets, Debtor concluded that (a) unsecured financing on any basis would not be available, and (b) super-priority claims and liens would, as a practical matter, be the only basis upon which to structure an alternative facility. Debtor believes that the proposal contained in the DIP Credit Agreement is the best financing available to Debtor.

D.  **Need for Postpetition Financing**

30. Without the funds contemplated in this Motion, Debtor will not have sufficient liquidity to properly sell or wind-down and liquidate its estate and its assets and the value of

Debtor's assets will deteriorate rapidly. Indeed, as set forth above and in the Plank-Dworkin Declaration, on an interim basis and pending the Final Hearing, Debtor needs the proceeds from the DIP Credit Facility in order to continue to pay all necessary expenses. Therefore, interim approval of the proposed financing pending the Final Hearing is in the best interests of Debtor, its estate and its creditors.

31.     On a longer-term basis, and for many of the same reasons, it is essential to the sale or wind-down and orderly liquidation of Debtor's assets that Debtor obtain authority to incur postpetition financing to continue ordinary course operations and conduct a successful sale or orderly liquidation of its business. Only through the DIP Credit Facility can Debtor be assured of sufficient liquidity to maximize the value of its assets for the benefit of its creditors.

E.  **Satisfaction of Bankruptcy Rule 6003(b) and Request for Waiver of Stay Under Bankruptcy Rule 6004(h).**

32.     Pursuant to Bankruptcy Rule 6003(b), any motion seeking to use property of the estate pursuant to section 363 of the Bankruptcy Code, or to incur an obligation regarding property of the estate within twenty (20) days of the petition date, requires that Debtor demonstrate that such relief would prevent "immediate and irreparable harm." As set forth herein, Debtor does not have sufficient liquidity to properly sell or wind-down and liquidate its estate and its assets and immediately obtaining the proposed financing is therefore vital to maintaining the value of Debtor's assets. Accordingly, Debtor respectfully submits that Bankruptcy Rule 6003(b) has been satisfied.

33.     Additionally, any delay in authorizing the relief requested herein would be detrimental to Debtor, its estate, and its creditors. Accordingly, and to successfully implement the foregoing, Debtor seeks a waiver of the stay of the order authorizing the use, sale or lease of

property under Bankruptcy Rule 6004(h), to the extent such provision may be applicable to the order approving this Motion.

### NOTICE

34. Given the exigencies of this case and Debtor's urgent need to obtain approval of up to $3,500,000 in postpetition financing on an interim basis, Debtor respectfully requests that the Court approve the proposed Scheduling and Notice Order.

35. No trustee or creditors' committee has been appointed in this case. Pursuant to Bankruptcy Rule 4001, Debtor respectfully proposes to promptly give notice of the Interim and Final Hearings. This would be accomplished by having the Scheduling and Notice order and Motion (without Exhibits or Schedules other than the form of Interim DIP Order) served promptly by Debtor upon execution thereof via facsimile to: (a) the Office of the United States Trustee for the Northern District of Georgia; (b) the entities listed on the List of Creditors Holding the Forty (40) Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to DIP Lender; (d) all relevant taxing authorities; (e) Crane; (f) the Equipment Creditors; and (g) all parties that have filed and served, pursuant to Bankruptcy Rule 2002, a notice of appearance in this case (collectively, the "**Notice Parties**"). The Scheduling and Order Notice will also provide that Debtor's attorneys will promptly transmit to any Notice Party via electronic mail a copy of the proposed DIP Credit Agreement (exclusive of schedules) upon the telephonic request of such Notice Party. In addition, any material modifications made to the forms of the DIP Loan Documents or the proposed DIP Interim Order that are attached to this Motion shall be disclosed at the Interim and/or Final Hearings as appropriate. The other terms of the notice are set forth more fully in the Scheduling and Notice Order.

36. The cost of mailing a notice to all creditors in this Chapter 11 Case would be exceedingly expensive, and would not, in Debtor's view, confer any substantial benefit on Debtor, its estate or its creditors. Accordingly, in light of the urgency of the relief requested, Debtor respectfully requests that notice of the Interim and Final Hearings, and of the relief requested, be provided only to the Notice Parties and that, other than as provided for in this Motion and in the Scheduling and Notice order, any other notice requirements be dispensed with and waived.

37. As discussed above, the current draft of the DIP Credit Agreement is attached to the Motion. Any modification made to the DIP Credit Agreement shall be disclosed at the Interim and/or Final Hearings. Debtor respectfully submits that the foregoing proposed notice procedures provide due and ample notice of the interim and final relief sought by this Motion.

38. No previous motion or application for the relief sought in this Motion has been made to this or any other Court.

WHEREFORE, Debtor respectfully requests that the Court enter an order (i) granting the relief requested herein, and (ii) granting such other relief as is just and proper.

This 2nd day of March, 2010.

ALSTON & BIRD LLP

/s/ Wendy R. Reiss
Dennis J. Connolly (Bar No. 182275)
Wendy R. Reiss (Bar No.600295)
Sage M. Sigler (Bar No. 300707)
1201 West Peachtree Street
Atlanta, GA 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777