# **EXHIBIT E**

## **DIP CREDIT AGREEMENT**

**WELLS FARGO BUSINESS CREDIT
POST-PETITION CREDIT AND SECURITY AGREEMENT**

This POST-PETITION CREDIT AND SECURITY AGREEMENT (this "Agreement") is dated March 3, 2010, and is entered into between **SWOOZIE'S, INC.**, a Delaware corporation and a Chapter 11 debtor-in-possession ("Company"), and **WELLS FARGO BANK, NATIONAL ASSOCIATION** (as more fully defined in Exhibit A attached hereto, "Wells Fargo"), acting through its Wells Fargo Business Credit operating division.

**RECITALS**

Company is a debtor-in-possession under Chapter 11 of the Bankruptcy Code in a case (the "Chapter 11 Case") pending in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division (together with any other court having jurisdiction over the Chapter 11 Case or any proceedings therein from time to time, the "Court"), as Case No. 10-66316-crm.  Company has asked Wells Fargo to provide it with a $3,500,000 DIP Facility in connection with the Chapter 11 Case in accordance with the provisions of this Agreement.

Wells Fargo is willing to make loans and other extensions of credit to Company, subject to the terms and conditions of this Agreement and subject to the terms and conditions set forth in orders of the Court approving the proposed financing.

For purposes of this Agreement, each capitalized term used in this Agreement and not otherwise defined in this Agreement shall have the meaning given to such term in Exhibit A attached hereto.

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth in this Agreement, and for good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.      **AMOUNT AND TERMS OF THE DIP FACILITY**

    1.1.      **DIP Facility; Limitations on Borrowings; Termination Date; Use of Proceeds.**

        (a)      DIP Facility and Limitations on Borrowing.  Wells Fargo shall make Advances to Company under the DIP Facility that shall not at any time exceed in the aggregate the lesser of (i) $3,500,000 less the Pre-Petition Debt (the "Maximum Line Amount"), or (ii) the Borrowing Base described in Section 1.2 hereof.  Within these limits, Company may periodically borrow, prepay in whole or in part, and reborrow.  **Other than as expressly set forth in this Agreement, Wells Fargo has no obligation to make an Advance during a Default Period or at any time Wells Fargo has a reasonable basis to believe that an Advance would result in an Event of Default.**

        (b)      Maturity and Termination Dates.  Company may request Advances from the date that the conditions set forth in Section 3 hereof are satisfied until the date (the "Termination Date") of the earliest to occur of: (i) the last day of the DIP Term,

(ii) the effective date of any Acceptable Plan or the date of entry of a Confirmation Order with respect to any other Reorganization Plan, (iii) the date of the closing of any sale of all or any substantial part of the Collateral or the sale of the right to sell any part of the Collateral on behalf of the Company, (iv) the effective date of Wells Fargo's termination of the DIP Facility pursuant to Section 6.2 of this Agreement, (v) the effective date of Company's termination of the DIP Facility pursuant to Section 1.10 of the Agreement, (vi) the date on which Wells Fargo is granted relief from the automatic stay, or (vii) the date on which the Chapter 11 Case is dismissed or converted. Subject to Wells Fargo's right to cease making Advances to Company in accordance with this Agreement when any Default or Event of Default exists or upon the Termination Date, the DIP Facility shall be in effect for the DIP Term. The DIP Term may be extended by written agreement between Company and Wells Fargo.

(c)     Use of DIP Facility Proceeds. The proceeds of Advances shall be used by Company during the pendency of the Chapter 11 Case exclusively for one or more of the following purposes: (i) to pay the Pre-Petition Debt to the extent authorized by the Court; (ii) to pay expenses described (and not to exceed 105% of the amount provided for) in the Budget during the Interim Period and, after the Interim Period, to pay any expenses incurred in the ordinary course of business of Company or, with Wells Fargo's consent after the occurrence of an Event of Default, to fund the costs of an orderly liquidation of the Collateral; (iii) to pay Adequate Protection Claims, but only to the extent authorized by the Court; (iv) to fund the Carve-Out in order to pay fees required to be paid to the office of the U.S. Trustee and pay Professional Expenses of Professional Persons subject to any limitations in the Financing Orders, allowance by the Court and Company's receipt of an itemized billing and expense statement from such Professional Person; (v) to pay any of the Indebtedness; (vi) to pay property taxes with respect to any Collateral to the extent nonpayment thereof is secured by a Lien senior to Wells Fargo's Liens thereon; and (vii) to pay other expenses authorized by the Court in orders entered in the Chapter 11 Case that are not otherwise inconsistent with this Agreement. Notwithstanding anything to the contrary contained herein, in no event shall proceeds of Advances or the Carve-Out be used to pay Professional Expenses incurred in connection with the assertion of or joinder in any claim, counterclaim, action, contested matter, objection, defense or other proceeding, the purpose of which is to seek or the result of which would be to obtain any order, judgment, declaration, or similar relief (a) seeking damages from Wells Fargo on account of any alleged cause of action arising on, before or after the Petition Date; (b) invalidating, setting aside, avoiding or subordinating, in whole or in part, (i) any of the Pre-Petition Debt or Indebtedness, or (ii) any of the Liens in any of the Collateral granted to Wells Fargo under this Agreement or the Financing Orders or under any of the Pre-Petition Loan Documents; (c) declaring any of the Loan Documents or Pre-Petition Loan Documents to be invalid, not binding or unenforceable in any respect; (d) preventing, enjoining, hindering or otherwise delaying Wells Fargo's enforcement of any of the Loan Documents or Pre-Petition Loan Documents, or any realization upon any Collateral (unless such enforcement or realization is in direct violation of an explicit provision in any of the Financing Orders); (e) declaring any Liens granted or purported to be granted under any of the Loan Documents or Pre-Petition Loan Documents to have a priority other than the priority set forth therein; (f) objecting to the amount or method of calculation by Wells Fargo of

the Pre-Petition Debt or any of the Indebtedness, or any accounting rendered by Wells Fargo with respect to any of those obligations; or (g) seeking to use the cash proceeds of any of the Collateral without the prior written consent of Wells Fargo.  Nothing in this <u>Section 1.1(c)</u> shall be construed to waive Wells Fargo's right to object to any requests, motions or applications made in or filed with the Court.

(d)    <u>Funding of Carve-Out</u>.    After the Termination Date, Lender shall make one or more Advances to fund the Carve-Out. Any funding of Advances by Lender after the Termination Date shall not operate to waive any default or Event of Default, reinstate Lender's commitment to make Advances under this Agreement, or otherwise waive any right or remedy Lender has under any of the Loan Documents.  All Advances by Lender, whether prior to or after the Termination Date, shall be entitled to all of the benefits and security of the Loan Documents and the Financing Orders and shall constitute Indebtedness of the Company.

(e)    <u>Post-Petition Revolving Note</u>.    Company's obligation to repay DIP Facility Advances, regardless of how initiated, shall be evidenced by a revolving promissory note (as renewed, amended, restated, modified, substituted or replaced from time to time, the "<u>Post-Petition Revolving Note</u>").

**1.2.    Borrowing Base; Mandatory Prepayment**.

(a)    <u>Borrowing Base</u>.  The borrowing base (the "<u>Borrowing Base</u>") is an amount, on any date of determination, equal to the lesser of: (i) the Maximum Line Amount on such date <u>minus</u> the aggregate unpaid Pre-Petition Debt outstanding on such date or, (ii)

(A)    85% or such lesser percentage of Eligible Credit Card Receivables as Wells Fargo in its sole discretion may deem appropriate, <u>plus</u>

(B)    a percentage, which is equal to the Inventory Advance Rate in effect at such time, of Eligible Inventory, <u>plus</u>

(C)    the Permitted Overadvance Amount, <u>less</u>

(D)    the Borrowing Base Reserve, <u>less</u>

(E)    Indebtedness that Company owes Wells Fargo that has not been advanced on the Post-Petition Revolving Note, <u>less</u>

(F)    Indebtedness that is not otherwise described in <u>Section 1</u> hereof, including, without limitation, Indebtedness that Wells Fargo in its sole discretion finds on the date of determination to be equal to Wells Fargo's net credit exposure with respect to any deposit, treasury management or similar transaction or arrangement extended to Company by Wells Fargo or Wachovia, <u>less</u>

(G)    the aggregate unpaid Pre-Petition Debt outstanding on such date, <u>less</u>

(H)    the Carve-Out.

(b)     <u>Mandatory Prepayment; Overadvances</u>. If unreimbursed DIP Facility Advances evidenced by the Post-Petition Revolving Note exceed the Borrowing Base, then Company shall immediately prepay the Post-Petition Revolving Note in an amount sufficient to eliminate the excess.

**1.3.    Procedures for DIP Facility Advances.**

(a)     <u>Advances Credited to Operating Account</u>.  All Advances shall accrue interest at the Floating Rate ("<u>Floating Rate Advances</u>") and shall be credited to Company's demand deposit account maintained with Wells Fargo or Wachovia (the "<u>Operating Account</u>"), unless the parties agree in an Authenticated Record to disburse to another account.

(b)     <u>Advances upon Company's Request</u>.   Company may request one or more Advances on any Business Day no later than 11:00 a.m., Atlanta, Georgia time, on the Business Day in which Company wants the Advance to be funded.  No request for an Advance will be deemed received until Wells Fargo acknowledges receipt, and Company, if requested by Wells Fargo, confirms the request in an Authenticated Record.  Company shall repay all Advances, even if the Person requesting the Advance on behalf of Company lacked authorization.

(c)     <u>Protective Advances; Advances to Pay Pre-Petition Debt and Indebtedness Due</u>. Wells Fargo may initiate a Floating Rate Advance on the DIP Facility in its sole discretion for any reason at any time, without Company's compliance with any of the conditions of this Agreement, and (i) disburse the proceeds directly to third Persons in order to protect Wells Fargo's interest in Collateral or to perform any of Company's obligations under this Agreement, or (ii) apply the proceeds to the amount of any Indebtedness or Pre-Petition Debt (to the extent permitted by the Financing Orders) then due and payable to Wells Fargo.

**1.4.    [<u>Intentionally Omitted</u>].**

**1.5.    [<u>Intentionally omitted</u>.]**

**1.6.    Collection of Accounts and Application to Revolving Notes.**

(a)     <u>Store Accounts</u>.  Company has granted a security interest to Wells Fargo in the Collateral, including, without limitation, all Inventory, Credit Card Receivables and other Accounts. Except as otherwise set forth in <u>Section 1.6(b)</u> hereof with respect to Credit Card Receivables and other Accounts, and except for cash on hand maintained at store locations in the ordinary course of the Company's business and consistent with historical practices (but in an amount not to exceed $1,500 for any store location at the beginning of any Business Day), or as otherwise agreed by both parties in an Authenticated Record, all proceeds of Inventory and other Collateral, upon receipt or collection, shall be deposited each Business Day into the Collection Account or into a Store Account for transfer each Business Day to the Collection Account, except in each case to the extent that Wells Fargo in its sole discretion agrees that such deposits or transfers may be made by Company less frequently than on each Business Day (it being understood that, as of the date of this Agreement, Company will be required to cause all proceeds collected at each store location to be deposited into the

Collection Account or a Store Account on Monday and Thursday of each week). Funds so deposited ("Store Funds") are the property of Wells Fargo, and may only be withdrawn from Store Accounts or the Collection Account by Wells Fargo. Until deposited into a Store Account or the Collection Account, Company will hold all such payments and proceeds in trust for Wells Fargo without commingling with other funds or property. All deposits held in any Store Account or the Collection Account shall constitute proceeds of Collateral and shall not constitute payment of Indebtedness.

(b)     Payment of Credit Card Receivables and Other Accounts.  Company shall instruct all account debtors other than in respect of Credit Card Receivables to make payments in respect of such accounts directly to the Collection Account, or to a Store Account for transfer to the Collection Account in accordance with Section 1.6(a) hereof. Company shall instruct all Credit Card Processors to make payments in respect of Credit Card Receivables directly to a Credit Card Collection Account, or instruct them to deliver such payments to Wells Fargo by wire transfer, ACH, or other means as Wells Fargo may direct for deposit to a Credit Card Collection Account or other account designated by Wells Fargo. All payments and proceeds of Credit Card Receivables deposited into a Credit Card Collection Account (subject to the maintenance by Company of a minimum balance required by Credit Card Processors to be maintained in Credit Card Collection Accounts, in an aggregate amount not to exceed $100,000) shall be remitted each Business Day from such Credit Card Collection Account to the Collection Account or other account designated by Wells Fargo, except to the extent that Wells Fargo in its sole discretion agrees to less frequent transfers. If Company receives a payment or the proceeds of Credit Card Receivables or other Accounts directly, Company will promptly deposit the payment or proceeds into a Store Account for transfer to the Collection Account or other account designated by Wells Fargo in accordance with Section 1.6(a) hereof. Funds so deposited ("Credit Card and Account Funds" and, collectively with Store Funds, "Account Funds") are the property of Wells Fargo, and may only be withdrawn from the Store Account, Collection Account or other account by Wells Fargo. Until deposited, Company will hold all such payments and proceeds in trust for Wells Fargo without commingling with other funds or property. All deposits held in any Credit Card Collection Account, the Collection Account or other account designated by Wells Fargo shall constitute Proceeds of Collateral and shall not constitute the payment of Indebtedness.

(c)     Application of Payments.  Wells Fargo will withdraw Account Funds deposited to the Collection Account and pay down borrowings on the Pre-Petition Debt or the DIP Facility by applying them to the Pre-Petition Revolving Note or Post-Petition Revolving Note on the first Business Day following the Business Day of deposit to the Collection Account, or, if payments are received by Wells Fargo that are not first deposited to the Collection Account pursuant to any treasury management service provided to Company by Wells Fargo, such payments shall be applied to the Pre-Petition Debt or the Post-Petition Revolving Note as provided in the Master Agreement for Treasury Management Services or the Financing Orders, as applicable. Notwithstanding anything herein to the contrary, Lender may, as provided in the Financing Orders, apply proceeds of the Collateral in existence on the Petition Date to the Pre-Petition Debt before application of same to the Indebtedness.

**1.7.    Interest and Interest Related Matters.**

(a)    <u>Interest Rates Applicable to DIP Facility</u>.  Except as otherwise provided in this Agreement, the unpaid principal amount of each DIP Facility Advance evidenced by the Post-Petition Revolving Note shall accrue interest as follows:

**Floating Rate Pricing**

The "<u>Floating Rate</u>" for DIP Facility Advances shall be an interest rate equal to the sum of (i) Daily Three Month LIBOR, which interest rate shall change whenever Daily Three Month LIBOR changes, <u>plus</u> (ii) eight percent (8%) (the "<u>Margin</u>"), subject to a minimum interest rate of eight percent (8%) per annum, which will apply regardless of fluctuations in Daily Three Month LIBOR that would otherwise cause the interest rate of the Post-Petition Revolving Note to be less than this minimum interest rate floor.

Any minimum interest rate floor described in this subsection will apply at all times to borrowings evidenced by the Post-Petition Revolving Note.  The minimum interest rate floor will apply to all borrowings.  Daily Three Month LIBOR on the date hereof is _____% and, therefore, the rate of interest in effect on the date hereof, expressed in simple interest terms, is _____% per annum with respect to all Advances outstanding on the date hereof.

(b)    <u>Default Interest Rate</u>.  Commencing on the day an Event of Default occurs, through and including, without limitation, the date that the Event of Default has been cured or waived (each such period a "<u>Default Period</u>"), or at any time following the Termination Date, in Wells Fargo's discretion and without waiving any of its other rights or remedies, the principal amount of the Post-Petition Revolving Note shall bear interest at a rate that is three percent (3.0%) above the contractual rate set forth in <u>Section 1.7(a)</u> hereof (the "<u>Default Rate</u>"), or any lesser rate that Wells Fargo may deem appropriate, starting on the first day of the month in which the Default Period begins through the last day of that Default Period, or any shorter time period to which Wells Fargo may agree in an Authenticated Record.

(c)    <u>Interest Accrual on Payments Applied to Revolving Notes</u>.  Payments received by Wells Fargo shall be applied to the Post-Petition Revolving Note or the Pre-Petition Revolving Note as provided in <u>Section 1.6(c)</u> hereof, but the principal amount paid down shall continue to accrue interest through the end of the first Business Day following the Business Day that the payment was applied to the Post-Petition Revolving Note or the Pre-Petition Revolving Note.

(d)    <u>Usury</u>.  No interest rate shall be effective which would result in a rate greater than the highest rate permitted by law.  Payments in the nature of interest and other charges made under any Loan Documents or any other document or agreement described in or related to this Agreement that are later determined to be in excess of the limits imposed by applicable usury law will be deemed to be a payment of principal, and the Indebtedness shall be reduced by that amount so that such payments will not be deemed usurious.

**1.8.    Fees.**

(a)     Origination Fee.  Company shall pay Wells Fargo a one time origination fee of $50,000, which fee shall be fully earned and payable upon the execution of this Agreement.

(b)     Unused Line Fee. Company shall pay Wells Fargo an annual unused line fee of one quarter of one percent (0.25%) of the daily average of the Maximum Line Amount reduced by the aggregate outstanding Advances (the "Unused Amount"), from the date of this Agreement to and including the Termination Date, which unused line fee shall be payable monthly in arrears on the first day of each month and on the Termination Date.

(c)     [Intentionally omitted.]

(d)     Collateral Exam Fees.  Company shall pay Wells Fargo fees in connection with any collateral exams, surveys, audits or inspections conducted by or on behalf of Wells Fargo at the current rates established from time to time by Wells Fargo as its collateral exam fees (which fees are currently $125 per hour per collateral examiner), together with all actual out-of-pocket costs and expenses incurred in conducting any collateral examination, survey, audit or inspection.

(e)     [Intentionally omitted.].

(f)     [Intentionally omitted.]

(g)     [Intentionally omitted.]

(h)     Treasury Management Fees.  Company will pay service fees to Wells Fargo or Wachovia, as applicable, for treasury management services provided pursuant to the Master Agreement for Treasury Management Services or any other agreement entered into by the parties, in the amount prescribed therein or in Wells Fargo's current service fee schedule as delivered to Company prior to the date hereof, and as the same may be updated from time to time by Wells Fargo in the ordinary course of its business.

(i)     [Intentionally omitted.]

(j)     [Intentionally omitted.]

(k)     Other Fees and Charges.  Wells Fargo may, during a Default Period, (i) impose additional fees and charges for waiving an Event of Default, in Wells Fargo's sole discretion, or (ii) impose reasonable additional fees and charges for the administration of Collateral by Wells Fargo. All such fees and charges shall be imposed by Wells Fargo following written notice to Company on either an hourly, periodic, or flat fee basis, and in lieu of or in addition to imposing interest at the Default Rate, and Company's request for an Advance following such notice shall constitute Company's agreement to pay such fees and charges.

**1.9.   Interest Accrual; Principal and Interest Payments; Computation.**

(a)     Interest Payments and Interest Accrual.  Accrued and unpaid interest under the Post-Petition Revolving Note on Floating Rate Advances shall be due and

payable on the first day of each month (each an "Interest Payment Date") and on the Termination Date, and shall be paid in the manner provided in Section 1.6(c) hereof.  Interest shall accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the date of Advance to the Interest Payment Date.

(b)     Payment of Post-Petition Revolving Note Principal.  The principal amount of the Post-Petition Revolving Note shall be paid from time to time as provided in this Agreement, and shall be fully due and payable on the Termination Date.

(c)     Payments Due on Non-Business Days.  If an Interest Payment Date or the Termination Date falls on a day which is not a Business Day, payment shall be made on the next Business Day, and interest shall continue to accrue during that time period.

(d)     Computation of Interest and Fees.  Interest accruing on the unpaid principal amount of the Post-Petition Revolving Note and fees payable under this Agreement shall be computed on the basis of the actual number of days elapsed in a year of 360 days.

(e)     Liability Records.  Wells Fargo shall maintain accounting and bookkeeping records of all Advances and payments under the DIP Facility and all other Indebtedness due to Wells Fargo in such form and content as Wells Fargo deems appropriate.  Wells Fargo's calculation of current Indebtedness shall be presumed correct unless proven otherwise by Company.  Upon Wells Fargo's request, Company will admit and certify in a Record the exact principal balance of the Indebtedness that Company then believes to be outstanding.  Any billing statement or accounting provided by Wells Fargo shall be conclusive and binding unless Company notifies Wells Fargo in a detailed Record of its intention to dispute the billing statement or accounting within 30 days of receipt.

**1.10.    Termination of DIP Facility by Company.**

(a)     Termination by Company after Advance Notice.  Company may terminate the DIP Facility at any time prior to the Termination Date, if it (i) delivers an Authenticated Record notifying Wells Fargo of its intentions at least five (5) days prior to the proposed Termination Date, (ii) pays the Indebtedness and the Pre-Petition Debt in full, and (iii) Cash Collateralizes any contingent or unmatured Indebtedness or Pre-Petition Debt in a manner satisfactory to Wells Fargo.

**2.     SECURITY INTEREST AND OCCUPANCY OF COMPANY'S PREMISES**

**2.1.    Grant of Security Interest**.  Company hereby pledges, assigns and grants to Wells Fargo, for the benefit of Wells Fargo and as agent for Wachovia, a Lien and security interest (collectively referred to as the "Security Interest") in the Collateral, as security for the payment and performance of all Indebtedness.  Following request by Wells Fargo, Company shall grant Wells Fargo, for the benefit of Wells Fargo and as agent for Wachovia, a Lien and security interest in all commercial tort claims that it may have against any Person.

**2.2.** **Notifying Account Debtors and Other Obligors; Collection of Collateral.**
Wells Fargo may at any time an Event of Default exists deliver a Record giving
an account debtor or other Person obligated to pay an Account, a General
Intangible, or other amount due, notice that the Account, General Intangible, or
other amount due has been assigned to Wells Fargo for security and must be paid
directly to Wells Fargo.  Company shall join in giving such notice and shall
Authenticate any Record giving such notice upon Wells Fargo's request.  After
Company or Wells Fargo gives such notice, Wells Fargo may, but need not, in
Wells Fargo's or in Company's name, demand, sue for, collect or receive any
money or property at any time payable or receivable on account of, or securing,
such Account, General Intangible, or other amount due, or grant any extension to,
make any compromise or settlement with or otherwise agree to waive, modify,
amend or change the obligations (including, without limitation, collateral
obligations) of any account debtor or other obligor.  If an Event of Default has
occurred and is continuing, Wells Fargo may, in Wells Fargo's name or in
Company's name, as Company's agent and attorney-in-fact, notify the United
States Postal Service to change the address for delivery of Company's mail to any
address designated by Wells Fargo, otherwise intercept Company's mail, and
receive, open and dispose of Company's mail, applying all Collateral as permitted
under this Agreement and holding all other mail for Company's account or
forwarding such mail to Company's last known address.

**2.3.** **Assignment of Insurance.**    As additional security for the Indebtedness,
Company hereby assigns to Wells Fargo and to Wachovia, all rights of Company
under every policy of insurance covering the Collateral and all business records
and other documents relating to it, and all monies (including, without limitation,
all proceeds and refunds) that may be payable under any policy, and Company
hereby directs the issuer of each policy to pay all such monies directly to Wells
Fargo.  If an Event of Default has occurred and is continuing, Wells Fargo may
(but need not), in Wells Fargo's or Company's name, execute and deliver proofs
of claim, receive payment of proceeds and endorse checks and other instruments
representing payment of the policy of insurance, and adjust, litigate, compromise
or release claims against the issuer of any policy.  Any monies received under
any insurance policy assigned to Wells Fargo, other than liability insurance
policies, or received as payment of any award or compensation for condemnation
or taking by eminent domain, shall be paid to Wells Fargo for application to the
Pre-Petition Debt or the Indebtedness as and to the extent authorized by the
Financing Orders and, so long as no Default Period or Overadvance is in
existence, will be available for re-borrowing in accordance with this Agreement.

**2.4.** **Company's Premises**

(a)     Wells Fargo's Right to Occupy Company's Premises.  Company hereby grants to
Wells Fargo the right, at any time during a Default Period and without notice or
consent, to take exclusive possession of all locations where Company conducts
its business or has any rights of possession, including without limitation the
locations described on Exhibit B to the Pre-Petition Credit Agreement (the
"Premises"), until the earlier of (i) payment in full and discharge of all
Indebtedness and termination of the DIP Facility, or (ii) final sale or disposition
of all items constituting Collateral and delivery of those items to purchasers.

(b) <u>Wells Fargo's Use of Company's Premises</u>.  During a Default Period, Wells Fargo may use the Premises to store, process, manufacture, sell, use, and liquidate or otherwise dispose of items that are Collateral, and for any other incidental purposes deemed appropriate by Wells Fargo in good faith.

(c) <u>Company's Obligation to Reimburse Wells Fargo</u>.  Wells Fargo shall not be obligated to pay rent or other compensation for the possession or use of any Premises, but if Wells Fargo elects to pay rent or other compensation to the owner of any Premises in order to have access to the Premises, then Company shall promptly reimburse Wells Fargo all such amounts, as well as all taxes, fees, charges and other expenses at any time payable by Wells Fargo with respect to the Premises by reason of the execution, delivery, recordation, performance or enforcement of any terms of this Agreement.

**2.5.    License.**  Without limiting the generality of any other Security Document, Company hereby grants to Wells Fargo a non-exclusive, worldwide and royalty-free license to use or otherwise exploit all Intellectual Property Rights of Company for the purpose of: (a) completing the manufacture of any in-process materials during any Default Period so that such materials become saleable Inventory, all in accordance with the same quality standards previously adopted by Company for its own manufacturing and subject to Company's reasonable exercise of quality control; and (b) selling, leasing or otherwise disposing of any or all Collateral during any Default Period.

**2.6.    Financing Statements**.

(a) <u>Authorization to File</u>.  Company authorizes Wells Fargo to file financing statements describing Collateral to perfect Wells Fargo's Security Interest in the Collateral, and Wells Fargo may describe the Collateral as "all personal property" or "all assets" or describe specific items of Collateral including without limitation any commercial tort claims.  All financing statements filed before the date of this Agreement to perfect the Security Interest were authorized by Company and are hereby re-authorized.

(b) <u>Termination</u>.  Wells Fargo shall, at Company's expense, release or terminate any filings or other agreements that perfect the Security Interest, provided that there are no suits, actions, proceedings or claims pending or threatened against any Indemnitee under this Agreement with respect to any Indemnified Liabilities, upon Wells Fargo's receipt of the following, in form and content satisfactory to Wells Fargo: (i) cash payment in full of all Indebtedness and Pre-Petition Debt (including, in each case and without limitation, the Cash Collateralization of any contingent or unmatured Indebtedness), and a completed performance by Company with respect to its other obligations under this Agreement, (ii) evidence that the commitment of Wells Fargo to make Advances under the DIP Facility or under any other facility with Company has been terminated, (iii) a Court-approved release of all claims against Wells Fargo by Company relating to Wells Fargo's performance and obligations under the Loan Documents and the Pre-Petition Loan Documents, which release shall, among other things, affirm the priority, perfection, enforceability and unavoidability of the Liens and security interests at any time granted by Company to Wells Fargo (whether prior to or after the Petition Date) and preclude any claims against Wells Fargo for refund or

disgorgement of any funds at any time received by Wells Fargo from Company or as proceeds of Collateral, and (iv) an agreement by Company, any Guarantor, and any new lender to Company to indemnify Wells Fargo for any payments received by Wells Fargo that are applied to the Indebtedness or the Pre-Petition Debt as a final payoff that may subsequently be returned or otherwise not paid for any reason.

2.7.    **Setoff.**  Wells Fargo may at any time, in its sole discretion and without demand or notice to anyone, setoff any liability owed to Company by Wells Fargo against any Indebtedness, whether or not due.

2.8.    **Collateral Related Matters.**  This Agreement does not contemplate a sale of Accounts or chattel paper, and, as provided by law, Company is entitled to any surplus and shall remain liable for any deficiency.  Wells Fargo's duty of care with respect to Collateral in its possession (as imposed by law) will be deemed fulfilled if it exercises reasonable care in physically keeping such Collateral, or in the case of Collateral in the custody or possession of a bailee or other third Person, exercises reasonable care in the selection of the bailee or third Person, and Wells Fargo need not otherwise preserve, protect, insure or care for such Collateral.  Wells Fargo shall not be obligated to preserve rights Company may have against prior parties, to liquidate the Collateral at all or in any particular manner or order or apply the Proceeds of the Collateral in any particular order of application.  Wells Fargo has no obligation to clean-up or prepare Collateral for sale.  Company waives any right it may have to require Wells Fargo to pursue any third Person for any of the Indebtedness.

2.9.    **Notices Regarding Disposition of Collateral.**  If notice to Company of any intended disposition of Collateral or any other intended action is required by applicable law in a particular situation, such notice will be deemed commercially reasonable if given in the manner specified in Section 7.4 hereof at least ten calendar days before the date of intended disposition or other action.

2.10.   **Liens Under Financing Orders.**  The Liens and security interests granted to Wells Fargo pursuant to the provisions of this Section 2 and pursuant to any of the other Loan Documents shall be in addition to all Liens conferred upon Wells Fargo pursuant to the terms of the Financing Orders.

2.11.   **Lien Priority.**  The Liens and security interests granted to Wells Fargo pursuant to the provisions of this Section 2 and pursuant to any of the other Loan Documents and the Financing Orders shall be first priority Liens and security interests in the Collateral, except for Permitted Senior Liens and the Carve-Out.

2.12.   **Administrative Priority.**  Subject to the entry of the Interim Financing Order, the Indebtedness will constitute allowed super-priority administrative expenses in the Chapter 11 Case, having priority in payment over all other administrative expenses and unsecured claims against Company of any kind or nature, whether now existing or hereafter arising, including all administrative expenses of the kind specified in or arising or ordered under Sections 105, 326, 328, 503(b), 506(e), 507(a), 507(b), 546(c) and 1114 of the Bankruptcy Code, except for the Carve-Out.

**2.13. Turnover of Collateral Proceeds**. All proceeds of Collateral shall be turned over by Company to Wells Fargo as and when received by Company.

## 3. CONDITIONS PRECEDENT

**3.1. Conditions Precedent to Initial Advance**. Wells Fargo's obligation to make the initial Advance shall be subject to the conditions that (i) the initial hearing on the DIP Motion shall have been held, with the presentation of evidence and the resolution of any objections to the DIP Motion or the proposed Interim Financing Order in a manner satisfactory to Wells Fargo, and the Interim Financing Order shall have been entered, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of Wells Fargo, and (ii) Wells Fargo shall have received this Agreement and each of the Loan Documents, and any document, agreement, or other item described in or related to this Agreement, and all fees and information described in **Exhibit C**, executed and in form and content satisfactory to Wells Fargo.

**3.2. Additional Conditions Precedent to All Advances**. Wells Fargo's obligation to make any Advance (including. without limitation, the initial Advance) shall be subject to the further additional conditions: (a) that the representations and warranties described in **Exhibit D** are correct on the date of the Advance, except to the extent that such representations and warranties relate solely to an earlier date; (b) that no event has occurred and is continuing, or would result from the requested Advance that would result in an Event of Default; and (c) with respect to all Advances requested after March 23, 2010, the final hearing on the DIP Motion shall have been held, with the presentation of evidence and the resolution of any objections to the DIP Motion or the proposed Final Financing Order in a manner satisfactory to Wells Fargo, and the Final Financing Order shall have been entered, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of Wells Fargo.

## 4. REPRESENTATIONS AND WARRANTIES

To induce Wells Fargo to enter into this Agreement, Company makes the representations and warranties described in **Exhibit D**. Any request for an Advance will be deemed a representation by Company that all representations and warranties described in **Exhibit D** are true, correct, and complete as of the time of the request, unless they relate exclusively to an earlier date. Company shall promptly deliver a Record notifying Wells Fargo of any change in circumstance that would affect the accuracy of any representation or warranty, unless the representation and warranty specifically relates to an earlier date.

## 5. COVENANTS

So long as the Indebtedness remains unpaid, or the DIP Facility has not been terminated, Company shall comply with each of the following covenants, unless Wells Fargo shall consent otherwise in an Authenticated Record delivered to Company:

**5.1. Reporting Requirements.** Company shall deliver to Wells Fargo the following information, compiled where applicable using GAAP consistently applied, in form and content acceptable to Wells Fargo:

(a) <u>Daily Collateral Reports</u>.  On Monday and Thursday of each calendar week, or more frequently if Wells Fargo requests, Wells Fargo's standard form of "daily collateral report," together with a sales report and a roll-forward report of Inventory (at retail and at cost and including sales discounts and markdowns) and ineligibles, and daily reports of Credit Card Receivables and collections thereof.

(b) <u>Monthly Collateral Reports</u>.  No later than twenty (20) days after each month end (or more frequently if Wells Fargo shall request it), detailed agings of Company's accounts payable, a detailed inventory report, an inventory certification report, inventory aging report, and a calculation of Company's Accounts, Eligible Credit Card Receivables, Inventory and Eligible Inventory as of the end of that month or shorter time period requested by Wells Fargo, which agings and calculations are to be submitted electronically to Wells Fargo through its *Commercial Electronic Office*® ("<u>CEO</u>") portal.  In addition, no later than Wednesday of each week (or more frequently if Wells Fargo shall request it), a weekly stock ledger report as of the close of business on Friday of the immediately preceding week.

(c) <u>Defaults</u>.  No later than three (3) days after learning of the occurrence of any Event of Default, a Record notifying Wells Fargo of the Event of Default and the steps being taken by Company to cure the Event of Default.

(d) <u>Disputes</u>.  Promptly upon discovery, a Record notifying Wells Fargo of (i) any disputes or claims by Company's customers (other than product returns in the ordinary course of business) exceeding $5,000 individually or $15,000 in the aggregate during any fiscal year**;** (ii) credit memos not previously reported in <u>Section 5.1(a)</u> hereof; and (iii) any goods returned to or recovered by Company with a value in excess of $5,000 (other than product returns in the ordinary course of business).

(e) <u>Collateral</u>.  Promptly upon discovery, a Record notifying Wells Fargo of any loss of or material damage to any Collateral or of any substantial adverse change in any Collateral or the prospect of its payment.

(f) <u>Commercial Tort Claims</u>.  Promptly upon discovery, a Record notifying Wells Fargo of any commercial tort claims (claiming in excess of $50,000) brought by Company against any Person, including, without limitation, the name and address of each defendant, a summary of the facts, an estimate of Company's damages, copies of any complaint or demand letter submitted by Company, and such other information as Wells Fargo may request.

(g) <u>Reports to Owners</u>.   Promptly upon distribution, copies of all financial statements, reports and proxy statements which Company shall have sent to its Owners.

(h) <u>Violations of Law</u>.  No later than three (3) days after discovery of any violation, a Record notifying Wells Fargo of Company's violation of any law, rule or regulation, the non-compliance with which could have a Material Adverse Effect on Company after the Petition Date.

(i) <u>Pension Plans</u>.  (i) Promptly upon discovery, and in any event within thirty (30) days after Company knows or has reason to know that any Reportable Event with

respect to any Pension Plan has occurred, a Record authenticated by Company's chief financial officer notifying Wells Fargo of the Reportable Event in detail and the actions which Company proposes to take to correct the deficiency, together with a copy of any related notice sent to the Pension Benefit Guaranty Corporation; (ii) promptly upon discovery, and in any event within ten (10) days after Company fails to make a required quarterly Pension Plan contribution under Section 412(m) of the IRC, a Record authenticated by Company's chief financial officer notifying Wells Fargo of the failure in detail and the actions that Company will take to cure the failure, together with a copy of any related notice sent to the Pension Benefit Guaranty Corporation; and (iii) promptly upon discovery, and in any event within ten (10) days after Company knows or has reason to know that it may be liable or may be reasonably expected to have liability for any withdrawal, partial withdrawal, reorganization or other event under any Multiemployer Plan under Sections 4201 or 4243 of ERISA, a Record authenticated by Company's chief financial officer notifying Wells Fargo of the details of the event and the actions that Company proposes to take in response.

(j)     Other Reports.  From time to time, with reasonable promptness, all inventory reports, collection reports, deposit records, and equipment schedules, and such other materials, reports, records or information as Wells Fargo may reasonably request.

(k)     Bankruptcy-Related Notices.  Promptly after Company's obtaining knowledge thereof, written notice of any claim that Company may make under any policy of insurance with respect to the Collateral; any pleading filed with the Court seeking relief from the automatic stay or conversion or dismissal of the Chapter 11 Case; any offer or other expression of interest from any Person to purchase any of the Collateral (other than sales of Inventory in the ordinary course of business); and any proposed sale of any of the Collateral (including with such notice copies of drafts of all instruments and agreements applicable to any such sale), which shall specify the identity of the proposed purchaser, the terms of the proposed sale and the expected date of closing, subject to Court approval.  Company shall provide, or shall cause its counsel in the Chapter 11 Case to provide, Wells Fargo's counsel with copies of all pleadings, motions, reports, applications and other papers filed by Company with the Court as well as copies of all billing and expense statements received from any Professional Person.  Company shall include counsel for Wells Fargo on any "Special Notice List" or other similar list of parties to be served with papers in the Chapter 11 Case.  Notice to Wells Fargo under this Section 5.1(k) shall be deemed sufficient if given to lead counsel for Wells Fargo in the Chapter 11 Case.

(l)     Budget Variance Report.  On each Monday, an updated Budget to show the actual results of Company's operations for the previous calendar week, together with a variance report comparing Company's actual results for such week to the projected results for such calendar week as shown in the Budget.

**5.2.    Financial Covenants.**  Company agrees to comply with the financial covenants described below.

(a)     Variance against Budget.

(i)      Company's actual receipts, sales and collections during any calendar week shall be not less than 90% of the projected receipts, sales and collections during such week according to the Budget.

(ii)      Company's actual disbursements for any calendar week shall be no greater than 105% of the projected disbursements during such week according to the Budget.

**5.3.    Other Liens and Permitted Liens.**

(a)    <u>Other Liens; Permitted Liens</u>.  Company shall not create, incur or suffer to exist any Lien upon any of its assets, now owned or later acquired, as security for any indebtedness, with the exception of the following (each a "<u>Permitted Lien</u>"; collectively, "<u>Permitted Liens</u>"): (i) Liens at any time granted in favor of Wells Fargo and other Liens in existence on the Petition Date that were not created or suffered to exist in violation of the Pre-Petition Loan Documents, which other Liens (with the exception of the Liens in favor of Crane described in the Crane Intercreditor Agreement) are listed on <u>Exhibit F</u>; (ii) post-Petition Date Liens for taxes (excluding any Lien imposed pursuant to any of the provisions of ERISA) not yet due or being properly contested; (iii) post-Petition Date statutory Liens (excluding Liens imposed pursuant to any of the provisions of ERISA) securing the claims or demands of materialmen, mechanics, carriers, warehousemen, landlords and other like Persons for labor, materials, supplies or rentals incurred in the ordinary course of business, but only if the payment thereof is not at the time required or the debt secured by such Lien is being properly contested; (iv) post-Petition Date Liens resulting from deposits made in the ordinary course of business in connection with workmen's compensation, unemployment insurance, social security and other like laws; (v) reservations, exceptions, easements, rights of way, and other similar encumbrances affecting real property of Company that were in existence on the Petition Date and do not violate any terms of the Pre-Petition Loan Documents; and (vi) such other Liens as Wells Fargo may consent to in writing from time to time in its discretion.

(b)    <u>Financing Statements</u>.  Company shall not authorize the filing of any financing statement by any Person as secured party with respect to any of Company's assets, other than Wells Fargo.  Company shall not amend any financing statement filed by Wells Fargo as secured party except as permitted by law.

**5.4.    Indebtedness.**  Company shall not incur, create, assume or permit to exist any indebtedness or liability on account of deposits or letters of credit issued on Company's behalf, or advances or any indebtedness for borrowed money of any kind, whether or not evidenced by an instrument, except: (a) Pre-Petition Debt and claims in existence on the Petition Date to the extent not incurred in violation of the Pre-Petition Loan Documents; (b) the Indebtedness; and (c) debt (other than debt for money borrowed) incurred in the ordinary course of business of Company during the Chapter 11 Case, including Professional Expenses, so long as such debts are not past due and payable and are not secured by any Lien that is not a Permitted Lien.

**5.5.    Guaranties.**  Company shall not assume, guarantee, endorse or otherwise become directly or contingently liable for the obligations of any Person,

except the endorsement of negotiable instruments by Company for deposit or collection or similar transactions in the ordinary course of business.

**5.6.    Investments and Subsidiaries.**  Company shall not make or permit to exist any loans or advances to, or make any investment or acquire any interest whatsoever in, any Person or Affiliate, including without limitation any partnership or joint venture, nor purchase or hold beneficially any stock or other securities or evidence of indebtedness of any Person or Affiliate, except:

(a)      Investments in direct obligations of the United States of America or any of its political subdivisions whose obligations constitute the full faith and credit obligations of the United States of America and have a maturity of one year or less, commercial paper issued by U.S. corporations rated "A-1" or "A-2" by Standard & Poor's Ratings Services or "P-1" or "P-2" by Moody's Investors Service or certificates of deposit or bankers' acceptances having a maturity of one year or less issued by members of the Federal Reserve System having deposits in excess of $100,000,000 (which certificates of deposit or bankers' acceptances are fully insured by the Federal Deposit Insurance Corporation);

(b)      Prepaid rent not exceeding one month or security deposits; and

(c)      Current investments in those Subsidiaries in existence on the date of this Agreement which are identified on **Exhibit D**.

**5.7.    Dividends and Distributions.**  Company shall not declare or pay any dividends (other than dividends payable solely in stock of Company) on any class of its stock, or make any payment on account of the purchase, redemption or retirement of any shares of its stock, or other securities or evidence of its indebtedness or make any distribution regarding its stock, either directly or indirectly.

**5.8.    Salaries.**  Company shall not pay excessive or unreasonable salaries, bonuses, commissions, consultant fees or other compensation; or increase the salary, bonus, commissions, consultant fees or other compensation of any Director, Officer or consultant, or any member of their families, by more than 10% in any one year, either individually or for all such Persons in the aggregate, or pay such an increase from any source other than profits earned in the year of payment.

**5.9.    Key Person Life Insurance**.  Company shall at all times maintain (or be the named beneficiary of) insurance upon the life of Plank, which shall have a death benefit in an amount not less than $1,000,000 (the "Key Person Life Insurance Policy").  The right to receive the proceeds of the Key Person Life Insurance Policy shall be assigned to Wells Fargo by the Life Insurance Assignment for application to the Pre-Petition Debt or the Indebtedness.

**5.10.    Books and Records; Collateral Examination; Inspection and Appraisals.**

(a)      Books and Records; Inspection.  Company shall keep complete and accurate books and records with respect to the Collateral and Company's business and financial condition and any other matters that Wells Fargo may request, in accordance with GAAP. Company shall permit any employee, attorney, accountant or other agent of Wells Fargo to audit, review, make extracts from

and copy any of its books and records at any time during ordinary business hours, and to discuss Company's affairs with any of its Directors, Officers, employees, Owners or agents.

(b)    <u>Authorization to Company's Agents to Make Disclosures to Wells Fargo; Continued Engagement of Clear Thinking Group</u>.  Company authorizes all accountants and other Persons acting as its agent to disclose and deliver to Wells Fargo's employees, accountants, attorneys and other Persons acting as its agent, at Company's expense, all financial information, books and records, work papers, management reports and other information in their possession regarding Company, subject to Company's right to exclude information necessary to maintain attorney-client privileges with its counsel.  Company shall continue to engage Clear Thinking Group, or another financial consultant reasonably acceptable to Wells Fargo, to provide consulting services to Company within the scope of services provided on the date of this Agreement.

(c)    <u>Collateral Exams and Inspections</u>.  Company shall permit Wells Fargo's employees, accountants, attorneys or other Persons acting as its agent, to examine and inspect any Collateral or any other property of Company at any time during ordinary business hours.

(d)    <u>Inventory Appraisals</u>.  Wells Fargo may also obtain, from time to time, at Company's expense, an appraisal of Company's Inventory, by an appraiser acceptable to Wells Fargo in its sole discretion; <u>provided</u>, <u>however</u>, that unless a Default Period exists, Company shall not be required to reimburse Wells Fargo for more than three (3) such appraisals in any calendar year.

(e)    <u>Real Property Appraisal</u>.  Wells Fargo may also obtain, from time to time, at Company's expense, an appraisal of the real property and improvements subject to the Plank Mortgage, by an appraiser acceptable to Wells Fargo in its sole discretion.

**5.11.    Account Verification.**  Wells Fargo or its agents may (i) contact account debtors and other obligors at any time to verify Company's Accounts; and (ii) require Company to send requests for verification of Accounts or send notices of assignment of Accounts to account debtors and other obligors.

**5.12.    Compliance with Laws.**

(a)    <u>General Compliance with Applicable Law; Use of Collateral</u>.  Company shall (i) comply, and cause each Subsidiary to comply, with the requirements of applicable laws and regulations, the non-compliance with which would have a Material Adverse Effect on its business or its financial condition and (ii) use and keep the Collateral, and require that others use and keep the Collateral, only for lawful purposes, without violation of any federal, state or local law, statute or ordinance.

(b)    <u>Compliance with Federal Regulatory Laws</u>.  Company shall (i) prohibit, and cause each Subsidiary to prohibit, any Person that is an Owner or Officer from being listed on the Specially Designated Nationals and Blocked Person List or other similar lists maintained by the Office of Foreign Assets Control ("<u>OFAC</u>"),

the Department of the Treasury or included in any Executive Orders, (ii) not permit the proceeds of the DIP Facility or any other financial accommodation extended by Wells Fargo to be used in any way that violates any foreign asset control regulations of OFAC or other applicable law, (iii) comply, and cause each Subsidiary to comply, with all applicable Bank Secrecy Act laws and regulations, as amended from time to time, and (iv) otherwise comply with the USA Patriot Act and Wells Fargo's related policies and procedures.

(c)  <u>Compliance with Environmental Laws</u>.  Company shall use commercially reasonable efforts to (i) comply, and cause each Subsidiary to comply, with the requirements of applicable Environmental Laws and obtain and comply with all permits, licenses and similar approvals required by them, and (ii) not, to its knowledge, generate, use, transport, treat, store or dispose of any Hazardous Substances in such a manner as to create any material liability or obligation under the common law of any jurisdiction or any Environmental Law.

(d)  <u>Compliance with Bankruptcy Code, Rule and Orders</u>.  To the extent having applicability to Company, Company shall comply with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Interim Financing Order, the Final Financing Order and all other orders entered by the Court in the Chapter 11 Case.

**5.13.  Payment of Taxes and Other Claims.**  Company shall pay and discharge, or cause to be paid and discharged, promptly all lawful claims incurred by or imposed upon Company after the Petition Date, including all lawful claims for labor, materials, supplies or services.  Company shall not make any payment of principal or interest on account of any claim against Company that arose prior to the Petition Date, except to the extent authorized by the Court after notice and a hearing.

**5.14.  Maintenance of Collateral and Properties.**

(a)  Company shall keep and maintain the Collateral and all of its other properties necessary or useful in its business in good condition, repair and working order (normal wear and tear excepted) and will from time to time replace or repair any worn, defective or broken parts, although Company may discontinue the operation and maintenance of any properties if Company believes that such discontinuance is desirable to the conduct of its business and not disadvantageous in any material respect to Wells Fargo.  Company shall take all commercially reasonable steps necessary to protect and maintain its Intellectual Property Rights.

(b)  Company shall defend the Collateral against all Liens, claims and demands of all third Persons claiming any interest in the Collateral. Company shall keep all Collateral free and clear of all Liens except Permitted Liens. Company shall take all commercially reasonable steps necessary to prosecute any Person Infringing its Intellectual Property Rights and to defend itself against any Person accusing it of Infringing any Person's Intellectual Property Rights, all as Company may deem to be commercially reasonable and necessary.

**5.15.  Insurance.**  Company shall at all times maintain insurance with insurers acceptable to Wells Fargo, in such amounts and on such terms (including,

without limitation, deductibles) as Wells Fargo may reasonably require and
including, as applicable and without limitation, business interruption insurance
(including, without limitation, *force majeure* coverage), hazard coverage on an
"all risks" basis for all tangible Collateral, and theft and physical damage
coverage for Collateral consisting of motor vehicles (it being understood that the
insurance coverage maintained by Company on the date of this Agreement is
acceptable to Wells Fargo on the date hereof). All insurance policies must
contain an appropriate lender's interest endorsement or clause, and name Wells
Fargo as an additional insured.

5.16.   **Sale Efforts**. Company shall (i) file the Sale Motion, together with an executed
Stalking Horse Agreement, with the Court no later than March 4, 2010, (ii) cause
the Court to schedule a hearing for a date no later than March 26, 2010, to
consider granting the Sale Motion and approving consummation of the Stalking
Horse Agreement, and (iii) close a sale of all or substantially all of Company's
assets and remit proceeds thereof to Wells Fargo no later than March 27, 2010.
Any of the deadlines set forth in this <u>Section 5.16</u> may be extended by written
agreement of Wells Fargo and Company without the need for any further order of
the Court.

5.17.   **Delivery of Instruments, etc.** Upon request by Wells Fargo, Company shall
promptly deliver to Wells Fargo in pledge all instruments, documents and chattel
paper constituting Collateral, endorsed or assigned by Company.

5.18.   **Sale or Transfer of Assets; Suspension of Business Operations.** Company
shall not sell, lease, assign, transfer or otherwise dispose of (a) the stock or other
equity interests of any Subsidiary, (b) all or a substantial part of its assets (and,
for purposes of this <u>Section 5.18</u>, without limiting the generality of the foregoing,
the sale of three (3) retail store locations shall be deemed a "substantial part" of
Company's assets), or (c) any Collateral, any interest in Collateral (whether in
one transaction or in a series of transactions) or any other assets to any other
Person other than (i) the sale of Inventory in the ordinary course of business, (ii)
dispositions in connection with which payment in full is made of all of the
Indebtedness and Pre-Petition Debt (to the extent not theretofore paid), (iii) the
rejection pursuant to Section 365 of the Bankruptcy Code of unexpired leases and
executory contracts and (iv) other sales, leases or dispositions that are consented
to by Wells Fargo, and Company shall not liquidate, dissolve or suspend business
operations other than pursuant to an order from the Court. Company shall not
transfer any part of its ownership interest in any Intellectual Property Rights and
shall not permit its rights as licensee of Licensed Intellectual Property to lapse,
except that Company may transfer such rights or permit them to lapse if it has
reasonably determined that such Intellectual Property Rights are no longer useful
in its business. If Company transfers any Intellectual Property Rights for value,
Company shall pay the proceeds to Wells Fargo for application to the Pre-
Petition Debt or the Indebtedness. Company shall not license any other Person to
use any of Company's Intellectual Property Rights, except that Company may
grant licenses in the ordinary course of its business in connection with sales of
Inventory or the provision of services to its customers.

5.19.   **Consolidation and Merger; Asset Acquisitions.** Company shall not
consolidate with or merge into any other entity, or permit any other entity to

merge into it, or acquire (in a transaction analogous in purpose or effect to a consolidation or merger) all or substantially all of the assets of any other entity.

**5.20.** **Sale and Leaseback.** Company shall not enter into any arrangement, directly or indirectly, with any other Person pursuant to which Company shall sell or transfer any real or personal property, whether owned now or acquired in the future, and then rent or lease all or part of such property or any other property which Company intends to use for substantially the same purpose or purposes as the property being sold or transferred.

**5.21.** **Restrictions on Nature of Business.** Company will not engage in any line of business materially different from that presently engaged in by Company, and will not purchase, lease or otherwise acquire assets not related to its business.

**5.22.** **Accounting.** Company will not adopt any material change in accounting principles except as required by GAAP, consistently applied. Company will not change its fiscal year.

**5.23.** **Discounts, etc.** After notice from Wells Fargo, Company will not grant any discount, credit or allowance to any customer of Company or accept any return of goods sold except in the ordinary course of Company's business. Company will not at any time modify, amend, subordinate, cancel or terminate any Account other than in the ordinary course of its business in the absence of a Default Period.

**5.24.** **Pension Plans.** Except as disclosed to Wells Fargo in a Record prior to the date of this Agreement, neither Company nor any ERISA Affiliate will (a) adopt, create, assume or become party to any Pension Plan, (b) become obligated to contribute to any Multiemployer Plan, (c) incur any obligation to provide post-retirement medical or insurance benefits with respect to employees or former employees (other than benefits required by law) or (d) amend any Plan in a manner that would materially increase its funding obligations.

**5.25.** **Place of Business; Name.** Company will not transfer its chief executive office or principal place of business. Company will provide written notice to Wells Fargo not less than thirty (30) days prior to moving, relocating or closing any retail store location or other business Premises. Company will not permit any tangible Collateral or any records relating to the Collateral to be located in any state or area in which, in the event of such location, a financing statement covering such Collateral would be required to be, but has not in fact been, filed in order to perfect the Security Interest. Company will not change its name or jurisdiction of organization.

**5.26.** **Constituent Documents; S Corporation Status.** Company will not amend its Constituent Documents in any manner that would, or might reasonably be expected by Company or its legal counsel to have, any adverse effect upon Wells Fargo, the Security Interest or any of Wells Fargo's rights in the Collateral, and Company shall provide written notice to Wells Fargo not less than thirty (30) days prior to the effectiveness of any amendment to its Constituent Documents. Company will not become an S Corporation.

**5.27.    Performance by Wells Fargo.**  If Company fails to perform or observe any of its obligations under this Agreement at any time, Wells Fargo may, but need not, perform or observe them on behalf of Company and may, but need not, take any other actions which Wells Fargo may reasonably deem necessary to cure or correct this failure; and Company shall pay Wells Fargo upon demand the amount of all costs and expenses (including, without limitation, reasonable attorneys' fees and legal expense) incurred by Wells Fargo in performing these obligations, together with interest on these amounts at the Default Rate.

**5.28.    Wells Fargo Appointed as Company's Attorney in Fact.**  To facilitate Wells Fargo's performance or observance of Company's obligations under this Agreement, Company hereby irrevocably appoints Wells Fargo and Wells Fargo's agents, as Company's attorney in fact (which appointment is coupled with an interest) with the right (but not the duty) to create, prepare, complete, execute, deliver, endorse or file on behalf of Company any instruments, documents, assignments, security agreements, financing statements, applications for insurance and any other agreements or any Record required to be obtained, executed, delivered or endorsed by Company in accordance with the terms of this Agreement.

**5.29.    Deposit Accounts.**  Company shall not open or maintain any deposit accounts, securities account, or investment account at any financial institution other than Wells Fargo, except for (a) deposit accounts, securities accounts or investment accounts maintained at Wachovia, each of which is subject to a Control Agreement in form and substance satisfactory to Wells Fargo in its discretion, (b) Store Accounts maintained with financial institutions other than Bank of America, N.A. or Citibank, N.A. and concentration accounts relating thereto, each of which is subject to a Control Agreement in form and substance satisfactory to Wells Fargo in its discretion, and (c) Store Accounts maintained with Bank of America, N.A. and a concentration account relating thereto or with Citibank, N.A., underlined provided that Company causes the entire balance of each such Store Account to be swept on each Business Day (or with such lesser frequency as Wells Fargo may agree in its sole discretion) to Wells Fargo for application to the Indebtedness or the Pre-Petition Debt (to the extent permitted by the Financing Orders) in accordance with this Agreement.

**5.30.    Retail Stores.**  Company shall not open any new retail stores, and Company shall not close any existing retail stores without the prior written consent of Wells Fargo.

**5.31.    [Intentionally Omitted.]**

**5.32.    Payment of Claims.**  Unless permitted or required by the Court, Company shall not make any payment of principal or interest on account of any claim against Company that arose prior to the Petition Date, other than claims that may be paid from the proceeds of Advances pursuant to Section 1.1(c).

**5.33.    Filing of Motions and Applications.**  Company shall not apply to the Court for authority to (i) take any action that is prohibited by the terms of any of the Loan Documents, (ii) refrain from taking any action that is required to be taken by the terms of any of the Loan Documents or the Financing Orders or (iii) permit any

debt or claim to be pari passu with or senior to any of the Indebtedness, except for the Carve-Out.

**5.34.    Modifications to Financing Orders.**  Company shall not seek or consent to any amendment, supplement or any other modification of any of the terms of the Financing Orders.

**5.35.    Use of Proceeds**.  Company shall not use any proceeds of Advances for a purpose that is not expressly permitted by Section 1.1(c).

## 6.    EVENTS OF DEFAULT AND REMEDIES

**6.1.    Events of Default.  An "Event of Default" means any of the following**:

(a)    Company fails to pay the amount of any Indebtedness on the date that it becomes due and payable;

(b)    Company fails to observe or perform any covenant or agreement of Company set forth in Sections 5.12 or 5.14(a) of this Agreement, or in any of the Loan Documents other than this Agreement, or in any other document or agreement described in or related to this Agreement or to any Indebtedness, and Company fails to cure such failure within ten (10) days after the earlier of Company's obtaining knowledge thereof or its receipt of written notice thereof from Wells Fargo (provided that such cure period shall not be applicable to any Default that is not capable of being cured during such period or that is the result of the intentional act of the Company or any of its employees, Officers, Directors, Owners or agents); or Company fails to observe or perform any other covenant or agreement of Company set forth in this Agreement;

(c)    An Overadvance arises or exists on any date and such Overadvance is not repaid in accordance with Section 1.2(b) hereof;

(d)    The Sale Motion is dismissed, withdrawn or not prosecuted by Company, the Stalking Horse Agreement is terminated or withdrawn by the proposed purchaser thereunder, or the conditions precedent to consummation of the Stalking Horse Agreement are not satisfied or become incapable of being satisfied for any reason;

(e)    [Intentionally Omitted];

(f)    Company shall fail to comply with any of the provisions of the Financing Orders; a trustee shall be appointed in the Chapter 11 Case; an examiner shall be appointed in the Chapter 11 Case with enlarged powers (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code; the Chapter 11 Case shall be dismissed or converted to a case under Chapter 7 or a motion for any such dismissal or conversion shall be filed by Company; Company or any Affiliate shall obtain Court approval of a disclosure statement for a Reorganization Plan other than an Acceptable Plan or a Confirmation Order shall be entered with respect to a Reorganization Plan (regardless of the proponent of such Reorganization Plan) if such Reorganization Plan is not an Acceptable Plan; there shall be filed by

Company any motion to sell all or a substantial part of the Collateral on terms that are not acceptable to Wells Fargo in its discretion; any substantial part of Company's assets, other than the Collateral, shall be sold by Company and, as a consequence of such sale, Company is not able to continue its business operations in substantially the same manner as was conducted by it prior to such sale; Company shall file any motion to alter, amend, vacate, supplement, modify, or reconsider, in any respect, either of the Financing Orders or, without Wells Fargo's prior written consent, either of the Financing Orders is amended, vacated, stayed, reversed or otherwise modified; the Court shall enter an order granting to any Person other than Wells Fargo relief from the automatic stay to foreclose upon a Lien with respect to any property of Company that has an aggregate book value in excess of $2,500 or with respect to any of the Collateral (without regard to its value); an order shall be entered for the substantive consolidation of the Estate of Company with any other Person; a Final Financing Order is not entered within 45 days of the Interim Financing Order; Company shall not have sufficient availability (taking into account the Permitted Overadvance Amount) on any date to pay, or shall otherwise fail to pay as and when due and payable, all costs and expenses of administration that are incurred by it in the Chapter 11 Case that are due and payable on such date; Company shall file a motion or other request with the Court seeking authority to use any cash proceeds of the Collateral or to obtain any financing under Section 364(d) of the Bankruptcy Code secured by a priming Lien, or Lien of equal priority with Wells Fargo's Liens, upon any Collateral, in each case without Wells Fargo's prior written consent; an application shall be filed by Company for the approval of any superpriority claim in the Chapter 11 Case that is pari passu with or senior to the Indebtedness or any of the Pre-Petition Debt or there shall arise or be granted any such pari passu or superpriority claim, except for the Carve-Out; Company shall file any action, suit or other proceeding or contested matter challenging the validity, perfection or priority of any Liens of Wells Fargo securing the Pre-Petition Debt, or the validity or enforceability of any of the Pre-Petition Loan Documents, or asserting any Avoidance Claim against Wells Fargo or seeking to recover any monetary damages from Wells Fargo; or, without Wells Fargo's consent, Company shall discontinue or suspend all or any material part of its business operations or commence an orderly wind-down or liquidation of any material part of the Collateral;

(g)     Any petition for relief under the Bankruptcy Code is filed by or against any Guarantor;

(h)     The Key Person Life Insurance Policy is terminated; or the Key Person Life Insurance Policy is scheduled to terminate and Company fails to deliver a renewal or substitute policy to Wells Fargo within thirty (30) days before the scheduled termination date; or Company fails to pay any premium on the Key Person Life Insurance Policy when due; or Company takes any other action that impairs the value of the Key Person Life Insurance Policy;

(i)     Any representation or warranty made by Company in this Agreement or by any Guarantor in any Pre-Petition Guaranty or other Loan Document, or by Company (or any of its Officers) or any Guarantor in any agreement, certificate, instrument or financial statement or other statement delivered to Wells Fargo in connection

with this Agreement or pursuant to such Pre-Petition Guaranty is untrue or misleading in any material respect when delivered to Wells Fargo;

(j)    A final, non-appealable arbitration award, judgment, or decree or order for the payment of money in an amount in excess of $100,000 which is not insured or subject to indemnity, is entered against Company after the Petition Date or any Guarantor at any time that is not immediately stayed or appealed;

(k)    [Reserved.]

(l)    Any Guarantor repudiates or purports to revoke the Guarantor's Pre-Petition Guaranty, or fails to perform any obligation under such Pre-Petition Guaranty, or any individual Guarantor dies or becomes incapacitated, or any other Guarantor ceases to exist for any reason;

(m)    Company engages in any act prohibited by the Plank Subordination Agreement, any Investor Subordination Agreement or any other Subordination Agreement, or makes any payment on Subordinated Indebtedness (as defined in the applicable Subordination Agreement) that the Subordinated Creditor was not contractually entitled to receive;

(n)    Any event or circumstance occurs that Wells Fargo in good faith believes may impair the prospect of payment of all or part of the Indebtedness, or Company's ability to perform any of its material obligations under any of the Loan Documents, or any other document or agreement described in or related to this Agreement, or, after the Petition Date, there occurs a material adverse change in the business or financial condition of Company or any event or condition exists that has a Material Adverse Effect;

(o)    Any Director, Officer, Guarantor, or Owner of at least 20% of the issued and outstanding common stock of Company is indicted for a felony offence under state or federal law, or Company hires an Officer or appoints a Director who has been convicted of any such felony offense, or a Person becomes an Owner of at least 20% of the issued and outstanding common stock of Company who has been convicted of any such felony offense; or

(p)    Any Reportable Event, which Wells Fargo in good faith believes to constitute sufficient grounds for termination of any Pension Plan or for the appointment of a trustee to administer any Pension Plan, has occurred and is continuing thirty (30) days after Company gives Wells Fargo a Record notifying it of the Reportable Event; or a trustee is appointed by an appropriate court to administer any Pension Plan; or the Pension Benefit Guaranty Corporation institutes proceedings to terminate or appoint a trustee to administer any Pension Plan; or Company or any ERISA Affiliate files for a distress termination of any Pension Plan under Title IV of ERISA; or Company or any ERISA Affiliate fails to make any quarterly Pension Plan contribution required under Section 412(m) of the IRC, which Wells Fargo in good faith believes may, either by itself or in combination with other failures, result in the imposition of a Lien on Company's assets in favor of the Pension Plan; or any withdrawal, partial withdrawal, reorganization or other event occurs with respect to a Multiemployer Plan which

could reasonably be expected to result in a material liability by Company to the Multiemployer Plan under Title IV of ERISA.

**6.2.    Rights and Remedies.**  During any Default Period, but subject at all times to any limitations in the Financing Orders or any other order of the Court, Wells Fargo may, in its discretion, exercise any or all rights and remedies available to Wells Fargo under the Pre-Petition Loan Documents to enforce collection of any Pre-Petition Debt then outstanding as well as the following rights and remedies to enforce collection of the Indebtedness:

(a)    Wells Fargo may terminate the DIP Facility and decline to make Advances, and terminate any services extended to Company under the Master Agreement for Treasury Management Services;

(b)    Wells Fargo may declare the Indebtedness to be immediately due and payable and accelerate payment of the Post-Petition Revolving Note, and all Indebtedness shall immediately become due and payable, without presentment, notice of dishonor, protest or further notice of any kind, all of which Company hereby expressly waives;

(c)    Wells Fargo may, without notice to Company, apply any money owing by Wells Fargo to Company to payment of the Indebtedness;

(d)    Wells Fargo may exercise and enforce any rights and remedies available upon default to a secured party under the UCC, the Loan Documents and the Financing Orders, including, without limitation, the right to take possession of Collateral (without posting a bond or other form of security, which Company hereby waives), to proceed with or without judicial process (without a prior hearing or notice of hearing, which Company hereby waives) and to sell, lease or otherwise dispose of Collateral for cash or on credit (with or without giving warranties as to condition, fitness, merchantability or title to Collateral, and in the event of a credit sale, Indebtedness shall be reduced only to the extent that payments are actually received), and Company will upon Wells Fargo's demand assemble the Collateral and make it available to Wells Fargo at any place designated by Wells Fargo which is reasonably convenient to both parties;

(e)    Wells Fargo may exercise and enforce its rights and remedies under any of the Loan Documents and any other document or agreement described in or related to this Agreement; and

(f)    Wells Fargo may exercise any other rights and remedies available to it by law or agreement.

**7.    MISCELLANEOUS**

**7.1.    No Waiver; Cumulative Remedies.**  No delay or any single or partial exercise by Wells Fargo of any right, power or remedy under the Loan Documents, or under any other document or agreement described in or related to this Agreement, shall constitute a waiver of any other right, power or remedy under the Loan Documents or granted by Company to Wells Fargo under other agreements or documents that are unrelated to the Loan Documents.  No notice to

or demand on Company in any circumstance shall entitle Company to any additional notice or demand in any other circumstances. The remedies provided in the Loan Documents or in any other document or agreement described in or related to this Agreement are cumulative and not exclusive of any remedies provided by law. Wells Fargo may comply with applicable law in connection with a disposition of Collateral, and such compliance will not be considered to adversely affect the commercial reasonableness of any sale of the Collateral.

7.2.    **Amendment; Consents and Waivers; Authentication.**    No amendment or modification of any Loan Documents, or any other document or agreement described in or related to this Agreement, or consent to or waiver of any Event of Default, or consent to or waiver of the application of any covenant or representation set forth in any of the Loan Documents, or any other document or agreement described in or related to this Agreement, or any release of Wells Fargo's Security Interest in any Collateral, shall be effective unless it has been agreed to by Wells Fargo and memorialized in a Record that: (a) specifically states that it is intended to amend or modify specific Loan Documents, or any other document or agreement described in or related to this Agreement, or waive any Event of Default or the application of any covenant or representation of any terms of specific Loan Documents, or any other document or agreement described in or related to this Agreement, or is intended to release Wells Fargo's Security Interest in specific Collateral; and (b) is Authenticated by the signature of an authorized employee of both parties, or by an authorized employee of Wells Fargo with respect to a consent or waiver. The terms of an amendment, consent or waiver memorialized in any Record shall be effective only to the extent, and in the specific instance, and for the limited purpose to which Wells Fargo has agreed.

7.3.    **Execution in Counterparts; Delivery of Counterparts.**    This Agreement and all other Loan Documents, or any other document or agreement described in or related to this Agreement, and any amendment or modification to them may be Authenticated by the parties in any number of counterparts, each of which, once authenticated and delivered in accordance with the terms of this Section 7.3 hereof, will be deemed an original, and all such counterparts, taken together, shall constitute one and the same instrument. Delivery by fax or by encrypted e-mail or e-mail file attachment of any counterpart to any Loan Document Authenticated by an authorized signature will be deemed the equivalent of the delivery of the original Authenticated instrument. Company shall send the original Authenticated counterpart to Wells Fargo by first class U.S. mail or by overnight courier, but Company's failure to deliver a Record in this form shall not affect the validity, enforceability, and binding effect of this Agreement or the other Loan Documents, or any other document or agreement described in or related to this Agreement.

7.4.    **Notices, Requests, and Communications; Confidentiality**.    Except as otherwise expressly provided in this Agreement:

(a)    Delivery of Notices, Requests and Communications. Any notice, request, demand, or other communication by either party that is required under the Loan Documents, or any other document or agreement described in or related to this Agreement, to be in the form of a Record (but excluding any Record containing

information Company must report to Wells Fargo under <u>Section 5.1</u> hereof) may be delivered (i) in person, (ii) by first class U.S. mail, (iii) by overnight courier of national reputation, or (iv) by fax, or the Record may be sent as an Electronic Record and delivered (v) by an encrypted e-mail, or (vi) through Wells Fargo's CEO portal or other secure electronic channel to which the parties have agreed.

(b)     <u>Addresses for Delivery</u>.  Delivery of any Record under this <u>Section 7.4</u> hereof shall be made to the appropriate address set forth on the signature pages of this Agreement (which either party may modify by a Record sent to the other party), or through Wells Fargo's *CEO* portal or other secure electronic channel to which the parties have agreed, and to any counsel for such party who has made an appearance in the Chapter 11 Case at the address for notices to such counsel in the Chapter 11 Case.

(c)     <u>Date of Receipt</u>.  Each Record sent pursuant to the terms of this <u>Section 7.4</u> hereof will be deemed to have been received on (i) the date of delivery if delivered in person, (ii) the date deposited in the mail if sent by mail, (iii) the date delivered to the courier if sent by overnight courier, (iv) the date of transmission if sent by fax, or (v) the date of transmission, if sent as an Electronic Record by electronic mail or through Wells Fargo's *CEO* portal or similar secure electronic channel to which the parties have agreed; <u>except</u> that any request for an Advance or any other notice, request, demand or other communication from Company required under <u>Section 1</u> hereof, and any request for an accounting under Section 9-210 of the UCC, will not be deemed to have been received until actual receipt by Wells Fargo on a Business Day by an authorized employee of Wells Fargo in accordance with <u>Section 1</u> hereof.

(d)     <u>Confidentiality of Unencrypted E-mail</u>.  Company acknowledges that if it sends an Electronic Record to Wells Fargo without encryption by e-mail or as an e-mail file attachment, there is a risk that the Electronic Record may be received by unauthorized Persons, and that by so doing it will be deemed to have accepted this risk and the consequences of any such unauthorized disclosure.

**7.5.     Company Information Reporting; Confidentiality.**   Except as otherwise expressly provided in this Agreement:

(a)     <u>Delivery of Company Information Records</u>.  Any information that Company is required to deliver under <u>Section 5.1</u> hereof in the form of a Record may be delivered to Wells Fargo (i) in person, or by (ii) first class U.S. mail, (iii) overnight courier of national reputation, or (iv) fax, or the Record may be sent as an Electronic Record (v) by encrypted e-mail, or (vi) through the file upload service of Wells Fargo's *CEO* portal or other secure electronic channel to which the parties have agreed.

(b)     <u>Addresses for Delivery</u>.  Delivery of any Record to Wells Fargo under this <u>Section 7.5</u> shall be made to the appropriate address set forth on the signature pages of this Agreement (which Wells Fargo may modify by a Record sent to Company), or through Wells Fargo's *CEO* portal or other secure electronic channel to which the parties have agreed.

(c) <u>Date of Receipt</u>.  Each Record sent pursuant to this Section will be deemed to have been received on (i) the date of delivery to an authorized employee of Wells Fargo, if delivered in person, or by U.S. mail, overnight courier, fax, or e-mail; or (ii) the date of transmission, if sent as an Electronic Record through Wells Fargo's *CEO* portal or similar secure electronic channel to which the parties have agreed.

(d) <u>Authentication of Company Information Records</u>.  Company shall Authenticate any Record delivered (i) in person, or by U.S. mail, overnight courier, or fax, by the signature of the Officer or employee of Company who prepared the Record; (ii) as an Electronic Record sent via encrypted e-mail, by the signature of the Officer or employee of Company who prepared the Record by any file format signature that is acceptable to Wells Fargo, or by a separate certification signed and sent by fax; or (iii) as an Electronic Record via the file upload service of Wells Fargo's *CEO* portal or similar secure electronic channel to which the parties have agreed, through such credentialing process as Wells Fargo and Company may agree to under the *CEO* agreement.

(e) <u>Certification of Company Information Records</u>.  Any Record (including, without limitation, any Electronic Record) Authenticated and delivered to Wells Fargo under this <u>Section 7.5</u> will be deemed to have been certified as materially true, correct, and, as to the matters set forth therein, complete, by Company and each Officer or employee of Company who prepared and Authenticated the Record on behalf of Company, and may be legally relied upon by Wells Fargo without regard to method of delivery or transmission.

(f) <u>Confidentiality of Company Information Records Sent by Unencrypted E-mail</u>.  Company acknowledges that if it sends an Electronic Record to Wells Fargo without encryption by e-mail or as an e-mail file attachment, there is a risk that the Electronic Record may be received by unauthorized Persons, and that by so doing it will be deemed to have accepted this risk and the consequences of any such unauthorized disclosure.   Company acknowledges that it may deliver Electronic Records containing Company information to Wells Fargo by e-mail pursuant to any encryption tool acceptable to Wells Fargo and Company, or through Wells Fargo's *CEO* portal file upload service without risk of unauthorized disclosure.   Wells Fargo shall treat all materials and Records furnished by Company as confidential and shall not disclose the same (and shall protect the same against disclosure) to any third party (except as required by law or legal process, or as permitted by <u>Section 7.11</u> hereof).

**7.6.**   **Further Documents.**  Company will from time to time execute, deliver, endorse and authorize the filing of any instruments, documents, conveyances, assignments, security agreements, financing statements, control agreements and other agreements that Wells Fargo may reasonably request in order to secure, protect, perfect or enforce the Security Interest or Wells Fargo's rights under the Loan Documents, or any other document or agreement described in or related to this Agreement (but any failure to request or assure that Company executes, delivers, endorses or authorizes the filing of any such item shall not affect or impair the validity, sufficiency or enforceability of the Loan Documents, or any other document or agreement described in or related to this Agreement, and the

Security Interest, regardless of whether any such item was or was not executed, delivered or endorsed in a similar context or on a prior occasion).

7.7.    **Costs and Expenses.**  Company shall pay on demand all costs and expenses, including, without limitation, reasonable attorneys' fees, incurred by Wells Fargo in connection with the Indebtedness, this Agreement, the Loan Documents, or any other document or agreement described in or related to this Agreement, and the transactions contemplated by this Agreement, including, without limitation, all such costs, expenses and fees incurred in connection with the underwriting (including, without limitation, field examinations, background investigations and other fees and out-of-pocket expenses incurred by Wells Fargo in connection therewith), negotiation, preparation, execution, delivery, amendment, administration, performance, collection and enforcement of the Indebtedness and all such documents and agreements, the monitoring of or participation in hearings during the Chapter 11 Case and the creation, perfection, protection, satisfaction, foreclosure or enforcement of the Security Interest.  Without limiting the generality of the foregoing, Company shall pay on demand all reasonable costs and expenses of any consultant engaged by Wells Fargo to assist with the review of financial information, budgets, bids and other matters related to Company's business or assets.

7.8.    **Indemnity.**  In addition to its obligation to pay Wells Fargo's expenses under the terms of this Agreement, Company shall indemnify, defend and hold harmless Wells Fargo, its parent Wells Fargo & Company, Wachovia and any of their respective affiliates and successors, and all of their present and future Officers, Directors, employees, attorneys and agents (each an "Indemnitee") from and against any of the following (collectively, "Indemnified Liabilities"):

(a)    Any and all transfer taxes, documentary taxes, assessments or charges made by any governmental authority by reason of the execution and delivery of the Loan Documents, or any other document or agreement described in or related to this Agreement or the making of the Advances;

(b)    Any claims, loss or damage to which any Indemnitee may be subjected if any representation or warranty contained in **Exhibit D** proves to be incorrect in any respect or as a result of any violation of the covenants contained in Section 5.12 hereof; and

(c)    Any and all other liabilities, losses, damages, penalties, judgments, suits, claims, costs and expenses of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel) in connection with this Agreement and any other investigative, administrative or judicial proceedings, whether or not such Indemnitee shall be designated a party to such proceedings, which may be imposed on, incurred by or asserted against any such Indemnitee, in any manner related to or arising out of or in connection with the making of the Advances and the Loan Documents, or any other document or agreement described in or related to this Agreement, or the use or intended use of the proceeds of the Advances, with the exception of any Indemnified Liability caused by the gross negligence or willful misconduct of an Indemnitee.

If any investigative, judicial or administrative proceeding described in this Section is brought against any Indemnitee, upon the Indemnitee's request, Company, or counsel designated by Company and satisfactory to the Indemnitee, will resist and defend the action, suit or proceeding to the extent and in the manner directed by the Indemnitee, at Company's sole cost and expense. Each Indemnitee will use its best efforts to cooperate in the defense of any such action, suit or proceeding. If this agreement to indemnify is held to be unenforceable because it violates any law or public policy, Company shall nevertheless make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities to the extent permissible under applicable law. Company's obligations under this Section shall survive the termination of this Agreement and the discharge of Company's other obligations under this Agreement.

7.9.    **Retention of Company's Records.**  Wells Fargo shall have no obligation to maintain Electronic Records or retain any documents, schedules, invoices, agings, or other Records delivered to Wells Fargo by Company in connection with the Loan Documents, or any other document or agreement described in or related to this Agreement for more than thirty (30) days after receipt by Wells Fargo. If there is a special need to retain specific Records, Company must notify Wells Fargo of its need to retain or return such Records with particularity, which notice must be delivered to Wells Fargo in accordance with the terms of this Agreement at the time of the initial delivery of the Record to Wells Fargo.

7.10.    **Binding Effect; Assignment; Complete Agreement.**  The Loan Documents, or any other document or agreement described in or related to this Agreement, shall be binding upon and inure to the benefit of Company and Wells Fargo and their respective successors and assigns, except that Company shall not have the right to assign its rights under this Agreement or any interest in this Agreement without Wells Fargo's prior consent, which must be confirmed in a Record Authenticated by Wells Fargo, and neither this Agreement nor any of the other Loan Documents shall inure to the benefit of any trustee appointed in the Chapter 11 Case or any Chapter 7 case of Company without Wells Fargo's express written consent . To the extent permitted by law, Company waives and will not assert against any assignee any claims, defenses or set-offs which Company could assert against Wells Fargo. This Agreement shall also bind all Persons who become a party to this Agreement as a borrower. This Agreement, together with the Loan Documents, or any other document or agreement described in or related to this Agreement, comprises the complete and integrated agreement of the parties on the subject matter of this Agreement and supersedes all prior agreements, whether oral or evidenced in a Record. To the extent that any provision of this Agreement contradicts other provisions of the Loan Documents other than this Agreement, or any other document or agreement described in or related to this Agreement, this Agreement shall control.

7.11.    **Sharing of Information.**  Wells Fargo may share any Confidential Information that it may have regarding Company and its Affiliates with its accountants, lawyers, and other advisors, and with each business unit and line of business within Wells Fargo, Wachovia and each direct and indirect subsidiary of Wells Fargo & Company, provided that such Persons are advised of the confidential nature of such information and agree to hold such information as such.

**7.12.    Severability of Provisions.**    Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining terms of this Agreement.

**7.13.    Headings.**  Section and subsection headings in this Agreement are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

**7.14.    Definitional Terms and Rules of Interpretation.**    All accounting terms not otherwise defined in this Agreement shall have the meanings given them in accordance with GAAP.  Unless the context clearly requires otherwise, the word "or" has the inclusive meaning represented by the phrase "and/or".  Reference to any agreement (including, without limitation, the Loan Documents), document or instrument means the agreement, document or instrument as amended or supplemented, subject to any restrictions on amendment contained therein (and, if applicable, in accordance with the terms of this Agreement and the other Loan Documents).  Unless otherwise specified, any reference to a statute or regulation means that statute or regulation as amended or supplemented from time to time, and any corresponding provisions of successor statutes or regulations.

**7.15.    Governing Law; Jurisdiction, Venue; Waiver of Jury Trial.**  This Agreement has been executed and delivered by Company and Wells Fargo in the State of Georgia and shall be deemed a contract made and entered into in the State of Georgia.  The Loan Documents (other than real estate related documents, if any) shall be governed by and construed in accordance with the substantive laws (other than conflict laws) of the State of Georgia.  The parties to this Agreement (a) consent to the personal jurisdiction of the state and federal courts located in the State of Georgia in connection with any controversy related to this Agreement; (b) waive any argument that venue in any such forum is not convenient; (c) agree that any litigation initiated by Wells Fargo or Company in connection with this Agreement or the other Loan Documents may be venued in either the state or federal courts located in the City of Atlanta, County of Fulton, State of Georgia; and (d) agree that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

**7.16.    WAIVER OF JURY TRIAL**.  COMPANY AND WELLS FARGO WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION AT LAW OR IN EQUITY OR IN ANY OTHER PROCEEDING BASED ON OR PERTAINING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT.

[Remainder of page intentionally left blank;
signatures begin on following page.]

**IN WITNESS WHEREOF,** each of the parties hereto has executed this Agreement under seal through its authorized officer on the date set forth above.

Swoozie's, Inc.
80 West Wieuca Road, Suite 302
Atlanta, Georgia 30342
Attention: John Sainsbury
E-Mail: johnsainsbury@swoozies.com
Facsimile: (404) 888-0145
State Organizational ID No.: 3811271
Federal Employee ID No.: 20-1315738

**SWOOZIE'S, INC.**

By: _____
Name:_____
Title:_____

[CORPORATE SEAL]

Wells Fargo Bank, National Association
400 Northridge Road, Suite 600
Atlanta, Georgia 30350
Fax: (770) 992-4720
Attention: Swoozie's, Inc. Loan Administration
E-mail: john.l.palermo@wellsfargo.com

**WELLS FARGO BANK, NATIONAL ASSOCIATION**

By: _____
Name:_____
Title:_____

## POST-PETITION REVOLVING NOTE

**$3,500,000.00**                                                                                     March 4, 2010

      **FOR VALUE RECEIVED**, the undersigned, **SWOOZIE'S, INC.**, a Delaware corporation (the "Company"), hereby promises to pay to the order of **WELLS FARGO BANK, NATIONAL ASSOCIATION** ("Wells Fargo"), acting through its Wells Fargo Business Credit operating division, on the Termination Date described in the Credit and Security Agreement dated October 19, 2009 (as amended, restated, supplemented or otherwise modified, the "Agreement") and entered into between Wells Fargo and Company, at Wells Fargo's office at 400 Northridge Road, Suite 600, Atlanta, Georgia 30350, or at any other place designated at any time by the holder, in lawful money of the United States of America and in immediately available funds, the principal sum of THREE MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($3,500,000.00) or the aggregate unpaid principal amount of all Advances under the DIP Facility made by Wells Fargo to Company under the terms of the Agreement, together with interest on the principal amount computed on the basis of actual days elapsed in a 360-day year, from the date of this Post-Petition Revolving Note until this Post-Petition Revolving Note is fully paid at the rate from time to time in effect under the terms of the Agreement.  Principal and interest accruing on the unpaid principal balance amount of this Post-Petition Revolving Note shall be due and payable as provided in the Agreement.  This Post-Petition Revolving Note may be prepaid only in accordance with the Agreement.

      This Post-Petition Revolving Note is the Post-Petition Revolving Note referred to in the Agreement, and is subject to the terms of the Agreement, which provides, among other things, for the acceleration of this Post-Petition Revolving Note.  This Post-Petition Revolving Note is secured, among other things, by the Agreement and the Security Documents as defined in the Agreement, and by any other security agreements, mortgages, deeds of trust, assignments or other instruments or agreements that may subsequently be given for good and valuable consideration as security for this Post-Petition Revolving Note.

      Company shall pay all costs of collection, including, without limitation, reasonable attorneys' fees and legal expenses, if this Post-Petition Revolving Note is not paid when due, whether or not legal proceedings are commenced.

      Presentment or other demand for payment, notice of dishonor and protest are expressly waived.

**SWOOZIE'S, INC.**

By:_____
Name: _____
Title: _____

[CORPORATE SEAL]

**Exhibit A to Post-Petition Credit and Security Agreement**

## DEFINITIONS

"Acceptable Plan" means a Reorganization Plan that provides for allowance of all claims in favor of Wells Fargo and Wachovia that hold Indebtedness or Pre-Petition Debt as fully secured claims; payment in full and in cash of all Indebtedness and any outstanding Pre-Petition Debt on the effective date of such Reorganization Plan; an effective date no later than forty-five (45) days after the date of entry of the Confirmation Order with respect to such Reorganization Plan; and a full and complete release of any and all claims that Company or the Estate might have or assert against Wells Fargo and its affiliates that hold Indebtedness or Pre-Petition Debt (whether arising prior to or after the Petition Date), including all claims that arise under any provision in Chapter 5 of the Bankruptcy Code; or which is otherwise acceptable to Wells Fargo in its discretion.

"Account Funds" is defined in Section 1.6(b) of the Agreement.

"Accounts" shall have the meaning given it under the UCC.

"Adequate Protection Claim" means the right of the holder of a secured claim against Company to receive periodic payments as adequate protection under Sections 361 or 363 of the Bankruptcy Code.

"Advance" and "Advances" means an advance or advances under the DIP Facility.

"Affiliate" or "Affiliates" means any other Person controlled by, controlling or under common control with Company, including without limitation any Subsidiary of Company.  For purposes of this definition, "control," when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; provided, however, for purposes of Section 5.1(a) and (b) of the Agreement, no individual officer, director or shareholder of Company shall be deemed to be an Affiliate of Company.

"Agreement" means this Post-Petition Credit and Security Agreement.

"Authenticate" or "Authenticated" means (a) to have signed; or (b) to have executed or to have otherwise adopted a symbol, or have encrypted or similarly processed a Record in whole or in part, with the present intent of the authenticating Person to identify the Person and adopt or accept a Record.

"Avoidance Claim" means any claim that could be asserted by or on behalf of Company or the Estate against a Person under 11 U.S.C.  §§ 544, 546, 547, 548, 549, 550 or 553.

"Bankruptcy Code" means title 11 of the United States Code.

"Borrowing Base" is defined in Section 1.2(a) of the Agreement.

"Borrowing Base Reserve" means, as of any date of determination, an amount or a percent of a specified category or item that Wells Fargo establishes in its discretion from time to time to reduce availability under the Borrowing Base (a) to reflect events, conditions, contingencies or risks which affect the assets, business or prospects of Company, or the Collateral or its value, or the enforceability, perfection or priority of Wells Fargo's Security Interest in the Collateral, as the term "Collateral" is defined in this Agreement, or (b) to reflect Wells Fargo's judgment that any collateral report or financial information relating to Company and furnished to Wells Fargo may be incomplete,

A-1

inaccurate or misleading in any material respect.  Without limiting the generality of the foregoing, the Borrowing Base Reserve includes the Gift Card Reserve.

"Budget" means a cash flow forecast, in form and substance acceptable to Wells Fargo, projecting, among other things, Company's cash receipts and disbursements (including costs of the Chapter 11 Case) and availability under the DIP Facility on a weekly basis from the Petition Date through April _____, 2010, a summary of which was attached to the DIP Motion and a complete copy of which is attached hereto as Exhibit G, as such budget may be modified, extended or supplemented from time to time with Wells Fargo's prior written consent.

"Business Day" means a day on which the Federal Reserve Bank of New York is open for business.

"Carve-Out" shall have the meaning ascribed to such term in the Financing Orders.

"Cash Collateral" means cash or cash equivalents, and any interest earned thereon, that is deposited with Wells Fargo as security for the Indebtedness to the extent provided in the Agreement.

"CEO" is defined in Section 5.1(b) of the Agreement.

"Chapter 11 Case" is defined in the Recitals to the Agreement.

"Collateral" means all of Company's assets, real and personal, including, without limitation, all of Company's Accounts, chattel paper (including, without limitation, tangible chattel paper and electronic chattel paper), deposit accounts, documents, Equipment, General Intangibles (including, without limitation, all Intellectual Property Rights), goods, instruments, Inventory, Investment Property, letter-of-credit rights, letters of credit, contract rights, rights under or pursuant to leases of real property, all sums on deposit in any Collection Account, and any items in any Lockbox; together with (a) all substitutions and replacements for and products of such property; (b) in the case of all goods, all accessions; (c) all accessories, attachments, parts, Equipment and repairs now or subsequently attached or affixed to or used in connection with any goods; (d) all warehouse receipts, bills of lading and other documents of title that cover such goods now or in the future; (e) all collateral subject to the Lien of any of the Security Documents; (f) any money, or other assets of Company that come into the possession, custody, or control of Wells Fargo now or in the future; (g) Proceeds of any of the above Collateral; (h) books and records of Company, including, without limitation, all mail or e-mail addressed to Company; and (i) all of the above Collateral, whether now owned or existing or acquired now or in the future or in existence on or acquired by Company after the Petition Date or in which Company has rights now or in the future and wherever located.  Notwithstanding the foregoing, the term "Collateral" shall not include Avoidance Claims or any proceeds or property recovered in connection with the successful prosecution or settlement of Avoidance Claims.

"Collection Account" means the "Collection Account" as defined in the Master Agreement for Treasury Management Services and related Lockbox and Collection Account Service Description or Collection Account Service Description, whichever is applicable.

"Collections" means proceeds of Company's Accounts that are received by Wells Fargo after the Petition Date for application to the Pre-Petition Debt or the Indebtedness.

"Committee" means a creditors' or equity security holders' committee appointed in the Chapter 11 Case by the U.S. Trustee.

"Confidential Information" means all non-public, confidential or proprietary information of Company that is disclosed to Wells Fargo prior to or during the term of this Agreement by Company or any of its officers, employees, agents or representatives, and includes, without limitation, any trade secrets, research and development test results, marketing or business plans, strategies, forecasts, budgets, projections, customer and supplier information, and any other analyses, computations or studies prepared by or for Company.

"Confirmation Order" means an order entered by the Court confirming a Reorganization Plan.

"Constituent Documents" means with respect to any Person, as applicable, that Person's certificate of incorporation, articles of incorporation, by-laws, certificate of formation, articles of organization, limited liability company agreement, management agreement, operating agreement, shareholder agreement, partnership agreement or similar document or agreement governing such Person's existence, organization or management or concerning disposition of ownership interests of such Person or voting rights among such Person's owners.

"Control Agreement" means each deposit account control agreement or similar agreement executed by a financial institution in favor of Wells Fargo with respect to any deposit account, securities account or other account of Company, and pursuant to which Wells Fargo has "control" of such account, as contemplated by Section 9-104 of the UCC.

"Court" is defined in the Recitals.

"Crane" means Crane & Co., Inc. a Massachusetts corporation.

"Crane Intercreditor Agreement" means that certain Intercreditor Agreement dated on or about October 19, 2009 between Crane and Wells Fargo.

"Credit Card Agreements" means all agreements now or hereafter entered into by Company with any Credit Card Issuer or any Credit Card Processor, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

"Credit Card and Account Funds" is defined in Section 1.6(b) hereof.

"Credit Card Collection Account" means any deposit account maintained by Company for the purpose of collection Proceeds of Credit Card Receivables, which is subject to the Security Interest and Wells Fargo's exclusive control pursuant to a Control Agreement in form and substance satisfactory to Wells Fargo in its discretion, provided that, notwithstanding Wells Fargo's exclusive control, the applicable Credit Card Processor may, if elected by Wells Fargo in its sole discretion, have rights to debit such deposit account for unpaid processing fees, chargebacks and other amounts due under the applicable Credit Card Agreement.

"Credit Card Issuer" means any Person (other than Company) who issues or whose members issue credit cards.

"Credit Card Processor" means any servicing or processing agent that facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to Company's sales transactions involving credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

"Credit Card Receivables" means, collectively, (a) all present and future rights of Company to payment from any Credit Card Issuer or Credit Card Processor arising from the sale of goods or rendition of services to customers who have purchased such goods or services using a credit or debit card and (b) all present and future rights of Company to payment from any Credit Card Issuer or Credit Card Processor in connection with the sale or transfer of Accounts arising pursuant to the sale of goods or rendition of services to customers who have purchased such goods or services using a credit card or a debit card, including, but not limited to, all amounts at any time due or to become due from any Credit Card Issuer or Credit Card Processor under the Credit Card Agreements or otherwise.

"Daily Three Month LIBOR" means, for any day, the rate of interest equal to LIBOR then in effect for delivery for a three (3) month period. When interest is determined in relation to Daily Three Month LIBOR, each change in the interest rate shall become effective each Business Day that Wells Fargo determines that Daily Three Month LIBOR has changed.

"Default Period" is defined in Section 1.7(b) of the Agreement.

"Default Rate" is defined in Section 1.7(b) of the Agreement.

"DIP Facility" means the $3,500,000 credit facility established by Wells Fargo in favor of Company under Section 1.1(a) of this Agreement and pursuant to which Advances are made available by Wells Fargo.

"DIP Motion" means the motion of Company for approval of the financing under the DIP Facility pursuant to the Agreement.

"DIP Term" means a period commencing on the date of entry of the Interim Financing Order and ending on April 15, 2010, unless extended by prior written agreement of Wells Fargo.

"Director" means a director if Company is a corporation, or a governor or manager if Company is a limited liability company.

"Electronic Record" means a Record that is created, generated, sent, communicated, received, or stored by electronic means, but does not include any Record that is sent, communicated, or received by fax.

"Eligible Credit Card Receivables" means Credit Card Receivables that satisfy the criteria set forth below:

(a)     such Credit Card Receivables arise from the actual and bona fide sale and delivery of goods or rendition of services by Company in the ordinary course of the business of Company, which transactions are completed in accordance with the terms and provisions contained in any agreements binding on Company or the other party or parties related thereto;

(b)     such Credit Card Receivables are not past due (beyond any stated applicable grace period, if any, therefor) pursuant to the terms set forth in the Credit Card Agreements with the Credit Card Issuer or Credit Card Processor of the credit card or debit card used in the purchase which give rise to such Credit Card Receivables;

(c)     such Credit Card Receivables are not unpaid more than three (3) Business Days after the date of the sale of inventory or rendition of services giving rise to such Credit Card Receivables;

(d)     all material procedures required by the Credit Card Issuer or the Credit Card Processor of the credit card or debit card used in the purchase which gave rise to such Credit Card Receivables shall have been followed by Company and all authorizations and approvals of such Credit Card Issuer or Credit Card Processor shall have been obtained in connection with the sale giving rise to such Credit Card Receivables;

(e)     there are no facts, events or occurrences which would impair the validity, enforceability or collectability of such Credit Card Receivables in any material respect or reduce the amount payable or delay payment thereunder (other than for setoffs for fees and chargebacks consistent with the practices of such Credit Card Issuer or Credit Card Processor with Company as of the date hereof or as such practices may hereafter change as a result of changes to the policies of such Credit Card Issuer or Credit Card Processor applicable to its customers generally and unrelated to the circumstances of Company);

(f)     such Credit Card Receivables are subject to the first priority, valid and perfected security interest and Lien of Wells Fargo and any goods giving rise thereto are not, and were not at the time of the sale thereof, subject to any security interest or lien in favor or any person other than Wells Fargo or Crane (to the extent such Liens in favor of Crane are permitted under Section 5.3(a) of the Agreement);

(g)     such Credit Card Receivables are owed by Credit Card Issuers or Credit Card Processor deemed creditworthy at all times by Wells Fargo in good faith (such that in the good faith determination of Wells Fargo, such Credit Card Issuer or Credit Card Processor does not have, or could reasonably be expected not to have, the financial ability to satisfy its outstanding obligations);

(h)     the Inventory that was sold and gave rise to such Credit Card Receivable shall not have been returned; and

(i)     Wells Fargo shall not have deemed such Credit Card Receivable ineligible in its sole discretion.

"Eligible Inventory" means all Inventory of Company, valued at the lower of cost or market in accordance with GAAP; but excluding Inventory having any of the following characteristics:

(a)     Inventory that is: in-transit; located at any warehouse, job site or other premises not approved by Wells Fargo in an Authenticated Record delivered to Company; not subject to a perfected first priority Lien in Wells Fargo's favor; covered by any negotiable or non-negotiable warehouse receipt, bill of lading or other document of title; on consignment from any consignor; or on consignment to any consignee or subject to any bailment unless the consignee or bailee has executed an agreement with Wells Fargo;

(b)     Supplies, packaging, parts or sample Inventory, or customer supplied parts or Inventory;

(c)     Work-in-process Inventory;

(d)     Inventory that is damaged, defective, contaminated, obsolete, out-of-season, on clearance, slow moving (defined as of the date of this Agreement as Inventory that is more than one (1) year old), or not currently saleable in the normal course of Company's operations (including, without limitation, Inventory of a type that has been discontinued by Company), Inventory consisting of special orders, or the amount of any Inventory that has been reduced by shrinkage;

(e)     Inventory that Company has returned, has attempted to return, is in the process of returning or intends to return to the vendor of the Inventory;

(f)     Inventory that is perishable or live;

(g)     Inventory manufactured by Company pursuant to a license unless the applicable licensor has agreed in a Record that has been Authenticated by licensor to permit Wells Fargo to exercise its rights and remedies against such Inventory;

(h)     Inventory that is subject to a Lien in favor of any Person other than Wells Fargo or Crane (to the extent any such Lien in favor of Crane is permitted under Section 5.3(a) hereof); and

(i)     Inventory otherwise deemed ineligible by Wells Fargo in its sole discretion.

"Environmental Law" means any federal, state, local or other governmental statute, regulation, law or ordinance dealing with the protection of human health and the environment.

"Equipment" shall have the meaning given it under the UCC.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that is a member of a group which includes Company and which is treated as a single employer under Section 414 of the IRC.

"Estate" means the estate created in the Chapter 11 Case pursuant to 11 U.S.C. § 541(a).

"Event of Default" is defined in Section 6.1 of the Agreement.

"Final Financing Order" means an order which is entered by the Court pursuant to Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001(c), is in form and substance acceptable to Wells Fargo in all respects, authorizes the incurrence by Company of post-petition secured and superpriority debt under the DIP Facility in accordance with the Loan Documents, and affords adequate protection of the Liens in favor of Wells Fargo under the Pre-Petition Loan Documents.

"Financing Orders" means the Interim Financing Order and the Final Financing Order.

"Floating Rate" is defined in Section 1.7(a) of the Agreement.

"Floating Rate Advance" is defined in Section 1.3(a) of the Agreement.

"GAAP" means generally accepted accounting principles, applied on a basis consistent with the accounting practices applied in the most recent audited financial statements delivered to Wells Fargo prior to the Petition Date.

"General Intangibles" shall have the meaning given it under the UCC.

"Gift Card Reserve" means a Borrowing Base Reserve in an amount equal at any time to the aggregate outstanding balances of gift cards or other prepayments received by Company that are undrawn by the holder thereof.

"Guarantor" means Plank and any other Person now or in the future guaranteeing any Pre-Petition Debt or Indebtedness through the issuance of a Pre-Petition Guaranty.

"Guaranty Reaffirmation Agreement" means a written agreement executed by each Guarantor, in form and substance satisfactory to Wells Fargo, by which each Guarantor shall ratify and reaffirm such Guarantor's Pre-Petition Guaranty, as well as any related security deed, assignment, pledge or other related security document, and agree that the obligations guaranteed and secured thereunder shall include both the Pre-Petition Debt and the Indebtedness.

"Hazardous Substances" means pollutants, contaminants, hazardous substances, hazardous wastes, or petroleum, and all other chemicals, wastes, substances and materials listed in, regulated by or identified in any Environmental Law.

"Indebtedness" is used in its most comprehensive sense and means any debts, obligations and liabilities of Company to Wells Fargo or Wachovia incurred after the Petition Date, whether voluntary or involuntary, and however arising, and whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, and including without limitation all obligations arising under any deposit, treasury management or similar transaction or arrangement however described or defined that Company may enter into at any time with Wells Fargo or Wachovia, whether or not Company may be liable individually or jointly with others, or whether recovery upon such Indebtedness may subsequently become unenforceable.

"Indemnified Liabilities" is defined in Section 7.8 of the Agreement.

"Indemnitee" is defined in Section 7.8 of the Agreement.

"Infringement" or "Infringing" when used with respect to Intellectual Property Rights means any infringement or other violation of Intellectual Property Rights.

"Intellectual Property Rights" means all actual or prospective rights arising in connection with any intellectual property or other proprietary rights, including without limitation all rights arising in connection with copyrights, patents, service marks, trade dress, trade secrets, trademarks, trade names or mask works.

"Interest Payment Date" is defined in Section 1.9(a) of the Agreement.

"Interim Financing Order" means an order that is entered by the Court pursuant to Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001(c), which authorizes Company to incur, during the Interim Period, post-petition secured and superpriority debt under the DIP Facility in accordance with the Loan Documents and affords adequate protection of the Liens in favor of Wells Fargo under the Pre-Petition Loan Documents and which is in form and substance satisfactory in all respects to Wells Fargo.

"Interim Period" means the period commencing upon entry of the Interim Financing Order and ending on the entry of the Final Financing Order.

"Inventory" shall have the meaning given it under the UCC.

"Inventory Advance Rate" means, with respect to Eligible Inventory, an advance rate established by Wells Fargo from time to time in its discretion in an amount of up to forty-two percent (42%) (or such lesser percentage as Wells Fargo in its reasonable discretion may deem appropriate) of the Net Orderly Liquidation Value of such Eligible Inventory, based upon the most recent Inventory appraisal received and accepted by Wells Fargo.

"Investment Property" shall have the meaning given it under the UCC.

"Investor Debt" means all debt, liabilities and obligations at any time owing by Company under any of the Investor Loan Documents as in effect on the date hereof.

"Investor Subordination Agreement" means each of (i) that certain Subordination Agreement dated on or about October 19, 2009 by Northwood Ventures LLC in favor of Wells Fargo, (ii) that certain Subordination Agreement dated on or about October 19, 2009 by Northwood Capital Partners LLC in favor of Wells Fargo (iii) that Debt Subordination Agreement dated on or about October 19, 2009 by Brand Equity Ventures II, L.P. in favor of Wells Fargo; and (iv) that certain Subordination Agreement dated on or about October 19, 2009 by TWJ Capital Opportunity Fund I, L.P. in favor of Wells Fargo, in each case, as the same may be amended, modified, restated or otherwise supplemented from time to time with Wells Fargo's written consent.  The term "Investor Subordination Agreements" means all of the foregoing.

"IRC" means the Internal Revenue Code, as amended from time to time.

"Key Person Life Insurance Policy" is defined in Section 5.9 of the Agreement.

"Licensed Intellectual Property" is defined in Exhibit D.

"LIBOR" means the rate per annum (rounded upward, if necessary, to the nearest whole $1/8^{th}$ of one percent (1%)) determined pursuant to the following formula:

$$LIBOR = \frac{Base\ LIBOR}{100\% - LIBOR\ Reserve\ Percentage}$$

(a)    "Base LIBOR" means the rate per annum for United States dollar deposits quoted by Wells Fargo for the purpose of calculating the effective Floating Rate for loans that reference Daily Three Month LIBOR as the Inter-Bank Market Offered Rate in effect from time to time for three (3) month delivery of funds in amounts approximately equal to the principal amount of such loans.  Company understands and agrees that Wells Fargo may base its quotation of the Inter-Bank Market Offered Rate upon such offers or other market indicators of the Inter-Bank Market as Wells Fargo in its discretion deems appropriate, including, but not limited to, the rate offered for U.S. dollar deposits on the London Inter-Bank Market.

(b)    "LIBOR Reserve Percentage" means the reserve percentage prescribed by the Board of Governors of the Federal Reserve System (or any successor) for "Eurocurrency Liabilities" (as defined in Regulation D of the Federal Reserve Board, as amended), adjusted by Wells Fargo for expected changes in such reserve percentage during the applicable term of the Post-Petition Revolving Note.

"Lien" means any security interest, mortgage, deed of trust, pledge, lien, charge, encumbrance, title retention agreement or analogous instrument or device, including, without limitation, the interest of each lessor under any capitalized lease and the interest of any bondsman under any payment or performance bond, in, of or on any assets or properties of a Person, whether now owned or subsequently acquired and whether arising by agreement or operation of law.

"Life Insurance Assignment" means an Assignment of Key Person Life Insurance Policy as Collateral to be executed by the owner and the beneficiary of the policy, in form and substance satisfactory to Wells Fargo, granting Wells Fargo a first priority Lien on the Key Person Life Insurance Policy, its cash surrender value, and any proceeds arising from its sale to secure payment of the Indebtedness and the Pre-Petition Debt.

"Loan Documents" means this Agreement, the Post-Petition Revolving Note, the Guaranty Reaffirmation Agreement, the Plank Guaranty, the Crane Intercreditor Agreement, the Subordination Agreements and the Security Documents, together with every other agreement, note, document, contract or instrument to which Company now or in the future may be a party and which may be required by Wells Fargo in connection with, or as a condition to, the execution of this Agreement.  Any documents or other agreements entered into between Company and Wells Fargo or Wachovia, or which are entered into with an operating division of Wells Fargo other than Wells Fargo Business Credit, shall not be included in this definition.

"Lockbox" means "Lockbox" as defined in the Master Agreement for Treasury Management Services and related Lockbox and Collection Account Service Description.

"Margin" means a rate per annum, expressed as a percentage, as more fully defined in Section 1.7(a) of the Agreement.

"Master Agreement for Treasury Management Services" means any Master Agreement for Treasury Management Services, any related Acceptance of Services, and any Service Description governing any treasury management service with Wells Fargo used by Company.

"Material Adverse Effect" means any of the following:

(a)     A material adverse effect, other than the filing of the Chapter 11 Case, on the business, operations, results of operations, assets, liabilities or financial condition of Company that (i) occurs after the Petition Date, and (ii) is not contemplated by this Agreement;

(b)     A material adverse effect on the ability of Company to perform its obligations under the Loan Documents, or any other document or agreement related to this Agreement;

(c)     A material adverse effect on the ability of Wells Fargo to enforce the Indebtedness or to realize the intended benefits of the Security Documents, including, without limitation, a material adverse effect on the validity or enforceability of any Loan Document or of any rights against any Guarantor, or on the status, existence, perfection, priority (subject to Permitted Liens) or enforceability of any Lien securing payment or performance of the Indebtedness, other than the filing of the Chapter 11 Case and any stay or other limitation on actions imposed by the filing of the Chapter 11 Case; or

(d)     Any filed claim against Company or litigation that is not stayed in connection with the Chapter 11 Case which if determined adversely to Company would cause Company to be liable to pay an amount exceeding $100,000 on a priority basis in the Chapter 11 Case or would result in the occurrence of an event described in clauses (a), (b) and (c) above.

"Maximum Line Amount" is defined in Section 1.1(a) of the Agreement.

"Multiemployer Plan" means a multiemployer plan (as defined in Section 4001(a)(3) of ERISA) to which Company or any ERISA Affiliate contributes or is obligated to contribute.

"Net Cash Proceeds" means the cash proceeds of any asset sale (including, without limitation, cash proceeds received as deferred payments pursuant to a note, installment receivable or otherwise, but only upon actual receipt) net of (a) attorney, accountant, and investment banking fees, (b) brokerage commissions, (c) amounts required to be applied to prior Liens the repayment of debt secured by a Lien

not prohibited by this Agreement on the asset being sold, and (c) taxes paid or reasonably estimated to be payable as a result of such asset sale.

"Net Orderly Liquidation Value" means a professional opinion of the probable Net Cash Proceeds that could be realized at a properly advertised and professionally conducted liquidation sale, conducted under orderly sale conditions for an extended period of time (usually six to nine months), under the economic trends existing at the time of the appraisal.

"OFAC" is defined in Section 5.12(b) of the Agreement.

"Officer" means with respect to Company, an officer if Company is a corporation, a manager if Company is a limited liability company, or a partner if Company is a partnership.

"Operating Account" is defined in Section 1.3(a) of the Agreement, and maintained in accordance with the terms of Wells Fargo's Commercial Account Agreement in effect for demand deposit accounts.

"Overadvance" means the amount, if any, by which the unpaid principal amount of the Post-Petition Revolving Note is in excess of the then-existing Borrowing Base.

"Owned Intellectual Property" is defined in **Exhibit D**.

"Owner" means with respect to Company, each Person having legal or beneficial title to an ownership interest in Company or a right to acquire such an interest.

"Patent and Trademark Security Agreement" means each Patent and Trademark Security Agreement entered into between Company and Wells Fargo.

"Pension Plan" means a pension plan (as defined in Section 3(2) of ERISA) maintained for employees of Company or any ERISA Affiliate and covered by Title IV of ERISA.

"Permitted Lien" and "Permitted Liens" are defined in Section 5.3(a) of the Agreement.

"Permitted Overadvance Amount" means from the date hereof through (and including) March 6, 2010, $385,000; from March 7, 2010 through (and including) March 13, 2010, $370,000; from March 14, 2010 through (and including) March 20, 2010, $355,000; from March 21, 2010 through (and including) March 27, 2010, $340,000; and from March 28, 2010 and thereafter, $-0-.

"Permitted Senior Lien" means a Lien upon any of the Collateral which (i) pursuant to the Financing Orders is senior in priority to the Liens granted in favor of Wells Fargo under the Loan Documents and the Financing Orders or (ii) constitutes a Lien for property taxes that are not yet due and payable (unless properly contested).

"Person" means any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision of a governmental entity.

"Petition Date" means March 2, 2010.

"Plan" means an employee benefit plan (as defined in Section 3(3) of ERISA) maintained for employees of Company or any ERISA Affiliate.

"Plank" means Kelly Plank Dworkin, a resident of the State of Georgia.

"Plank Guaranty" means that certain Limited Guaranty Agreement executed by Plank in favor of Wells Fargo on or about October 19, 2009, as at any time amended, modified, restated or reaffirmed.

"Plank Mortgage" means that certain Deed to Secure Debt executed by Plank in favor of Wells Fargo on or about October 19, 2009, pursuant to which Plank has granted to Wells Fargo a security interest in and Lien upon the real property and improvements located at 4128 Northside Drive, N.W., Atlanta, Georgia 30342, to secure the Plank Guaranty, the Pre-Petition Debt and the Indebtedness.

"Plank Subordination Agreement" means that certain Subordination Agreement dated October 19, 2009 between Wells Fargo and Plank, as the same may be amended, modified, restated, or otherwise supplemented from time to time with Wells Fargo's written consent.

"Post-Petition Revolving Note" is defined in Section 1.1(e) of the Agreement.

"Premises" is defined in Section 2.4(a) of the Agreement.

"Pre-Petition Credit Agreement" means the Credit and Security Agreement dated October 19, 2009, between Wells Fargo and Company, as at any time amended, modified, supplemented or restated.

"Pre-Petition Debt" means all Indebtedness (as defined in the Pre-Petition Credit Agreement) and other obligations of Company to Wells Fargo, Wachovia and their affiliates on the Petition Date and arising under any of the Pre-Petition Loan Documents, whether direct or indirect, absolute or contingent or due or to become due, including all interest thereon accruing after the Petition Date and all legal fees and collection expenses heretofore or hereafter incurred in collecting any of such indebtedness.

"Pre-Petition Guaranty" means an unconditional continuing guaranty executed by a Guarantor in favor of Wells Fargo (if more than one, the "Guaranties"), including, without limitation, the Plank Guaranty.

"Pre-Petition Loan Documents" means the Pre-Petition Credit Agreement, the Pre-Petition Revolving Note and all instruments, agreements, pledges, assignments and other documents executed in connection therewith or with reference thereto or to evidence or secure payment of the whole or any part of the Pre-Petition Debt.

"Pre-Petition Revolving Note" means the Revolving Note (as defined in the Pre-Petition Credit Agreement).

"Proceeds" shall have the meaning given it under the UCC.

"Professional Expenses" means the fees and reimbursable expenses of a Professional Person.

"Professional Person" means a Person who is an attorney, accountant, appraiser, auctioneer or other professional person and who is retained, with Court approval, by (i) Company pursuant to Section 327 of the Bankruptcy Code or (ii) a Committee pursuant to Section 1103(a) of the Bankruptcy Code.

"Record" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form, and includes all information that is required to be reported by Company to Wells Fargo pursuant to Section 5.1 of the Agreement.

"Reorganization Plan" means a plan of reorganization filed in the Chapter 11 Case under Section 1121 of the Bankruptcy Code.

"Reportable Event" means a reportable event (as defined in Section 4043 of ERISA), other than an event for which the 30-day notice requirement under ERISA has been waived in regulations issued by the Pension Benefit Guaranty Corporation.

"Sale Motion" means a motion filed by Company with the Court seeking approval to sell all or substantially all of Company's assets, or to approve an agreement by which an agent will sell all or substantially all of Company's assets on behalf of Company, pursuant to Section 363 of the Bankruptcy Code.

"Security Documents" means this Agreement, the Patent and Trademark Security Agreement, the Plank Mortgage, the Life Insurance Assignment, each Control Agreement and any other document delivered to Wells Fargo from time to time to secure the Indebtedness.

"Security Interest" is defined in Section 2.1 of the Agreement.

"Stalking Horse Agreement" shall mean an agreement of a qualified purchaser to purchase all or substantially all of Company's assets, or to sell all or substantially all of Company's assets on behalf of Company, in each case on terms and conditions that are acceptable to Wells Fargo in its discretion.

"Store Account" means any deposit account maintained by Company for the purpose of collecting Proceeds of Inventory and other Collateral (other than Credit Card Receivables), which is subject to the Security Interest and Wells Fargo's exclusive control pursuant to a Control Agreement in form and substance satisfactory to Wells Fargo in its sole discretion.

"Store Funds" is defined in Section 1.6(a) of the Agreement.

"Subordinated Creditor" means Plank and any other Person now or in the future subordinating indebtedness of Company held by that Person to the payment of the Indebtedness.

"Subordination Agreement" means a subordination agreement executed by any Subordinated Creditor in favor of Wells Fargo (if more than one, the "Subordination Agreements"), including, without limitation, the Plank Subordination Agreement and the Investor Subordination Agreements.

"Subsidiary" means any Person of which more than 50% of the outstanding ownership interests having general voting power under ordinary circumstances to elect a majority of the board of directors or the equivalent of such Person, irrespective of whether or not at the time ownership interests of any other class or classes shall have or might have voting power by reason of the happening of any contingency, is at the time directly or indirectly owned by Company, by Company and one or more other Subsidiaries, or by one or more other Subsidiaries.

"Termination Date" is defined in Section 1.1(b) of the Agreement.

"U.S. Trustee" means the Office of the United States Trustee, a division of the United States Department of Justice.

"UCC" means the Uniform Commercial Code in effect in the state designated in this Agreement as the state whose laws shall govern this Agreement, or in any other state whose laws are held to govern this Agreement or any portion of this Agreement.

"Unused Amount" is defined in Section 1.8(b) of the Agreement.

"Wachovia" means Wachovia Bank, National Association, in its broadest and most comprehensive sense as a legal entity.

"Wells Fargo" means Wells Fargo Bank, National Association in its broadest and most comprehensive sense as a legal entity, and is not limited in its meaning to the Wells Fargo Business Credit operating division, or to any other operating division of Wells Fargo.

**Exhibit B to Post-Petition Credit and Security Agreement**

[*Reserved*.]

**Exhibit C to Post-Petition Credit and Security Agreement**

## CONDITIONS PRECEDENT

Wells Fargo's obligation to make an initial Advance shall be subject to the condition that Wells Fargo shall have received the following, executed and in form and content satisfactory to Wells Fargo or the following shall have been satisfied, as applicable. The following descriptions are limited descriptions for reference purposes only and should not be construed as limiting in any way the subject matter that Wells Fargo requires each document to address.

**A.      Loan Documents to be Executed by Company:**

(1)      The **Post-Petition Revolving Note**.

(2)      The **Post-Petition Credit and Security Agreement.**

**B.      Loan Documents to be Executed by Third Parties:**

(1)      the **Guaranty Reaffirmation Agreement** providing the continued guaranty by Plank of the Indebtedness and the Pre-Petition Debt pursuant to the Plank Guaranty;

**C.      Constituent Documents:**

(1)      The **Certificate of Authority** of Company, which shall include as part of the Certificate or as exhibits to the Certificate, the **Resolutions** of Company's Directors and, if required, Owners, authorizing the execution, delivery and performance of the Loan Documents to be executed by Company and the other documents or agreements described in or related to this Agreement to which Company is a party.

**D.      Miscellaneous Matters or Documents:**

(1)      Payment of fees and reimbursable costs and expenses due under this Agreement through the date of initial Advance including, without limitation, all legal expenses incurred through the date of the closing of this Agreement.

(2)      Such financial statements (including, without limitation, income statements), balance sheets, projections (including, without limitation, Company's Budget) and other financial documentation as Wells Fargo in its sole discretion may require.

(3)      Acknowledgments or verification statements of all filings or recordations necessary to perfect Wells Fargo's Liens in the Collateral, as well as Lien searches and other evidence satisfactory to Wells Fargo that upon entry of the Interim Financing Order, and thereafter upon entry of the Final Financing Order, such Liens are the only Liens upon the Collateral, except Permitted Liens subordinated to Wells Fargo's first priority Liens.

(4)      The Interim Financing Order shall have been entered, shall be in full force and effect and shall not have been vacated, reversed, modified or stayed in any respect (and, if such Order is the subject of a pending appeal, no performance of any obligation of any party shall have been stayed pending such appeal).

(5)     All of the "first day orders" presented to the Court at or about the time of the commencement of the Chapter 11 Case (including orders with respect to maintenance of Company's cash management system) shall be satisfactory in form and substance to Wells Fargo.

(6)     There is not pending any motion which, if granted by the Court, would result in an Event of Default.

(7)     Such other documents as Wells Fargo may reasonably require.

**Exhibit D to Post-Petition Credit and Security Agreement**

<u>**REPRESENTATIONS AND WARRANTIES**</u>

Company represents and warrants to Wells Fargo as follows:

(a)     <u>Existence and Power; Name; Chief Executive Office; Inventory and Equipment Locations;
Federal Employer Identification Number and Organizational Identification Number</u>.  Company is
a corporation organized, validly existing and in good standing under the laws of the State of
Delaware and is licensed or qualified to transact business in all jurisdictions where the character
of the property owned or leased or the nature of the business transacted by it makes such
licensing or qualification necessary, and the failure to so qualify could reasonably be anticipated
to have a Material Adverse Effect.  Company has all requisite power and authority to conduct its
business, to own its properties and to execute and deliver, and to perform all of its obligations
under, those Loan Documents and any other documents or agreements that it has entered into
with Wells Fargo related to this Agreement.  During its existence, Company has done business
solely under the names set forth in the Pre-Petition Credit Agreement in addition to its correct
legal name.  Company's chief executive office and principal place of business is located at the
address set forth in the Pre-Petition Credit Agreement, and all of Company's records relating to its
business or the Collateral are kept at that location.  All Inventory and Equipment is located at that
location or at one of the other locations set forth in the Pre-Petition Credit Agreement and shall at
all times be kept by Company at such location as of the Petition Date and shall not be moved
therefrom, without the prior written approval of Wells Fargo or order of the Court.  Company's
name, Federal Employer Identification Number and Organization Identification Number are
correctly set forth at the end of the Agreement next to Company's signature.

(b)     <u>Capitalization</u>.  The List of Equity Holders filed at Docket Number 1 in the Chapter 11 Case
constitutes a correct and complete list of all ownership interests of Company.

(c)     <u>Authorization of Borrowing; No Conflict as to Law or Agreements</u>.  The execution, delivery and
performance by Company of the Loan Documents and any other documents or agreements
described in or related to this Agreement, and all borrowing under the DIP Facility have been
authorized, on the date of the initial Advance hereunder, will be authorized by the Interim
Financing Order pursuant to Sections 363 and 364 of the Bankruptcy Code and do not (i) require
the consent or approval of Company's Owners (to the extent not previously received); (ii) require
the authorization, consent or approval by, or registration, declaration or filing with, or notice to,
any governmental agency or instrumentality, whether domestic or foreign, or any other Person,
except to the extent obtained, accomplished or given prior to the date of this Agreement and the
entry by the Court of the Interim Financing Order and thereafter the Final Financing Order;
(iii) following entry of the Interim Financing Order, violate any provision of any law, rule or
regulation (including, without limitation, Regulation X of the Board of Governors of the Federal
Reserve System) or of any order, writ, injunction or decree presently in effect having applicability
to Company or of Company's Constituent Documents; (iv) result in a breach of or constitute a
default or event of default under any indenture or loan or credit agreement or any other material
agreement, lease or instrument to which Company is a party or by which it or its properties may
be bound or affected; or (v) result in, or require, the creation or imposition of any Lien (other than
the Security Interest) upon or with respect to any of the properties now owned or subsequently
acquired by Company.

D-1

(d)     <u>Legal Agreements</u>.  This Agreement, the other Loan Documents, and any other document or agreement described in or related to this Agreement, will constitute the legal, valid and binding obligations of Company, enforceable against Company in accordance with their respective terms.

(e)     <u>Subsidiaries</u>.  Except as disclosed in the Pre-Petition Credit Agreement, Company has no Subsidiaries.

(f)     <u>Reserved</u>.

(g)     <u>Reserved</u>.

(h)     <u>Intellectual Property Rights</u>.

(i)     <u>Owned Intellectual Property</u>.  Set forth in the Pre-Petition Credit Agreement is a complete list of all patents, applications for patents, trademarks, applications to register trademarks, service marks, applications to register service marks, mask works, trade dress and copyrights for which Company is the owner of record (the "<u>Owned Intellectual Property</u>"). Except as set forth in the Pre-Petition Credit Agreement, as of the date hereof, (A) Company owns the Owned Intellectual Property free and clear of all restrictions (including, without limitation, covenants not to sue any Person), court orders, injunctions, decrees, writs or Liens, whether by agreement memorialized in a Record Authenticated by Company or otherwise, (B) no Person other than Company owns or has been granted any right in the Owned Intellectual Property, (C) all Owned Intellectual Property is valid, subsisting and enforceable, and (D) Company has taken all commercially reasonable action necessary to maintain and protect the Owned Intellectual Property.

(ii)     <u>Agreements with Employees and Contractors</u>.  Company has entered into a legally enforceable agreement with each Officer set forth in the Pre-Petition Credit Agreement to assign to Company, without additional compensation, any Intellectual Property Rights created, discovered or invented by that Person in the course of that Person's employment or engagement with Company (except to the extent prohibited by law), and further obligating that Person to cooperate with Company, without additional compensation, to secure and enforce the Intellectual Property Rights on behalf of Company, unless the job description of the Person is such that it is not reasonably foreseeable that the employee or subcontractor will create, discover, or invent Intellectual Property Rights.

(iii)     <u>Intellectual Property Rights Licensed from Others</u>.  Set forth in the Pre-Petition Credit Agreement is a complete list of all agreements under which Company has licensed Intellectual Property Rights from another Person ("<u>Licensed Intellectual Property</u>") other than readily available, non-negotiated licenses of computer software and other intellectual property used solely for performing accounting, word processing and similar administrative tasks ("<u>Off-the-shelf Software</u>") and a summary of any ongoing payments Company is obligated to make with respect to Licensed Intellectual Property.  Except as set forth in the Pre-Petition Credit Agreement or in any other Record, copies of which have been given to Wells Fargo, Company's licenses to use the Licensed Intellectual Property are free and clear of all restrictions, Liens, court orders, injunctions, decrees, or writs, whether agreed to in a Record Authenticated by Company or otherwise.  Except as disclosed in the Pre-Petition Credit Agreement, as of the date hereof, Company is not contractually obligated to make royalty payments of a material nature, or pay fees to any owner of, licensor of, or other claimant to, any Intellectual Property Rights.

(iv)    Other Intellectual Property Needed for Business.  Except for Off-the-shelf Software and as disclosed in the Pre-Petition Credit Agreement, as of the date hereof, the Owned Intellectual Property and the Licensed Intellectual Property constitute all Intellectual Property Rights used or necessary to conduct Company's business as it is presently conducted or as Company reasonably foresees conducting it.

(v)    Infringement.  Except as disclosed in the Pre-Petition Credit Agreement, Company has no knowledge of, and has not received notice either orally or in a Record alleging, any Infringement of another Person's Intellectual Property Rights (including, without limitation, any claim set forth in a Record that Company must license or refrain from using the Intellectual Property Rights of any Person) nor, to Company's knowledge, is there any threatened claim or any reasonable basis for any such claim.

(i)    Taxes.  Company and its Affiliates have paid or caused to be paid to the proper authorities when due all federal, state and local taxes required to be withheld by each of them that arose after the Petition Date (except for taxes the amount, applicability or validity of which are being contested diligently and in good faith by Company and adequate provisions for which have been made by Company).  Company and its Affiliates have filed all federal, state and local tax returns which to the knowledge of the Officers of Company or any Affiliate, as the case may be, are required to be filed after the Petition Date, and Company and its Affiliates have paid or caused to be paid to the respective taxing authorities all taxes as shown on these returns or on any assessment received by any of them to the extent such taxes arise and have become due after the Petition Date.

(j)    Titles and Liens.  Company has good and absolute title to all Collateral free and clear of all Liens other than Permitted Liens.  No financing statement naming Company as debtor is on file in any office except to perfect only Permitted Liens.

(k)    No Defaults.  Except as disclosed in the Pre-Petition Credit Agreement, Company is in compliance with all provisions of all agreements, instruments, decrees and orders to which it is a party or by which it or its property is bound or affected, the breach or default of which could have a Material Adverse Effect on Company's financial condition, properties or operations .

(l)    Submissions to Wells Fargo.  All financial and other information provided to Wells Fargo by or on behalf of Company in connection with this Agreement (i) is true and correct in all material respects, (ii) does not omit any material fact that would cause such information to be misleading, and (iii) as to projections, valuations or pro forma financial statements, presents a good faith estimate as to such projections, valuations and pro forma condition and results (but in no event shall be deemed a guarantee of such results).

(m)    Financing Statements.  Company has previously authorized the filing of financing statements sufficient when filed to perfect the Security Interest and other Liens created by the Security Documents.  When the Interim Financing Order is entered, Wells Fargo will have a valid and perfected security interest in all Collateral.  None of the Collateral is or will become a fixture on real estate, unless a sufficient fixture filing has been filed with respect to such Collateral.

(n)    Rights to Payment.  Each right to payment and each instrument, document, chattel paper and other agreement constituting or evidencing Collateral is (or, in the case of all future Collateral, will be when arising or issued) the valid, genuine and legally enforceable obligation of the account debtor or other obligor named in that instrument.

(o)    Employee Benefit Plans.

(i)    <u>Maintenance and Contributions to Plans</u>.  Except as disclosed in the Pre-Petition Credit Agreement, neither Company nor any ERISA Affiliate (A) maintains or has maintained any Pension Plan, (B) contributes or has contributed to any Multiemployer Plan, or (C) provides or has provided post-retirement medical or insurance benefits to employees or former employees (other than benefits required under Section 601 of ERISA, Section 4980B of the IRC, or applicable state law).

(ii)    <u>Knowledge of Plan Noncompliance with Applicable Law</u>.  Except as disclosed in the Pre-Petition Credit Agreement, neither Company nor any ERISA Affiliate has (A) knowledge that Company or the ERISA Affiliate is not in full compliance with the requirements of ERISA, the IRC, or applicable state law with respect to any Plan, (B) knowledge that a Reportable Event occurred or continues to exist in connection with any Pension Plan, or (C) sponsored a Plan that it intends to maintain as qualified under the IRC that is not so qualified, and no fact or circumstance exists which may have an adverse effect on such Plan's tax-qualified status.

(iii)    <u>Funding Deficiencies and Other Liabilities</u>.  Neither Company nor any ERISA Affiliate has liability for any (A) accumulated funding deficiency (as defined in Section 302 of ERISA and Section 412 of the IRC) under any Plan, whether or not waived, (B) withdrawal, partial withdrawal, reorganization or other event under any Multiemployer Plan under Section 4201 or 4243 of ERISA, or (C) event or circumstance which could result in financial obligation to the Pension Benefit Guaranty Corporation, the Internal Revenue Service, the Department of Labor or any participant in connection with any Plan (other than routine claims for benefits under the Plan).

(p)    <u>Environmental Matters</u>.

(i)    <u>Hazardous Substances on Premises</u>.  Except as disclosed in the Pre-Petition Credit Agreement, to Company's knowledge (but without investigation), there are not present in, on or under the Premises any Hazardous Substances in such form or quantity as to create any material liability or obligation for either Company or Wells Fargo under the common law of any jurisdiction or under any Environmental Law.

(ii)    <u>Disposal of Hazardous Substances</u>.  Except as disclosed in the Pre-Petition Credit Agreement, Company has not disposed of Hazardous Substances in such a manner as to create any material liability under any Environmental Law.

(iii)    <u>Claims and Proceedings with Respect to Environmental Law Compliance</u>. Except as disclosed in the Pre-Petition Credit Agreement, to Company's knowledge there are not any impending requests, claims, notices, investigations, demands, administrative proceedings, hearings or litigation relating in any way to the Premises or Company, alleging material liability under, violation of, or noncompliance with any Environmental Law or any license, permit or other authorization issued pursuant to such an Environmental Law.

(iv)    <u>Compliance with Environmental Law; Permits and Authorizations</u>.  Except as disclosed in the Pre-Petition Credit Agreement, Company (A) conducts its business at all times in material compliance with applicable Environmental Law, (B) possesses valid licenses, permits and other authorizations required under applicable Environmental Law for the lawful and efficient operation of its business, none of which are scheduled to expire, or for withdrawal or material limitation within the next 12 months, and (C) has not been denied insurance on grounds related to potential environmental liability.

       (v)   <u>Environmental Audits, Reports, Permits and Licenses</u>.  Company has delivered to Wells Fargo all environmental assessments, audits, reports, permits, licenses and other documents describing or relating in any way to the Premises or Company's businesses which Company has in its possession.

All of the foregoing representations and warranties made by Company in this Agreement or in any of the other Loan Documents shall survive the execution and delivery of this Agreement and such other Loan Documents, and shall be deemed to have been remade and reaffirmed on each day that any Indebtedness is outstanding or that Company requests or is deemed to have requested an Advance under the DIP Facility, except for changes that may occur after the date hereof in the ordinary course of business as long as Wells Fargo has consented to such changes or such changes are not violative of any provision of this Agreement.

**Exhibit E to Post-Petition Credit and Security Agreement**

[Intentionally Deleted]

**Exhibit F to Post-Petition Credit and Security Agreement**

**PERMITTED LIENS**

| Creditor | Jurisdiction | File Number | Filing Date | Collateral |
|---|---|---|---|---|
| Heritage Pacific Leasing | Delaware Secretary of State | 4311682 1 | 10/29/04 (amendment filed on 1/26/2005) | Specific Equipment |
| Heritage Pacific Leasing | Delaware Secretary of State | 4311684 7 | 10/29/04 (amendment filed on 11/18/04) | Specific equipment |
| Heritage Pacific Leasing | Delaware Secretary of State | 4311685 4 | 10/29/04 | Specific equipment |
| Heritage Pacific Leasing | Delaware Secretary of State | 4311720 9 | 10/29/04 (amendment filed on 12/6/04) | Specific equipment |
| Evans National Leasing, Inc. | Delaware Secretary of State | 5353531 8 | 11/15/05 | Specific equipment |
| Evans National Leasing, Inc. | Delaware Secretary of State | 5353555 7 | 11/15/05 | Specific equipment |
| Royal Bank America Leasing | Delaware Secretary of State | 6367637 6 | 10/3/06 | Specific equipment |
| Royal Bank America Leasing | Delaware Secretary of State | 6394981 5 | 10/26/06 | Specific equipment |
| LEAF Funding Inc. | Delaware Secretary of State | 2007 0341833 | 1/26/07 | Specific equipment |
| Susquehanna Commercial Finance, Inc. | Delaware Secretary of State | 2007 0446251 | 2/1/07 | Specific equipment |
| General Electric Capital Corporation | Delaware Secretary of State | 2007 0939024 | 3/8/07 | Specific equipment |

| Creditor | Jurisdiction | File Number | Filing Date | Collateral |
|---|---|---|---|---|
| Heritage Pacific Leasing | Fulton County, Georgia | 060-2004-014025 | 11/3/04 (amendment filed on 1/31/05) | Specific equipment |
| Heritage Pacific Leasing | Fulton County, Georgia | 060-2004-014026 | 11/3/04 (amendment filed on 11/22/04 to add equipment) | Specific equipment |
| Heritage Pacific Leasing | Fulton County, Georgia | 060-2004-014027 | 11/3/04 (amendment filed on 12/7/04) | Specific equipment |
| Heritage Pacific Leasing | Fulton County, Georgia | 060-2005-001994 | 2/15/05 (amendment filed on 3/7/05) | Specific equipment |
| CFC Investment Company | Fulton County, Georgia | 060-2005-011356 | 9/12/05 | Specific equipment |
| CFC Investment Company | Fulton County, Georgia | 060-2005-013340 | 10/24/05 | Specific equipment |
| The Leasing Experts, Inc. Mainstreet Bank | Barrow County, Georgia | 007-2006-005492 | 3/31/06 | Specific equipment |
| Leaf Funding, Inc. | Barrow County, Georgia | 007-2007-024265 | 11/29/07 | Specific equipment |
| Financial Pacific Leasing, LLC Assigned to: Wells Fargo Bank N.A. | Barrow County, Georgia | 007-2005-017861 | 12/2/05 | Specific equipment |
| BB&T Equipment Finance | Fulton County, Georgia | 060-2008-002837 | 3/13/08 | Specific equipment (computer hardware and software) |

| Creditor | Jurisdiction | File Number | Filing Date | Collateral |
|---|---|---|---|---|
| BB&T Equipment Finance | Fulton County, Georgia | 060-2008-002838 | 3/13/08 | Specific equipment (computer hardware and software) |
| Dell Financial Services L.P. | Cobb County, Georgia | 033-2007-007614 | 8/6/07 | Specific equipment (computer equipment) |
| US Bancorp | Barrow County, Georgia | 007-2004-015162 | 11/5/04 | Specific equipment |

**Exhibit G to Post-Petition Credit and Security Agreement**

## **<u>BUDGET</u>**

**Swoozies, Inc.**

**Interim DIP Budget**

| For the week ending, Saturday | | Week 1 Budget 3/2/10 - 3/6/10 | Week 2 Budget 3/13/2010 | Week 3 Budget 3/20/2010 | Week 4 Budget 3/27/2010 | Budget Totals |
|---|---|---|---|---|---|---|
| Forecasted Receipts | $ | 306,400.0 | $ 356,400.0 | $ 356,400.0 | $ 356,400.0 | $ 1,375,600.0 |
| DISBURSEMENTS: | | | | | | |
| Total Sales Tax | | - | 24,699.7 | - | - | 24,699.7 |
| Total Oustanding Checks, net | | - | - | - | - | - |
| Total Occupancy Costs | | - | - | - | 536,000.0 | 536,000.0 |
| Total Vendor Payments | | 26,241.3 | 26,241.3 | 26,241.3 | 21,241.3 | 99,965.4 |
| Subtotal Other Operating overheads | | 17,667.1 | 342,667.1 | 17,667.1 | 342,667.1 | 720,668.2 |
| Total Operating overheads | | 43,908.4 | 393,608.1 | 43,908.4 | 899,908.4 | 1,381,333.3 |
| Subtotal Estate overheads | | 425,673.6 | 3,600.0 | 3,600.0 | 3,600.0 | 436,473.6 |
| Total Other Overhead (Operating & Estate) | | 443,340.7 | 346,267.1 | 21,267.1 | 346,267.1 | 1,157,141.8 |
| Professional Fees: | | | | | | |
| Total Professional Fees | | 15,000.0 | 15,000.0 | 15,000.0 | 15,000.0 | 60,000.0 |
| Total Cash Disbursements | | 484,582.0 | 412,208.1 | 62,508.4 | 918,508.4 | 1,877,806.9 |
| NET CASH FLOW | $ | (178,182.0) | $ (55,808.1) | $ 293,891.6 | $ (562,108.4) | $ (502,206.9) |
| CUMULATIVE NET CASH FLOW (post petition) | | (178,182.0) | (233,990.1) | 59,901.5 | (502,206.9) | (502,206.9) |

| Post-Petition Interim DIP Loan Balance | | Week 1 Budget 3/2/10 - 3/6/10 | Week 2 Budget 3/13/2010 | Week 3 Budget 3/20/2010 | Week 4 Budget 3/27/2010 | Budget Totals |
|---|---|---|---|---|---|---|
| Loan Summary | | | | | | |
| Beginning Loan Balance | $ | 2,952,335.9 | $ 3,135,201.9 | $ 3,195,984.1 | $ 2,907,163.0 | $ 2,952,335.9 |
| Less: Collections/Deposits | | (306,400.0) | (356,400.0) | (356,400.0) | (356,400.0) | (1,375,600.0) |
| Advances | | 484,582.0 | 412,208.1 | 62,508.4 | 918,508.4 | 1,877,806.9 |
| Interest, Fees, Other | | 4,684.0 | 4,974.1 | 5,070.6 | 4,612.3 | 19,341.0 |
| Ending Loan Balance | $ | 3,135,201.9 | $ 3,195,984.1 | $ 3,473,883.7 | $ 3,473,883.7 | $ 3,473,883.7 |

***Note:  It is the goal of the Company to have an auction and sale hearing completed during the week ending 3/27/10.  For the purposes of this analysis there have not been any provisions made to account for either the sale proceeds or the eventual payoff to the DIP Lender (Wells Fargo Business Credit).  However the Company is currently seeking

**The accompanying financial information is based on information provided by Swoozies, Inc
Clear Thinking Group has not audited or otherwise verified the information provided to us, nor will we provide any assurances
as concerning the reliability, accuracy, or completeness of any materials provided by or on behalf of Swoozies, Inc