## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SWOOZIE'S, INC.,[1] | ) | Case No. 10-66316-CRM |
| | ) | |
| Debtor. | ) | |

**NOTICE OF HEARING TO CONSIDER THE "INITIAL RELIEF"
REQUESTED IN THE MOTION OF DEBTOR FOR ORDERS (A)
(I) APPROVING SALE PROCEDURES AND BIDDING PROTECTIONS
TO BE EMPLOYED IN CONNECTION WITH THE PROPOSED SALE OF
DEBTOR'S ASSETS, (II) SCHEDULING AN AUCTION AND HEARING TO
CONSIDER APPROVAL OF THE SALE OF DEBTOR'S ASSETS, AND
(III) APPROVING NOTICE OF RESPECTIVE DATES, TIMES, AND PLACES
FOR AUCTION AND FOR HEARING ON APPROVAL OF SALE OF ASSETS;
AND (B)(I) AUTHORIZING AND APPROVING THE ASSET PURCHASE,
AGENCY, AND LEASE DESIGNATION RIGHTS AGREEMENTS WITH
HUDSON CAPITAL PARTNERS, LLC, OR SUCH OTHER PURCHASER(S)
PROVIDING HIGHER OR OTHERWISE BETTER OFFER(S), (II)
AUTHORIZING THE SALE OF DEBTOR'S ASSETS, FREE AND CLEAR OF
ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS,
(III) AUTHORIZING DEBTOR TO CONSUMMATE ALL TRANSACTIONS
RELATED TO THE ABOVE, AND (IV) GRANTING OTHER RELIEF**

Please take notice that a hearing to consider the Initial Relief (as such term is

defined below) requested in the attached Motion of the above-captioned debtor and

debtor in possession (the "**Debtor**") for orders (A)(I) approving the sale procedures and

bidding protections (collectively, the "**Bidding Procedures**") to be employed in

connection with the proposed sale (the "**Sale**") of substantially all of Debtor's assets (the

"**Assets**") pursuant to Section 363 of the United States Bankruptcy Code, (II) scheduling

an auction and hearing to consider approval of the Sale of the Assets to Hudson Capital

Partners, LLC (the "**Stalking Horse**"), or such other purchaser(s) providing a higher or

---

[1] The last four digits of Debtor's taxpayer identification number are 5738 and Debtor's mailing address is
80 W. Wieuca Road, Suite 302, Atlanta, GA 30342.

otherwise better offer for any or all of the Assets; (III) approving notice of the respective dates, times, and places for an auction and for the hearing on approval of the Sale (the relief requested in such items (A)(I) through (III) is collectively referred to herein as the "**Initial Relief**"); will be held before The Honorable C. Ray Mullins, United States Bankruptcy Judge, in Courtroom 1203, United States Bankruptcy Court, 75 Spring Street, S.W., Atlanta, Georgia 30303, on **March 5, 2010 at 2:00 p.m.** (Eastern Time) (the "**Bidding Procedures Hearing**"). Any party having any objection to the Initial Relief sought in the Motion must appear at the Bidding Procedures Hearing.

Dated: March 4, 2010

ALSTON & BIRD LLP

/s/ Wendy R. Reiss
Dennis J. Connolly (Bar No. 182275)
Wendy R. Reiss (Bar No.600295)
Sage M. Sigler (Bar No. 300707)
1201 West Peachtree Street
Atlanta, GA 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777

Proposed Attorneys for Debtor

## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SWOOZIE'S, INC.,[1] | ) | Case No. 10-66316-CRM |
| | ) | |
| Debtor. | ) | |

**MOTION OF DEBTOR FOR ORDERS (A) (I) APPROVING SALE
PROCEDURES AND BIDDING PROTECTIONS TO BE EMPLOYED IN
CONNECTION WITH THE PROPOSED SALE OF DEBTOR'S ASSETS,
(II) SCHEDULING AN AUCTION AND HEARING TO CONSIDER
APPROVAL OF THE SALE OF DEBTOR'S ASSETS, AND (III) APPROVING
NOTICE OF RESPECTIVE DATES, TIMES, AND PLACES FOR AUCTION
AND FOR HEARING ON APPROVAL OF SALE OF ASSETS; AND
(B)(I) AUTHORIZING AND APPROVING THE ASSET PURCHASE, AGENCY,
AND LEASE DESIGNATION RIGHTS AGREEMENTS WITH HUDSON
CAPITAL PARTNERS, LLC, OR SUCH OTHER PURCHASER(S)
PROVIDING HIGHER OR OTHERWISE BETTER OFFER(S), (II)
AUTHORIZING THE SALE OF DEBTOR'S ASSETS, FREE AND CLEAR OF
ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS,
(III) AUTHORIZING DEBTOR TO CONSUMMATE ALL TRANSACTIONS
RELATED TO THE ABOVE, AND (IV) GRANTING OTHER RELIEF**

The above-captioned debtor and debtor in possession ("**Debtor**"), by and through

its undersigned attorneys, hereby submits this motion (the "**Motion**") for orders (A) (I)

approving sale procedures and bidding protections to be employed in connection with the

proposed sale (the "**Sale**") of substantially all of Debtor's assets (collectively, the

"**Assets**"), (II) scheduling an auction (the "**Auction**") and a hearing (the "**Sale Hearing**")

to consider approval of the Sale and other related relief, and (III) approving the proposed

notice of the respective dates, times, and places for the auction and for the Sale Hearing

(the relief requested in such items (A)(I) through (III) is collectively referred to herein as

---

[1]  The last four digits of Debtor's taxpayer identification number are 5738 and Debtor's mailing address is
80 W. Wieuca Road, Suite 302, Atlanta, GA 30342.

the "**Initial Relief**"); and (B)(I) authorizing and approving proposed asset purchase, agency, and lease designation rights agreements with Hudson Capital Partners, LLC ("**Hudson Capital**" or the "**Stalking Horse**"), or such other purchaser providing a higher or otherwise better offer for the Assets; (II) authorizing the Sale of the Assets free and clear of all liens, claims, encumbrances, and other interests; (III) authorizing Debtor to consummate all transactions related to the above; and (IV) granting other relief; and in support thereof, respectfully state as follows:

## JURISDICTION

1.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these proceedings, and this Motion, is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The statutory predicates for the relief sought herein are Sections 105(a) and 363 of the Bankruptcy Code and Rules 2002, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

## BACKGROUND

3.     On March 2, 2010 (the "**Petition Date**"), Debtor commenced a voluntary case under Chapter 11 of the Bankruptcy Code (the "**Bankruptcy Case**").  Debtor is authorized to operate its business and manage its properties as debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

4.     No trustee or examiner has been appointed in this Bankruptcy Case and the United States Trustee has not yet appointed an official committee of unsecured creditors.

**Debtor's Business**

5.      Debtor is a specialty retailer focusing on the art of giving, home entertaining and life celebrations.  Debtor offers a broad combination of products and services ranging from invitations and custom printing to housewares and party goods. Founded in 1999 and based in Atlanta, Georgia, Debtor employs 350 employees in 43 stores and a corporate headquarters.  Debtor opened its first store in February 2001 and now operates stores in 14 states across the Southeast, Northeast, Texas and California.

**Events Leading to Chapter 11**

6.      There are three major contributing factors to Debtor's lowered sales results.  First, in February 2009, Debtor entered the Northeast market through its purchase of 13 Blue Tulip stores, a chain of stores specializing in similar gift and social stationery consumer segments, out of bankruptcy.  The impact of Blue Tulip's liquidation sale and the stores going "dark" for one month prior to the grand opening of the Swoozie's brand in the previous Blue Tulip locations had a deeper impact on customer retention than was anticipated.  The assumptions for Debtor's 2009 sales plan predicted that sales in the Northeast would reach an estimated $12.8 Million, however, actual resulting sales figures were approximately $8.5 Million, missing the target numbers by over $4 Million.

7.      Second, around the same time as Debtor's purchase of the Blue Tulip stores, there was a seismic shift in the economy which was especially felt in Debtor's industry.  Consumer behavior drastically changed as consumers pulled back on spending associated with paper, invitations, party goods, life celebrations and home accessories. Debtor's industry as a whole has been affected by the changing economic climate and resulting changes in consumer behavior.  By way of example, as of December 2009, sales

- 3 -

for manufacturers of paper and invitations were off target by approximately 28 percent nationwide, and approximately 35 percent in the Northeast.

8.    Finally, in the second quarter of 2009, Debtor had the opportunity to improve its sales figures as new categories of products were tested to offset the decline in consumer desire for paper and invitations, and those new products performed exceptionally well.  However, to realize the opportunity for growth, Debtor required capital and, accordingly, sought a loan from a number of sources, including Wells Fargo Capital Finance ("**Wells Fargo**").

9.    Debtor and Wells Fargo were in the process of closing the loan in the third quarter of 2009 when a number of negative converging factors, the most notable of which was the loss of Debtor's Chief Financial Officer and Chief Operating Officer (the "**CFO/COO**"), delayed the closing of the loan.  Due to this delay and the loss of Debtor's CFO/COO, Debtor operated without a CFO/COO from July 2009 through November 2009 and was not able to properly keep control of its inventory and related business finances.  Furthermore, because the capital infusion was delayed, Debtor was unable to purchase new inventory or timely pay its vendors for delivered product.  As a result, Debtor's sales missed targets by $2.2 Million.

10.    While Debtor did eventually close the loan with Wells Fargo in October 2009, the damage associated with the delay was irreparable.  Debtor's inability to react to trend, aging inventory and a delayed holiday set-up of over four weeks resulted in Debtor's worst performance in its history.

11.    Given its losses in the third and fourth quarters of 2009, combined with the uncertainty facing the U.S. economy and the lack of consumer spending, Debtor

cannot sustain further projected losses. In order to maximize return to all creditors through a sale, whether as a going-concern or through an orderly liquidation, Debtor decided to file the instant Bankruptcy Case.

12. Additional information about Debtor's business and the events leading up to the commencement of the Bankruptcy Case can be found in the Declaration of Kelly Plank-Dworkin in Support of Chapter 11 Petition and First Day Motions ("**Plank-Dworkin Declaration**") which is incorporated herein by reference.

**Debtor's Prepetition Debt Structure**

13. Debtor is party to that certain Credit Facility Agreement (the "**Prepetition Credit Agreement**"), dated as of October 19, 2009 as amended, by and between the Borrower and Wells Fargo Capital Finance, LLC ("**Wells Fargo**" or "**Prepetition Lender**" or "**Secured Party**"). Pursuant to the Prepetition Credit Agremeent, the Prepetition Lender extended a working capital facility providing for a Revolving Credit Loan (the "**Prepetition Loan Documents**"). As of the Petition Date, Debtor was indebted to the Prepetition Lender in the approximate amount under the Revolving Credit Loan of approximately $3,100,000, which was secured by substantially all of Debtor's personal property (the "**Prepetition Collateral**").

14. Debtor is also party to that certain Secured Promissory Note dated February 25, 2009, as amended and restated, entered into between Debtor and Crane & Co., Inc. ("**Crane**"). As of the Petition Date, Debtor was indebted to Crane, on account of the Secured Promissory Note (the "**Crane Promissory Note**"), in the principal sum of $196,000, plus interest accrued and accruing, costs, fees and professional fees and expenses, and all other "obligations" as defined in the Crane Promissory Note. In

addition, Debtor entered into that certain Security Agreement (the "**Crane Security Agreement**"), dated February 25, 2009, by and between Debtor and Crane for the benefit of Crane, in which Debtor secured payment of all of its obligations under the Crane Promissory Note by granting to Crane a security interest in all of Debtor's present and future inventory, goods, merchandise and other tangible personal property with any and all additions, accessions and attachments thereto and substitutions, replacements, proceeds (including, without limitation, insurance proceeds) and products therefrom and thereof (collectively, the "**Crane Collateral**").

15.    All of the obligations due and owing to Crane are subject to that certain Intercreditor Agreement dated as of October 19, 2009 by and between the Prepetition Lender and Crane, as the same may have been amended or modified from time to time (the "**Intercreditor Agreement**").

16.    Additionally, other creditors assert security interests in individual pieces of Debtor's equipment (collectively, these parties are the "**Equipment Creditors**").

### Debtor's Postpetition Credit Facility

17.    By an Order entered on March 4, 2010, the Court approved, on an interim basis, Debtor's entry into a secured revolving credit facility (the "**DIP Facility**") with Wells Fargo Bank, N.A. (the "**DIP Lender**") pursuant to which Debtor may obtain loans from time to time (the "**DIP Loans**"), in an aggregate amount up to $3,500,000 outstanding at any time, secured by all assets of Debtor.

18.    The DIP Facility matures on April 15, 2010. Additionally, it is an Event of Default under the DIP Facility if the Sale Hearing does not occur on or prior to March

29, 2010.  It is therefore imperative that Debtor effectuate a sale of substantially all of its assets prior to that time.

### Marketing Efforts and Proposed Sale

19.    Given Debtor's reduced revenues and continued losses during 2009, Debtor analyzed all of its options regarding a going concern sale outside of bankruptcy and marketed its assets to a number of potential going concern buyers including Books-A-Million and Tiger Capital.  Beginning in December 2009, Debtor retained a marketing consultant to create a marketing package that was distributed to twenty (20) strategic buyers.  As a result, Debtor had in-depth discussions with at least nine strategic buyers. Debtor also contacted and met with an investment banking firm who sought to find a strategic fit for a merger opportunity.   Additionally, Debtor contacted two firms that considered making mezzanine loans to support a capital infusion.

20.    After discussions with its professionals and lender, Debtor ultimately determined that a quick sale of its assets, pursuant to the applicable provisions of the Bankruptcy Code, was in the best interests of Debtor and its creditors.  As a result, in December 2009, Debtor began preparing for such a scenario.  For example, Debtor stopped taking special orders from customers and stopped purchasing new inventory except for inventory needed to fulfill outstanding, pre-paid in full, orders for customers.

21.    In addition, Debtor retained Clear Thinking Group, LLC ("**CTG**") to assist in an analysis of a sale as well as a proposed plan for either a sale to a going concern purchaser or the hiring of a liquidator to liquidate Debtor's remaining assets, all with the intention of receiving the highest and best value for the assets.  Beginning in February 2010, Debtor and CTG put together a package of information that interested

going concern purchasers and liquidators would need to make a proposal regarding Debtor's assets (the "**Proposal Package**"). CTG contacted over 40, combined, going concern purchasers and liquidators to gauge their interest regarding Debtor's assets including: American Retail Group, Buxbaum Group, Fuel Break Capital Partners, Gordon Brothers Group, LLC, Great American Group, Hilco Merchant Resources, LLC, Hudson Capital Partners, LLC, SB Capital Group, Talon Merchant Capital, The Nassi Group, LLC, Tiger Capital Group, Bed Bath & Beyond, Books-A-Million, Cracker Barrel, Dollar Tree, Kate's Paperies, MudPie, Things Remembered, Big Lots Capital, Angel Fund Network, Apex Fundamental Partners LLC Blackstreet Capital Management, LLC, Chatham Capital, Chestnut Hill Partners, LLC, Comvest Group, Crystal Capital Fund, Edmonds Capital, Eureka Growth Capital, Golden Gate Capital, Greystone Private Equity, H.I.G. Capital/Bayside Capital, Insight Holdings, Longroad Asset Management, Marlin Equity Partners, Oak Hill Capital Partners, Summit Investment Management, Sun Capital Partners, Inc., Thompson Street Capital Partners, LP, Versa Capital Management, Inc.

22.    Nondisclosure agreements were signed with many of the interested parties and those parties were given access to a data room containing key information about Debtor including (a) information regarding store sales and expenses information; (b) inventory information; (c) lease information; (d) other fixed asset information; and (e) other miscellaneous information including copyright and trademark and employee turnover information. The Proposal Package included a process letter and a form asset purchase agreement and a form agency agreement that will serve as the basis for a sale of the inventory, furniture, fixtures and equipment and/or a global bid on all of Debtor's

- 8 -

assets including Debtor's leased real estate.  A bid deadline was set for all bids to be received by 4:00 p.m. on March 2, 2010.

23.      In response to the Proposal Package, Debtor received numerous bids from potential purchasers to be the stalking horse bidder at an auction of Debtor's assets, and numerous other indications of interest from parties that have indicated intent to bid at an auction.  From these bids, Debtor, in consultation with its financial advisors, has identified Hudson Capital's offer to enter into an agency agreement (the "**Agency Agreement**," attached hereto as <u>Exhibit A</u>), an asset purchase agreement (the "**APA**," attached hereto as <u>Exhibit B</u>), and a lease designation rights agreement (the "**Designation Rights Agreement**," attached hereto as <u>Exhibit C</u>) (collectively, the "**Stalking Horse Bid**") with Debtor as being the highest and best offer and an appropriate Stalking Horse Bid at the Auction of Debtor's Assets.

24.      It is imperative that Debtor have a going concern sale or liquidator approved and in place before the end of March.  First, as a part of the proposed debtor in possession financing, Debtor's secured lender has insisted as a condition to providing financing that Debtor have a sale or liquidator approved and in place prior to the end of March.  Also, because Debtor is no longer purchasing inventory, it may not produce enough revenue to cover its expenses and not having any availability under the DIP Facility should Debtor not have a going concern buyer or a liquidator in place prior to that time.  The DIP Loans are based on a borrowing base that is largely dependent on Debtor's inventory levels, which continue to drop as Debtor has not been in a position to purchase any new inventory for sale since early December.  As a result, Debtor's availability under its financing facility will continue to deteriorate.  Additionally, Debtor

faces a continued decline in employee morale given its current financial situation.  Debtor does not believe it will be able to keep the necessary employees in place to continue operations beyond the end of March 2010.

25.    The immediate sale is critical to maximizing the purchase price of Debtor's assets.  Debtor believes that the price going concern buyers or liquidators would be willing to pay for Debtor's assets will decline rapidly if approval of the sale is delayed, due to Debtor's continued sale of its inventory and inability to purchase appropriate replenishment inventory.  Accordingly, Debtor believes that an expedited sale of its business or substantially all of its assets is necessary and appropriate.

## SUMMARY OF RELIEF REQUESTED

26.    Pursuant to Bankruptcy Code sections 105, 363, 365, and 1146 and Bankruptcy Rules 2002, 6004, and 6006, Debtor hereby seeks entry of the following orders:

(a)    an order, substantially in the form annexed hereto as Exhibit G (the "**Bidding Procedures Order**") granting the Initial Relief, including, among other things:

(i)    authorizing and approving certain bidding protections and setting deadlines, requirements, and other procedures for the Sale and auction process (collectively, and as more fully set forth herein, the "**Bidding Procedures**");

(ii)    scheduling (1) the Auction for the Assets to be held prior to the Sale Hearing and (2) the Sale Hearing;

(iii)    establishing the relevant objection deadlines; and

(iv)    approving the form and manner of notice of the Sale, the Auction, and the Sale Hearing, among other things; and

(b)    after the Sale Hearing, the entry of an order (the "**Sale Order**") granting relief including, among other things:

(i)    authorizing and approving the proposed (a) Agency Agreement, (b) APA, and (c) Designation Rights Agreement by and between Debtor, as

sellers, and Hudson Capital or such other entity submitting a higher or otherwise better offer, as purchaser;

(ii)    authorizing and approving the Sale of the Assets pursuant to the Agency Agreement, the APA, and the Designation Rights Agreement to Hudson Capital or such other entity submitting a higher or otherwise better offer, free and clear of all liens, claims, encumbrances, and other interests other than certain assumed liabilities and permitted liens;

(iii)    authorizing and approving the exemption of the Sale from stamp or similar taxes;

(iv)    authorizing and approving the assumption and assignment of substantially all of Debtor's unexpired leases, or the rejection of other such executory contracts and unexpired leases, consistent with the terms of the Designation Rights Agreement; and

(v)    granting other related relief.

## THE PROPOSED SALE AND RELATED TRANSACTIONS[2]

### The Asset Purchase Agreement

27.    Pursuant to the terms of the APA, Hudson Capital would acquire the Purchased Assets, including, among other things, all the business, goodwill, operations as a going concern, assets, properties, interests, and rights owned, leased,[3] licensed, or used by Debtor of every kind and wherever situated, excluding only the Excluded Assets. The Acquired Assets therefore would include, among other things, all Inventory, Equipment, Furniture and Fixtures, and Intellectual Property in which Debtor has an interest, and all proceeds and products thereof. See APA, § 1.01.

---

[2]   The following descriptions of the terms of the APA, the Agency Agreement, and the Designation Rights Agreement are intended solely to provide a brief overview thereof. Parties should refer to the APA, the Agency Agreement, and the Designation Rights Agreement for the complete and detailed terms thereof. In addition, all capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the APA, the Agency Agreement, and the Lease Designation Rights Agreement.

[3]   To the extent equipment is subject to a lease, the lessor will receive a notice of the sale including procedures for the resolution of any dispute regarding the assumption and assignment of such lease.

28.     The Excluded Assets that Hudson Capital would not be acquiring in connection with the Sale include, among other things, (a) Debtor's cash; (b) Debtor's causes of action, other than causes of action related to the Acquired Assets; (c) Debtor's books and records; (d) Debtor's credit card deposits and receivables; (e) Debtor's security deposits; (f) Debtor's insurance refunds; and (g) Debtor's tax refunds.  See APA, § 1.04.

**The Agency Agreement**

29.     The Agency Agreement would allow Hudson Capital to act as Debtor's exclusive agent (the "**Agent**") for the limited purpose of: (a) selling all of the Merchandise located or to be located in Debtor's stores (collectively, the "**Stores**"), as identified in Exhibit A to the Agency Agreement (collectively, the "**Closing Locations**"), by conducting "going out of business," "store closing," "bankruptcy liquidation," or similar themed sales at the Stores (the "**Liquidation Sales**"); and (b) disposing of Debtor's owned FF&E located at the Closing Locations, pursuant to the terms and using procedures set forth in the Agency Agreement.  See Agency Agreement § 6.

**The Designation Rights Agreement**

30.     The Designation Rights Agreement provides Hudson Capital with the right to act as Debtor's exclusive agent for the purposes of marketing and disposing of the Designated Leases, and to designate the ultimate assignee or purchaser of all of Debtor's right, title and interest in and to such Leases, together with all permanent fixtures and improvements owned by Debtor, free and clear of all liens, claims, interests, or encumbrances (the "**Designation Rights**").  See Designation Rights Agreement § 4.2.

**The Total Consideration to be Provided by Hudson Capital**

31. In connection with the APA, Agency Agreement, and Designation Rights Agreement, Hudson Capital would provide cash consideration of $5,340,000 (the "**Guaranteed Amount**"). Additionally, to the extent that Proceeds exceed the sum of (x) the Guaranteed Amount, and (y) the Expenses of the Sale, Hudson Capital shall be entitled to retain the balance of the Proceeds up to five percent (5%) of the aggregate Cost Value of the Merchandise (the "**Agent's Fee**" and the sum of (x), (y) and the Agent's Fee, is the "**Sharing Threshold**"). All remaining Proceeds above the Sharing Threshold shall be shared fifty percent (50%) to Debtor and fifty percent (50%) to Hudson Capital. See APA, § 3.1.

32. Hudson Capital would provide an earnest money deposit equal to ten percent (10%) of the Guaranteed Amount, $534,000, upon the execution of the APA, to be held in an interest bearing escrow account. See APA, § 2.03.

33. In addition, Hudson Capital would be unconditionally responsible for all Expenses incurred in conducting the Liquidation Sales in accordance with Section 4.2 of the Agency Agreement. "Expenses" includes all Store-level operating expenses of the Liquidation Sale and includes Occupancy Expenses, payroll and commissions for Retained Employees, and actual costs relating to the marketing and execution of the Liquidation Sales. See Agency Agreement § 4.1.

**Termination of the APA**

34. Debtor and Hudson Capital would be able to terminate the APA if (i) both Debtor and Hudson Capital mutually consent in writing thereto or (ii) the Sale Order is

not entered by March 29, 2010, unless such time is extended by mutual agreement of the
parties.  <u>See</u> APA, § 9.01.

### **<u>Appropriateness of Hudson Capital as the Stalking Horse Bidder</u>**

35.    Debtor and its professionals, including CTG[4] have marketed the Assets
among numerous potential strategic and financial acquirers on several different
occasions, both prior to and since the filing of this Bankruptcy Case.  As a result, Debtor
believes that the fact that the Assets have long been for sale is well known within its
industry and among the entities otherwise considered to be the most likely potential
acquirers.

36.    Specifically, in December 2009, Debtor retained a marketing consultant to
create a marketing package that was distributed to twenty (20) strategic buyers.  As a
result, Debtor had in-depth discussions with at least nine strategic buyers.  Debtor also
contacted and met with an investment banking firm who sought to find a strategic fit for a
merger opportunity.  Additionally, Debtor contacted two firms that considered making
mezzanine loans to support a capital infusion.

37.    Ultimately, Debtor determined that a quick sale of the Assets was in the
best interest of its stakeholders and, beginning in February 2010, Debtor and CTG
embarked on putting together a package of information that interested going concern
purchasers and liquidators would need to make a proposal regarding Debtor's assets and
contacted over 40, combined, going concern purchasers and liquidators to gauge their
interest regarding Debtor's assets including: American Retail Group, Buxbaum Group,

---

[4]  Debtor will soon file a motion to retain CTG as its financial advisor pursuant to Section 327(a) of the
Bankruptcy Code.

Fuel Break Capital Partners, Gordon Brothers Group, LLC, Great American Group, Hilco Merchant Resources, LLC, Hudson Capital Partners, LLC, SB Capital Group, Talon Merchant Capital, The Nassi Group, LLC, Tiger Capital Group, Bed Bath & Beyond, Books-A-Million, Cracker Barrel, Dollar Tree, Kate's Paperies, MudPie, Things Remembered, Big Lots Capital, Angel Fund Network, Apex Fundamental Partners LLC Blackstreet Capital Management, LLC, Chatham Capital, Chestnut Hill Partners, LLC, Comvest Group, Crystal Capital Fund, Edmonds Capital, Eureka Growth Capital, Golden Gate Capital, Greystone Private Equity, H.I.G. Capital/Bayside Capital, Insight Holdings, Longroad Asset Management, Marlin Equity Partners, Oak Hill Capital Partners, Summit Investment Management, Sun Capital Partners, Inc., Thompson Street Capital Partners, LP, Versa Capital Management, Inc.

38.     Nondisclosure agreements were signed with many of the interested parties and those parties were given access to a data room containing key information about Debtor including (a) information regarding store sales and expenses information; (b) inventory information; (c) lease information; (d) other fixed asset information; and (e) other miscellaneous information including copyright and trademark and employee turnover information.  The Proposal Package included a process letter and a form asset purchase agreement and a form agency agreement that will serve as the basis for a sale of the inventory, furniture, fixtures and equipment and/or a global bid on all of Debtor's assets including Debtor's leased real estate.  A bid deadline was set for all bids to be received by 4:00 p.m. on March 2, 2010.

39.     Debtor received multiple bids from purchasers seeking to be a stalking horse.  The bid by Hudson Capital as embodied in the APA, the Agency Agreement, and

the Designation Rights Agreement (the "**Stalking Horse Bid**") represents the highest and otherwise best offer so far received for the purchase of the Assets, and Debtor believes that is otherwise fair and reasonable, and appropriate to proceed with under the circumstances.

40.    Debtor expects that there are other bidders who may provide a higher or better offer for the Assets.  Thus, and as is customary with transactions of this nature, Debtor have determined that it is in the best interest of its estate to subject and expose the Stalking Horse Bid to further competing bids (a "**Competing Bid**") at the Auction pursuant to the Bidding Procedures set forth below.

### **Termination Fee and other Bidding Protections**

41.    Hudson Capital has consented to participate in the Auction as the initial bidder (the "**Stalking Horse Bidder**") subject to certain terms and conditions.  Such terms and conditions include certain provisions related to bidding protections (collectively, the "**Bidding Protections**") in favor of Hudson Capital.  <u>See</u> Agency Agreement § 16.1.  Debtor believes that the Bidding Protections are appropriate under the circumstances, balancing (a) Debtor's interest in having a baseline minimum price, in order to ensure the highest and best net result for Debtor's estate with (b) protecting the substantial investment made and to be made by Hudson Capital in entering into the Stalking Horse Bid (including, without limitation, costs of due diligence, financing, and professional advisers).

42.    In particular, the Agency Agreement provides for the payment of a termination fee (the "**Breakup Fee**") to Hudson Capital in an amount equal to $75,000, which represents approximately 1.4% of the Guaranteed Amount, in the event that

Hudson Capital is not selected as the winning bidder at the Auction.  <u>See</u> Agency Agreement § 16.1.

43.    Additionally, the Agency Agreement requires that the minimum amount of any initial competing overbid provide value to Debtor of $20,000 more than the Stalking Horse Bid.  <u>See</u> Agency Agreement § 16.1.

## THE BIDDING PROCEDURES

44.    In order to appropriately evaluate competing bids and ensure an orderly auction process that serves to maximize the value of the Assets, Debtor submits that it is necessary to establish certain uniform sale and bidding procedures (including, without limitation, the Bidding Protections set forth above).  Exhibit D hereto sets forth Debtor's proposed Bidding Procedures in detail.[5]  Specifically, Debtor proposes that the Auction of the Assets be conducted generally on the following terms and conditions:

(a)    In the Auction and Hearing Notice, Debtor will invite all potential bidders to request a copy of a confidentiality agreement from the Debtor's financial advisors, Clear Thinking Group ("**CTG**").  The Auction and Hearing Notice will be served upon all parties who appear on Debtor's Master Service List, Landlords with respect to Debtor's non-residential real property leases, the Attorney General's Office for each state in which Debtor's stores are located, parties having liens on Debtor's Equipment and all other parties requesting notice in this chapter 11 case.  CTG, on its own initiative, may also send a copy of a confidentiality agreement to those parties who have not yet executed one but whom CTG, Debtor, and/or Wells Fargo have identified as being likely to be interested in making an offer to purchase the Assets and participating in the Auction.  All parties who timely execute and return a confidentiality agreement to CTG and who provide, in Debtor's discretion, in consultation with Wells Fargo and counsel to the Committee, information demonstrating sufficient financial wherewithal, will be provided certain due diligence materials, including, but not limited to, a process letter, and access to an electronic Data Room containing information, among other things, relevant to Debtor's inventory, forecasts, earnings and revenues.

---

[5]  The following description of the Bidding Procedures is intended to serve as a summary thereof.  In the event of any inconsistencies between such summary and the Bidding Procedures set forth on Exhibit D hereto, the latter shall govern.

(b)     Thereafter, Debtor and CTG shall entertain any further reasonable requests for additional information and due diligence from any party who has so executed a confidentiality agreement and provided the required satisfactory evidence of financial wherewithal, and has also submitted a written non-binding expression of interest to the reasonable satisfaction of Debtor and its advisors. Debtor, in its discretion and after consultation with Wells Fargo and counsel to the Committee, may deny any such requests for additional information, if, after taking into account, among other things, business factors (such as whether the proposed purchaser is currently a competitor of Debtor), legal, regulatory, and other considerations, Debtor determines that denying such a request would be in the best interest of its estate and creditors or is otherwise consistent with the goals of the Auction and the Sale.

(c)     Written bids for the acquisition of the Assets must be received by Clear Thinking Group, Lee Diercks (ldiercks@clearthinkinggrp.com), Alan Minker (aminker@clearthinkinggrp.com), Roxanne Norris (rnorris@clearthinkinggrp.com); and Alston & Bird LLP, Wendy R. Reiss (wendy.reiss@alston.com), Sage M. Sigler (sage.sigler@alston.com), Dennis J. Connolly (dennis.connolly@alston.com); and; counsel to Wells Fargo, Parker Hudson Rainer & Dobbs LLP.; James S. Rankin (jsr@phrd.com); and counsel to the Committee, [_____] no later than 12:00 noon on March 23, 2010 (the "**Bidding Deadline**"), as scheduled pursuant to the Bidding Procedures Order.  Debtor, in consultation with Wells Fargo and counsel to the Committee may, but in no way is obligated to, extend the deadlines contained in the Bidding Procedures for one or more Qualified Bidders (as such term is defined below).

(d)     Only Qualified Bidders will be entitled to bid at the Auction, unless either Debtor, in consultation with Wells Fargo and counsel to the Committee, or the Court determines otherwise.  Hudson will be deemed a Qualified Bidder for purposes of the Auction.  Within 24 hours after the Bidding Deadline, Debtor shall notify all parties who submitted a bid whether or not they constitute a Qualified Bidder.

(e)     In addition to Hudson, a "Qualified Bidder" is one who has substantially complied with the terms and conditions set forth herein and has demonstrated the ability to close the transaction to the reasonable satisfaction of Debtor, in consultation with Wells Fargo and counsel to the Committee.  In order to be considered for Qualified Bidder status, a Person must  (a) make a Bid (as that term is defined below); (b) provide evidence reasonably satisfactory to Debtor and its financial advisor (in consultation with Wells Fargo and the Committee) of such bidder's ability to fund the Guaranteed Amount in full at closing and to assume any liabilities for obligations proposed to be assumed from and after the Closing; (c) complete and execute a confidentiality agreement acceptable to Debtor and its professionals in consultation with Wells Fargo

and counsel to the Committee; and (d) provide an earnest money deposit equal to ten percent (10%) of the Guaranteed Amount (a "**Deposit**").

(f)     Deposits shall be in the form of a wire transfer to the account of an escrow agent selected by Debtor (the "**Escrow Agent**"), pursuant to instructions to be provided upon request. All Deposits for Bids shall be deposited in an escrow account under an escrow agreement with the Escrow Agent, and shall be returned pursuant to the terms of the escrow agreement.

(g)     Any Deposit, together with any interest earned thereon, shall be returned to any Bidder whose Bid is not accepted by Debtor within three business days of the conclusion of the Sale Hearing, except that in the case of the party (or parties) who submits the Second Place Bid (as such term is defined below) Debtor reserves the right to retain such deposit until three days after the transactions with the Winning Bidder (as such term is defined below) has been consummated. If the Winning Bidder fails to consummate the purchase of the Assets, and such failure to consummate the purchase is the result of a breach by the Winning Bidder, the Winning Bidder's Deposit shall be forfeited to Debtor and Debtor specifically reserves the right to seek all available damages from the defaulting offeror.

(h)     To be considered a Bid, a bid must (a) identify the Assets to which it relates; (b) state the Guaranteed Amount to be paid for the Assets; (c) state any non-cash consideration to be paid for the Assets and provide information concerning such non-cash consideration to permit Debtor to accurately assess the value thereof; (d) identify each and every executory contract or unexpired lease, the assumption and assignment of which is a condition to closing; (e) identify pre-petition liabilities to be assumed or paid and the manner and timing of such assumption and/or payment; (f) provide sufficient indicia that such bidder or its representative is legally empowered, by power of attorney or otherwise, (i) to bid on behalf of the prospective bidder and (ii) to complete and sign, on behalf of the bidder, a binding and enforceable agreement to purchase the Assets; (g) not contain any contingencies to closing, including, without limitation, contingencies for financing, diligence, board approval, or similar contingencies or condition; (h) fully disclose the identity of entities, if any, which shall be acquiring directly or indirectly a portion of the Assets under or in connection with a Bid; and (i) include a definitive closing date no later than March 30, 2010.

(i)     Bids submitted on or prior to the Bidding Deadline as modified by a Bidder at the Auction shall remain open and irrevocable until the Sale Hearing; provided, however, that the Winning Bid and the Second Place Bid shall be deemed to remain open and irrevocable until the closing of a transaction with respect to the Assets that are the subject of such Bid or further Order of the Court (except as otherwise may be set forth in the Agreements with Hudson). Acceptance of a Bid shall, in all respects, be subject to entry of an order by the

Court that, among other things, authorizes Debtor to close a sale to the Winning Bidder. Following the Sale Hearing, if any Winning Bidder (as the case may be) fails to consummate an approved sale because of a breach or failure to perform on its part, the next highest or otherwise best Qualified Bid, as disclosed at the Auction (the "**Second Place Bid**"), shall be deemed to be the Winning Bid, and Debtor shall be authorized, but not required, to consummate the Sale with the Bidder submitting such Bid (i) without the need for further notice or order of the Court and (ii) without prejudice to Debtor's right to seek all available damages from the defaulting Winning Bidder.

(j)     If, in addition to the Bid of Hudson as embodied in the Agreements, one or more Qualified Bids are received by the Bidding Deadline, the Auction will be conducted at the offices of Alston & Bird LLP, 1180 West Peachtree Street, Fifteenth Floor, Atlanta, Georgia 30319, or at another location as may be timely disclosed by Debtor to Qualified Bidders, on or about 10:00 a.m. on March 25, 2010 (the "**Auction Date**").

(k)     If, however, the only Bid received by the Bidding Deadline (unless Debtor has extended such deadline in accordance with the terms hereof) is the bid embodied in the Agreements with Hudson, then the Auction will not be held and Hudson will be deemed the Winning Bidder for the Assets, and Debtor will seek approval thereof at the Sale Hearing.

(l)     In the event there is an Auction, all bidders must appear in person or through a duly authorized representative. At or prior to the commencement of the Auction, Debtor will notify all Qualified Bidders of the then highest and best Qualified Bid for the Assets as received by that time.

(m)     If more than one Bid is submitted, each such bidder shall have the right to continue to improve its Bid at the Auction. The procedures and the manner in which the Auction will proceed shall be determined by Debtor and CTG in consultation with Wells Fargo and counsel to the Committee (unless inconsistent with the terms of the Agreements). Qualified Bidders will be notified of such procedures prior to the beginning of the Auction.

(n)     The initial minimum Bid at the Auction for the Assets must provide for a Guaranteed Amount equal to at least (i) the Guaranteed Amount stated in the Hudson Bid; (ii) the Breakup Fee; and (iii) an initial overbid equal to $20,000 (the "**Initial Minimum Overbid**"). Subsequent Bids after the Initial Minimum Overbid must be in increments of no less than $100,000 (a "**Subsequent Overbid**"). Debtor and CTG in consultation with Wells Fargo and counsel to the Committee may alter the bidding increments for any Subsequent Overbid at any time.

(o)     The Auction will continue in one or more rounds of bidding and shall conclude after each participating bidder has had an opportunity to submit an additional Subsequent Overbid, after being advised of the then highest bid and

the identity of the party making such next highest bid.  Unless otherwise
agreed by Debtor and Hudson, the Auction shall run continuously until
completed.

(p)    Debtor further reserves the right, in consultation with Wells Fargo and counsel
to the Committee, to (a) amend and/or impose additional terms and/or
conditions at or prior to the Auction that they believe will better promote the
goals of the Auction and do not otherwise conflict with the terms and
requirements set forth in the Agreements and (b) subject to the terms of the
Agreements, extend the deadlines set forth in the Bidding Procedures and/or
adjourn the Auction at the Auction and/or the Sale Hearing in open court or on
the Court's calendar on the date scheduled for said hearing without further
notice to creditors or parties-in-interest.

(q)    At the conclusion of the Auction, (i) the highest or otherwise best bids for the
Assets (whether (A) the highest or otherwise best bid for the Assets or (B) a
combination of highest or otherwise best bids for certain Assets (taking into
consideration Debtor's reasonable estimate of net realizable short term value
for all Assets which would not be purchased by the bids considered in this
clause B) (whether one or more, the "**Winning Bid**"), and (ii) the Second
Place Bid shall in each case be determined by Debtor in consultation with
Wells Fargo and counsel to the Committee.  Debtor and the entity (or entities)
that made the Winning Bid (each, a "**Winning Bidder**") will enter into
definitive agreements (which are subject to Court approval) before the
Auction is adjourned.  In selecting the Winning Bid(s), Debtor will take into
consideration, among other things, a bid's financial and contractual terms and
the factors relevant to the sale process and the best interests of Debtor's
estates and creditors, including, without limitation, those factors affecting the
speed and certainty of consummating a Sale Transaction, as well as the
Debtor's liability, if any, for payment of the Breakup Fee..

## PROPOSED FORM OF NOTICE OF THE MOTION AND SALE

### The Auction and the Sale Hearing

45.    Debtor submits that its proposed time frame for the Auction and Sale

Hearing, requested to be scheduled for March 25th and March 29th, respectively, would

give all potential competing bidders ample time to review Debtor's assets and operations[6]

and to formulate a competing bid.  This is especially true in light of Debtor's and its

---

[6]    To that end, the Auction and Hearing Notice (as defined and discussed below) invites all potential
bidders to request a copy of a confidentiality agreement from CTG, in order to initiate such review of
Debtor's assets and operations in accordance with the terms and conditions thereof.

professionals' marketing and restructuring efforts both during the Bankruptcy Case and prior to its commencement, such that they do not believe that a more extended marketing period is either necessary or warranted under the circumstances.  Indeed, in light of the liquidity and operational concerns described above, Debtor is concerned that any delay in proceeding with the Sale would serve only to diminish the value of the Assets and threaten its ability to continue operating as a going concern, to the detriment of Debtor's estate and creditors.  Accordingly, Debtor requests that the Court approve these requested dates.[7]

### **The Proposed Bidding Procedures Notice List**

46.     Pursuant to Bankruptcy Rule 2002(m), this Court is empowered to enter any order "designating the matters in respect to which, the entity to whom, and the form and manner in which notices shall be sent except as otherwise provided by these rules."

47.     To ensure that adequate notice of the Sale, the Auction, and the Sale Hearing is provided, Debtor will serve notice of the Auction and of the Sale Hearing substantially in the form annexed hereto as Exhibit E (the "**Auction and Hearing Notice**") establishing the respective dates, times, and places of the Auction and the Sale Hearing within three (3) business days of the entry of the Bidding Procedures Order, by first class mail, postage prepaid, to (a) all of the parties identified on the Master Service List (b) and all other parties in interest known to Debtor as of the Petition Date (the "**Auction and Hearing Notice Service List**").

---

[7]   Of note, the Agency Agreement provides that Hudson Capital's obligation to consummate the Sale is contingent upon, among other things, the Approval Order having been entered on or before March 29, 2010. See APA §9.01.

48.    Given that the complete transaction documents may comprise hundreds of pages, Debtor believes the foregoing notice procedures would provide the most effective notice possible of the relief requested.  Any party in interest wishing to receive a complete set of transaction documents would be permitted to do so by request to Debtor's counsel or by downloading a copy of same from the website maintained by Debtor's claims and noticing agent:  http://dm.epiq11.com/swoozies.

49.    Further, Debtor reserves the right to publish an abbreviated version of the Auction and Hearing Notice one or more times prior to the Auction in an appropriate publication or publications, to be determined by Debtor, in its sole discretion.

50.    Debtor submits that such notice as outlined in the preceding paragraphs would constitute good and sufficient notice of the Sale, the Auction, the Sale Hearing, any other transaction set forth in the Stalking Horse Bid, and all the relief requested herein.

### THE PROPOSED SALE IS IN THE BEST INTEREST OF DEBTOR'S ESTATE, CREDITORS, AND INTEREST HOLDERS

51.    The proposed Sale pursuant to Hudson Capital's APA, Agency Agreement, and Designation Rights Agreement (or any higher and better offer as determined by Debtor) is supported by sound business justifications.  Debtor and its advisors firmly believe that creditors would receive more value through the prompt Sale of the Assets than through continued operations, or conversion to Chapter 7, which is a significant possibility if Debtor cannot complete a going concern sale in a timely manner.

### Applicable Legal Standards

52.    Ample authority exists for the approval of the proposed Sale.  Section 363 of the Bankruptcy Code, which authorizes a debtor to sell assets of the estate other than

in the ordinary course of business free and clear of liens, claims, and encumbrances,

provides, in relevant part, as follows:

> (b)(1) The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.

> \*\*\*

> (f)    The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if -

> (1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

> (2)    such entity consents;

> (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

> (4)    such interest is in bona fide dispute; or

> (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

See 11 U.S.C. § 363(b)(1), (f); see also Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the

ordinary course of business may be by private sale or by public auction.").

53.    Section 363 does not set forth a standard for determining when it is

appropriate for a court to authorize the sale or disposition of a debtor's assets prior to

confirmation of a plan.  However, courts generally require that the decision to sell assets

outside the ordinary course of business be based upon the sound business judgment of the

debtor.  See In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992); Stephens Indus v.

McClung, 789 F.2d 386, 390 (6th Cir. 1986) ("bankruptcy court can authorize a sale of

all a Chapter 11 debtor's assets under §363(b)(1) when a sound business purpose dictates

such action"); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986);

Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d

1063, 1071 (2d Cir. 1983).  See also In re Delaware & Hudson Rv. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Titusville Country Club, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Indus. Valley Refrig. & Air Conditioning Supplies, Inc., 77 B.R. 15, 20 (Bankr. E.D. Pa. 1987); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that judicial approval of a Section 363 sale requires a showing that the proposed sale is fair and equitable, a good business reasons exists for completing the sale and that the transaction is in good faith).

54.     The "sound business purpose" test requires a debtor to establish four elements to sell property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons; (c) that the debtor has obtained a fair and reasonable price, and (d) good faith.  See Abbotts Dairies, infra; Titusville, 128 B.R. at 399; In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); Phoenix, 82 B.R. at 335-36; Industry Valley, 77 B.R. at 21.  Courts have made it clear that a debtor's showing of a sound business justification need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reason."  In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).

55.     Courts in this district have also recognized that Section 363(b) may be used to sell a debtor's principal assets.  For example, in In re WFDR, Inc., 10 B.R. 109 (Bankr. N.D. Ga. 1981), this Court authorized the sale of the Chapter 11 debtor's principal assets, real and personal property comprising a radio station, pursuant to a court-supervised bidding process, commenced upon the debtor's application to sell such

assets.  The sale took place prior to the acceptance of a Chapter 11 plan and this Court expressly held that Section 363(b) authorizes such sale outside the ordinary course of business.  10 B.R. at 110.  See also In re Sport Court, Inc., No. 04-41107 (Bankr. N.D. Ga. June 10, 2004) (Bonapfel, J.) (order approving sale of substantially all of the debtor's assets free and clear of all liens, claims, and encumbrances); In re All American, 40 B.R. 104 (Bankr. N.D. Ga. 1984) (recognizing authority under Section 363(b) to sell all of the debtor's assets prior to the confirmation of a plan of reorganization).  Clear authority for a Section 363(b) sale exists where the debtor's estate will be impaired unless the assets are sold quickly.  See In re Equity Funding Corp. of America, 492 F.2d 793 (9th Cir.), cert. denied, 419 U.S. 964 (1974)).

56.    Debtor submits that the decision to sell the Assets is based upon its sound business judgment and should be approved.  Debtor believes that the Sale according to the Bidding Procedures and the APA, Agency Agreement, and Designation Rights Agreement will enable it to obtain the greatest value for such Assets and to maximize the value of its estate, in the best interest of Debtor, its creditors, and other parties in interest.[8]

57.    Specifically, as described above, despite its efforts to address its liquidity and related concerns, Debtor has faced increasing pressure resulting both from numerous industry-wide and macroeconomic problems.  These problems have threatened Debtor's ability to continue operating as a going concern.

---

[8]    As several courts have noted, the paramount goal for any proposed sale or property of a bankruptcy estate is to maximize the proceeds received by the estate.  See, e.g., Integrated Resources, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the objective of bankruptcy sales and the Debtor's duty with respect to such sales is to obtain the highest price or overall greatest benefit possible for the estate.") (quoting In re Atlanta Packaging Prods., Inc., 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

58.     Thus, Debtor has determined that an immediate sale of the Assets is appropriate and is concerned that if it is unable to complete the proposed Sale to Hudson Capital (or such other entity that makes a higher and better offer for the Assets at the Auction), it will have no other choice but to cease operations and convert this case to one under Chapter 7,[9] which would result in a diminished return to Debtor's creditors.

59.     Hudson Capital's Stalking Horse Bid represents the culmination of Debtor's marketing efforts to date, while also allowing Debtor to continue seeking higher or better offers from other parties. In addition, it is the opinion of Debtor and its financial advisors that the proposed course of action, a timely yet open Sale process, is designed to protect the interests of all parties in this case. In particular, by selling the Assets in the timeframe and manner proposed in this Motion, Debtor intends to preserve value by reducing the costs of, and risk of damage to, its commercial standing inherent in a lengthy reorganization. Also, Debtor does not have the financial wherewithal to sustain a lengthy reorganization process. Accordingly, time is of the essence in preserving value here.

60.     Moreover, Debtor intends to continue operating its Stores during the Sale process. Currently operating retail stores are of greater value to potential purchasers and all other parties in interest than closed stores and empty premises.

61.     Debtor also believes that the total consideration to be paid by Hudson Capital is fair and reasonable and far exceeds what could be obtained in a Chapter 7 liquidation. Part of the Guaranteed Amount will, among other things, enable Debtor to

---

[9]  Given Debtor's current capital structure and operational challenges, and in light of its familiarity with the financing markets, Debtor believes it would be unable to obtain the financing necessary to enable it to weather its liquidity crisis through an internal restructuring. Debtor's recent experiences pursuing alternative financing (as described in the DIP Motion) have borne this out.

satisfy its obligations under the DIP Facility and other secured debt and pay other administrative costs of this case.  Finally, the auction process itself will confirm that Debtor has obtained the highest and best offer for the Assets.

62.     Accordingly, as set forth herein, the proposed Sale is supported by sound business reasons and is in the best interests of Debtor's estate.

**The Procedures Undertaken by Debtor Assure the the
Highest Value for the Assets Will be Received**

63.     In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside of the ordinary course of business may be by private or by public auction.  <u>See</u> Fed. R. Bankr. Pro. 6004(f)(1).  Further, pursuant to Bankruptcy Rule 2002(a)(2), this Court may, for cause shown, shorten or direct another method of giving notice regarding the general twenty-day by-mail period for the proposed use, sale, or lease of property of the estate other than in the ordinary course of business.  <u>See</u> Fed. R. Bankr. Pro. 2002(a)(2). Subject to Bankruptcy Rule 6004, the notice of a proposed use, sale, or lease of property required under Bankruptcy Rule 2002(a)(2) must include the time and place of any public sale, the terms and conditions of any private sale, and the time fixed for filing objections. <u>See</u> Fed. R. Bankr. Pro. 2002(c)(1). Moreover, the notice of a proposed use, sale, or lease of property is sufficient if it generally describes the property.  <u>Id</u>.

64.     Debtor submits that the notice, procedures, and rules set forth in this Motion, as well as the requested respective dates for the Auction and the Sale Hearing, satisfy the timing and notice requirements of the Bankruptcy Rules and Section 363(b) of the Bankruptcy Code, constitute good and sufficient notice, and that no other or further notice of the Sale, the Auction, the Sale Hearing, or any other of the transactions

referenced in the Motion, the APA, the Agency Agreement, or the Designation Rights Agreement is required.

### The Proposed Sale and Purchase Would Be in Good Faith

65. Section 363(m) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under [Section 363(b) or (c)] of a sale or lease of property does not affect the validity of the sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

66. Debtor has fully disclosed and requested the Court's approval of all of the terms and conditions of the proposed Sale and intends to provide notice as directed by the Court. See generally In re Colony Hill Associates, 111 F.3d 269 (2nd Cir. 1997) (stating that determination of "in good faith" is based upon traditional equitable principles, including whether there has been full disclosure to the bankruptcy court).

67. Hudson Capital is not an equity holder of Debtor, nor does any representative of Hudson Capital serve on Debtor's board of directors. No employee or other representative of Hudson Capital was involved in the deliberations of Debtor's boards of directors regarding the proposed Sale or the sales process in general, and no employee or representative of Hudson Capital participated on Debtor's behalf in any negotiations with Hudson Capital with respect to the proposed Sale. In that regard, Hudson Capital and Debtor were each represented by separate experienced professionals, helping to ensure that the Sale process has been fair to date and will continue to be so, and that the APA, Agency Agreement, and Designation Rights Agreement were negotiated, proposed, and entered into by Debtor and Hudson Capital without collusion,

in good faith, and at arm's-length. Hudson Capital should therefore be considered a good faith purchaser under Section 363(m).

### The Proposed Sale Satisfies the Requirements of
### Section 363(f) of the Bankruptcy Code

68.    All of the Assets have been pledged to the DIP Lender under the DIP Facility. Furthermore, various other creditors may hold or assert security interests in some of the Assets. Thus, in order to facilitate the Sale of such property, Debtors request authorization to sell all of the Assets free and clear of any and all liens, claims, encumbrances, and other interests which may be asserted.

69.    In accordance with Section 363(f) of the Bankruptcy Code, a debtor in possession may sell property under Section 363(b) "free and clear of any interest in such property of an entity other than the estate" if *any one* of the following conditions is satisfied:

    (a)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

    (b)    such entity consents;

    (c)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    (d)    such interest is in bona fide dispute; or

    (e)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). In re Elliot, 94 B.R. 343, 354 (E.D. Pa. 1988) (Section 363(f) "is written in disjunctive, not the conjunctive. Therefore, if any of the five conditions of § 363(f) are met, the Trustee has the authority to conduct the sale free and clear of all liens"). See also Michigan Employment Security Comm'n v. Wolverine Radio Co. (In re

Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991), cert. dismissed, 503

U.S. 987 (1992) (same). Debtor anticipates that it can satisfy one or more of these

requirements.

      70.    Pursuant to the documents governing the DIP Facility, Debtor may only

consummate a Sale with the DIP Lender's consent. Additionally, the Intercreditor

Agreement provides that Crane shall be deemed to have consented to any Section 363

sale consented to by the DIP Lender. To the extent that any other holder of a lien, claim,

encumbrance, or other interest does not consent to the proposed Sale, but receives the

requisite notice of this Motion and does not object within the prescribed time period, such

holder will be deemed to have consented to the proposed Sale, and the Assets may then

be sold free and clear of such holder's liens, claims, encumbrances, and other interests.

See, e.g., Veltman v. Whetzel, 93 F.3d 517 (8th Cir. 1996) (failure to object to proposed

sale, coupled with agreement to stipulation on authorizing sale free of interest, constituted

consent); Hargrave v. Pemberton (In re Tabore, Inc.), 175 B.R. 855 (Bankr. D. N.J. 1994)

(failure to object to notice of sale or attend hearing deemed consent to sale for purposes

of Bankruptcy Code section 363); Elliot, 94 B.R. at 345 ("implied consent" sufficient to

satisfy the consent requirement of section 363(f)(2): "Because [secured creditor] admits

that it received notice of the proposed sale and also admits that it did not file any timely

objection the sale was authorized by § 363(f)."). Additionally, Debtor has reserved the

right to require any Bidder to allocate any purchase price consideration among assets in

which a creditor has filed a UCC statement.

      71.    In addition, because the Assets will be sold for what Debtor, in the

exercise of its business judgment, believes will be fair value, particularly in light of the

opportunity for competitive bidding at the Auction, the holders of any liens thereon can be compelled to accept money in satisfaction of same, satisfying the requirement of section 363(f)(5). See In re WPRV-TV, Inc., 143 B.R. 315, 321 (Bankr. D.P.R. 1991), vacated on other grounds, 165 B.R. 1 (D.P.R. 1992), aff'd in part, rev'd in part, 983 F.2d 336 (1st Cir. 1993).

72.    Accordingly, Debtor submits that at least one (if not more) of the subsections of Bankruptcy Code section 363(f) will be satisfied here, such that the Court should approve the Sale of the Assets free and clear of liens, claims, encumbrances, and other interests. All liens on the Assets will attach to the proceeds of the Sale with the same force, effect, and priority as such liens have on the Assets, subject to the rights and defenses of Debtor and any party in interest with respect thereto.

**Cause Exists to Approve the Bidding Protections**

73.    Sellers of assets often employ bidding protections such as the Breakup Fee in order to encourage the making of bids. Such fees are "important tools to encourage bidding and to maximize the value of the debtor's assets." The Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650 (S.D.N.Y. 1992).

74.    Outside of the bankruptcy context, courts commonly approve break-up fees. Such fees are presumptively appropriate under the business judgment rule and nonbankruptcy courts rarely rule on their propriety. See, e.g., Cottle v. Storer Communications, Inc., 849 F.2d 570 (11th Cir. 1988); CRTF Corp. v. Federated Dep't. Stores, 683 F. Supp. 422, 440 (S.D.N.Y. 1988); Samjens Partners I v. Burlington Industries, 663 F. Supp. 614 (S.D.N.Y. 1987).

75.    Similarly, bankruptcy courts generally presume that a board's decision to agree to a break-up fee was a valid exercise of its business judgment. In re Integrated Resources, Inc., 135 B.R. 746, 753 (Bankr. S.D.N.Y. 1992); In re 995 Fifth Avenue Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989).[10] Bankruptcy courts will generally authorize bidding protections where such bidding protections enhance rather than deter bidding. See, e.g., In re 995 Fifth Ave. Assocs., L.P., 96 B.R. at 28. One such situation is where the bidder (like Hudson Capital here) is a "stalking horse," an initial interested party that promotes competition and encourages other bidders to come forward by submitting a binding offer and providing a baseline against which higher and better offers can be measured. In re Marrose Corp., Nos. 89 B 12171-12180 (CB), 1992 WL 33848 at *5 (Bankr. S.D.N.Y. 1991); In re Integrated Resources, Inc., 135 B.R. 246, 250 (Bankr. S.D.N.Y. 1992).

76.    Given the posture of the Auction of the Assets, the various Bidding Protections described above were reasonably calculated to have encouraged, and did indeed encourage, Hudson Capital to submit a final bid within the upper range of reasonably anticipated values. Hudson Capital is a stalking horse for competing bids, perhaps leading to further competition and the establishment of a baseline against which higher and better offers can be measured.

---

[10]    As the District Court for the Southern District of New York held in In re Integrated Resources, Inc., 147 B.R. at 657, three issues must be considered by the Bankruptcy Court in assessing bidding protections such as break-up fees: "(i) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation, (2) does the fee hamper, rather than encourage, bidding, [and] (3) is the amount of the fee unreasonable relative to the proposed purchase price?" The court added that a "break-up fee" may serve one of three functions: "(l) to attract or retain a potentially successful bid, (2) to establish a bid standard or minimum for other bidders to follow, or (3) to attract additional bidders." Id. at 662.

77.     In addition, the Bidding Protections proposed here are "reasonably related to the bidder's efforts and the transaction's magnitude." Integrated Resources, 147 B.R. at 662-63. The "bidding incentive" here is not unreasonable in relation to the funding amount. The amount of the Breakup Fee is equal to approximately 1.4% of the Guaranteed Amount offered by Hudson Capital. Thus, this proposed Breakup Fee is lower, on a percentage basis, than other comparable fees that have been approved in connection with Section 363 transactions. See, e.g., In re HHL Fin. Servs. Inc., No. 97-398 (SLR) (D. Del., March 31, 1997) (approving 5.5% to 5.9% break-up fees); In re Am. White Cross, Inc., No. 96-1109 (PJW) (Bankr. D. Del., March 31, 1997) (approving up to 5.8% break-up fee); In re Mid-Am. Waste Sys., Inc., No. 97-0104 (PJW) (Bankr. D. Del. Jan. 1997) (3.3% fee approved); In re Simmons Upholstered Furniture, Inc., Case No. 94-635 (HSB) (Bankr. D. Del., Aug. 10, 1995) (approving 4.64% fee); In re Smith Corona Corp., No. 95-788 (HSB) (Bankr. D. Del., Nov. 1995) (approving 3.9% fee); In re Edison Bros. Stores, Inc., No. 95-1354 (Bankr. D. Del., Dec. 29, 1995) (approving break-up fees up to 3.5%).

78.     The proposed Bidding Protections here are also appropriate under the "business judgment rule," as they are the product of extended good faith and arm's-length negotiations between Debtor and Hudson Capital. Hudson Capital has made the highest and best offer for the Assets; however, its bid is contingent upon this Court's timely approval of the Breakup Fee and other Bidding Procedures.

79.     In addition, Debtor believes that the proposed Bidding Protections are fair and reasonable in amount, particularly in view of Hudson Capital's efforts to date, and the risk to Hudson Capital of being used as a stalking horse. Further, the proposed

Breakup Fee and other Bidding Protections already have encouraged bidding, in that Hudson Capital would not have entered into the Stalking Horse Bid without these provisions. These Bidding Protections thus have induced a bid that otherwise would not have been made and without which bidding would be limited. Similarly, Hudson Capital's offer provides a minimum bid on which other bidders can rely, thereby increasing the likelihood that the price at which the Assets will be sold will reflect their true worth." Finally, the mere existence of these proposed Bidding Protections permits Debtor to insist that competing bids for the Assets be materially higher or otherwise better than that contained in the Agency Agreement, the APA, and the Designation Rights Agreement, providing a clear benefit to Debtor's estate.

80.     In sum, Debtor's ability to offer the proposed Bidding Protections enables it to ensure the Sale of the Assets to a contractually committed bidder (be it Hudson Capital or any winning competing bidder) at a price it believes to be fair while, at the same time, providing it with the potential of even greater benefit to the estate. Thus, under these circumstances, the Court should not override the business judgment of Debtor, and the Breakup Fee and the other proposed Bidding Protections should be approved.

### Approval of the Going Out of Business Sale Guidelines.

81.     To facilitate and effect the Sale, Debtor seeks this Court's approval of the going out of business sale guidelines (the "**GOB Sale Guidelines**"), which are set forth in Exhibit 7.1 to the Agency Agreement, and attached hereto as <u>Exhibit F</u>. To the extent the GOB Sale Guidelines require the waiver of Debtor's compliance with state and local laws, statutes, rules and ordinances regarding going out of business sales, Debtor requests

this Court's approval of the same.  Likewise, Debtor requests that this Court deem unenforceable any restrictions on store closings in Debtor's leases.

82.    Many state and local laws, statutes, rules and ordinances require special and cumbersome licenses, waiting periods, time limits and other procedures for store closing, going out of business or similar sales conducted outside of bankruptcy. In addition, some states and localities have statutes or regulations requiring creditor notification before a company conducts a bulk sale. In the context of bankruptcy cases such as these, however, when creditors receive notice of the proposed sale, as well as the opportunity to be heard in this Court, enforcement of such statutes and regulations is redundant and unnecessary. Debtor requests by this Motion that the Sale Order approve the GOB Sale Guidelines, or similar guidelines as may be required by another successful bidder at the Auction.

83.    Debtors must generally comply with 28 U.S.C. § 959(b), which states that a debtor in possession must "manage and operate the property . . . according to the requirements of the valid laws of the state in which such property is situated."  Courts, however, have held that a debtor in possession that is liquidating estate assets does not "manage and operate" the property for the purposes of 28 U.S.C. § 959(b).  See Alabama Surface Mining Comm'n v. N.P. Mining Co., Inc. (In re N.P. Mining Co., Inc.), 963 F.2d 1449, 1460-61 (11th Cir. 1992) (holding that 28 U.S.C. § 959(b) does not apply when debtor in possession is liquidating property and not operating business); Missouri v. U.S. Bankr. Court, 647 F.2d 768, 778 n.18 (8th Cir. 1981) (same); Missouri Dept. of Natural Res. v. Valley Steel Prods. Co., Inc. (In re Valley Steel Prods. Co., Inc.), 157 B.R. 442, 447-48 (Bankr. E.D. Mo. 1993) (same); Matter of Boume Chem. Co., 54 B.R. 126, 135

(Bankr. D.N.J. 1984) (holding that "[s]ection 959(b) is applicable only where the property is being managed or operated for the purpose of continuing operations").

84.     Debtor, however, is seeking to liquidate merchandise from some or all of its stores and will no longer continue to operate such stores as a debtor in possession. Therefore, 28 U.S.C. § 959(b) does not require compliance with these state and local licensing procedures and other regulations, especially when Debtor will conduct any going out of business sales with the knowledge and oversight of the creditors and this Court. Bankruptcy courts routinely have excused compliance with state and local laws which do not relate to public health and safety or consumer protection and interfere with store closing sales by a retail Chapter 11 debtor. See, e.g., In re the Bombay Co., Case No. 07-44084-dml-11 (Bankr. N.D. Tex. Oct. 16, 2007); In re Musicland Holding Corp., Case No. 06-1064 (SMB) (Bankr. S.D.N.Y. Feb. 1, 2006); In re CWT Specialty Stores, Inc., Case No. 00-10758 (JHG) (Bankr. S.D.N.Y. Mar. 7, 2000); In re Caldor, Inc.-NY, Case No. 95-44080 (JLG) (Bankr. S.D.N.Y. Feb. 11, 1999); In re The Wiz, Inc., Case No. 97-48257 (CB) (Bankr. S.D.N.Y. Dec. 18, 1997). The Court should therefore waive the requirement that Debtor comply with state laws regulating going out of business sales, bulk sale laws or other laws not related to public health and safety or consumer protection.

85.     Additionally, certain of Debtor's leases contain provisions purporting to restrict or prohibit Debtor from conducting store closing, liquidation or similar sales. Such provisions have been held to be unenforceable in Chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to maximize the value of its assets under section 363 of the Bankruptcy Code. See In re Ames Dep't Stores, Inc., 136

B.R. 353, 359 (Bankr. S.D.N.Y. 1992) (landlord could not recover damages under section 365 of the Bankruptcy Code for debtor's conduct of store closing sale because section 363(b) fosters the fundamental bankruptcy policy of maximizing estate assets and "to enforce the anti-GOB sale clause of the Lease would contravene overriding federal policy requiring Debtor to maximize estate assets. . ."); In re Tobago Bay Trading Co., 112 B.R. 463, 467 (Bankr. N.D. Ga. 1990) (overruling objection of landlords to store closing program based on lease provisions); In re Lisbon Shops, Inc., 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (finding lease provisions restraining a going out of business sale were unenforceable in Chapter 11).

86.    Courts in retail Chapter 11 cases have routinely approved orders preventing landlords from interfering with store closing sales. See, e.g., In re Movie Gallery, Inc., Case No. 07-33849 (Bankr. E.D. Va. Oct. 17, 2007); In re the Bombay Co., Case No. 07-44084-dml-11 (Bankr. N.D. Tex. Oct. 16, 2007); In re Musicland Holding Corp., Case No. 06-1064 (SMB) (Bankr. S.D.N.Y. Feb. 1, 2006); In re CWT Specialty Stores, Inc., Case No. 00-10758 (JHG) (Bankr. S.D.N.Y. Mar. 7, 2000); In re Caldor, Inc.-NY, Case No. 95-44080 (JLG) (Bankr. S.D.N.Y. Feb. 11, 1999); In re The Wiz, Inc., Case No. 97-48257 (CB) (Bankr. S.D.N.Y. Dec. 18, 1997).  As such, to the extent that such provisions or restrictions exist in any of Debtor's leases, the lessors may not interfere with or otherwise seek to restrict Hudson Capital, or such other purchaser of the Assets, from conducting any going out of business sales. Accordingly, Debtor requests that the Court authorize Hudson Capital, or such other purchaser of the Assets, to conduct any going out of business sales without such interference from any lessors or other persons affected, directly or indirectly, by such sales.

- 38 -

## REQUEST FOR WAIVER OF STAY OF BANKRUPTCY RULE 6004(h)

87.    Rule 6004(h) of the Bankruptcy Rules provides, in substance, that an order authorizing the sale of a debtor's property is stayed for a period of ten days after entry of the order unless the court orders otherwise.  In this case, faced with its continuing constrained cash position and other financial concerns described above, Debtor submits that it should be authorized to close and consummate any and all asset sales developed as a result of the Auction immediately after entry of the order authorizing such sale(s). Indeed, if this Court did not waive Bankruptcy Rule 6004(h), Debtor could not proceed with the Sale to Hudson Capital, which contemplates a closing of the sale within the ten day period.

88.    In light of the ample benefits that the Sale would provide to Debtor's estate and creditors, Debtor knows of no reason to prolong the closing in the event that this Court approves the Sale.  Instead, for these and the reasons set forth above, it is both necessary and appropriate that the 10-day period set forth in Bankruptcy Rule 6004(h) be waived.

## NOTICE

89.    Debtor has served, or will hereinafter serve, a copy of this Motion, including all exhibits hereto, on the following parties, or in lieu thereof, to their counsel: (a) the Office of the United States Trustee for the Northern District of Georgia; (b) Debtor's forty (40) largest unsecured creditors; (c) Wells Fargo Business Credit, LLC and Wells Fargo Bank, N.A., Debtor's prepetition senior secured lender and proposed postpetition lender; (d) Crane & Co., Inc., Debtor's prepetition second lien lender; (e) the Internal Revenue Service, (f) Hudson Capital, (g) all parties to unexpired leases, (h) all UCC lien holders, (i) the Office of the Attorney General for each state in which Debtor

operates a Store, (j) those potential purchasers of the Assets that have been identified by Debtor and CTG as being likely to be interested in making an offer to purchase the Assets and participating in the Auction, (k) all parties that have requested notice pursuant to Bankruptcy Rule 2002, and (l) counsel to any committee appointed in these cases.

WHEREFORE, Debtor respectfully requests that the Court grant the Interim Relief requested in this Motion by entering an order substantially in the form of the proposed Bidding Procedures Order attached hereto as Exhibit G, grant the remaining relief requested in this Motion at the Sale Hearing, and grant such other and further relief as this Court deems just and proper.

Dated: March 4, 2010.

ALSTON & BIRD LLP

/s/ Wendy R. Reiss
Dennis J. Connolly (Bar No. 182275)
Wendy R. Reiss (Bar No.600295)
Sage M. Sigler (Bar No. 300707)
1201 West Peachtree Street
Atlanta, GA 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777

Proposed Attorneys for Debtor