**IT IS ORDERED as set forth below:**

**Date: March 29, 2010**

_____
**C. Ray Mullins**
**U.S. Bankruptcy Court Judge**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SWOOZIE'S, INC.,[1] | ) | Case No. 10-66316-CRM |
| | ) | |
| Debtor. | ) | |

**ORDER PURSUANT TO SECTION 363 OF THE BANKRUPTCY
CODE AUTHORIZING AND APPROVING (I) DEBTOR'S ENTRY INTO
THE ASSET PURCHASE AND AGENCY AGREEMENTS WITH HILCO
MERCHANT RESOURCES, LLC, (II) AUTHORIZING THE SALE OF
CERTAIN OF THE DEBTOR'S ASSETS, FREE AND CLEAR OF ALL
LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS,
(III) AUTHORIZING DEBTOR TO CONSUMMATE ALL TRANSACTIONS
RELATED TO THE ABOVE, AND (IV) GRANTING OTHER RELIEF**

This matter having come before the Court upon the motion (the "**Motion**") of

Swoozie's, Inc. ("**Debtor**") pursuant to Section 363 of the Bankruptcy Code for an order

(I) authorizing and approving Debtor's entry into an asset purchase agreement

(the "**APA**," attached hereto as <u>Exhibit A</u>) and an agency agreement (the "**Agency**

---

[1] The last four digits of Debtor's taxpayer identification number are 5738 and Debtor's mailing address is
80 W. Wieuca Road, Suite 302, Atlanta, GA 30342.

**Agreement**," attached hereto as <u>Exhibit B</u> and together with the APA, the "**Agreements**") with Hilco Merchant Resources, LLC ("**Hilco**" or "**Purchaser**"); (II) authorizing the sale of substantially all of Debtor's assets free and clear of all liens, claims, encumbrances, and other interests; (III) authorizing Debtor to consummate all transactions related to the above; and (IV) granting other relief; the Court having subject matter jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334; consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and upon evidence presented at the hearing held on March 29, 2010 (the "**Sale Hearing**"); and it appearing that the relief requested in the Motion is in the best interests of Debtor, its estate, creditors and parties in interest; and upon the record at the Sale Hearing, including the decision of the Court to approve the Motion as reflected on the record of the Sale Hearing; and any objections filed to the Motion having been resolved, withdrawn, or otherwise overruled by this Order; and after due deliberation and good and sufficient cause appearing therefore,

IT IS HEREBY FURTHER FOUND AND DETERMINED AS FOLLOWS:

A.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.    To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.    Notice of the Motion and of the Sale Hearing was given in accordance

with the directive of the Court and as otherwise required by applicable law, as evidenced by the affidavits of service on file with the Clerk of the Court.

D.    Notice of the Sale Motion and of the Sale Hearing was adequate and sufficient under the circumstances.

E.    Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Motion or the Agreements.

F.    The Agreements were negotiated and proposed, and have been entered into by the parties in good faith within the meaning of Section 363(m) of the Bankruptcy Code, at arm's length bargaining positions, and without collusion; the Purchaser is a good faith purchaser of the Acquired Assets (as defined in the APA) within the meaning of Section 363(m) of the Bankruptcy Code and entitled to the protections thereof; the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and the relief granted herein is in the best interests of Debtor and its estate.

G.    The highest and best offer to perform the transactions contemplated by the Agreements was submitted by Hilco pursuant to the terms of the Agreements and in accordance with the bid procedures previously approved by the Court.

H.    The closing of Debtor's retail store locations identified in Exhibit C annexed hereto and incorporated herein (collectively, the "**Closing Locations**") is in the best interest of Debtor's estate.

I.    Debtor's agreement, permitting Hilco, in its capacity as Debtor's agent (the "**Agent**"), to operate "going out of business" sales (the "**Sales**") at the Closing Locations will provide an efficient means for Debtor to dispose of the merchandise and other assets located at the Closing Locations in accordance with the terms of the

Agreements.

IT IS HEREBY ORDERED AS FOLLOWS:

1.      The Motion is granted to the extent provided herein.  All objections to the Motion that have not been withdrawn, waived, settled, or specifically addressed in this Order, and all reservations of rights included in such objections, are overruled in all respects on the merits and denied.

2.      Debtor, through Agent, is hereby authorized, pursuant to Sections 105(a) and 363(b)(1) of the Bankruptcy Code, to conduct the Sales at the Closing Locations in accordance with the Agreements, and to sell or otherwise dispose of Debtor's inventory and merchandise, as well as all equipment, trade fixtures and other personal property used to facilitate day-to-day operations (collectively, but excluding the property subject to the liens and lease claims described in Schedule 1 to the bid procedures order (Docket No. 62), the "**FF&E**") at the Closing Locations.  No bulk sale or similar law shall prohibit Debtor or the Agent from taking any action contemplated by the Agreements.

3.      Debtor is hereby authorized and empowered to enter into the Agreements and the Agreements are hereby approved in their entirety and incorporated herein by reference, and it is further ordered that all amounts payable to the Agent under the Agreements shall be payable to the Agent without the need for any application of the Agent therefor or a further order of the Court.

4.      Pursuant to Section 363(f) of the Bankruptcy Code, all Merchandise and Additional Merchandise shall be sold free and clear of any and all mortgages, security interests, conditional sales or title retention agreements, pledges, hypothecations, liens, judgments, encumbrances or claims of any kind or nature (including, without limitation,

any and all "claims" as defined in section 101(5) of the Bankruptcy Code), including, without limitation, the liens of Wells Fargo Bank, National Association ("**Wells Fargo**"), whether arising by agreement, any statute or otherwise and whether arising before, on or after the date on which this Chapter 11 case was commenced (collectively, the "**Liens**"), with such Liens to attach to the Guaranteed Amount, letter of credit rights and any other amounts and consideration (whether in the form of cash or otherwise) payable to or at any time received by Debtor under the Agreements with the same validity, force and effect as the same had with respect to the assets at issue, subject to any and all defenses, claims and/or counterclaims or setoffs that may exist.

5.      At Closing, the Initial Guaranty Payment to be paid by Agent to Debtor shall be distributed as follows:

(a)      First, to Hudson Capital Partners, LLC ("**Hudson**"), for the Breakup Fee in the amount of $75,000, as contemplated by the Bidding Procedures previously approved by this Court by its Order dated March 10, 2010 (Docket No. 62), in full and final satisfaction of Debtor's obligations with respect to the Breakup Fee owed to Hudson;

(b)      Second, pursuant to the final order authorizing post-petition financing from Wells Fargo (Doc. No. 97) (the "**Financing Order**"), including, without limitation, paragraph 9 thereof, $470,000 shall be deposited in trust with Debtor's counsel to fund the Carve-Out under (and as defined in) the Financing Order and in full and final satisfaction of any obligations of Wells Fargo in respect of such Carve-Out;

(c)     Third, the aggregate amount of known outstanding non-contingent and liquidated obligations owed by Debtor to Wells Fargo (collectively, the "**Wells Obligations**"), as shown in a written statement provided by Wells Fargo, shall be paid directly to Wells Fargo in cash.  Unless otherwise expressly provided by subsequent order of the Court, such payment to Wells Fargo (i) shall be without prejudice to the right of Debtor, the Committee or any other party in interest to request an accounting from Wells Fargo and to review and contest any such accounting, (ii) shall not constitute a waiver of any rights or claims Debtor, or the Committee, may have against Wells Fargo with respect to the Wells Obligations, and (iii) shall not constitute a release of the liens or claims of Wells Fargo, which claims and liens shall continue to encumber the property of Debtor's estate existing after Closing.  Notwithstanding such payment, the final calculation, amount and payment of the Wells Obligations shall be determined by further order of the Court at a later date; and

(d)     Fourth, the remaining cash proceeds of the Initial Guaranty Payment shall be remitted to Debtor, subject to the Liens that attach thereto at Closing. Pursuant to 11 U.S.C. § 363(c)(2)(A), after Closing, Debtor shall be entitled to use cash collateral of Wells Fargo through June 5, 2010, pursuant to the budget, subject to a permitted negative variance not to exceed 10%, that has been agreed upon by Debtor and Wells Fargo (the "**Budget**"), which Budget is attached hereto as <u>Exhibit D</u> and may be amended or extended from time to time by written agreement of Debtor

and Wells Fargo.

6.     Debtor and the Agent are hereby authorized to take such actions necessary and appropriate to implement the Agreements and to conduct the Sales without the necessity of a further order of this Court as provided by the Agreements, including, but not limited to, advertising the Sales through the posting of signs (including the use of exterior banners in non-enclosed malls), use of sign walkers and street signage, in accordance with the Agreements and as otherwise provided in the sale guidelines attached to the Agency Agreement (the "**Sale Guidelines**"), which Sale Guidelines are hereby approved in the form annexed hereto as Exhibit E; provided that written agreements between the Agent and any landlord of the Closing Locations (collectively, the "**Landlords**") modifying the terms of the Sale Guidelines at applicable locations shall govern the conduct of the Sale at such Closing Locations.

7.     Agent is hereby granted a limited license and right to use until the Sale Termination Date the trade names, logos, and customer lists (mailing and e-mail) relating to and used in connection with the operation of the Closing Locations, solely for the purpose of advertising the Sale in accordance with the terms of the Agreement; provided, however that the utilization of the customer lists shall be provided solely through Merchant or Merchant's outside advertising services and Agent shall not have direct access to any personally identifiable information that may be contained therein.

8.     Except as expressly provided for in the Agreements, nothing in this Order or the Agreements, and none of Hilco's actions taken in respect of the Sales, shall be deemed to constitute an assumption by Hilco of any of Debtor's obligations relating to any of Debtor's employees, except as specifically set forth in the Agreements, nor shall

Hilco become liable under any employment agreement or be deemed a joint or successor employer with respect to such employees.

9.    All the transactions contemplated by the Agreements and all sales of, among other things, the Acquired Assets, the Additional Merchandise, Merchandise and FF&E by Hilco shall be protected by Section 363(m) of the Bankruptcy Code in the event that this Order is reversed or modified on appeal.

10.    The provisions of this Order shall be self-executing notwithstanding any restrictions in the Agreements on the Agent's ability to conduct the Sales in compliance with applicable laws or Closing Location leases.  All Landlords are directed to accept this Order as binding authority so as to authorize Debtor and the Agent to consummate the Agreements and to conduct the Sales at the Closing Locations, including, without limitation, conducting the Sales in accordance with the Agreements, the Sale Guidelines and this Order; and no further approval, license or permits of any governmental authority shall be required.

11.    If any parties or persons, including but not limited to Landlords, subtenants, utility companies, governmental agencies (except to the extent provided otherwise in this Order), sheriffs, marshals or other public officers, creditors and all those acting for or on their behalf, believe that cause exists to: (a) prohibit the Agent from advertising the Sales, to the extent same is consistent with the Agreements; (b) in any way interfere with or otherwise impede the conduct of the Sales at the Closing Locations or the use or maintenance of the Merchandise and FF&E thereat; or (c) institute any action or proceeding in any court or other administrative body having as its objective the obtaining of an order or judgment against Debtor, the Agent or a Landlord which might

in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Sales at the Closing Locations or corporate headquarters and/or seek to recover damages for breach(es) of covenants or provisions in any lease or sublease based upon any relief authorized herein, this Court shall retain exclusive jurisdiction to resolve such dispute, and such parties or persons shall take no action against Debtor, the Agent, the Landlord or the Sales until this Court has resolved such dispute.  This Court shall hear the request of such persons or parties with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances.

12.    The Sales at the Closing Locations and the sale of the FF&E shall be conducted by Debtor and the Agent without the necessity of compliance with any federal, state or local statute or ordinance, lease provision or licensing requirement affecting store closing, "going out of business", liquidation or auction sales, or affecting advertising, including signs, sign walkers, banners, and posting of signage, other than those relating to public health and safety, except to the extent set forth in the Sale Guidelines.

13.    Other than otherwise expressly provided for in the Agreements, the Sales at the Closing Locations and the sale of the FF&E shall be conducted by Debtor and the Agent notwithstanding any restrictive provision of any lease, sublease or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Sales, provided, however, that nothing in this Order shall impact any objection a Landlord may have to assumption, assignment or rejection of their respective lease or to any proposed cure amount or rejection damages claim in association with such assumption, assignment or rejection.

14.    Debtor and/or the Agent (as the case may be), are authorized and

- 9 -

empowered to transfer Merchandise and FF&E among the Closing Locations in accordance with the Agreements.

15.    Provided that the Sales are conducted in accordance with the terms of this Order, the Agreements and the Sale Guidelines, Debtor, its Landlords and the Agent are presumed to be in compliance with the requirements of any applicable "going out of business," "store closing," similar inventory liquidation sales, or bulk sale laws, including laws restricting safe, professional and non-deceptive, customary advertising of GOB Sales such as signs, banners, posting of signage, and use of sign walkers, and including ordinances establishing licensing or permitting requirements, waiting periods, time limits or bulk sale restrictions that would otherwise apply (the "**GOB Laws**").  To the extent there is a dispute arising from or relating to the Sales, this Order, the Agreements, or the Sale Guidelines, which dispute relates to any GOB Law (a "**Reserved Dispute**"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute.

16.    Except as otherwise set forth in this Order, this Court shall retain exclusive jurisdiction with regard to all issues on disputes in connection with this Order and the relief provided for herein, including, without limitation, to protect Debtor, the Landlords and/or the Agent from interference with the Sale, and to resolve any disputes related to the Sale or arising under the Agreements or the implementation thereof.

17.    Hilco shall not be liable for any claims against Debtor other than as expressly provided for in the Agreements.

18.    Debtor and the Agent are hereby authorized to conduct the Sale pursuant to the Agreements and the Sale Guidelines, and take all actions reasonably related thereto or arising in connection therewith.  Debtor, the Agent and each of their respective

officers, employees and agents are hereby authorized to execute such documents and to do such acts as are necessary or desirable to carry out the Sale and effectuate the Agreements and the related actions set forth therein.

19.     Upon payment of the Initial Guaranty Payment as provided in Section 3.3(a) of the Agency Agreement, Hilco shall have a first priority security interest in and lien upon the Merchandise, FF&E and Proceeds to secure all obligations of Debtor to Hilco under the Agreements.  Upon entry of this Order, the security interest granted hereby shall be properly perfected without the need for further filings or further documentation.

20.     The provisions of this Order and the Agreements and any actions taken pursuant hereto or thereto shall survive entry of any order which may be entered confirming or consummating any plan of reorganization of Debtor, or which may be entered converting Debtor's case from Chapter 11 to Chapter 7, and the terms and provisions of the Agreements as well as the rights and interests granted pursuant to this Order and the Agreements shall continue in this or any superseding case and shall be binding upon Debtor, Hilco and their respective successors and permitted assigns, including any trustee or other fiduciary hereafter appointed as a legal representative of Debtor under Chapter 7 or 11 of the Bankruptcy Code.  Any trustee appointed in the case shall be and hereby is authorized and directed to operate the business of Debtor to the fullest extent necessary to permit compliance with the terms of this Order and the Agreements and Hilco and the trustee shall be and hereby are authorized to perform under the Agreements upon the appointment of a trustee with the need for further order of this Court.

21.    Pursuant to and in accordance with the terms of the Agreements and the Sale Guidelines, the Agent may, but is not required to, supplement Merchandise in Debtor's Closing Locations only with additional goods procured by Agent, at its expense, which are of like kind and quality to the Merchandise located in the Closing Locations ("**Additional Merchandise**"); provided, however, that no more than 25% of the Additional Merchandise may be obtained from sources other than Merchant's existing vendors.   In order to distinguish the Additional Merchandise from the Merchandise located in the Closing Locations, Agent shall ascribe a unique or "dummy" SKU to such Additional Merchandise, which shall enable Debtor and Agent to distinguish the sales of the Additional Merchandise from the sale of the Merchandise presently included in the Sale at the Closing Locations.   To the extent Agent complies with the foregoing procedures, Agent shall be deemed to be in compliance with GOB Laws and consumer protection laws including consumer laws relating to deceptive practices and false advertising.

22.    This Order constitutes an authorization of conduct by Debtor and nothing contained herein shall be deemed to constitute a ruling with regard to the sovereign immunity of any state, and the failure of any state to object to the entry of this Order shall not operate as a waiver with respect thereto.

23.    To the extent, if any, anything contained in this Order conflicts with a provision in the Agreements or the Sale Guidelines, this Order shall govern and control. The Court shall retain jurisdiction with respect to any matters, claims, rights, or disputes arising from or related to the implementation of this Order.

24.    Debtor shall be, and hereby is, authorized and empowered to sell, transfer

and convey the Acquired Assets to Hilco pursuant to the Agreements.

25.    This Order shall be binding on all creditors (whether known or unknown) of Debtor, all successors and assigns of Hilco, Debtor, its affiliates and any subsequent trustee(s) appointed in Debtor's Chapter 11 case or upon a conversion to Chapter 7 under the Bankruptcy Code and shall not be subject to rejection or revocation.

26.    Nothing in this Order shall alter any statutory priorities respecting the tax claims of governmental entities to the extent such claims are valid, senior, due and owing and become allowed claims under applicable law.

27.    To the extent the Guaranteed Amount constitutes cash collateral, Debtor is authorized to use such Guaranteed Amount for the purposes of performing all its obligations under the Agreements, subject to compliance with the Budget.

28.    Hilco is a party in interest and shall have the ability to appear and be heard on all issues related to or otherwise connected to the Agreements and related transactions.

29.    In the event that Hilco fails to consummate the Sale in accordance with this Order and the Agreements, Debtor and Gordon Brothers Retail Partners, LLC, ("**GBRP**") may consummate a sale in accordance with the terms and conditions of GBRP's Second Place Bid without further notice or order of the Court.

30.    The provisions of Bankruptcy Rule 6004(h) staying the effectiveness of this Order for fourteen (14) days are hereby waived, and this Order shall be effective immediately upon entry thereof.

**\*\*\*END OF DOCUMENT\*\*\***

*Prepared and presented by:*

ALSTON & BIRD LLP

/s/Wendy R. Reiss
Dennis J. Connolly (Bar No. 182275)
Wendy R. Reiss (Bar No.600295)
Sage M. Sigler (Bar No. 300707)
1201 West Peachtree Street
Atlanta, GA 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777

# **Exhibit A**

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "Agreement"), dated as of the 26th day of March 2010, is made and entered into by and among **SWOOZIE'S, INC.,** (the "Seller") and Hilco Merchant Resources, LLC (the "Purchaser").

WHEREAS, Seller is currently a debtor in possession under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in Case Number 10-66316-CRM (the "Bankruptcy Case") pending before the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court");

WHEREAS, Seller desires to sell, and Purchaser desires to purchase, the assets described in Section 1.01 hereto, free and clear of all liens, claims and encumbrances pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and subject to the terms and conditions contained in this Agreement;

NOW, THEREFORE, in consideration of the foregoing, the mutual agreements, covenants, representations and warranties contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the terms and conditions hereinafter set forth, the parties hereto agree as follows:

## ARTICLE I
## SALE AND PURCHASE OF ASSETS

**1.01    Sale and Purchase of Acquired Assets.**    On the terms and subject to the conditions hereinafter set forth, Seller hereby agrees to sell, convey, assign, transfer and deliver to Purchaser, free and clear of any and all liens, claims, charges, encumbrances and security interests of any kind or nature, and Purchaser agrees to purchase and accept from Seller, the following assets (collectively, the "Acquired Assets"):

(a)    The exclusive rights to serve Seller's exclusive agent with exclusive "designation rights" for purpose of disposing of all inventory owned by Seller and including but not limited to that listed on Schedule 1.01(a) hereto, with replacements and similar goods (the "Inventory");

(b)    The exclusive rights to serve Seller's exclusive agent with exclusive "designation rights" for purpose of disposing of all equipment owned by Seller, including, but not limited to the Equipment identified on Schedule 1.01(b) hereto, with all replacements and similar equipment (collectively, the "Equipment");

(c)    The exclusive rights to serve as Seller's exclusive agent with exclusive "designation rights" for purpose of disposing of all furniture and fixtures owned by Seller, including, but not limited to the furniture and fixtures identified on Schedule 1.01(c) hereto, with all replacements and similar furniture and fixtures (the "Furniture and Fixtures");

(d)    The exclusive rights to serve Seller's exclusive agent with exclusive "designation rights" for purpose of disposing of all ownership, maintenance, and warranty records with respect to the Inventory, Equipment, and Furniture and Fixtures.

**1.02    Access to Locations**. Following the sale and purchase of the Acquired Assets, to the extent that Seller retains the right to control access to the locations where the Acquired Assets are located, Seller shall provide Purchaser, at no cost or expense to Purchaser whatsoever, with peaceful use and occupancy of, and reasonable access (including reasonable before-hours and after-hours access and normal utilities/phone service) to, those locations for the sole purposes of preparing for, conducting (including inspection), and completing sales of the Inventory, Equipment, Furniture and Fixtures to third parties.

**1.03    Excluded Liabilities.** Purchaser shall not assume or become liable for any obligations, commitments or liabilities of Seller, whether known or unknown, absolute, contingent or otherwise, and whether or not related to the Acquired Assets (the obligations and liabilities of Seller not assumed by Purchaser are hereinafter referred to as the "Excluded Liabilities").

**1.04    Excluded Assets**. Purchaser is not purchasing any of Seller's rights under its financing agreements with Wells Fargo Bank, National Association ("Wells Fargo"), and except as provided in the Agency Agreement (as defined below) and this Agreement, Purchaser is not purchasing any of the following assets: (a) Seller's cash; (b) Seller's causes of action, other than causes of action related to the Acquired Assets; (c) Seller's books and records; provided however Purchaser shall have reasonable access to such books and records to the extent necessary to consummate the transactions contemplated by the Agreement and/or the Agreements (as defined below); (d) Seller's credit card deposits and receivables; (e) Seller's security deposits; (f) Seller's insurance refunds; (g) Seller's tax refunds; (h) Seller's leased equipment, which remains subject to liens, as identified on Schedule 1.04; (i) subject to Purchaser's rights under the Agency Agreement, Seller's intellectual property, which includes, but is not limited to, the items listed on Schedule 1.04; and (j) Seller's causes of action under Chapter 5 of the Bankruptcy Code.

**ARTICLE II**
**PURCHASE PRICE & CLOSING**

**2.01    Purchase Price.**

(a)  In consideration for the Acquired Assets, along with other consideration as set out in the contemporaneously executed Agency Agreement (the "Agency Agreement," collectively, the "Agreements") between Purchaser and Seller, Purchaser shall tender to Seller the Guaranteed Amount (as defined in Section 3.1 of the Agency Agreement) and such other amounts as are provided in Section 3.2 of the Agency Agreement. The Guaranteed Amount shall be paid according to the timing and payment mechanisms established in the Agreements.

(b)  The Guaranteed Amount has been calculated and agreed upon based upon Seller's representations with respect to Schedules 1.01(a),(b), and (c) in addition to all terms set forth in this Agreement and related agreements. Specifically, Purchaser has relied on Seller's representations that: (i) at least all of the assets identified on those schedules are: (x) available for immediate sale and pickup at the Seller-owned or leased locations identified on the schedules, and (y) in substantially the same condition as they were when inspected by representatives of Purchaser in or about March 2010; (ii) all personal property or excise taxes on all the Acquired Assets will have been paid through Closing Date (as defined below), or a reserve will be

- 2 -

established therefor; (iii) Seller has the ability to immediately deliver good and marketable title to Equipment and Furniture and Fixtures to purchaser free and clear of all liens, claims and encumbrances in connection with the Acquired Assets, and (iv) Seller has the ability to deliver accurate maintenance history records for the Equipment and Furniture and Fixtures in connection with the Acquired Assets.

**2.02    The Closing.**  The closing of the purchase and sale of the Acquired Assets and the consummation of the other transactions contemplated by the Agreements (the "Closing") shall take place as soon as practically possible after the satisfaction or waiver of the conditions set forth in Article VIII hereof, and in no event more than one (1) day following the entry of the Approval Order, at a location mutually agreeable to the parties hereto.  The date on which the Closing actually occurs is herein referred to as the "Closing Date."  At the Closing, all of the transactions contemplated by the Agreements shall be deemed to occur simultaneously and become effective as of 12:01 a.m. Atlanta local time on the Closing Date (the "Effective Time").

**2.03    Deposit.**  On March 24, 2010, Purchaser executed and delivered to Seller and the Deposit Escrow Agent that certain Deposit Escrow Agreement and immediately available funds in the amount of $543,500 (the "Cash Deposit").  The Cash Deposit shall be held by the Deposit Escrow Agent in an interest bearing account reasonably acceptable to Purchaser and Seller.  The Cash Deposit shall be held by the Deposit Escrow Agent to serve as an earnest money deposit under this Agreement to be released as follows:

(a) Effect of Closing. If the Closing shall occur, Seller and Purchaser shall jointly instruct the Deposit Escrow Agent to, on the Closing Date, deliver the Cash Deposit, together with all accrued investment income thereon, by wire transfer of immediately available funds, on behalf of Seller, to the Administrative Agent (and such amounts shall be applied toward the payment of the Guaranteed Amount) in accordance with the terms of the Deposit Escrow Agreement.

(b) Effect of Termination. If this Agreement is validly terminated prior to the Closing Date, the Deposit Escrow Agent shall deliver the Cash Deposit in accordance with the terms of the Deposit Escrow Agreement.  If pursuant to this Agreement and the Deposit Escrow Agreement the Cash Deposit is delivered to, or becomes deliverable to, anyone other than Purchaser the Cash Deposit will constitute liquidated damages and shall be delivered to an account or accounts designated by the Administrative Agent (pursuant to the Approval Order) on behalf of Sellers.  Because it would be impractical and extremely difficult to determine the extent of any damages that might result from a breach of, or default under, this Agreement by Purchaser prior to the Closing Date, it is understood and agreed that such liquidated damages represent Purchaser's and Seller's reasonable estimate of actual damages, such liquidated damages do not constitute a penalty and the Cash Deposit will constitute Seller's sole and exclusive remedy for any breach of, or default under, this Agreement by Purchaser prior to the Closing Date.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser as follows as of the date hereof and as of the Closing:

**3.01    Validity.**    Subject to approval by the Bankruptcy Court as set forth in Section 6.01, this Agreement has been duly executed and delivered by duly authorized officers of Seller and constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms except as enforceability may be limited by applicable equitable principles (whether applied at a proceeding in law or in equity) or by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally, to the exercise of judicial discretion in accordance with general equitable principles and to equitable defenses that may be applied to the remedy of specific performance.    Seller has the corporate power and authority necessary to enter into and perform its obligations under this Agreement and to consummate the transactions contemplated hereby.

**3.02    Organization.**    Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.

**3.03    Title to Acquired Assets; Encumbrances.**    Upon entry of the Approval Order, Seller has good, valid and marketable title to the Inventory, Equipment, and Furniture and Fixtures free and clear of any and all liens, claims, charges, encumbrances and security interests of any kind or nature.    Purchaser is acquiring the Acquired Assets free and clear of any liens, claims, interests, or Encumbrances; provided, however, that notwithstanding anything to the contrary set forth herein or in any of the Agreements, the liens, security interests and other encumbrances of Wells Fargo shall continue in all Excluded Assets and, subject to Section 2.3(i) of the Agency Agreement, in the proceeds of all Acquired Assets and in all of Merchant's right, title and interest in and to the Agreements.    Furthermore, no action, arbitration, suit, notice, or legal, administrative or other proceeding before any court or governmental body has been instituted by or against Seller, or has been settled or resolved, or to Seller's knowledge, is threatened against or affects Seller, relative to Inventory, Equipment, Furniture or Fixtures, or which questions the validity of this Agreement, or that if adversely determined, would materially adversely affect the transaction contemplated by this Agreement.

**3.04    Brokers and Finders.**    Seller has not incurred any obligation or liability to any party for any brokerage fees, agent's commissions or finder's fees in connection with the transactions contemplated by this Agreement.

**3.05    No Conflict**.    No contract or other agreement to which Seller is a party or by which the Inventory, Equipment, and Furniture and Fixtures are bound will prevent or impair the transaction contemplated by this Agreement.

**3.06    Removal of Data**.    Prior to Purchaser's disposal of the Equipment and Furniture and Fixtures, Seller will have permanently removed from all of the Equipment and Furniture and Fixtures any and all data relating to Seller's former customers and employees (including without limitation names, addresses (street and email), etc.), and any other data, programs, intellectual

- 4 -

property and the like, the transference of which in connection with the Sale contemplated by this Agreement, would constitute a violation of applicable law or contract.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller that, as of the date hereof and as of the Closing:

**4.01    Organization.**  Purchaser is an entity duly organized, validly existing.

**4.02    Authority and Binding Effect.**  This Agreement has been duly executed and delivered by duly authorized officers of Purchaser and constitutes the legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms.  Purchaser has the corporate power and authority necessary to enter into and perform its obligations under this Agreement and to consummate the transactions contemplated hereby.

**4.03    No Conflict.**  Neither the execution, delivery and performance of this Agreement by Purchaser nor the consummation by Purchaser of the transactions contemplated hereby (a) will result in a violation by Purchaser of any law or order of any court or governmental unit to which Purchaser is subject, or (b) requires the consent of any third party.

**4.04    Brokers and Finders.**  Purchaser has not incurred any obligation or liability to any party for any brokerage fees, agent's commissions or finder's fees in connection with the transactions contemplated by this Agreement.

## ARTICLE V
## COVENANTS AND ADDITIONAL AGREEMENTS OF SELLER AND PURCHASER

**5.01    Consents and Approvals.**  Seller agrees to use its commercially reasonable efforts to obtain, prior to the Closing Date, the waiver, consent and approval of all persons whose waiver, consent or approval is required in order to consummate the transactions contemplated by this Agreement, including that of Wells Fargo, the consent by which is a condition to Purchaser's Closing.

**5.02    Expenses.**  Except as expressly provided for the Agreements, each of Purchaser and Seller shall be responsible for all the expenses and fees incurred by it in connection with the transactions contemplated hereby.  Purchaser shall have no liability for taxes incurred in connection with the transfers to be made through this Agreement and such taxes shall be paid by Seller as an administrative expense of its bankruptcy estate.

**5.03    Further Assurances.**  At any time and from time to time after the date of this Agreement, Seller shall, at the request of Purchaser, take any and all actions reasonably necessary to fulfill Seller's obligations hereunder, including executing and delivering such further instruments of conveyance, sale, transfer and assignment, and taking such other actions reasonably necessary or desirable to effectuate the transfer of the Acquired Assets to Purchaser.

- 5 -

**5.04    Taxes.**

(a)    Personal Property Taxes including, without limitation, accruals or prepayments thereof shall be paid by Seller.

(b)    For purposes of this Section 5.04, the term "Personal Property Taxes" shall mean ad valorem taxes imposed upon the Equipment, Furniture and Fixtures.

**5.05    Condition of Acquired Assets.**    Except as expressly set forth in this Agreement, the Acquired Assets are being sold "as is, where is" without any representation or warranty of any kind, either express or implied, including, without limitation, any representation or warranty as to the design, quality or condition of the Equipment, Furniture or Fixtures, any warranty of merchantability or fitness of the Equipment, Furniture or Fixtures for any particular purpose or as to any other matter relating to the Acquired Assets or any part thereof.

**5.06    Conduct of Business Prior to Closing.**    From March 25, 2010 to the date of final disposition of the Inventory, Equipment, and Furniture and Fixtures as contemplated by the Agreements, and except as required or contemplated by the Agreements, and except to the extent that Purchaser shall otherwise consent in writing and subject to the requirements and restrictions of the Bankruptcy Court proceedings, Seller shall:

(a)    Operate its business in all material respects in compliance with the Bankruptcy Code and any orders entered by the Bankruptcy Court in the Bankruptcy Case;

(b)    Not waive or agree to waive any rights of material value relating to the Inventory, Equipment, or Furniture and Fixtures or allow to lapse or fail to keep in force any material license, permit, authorization or other material right relating thereto;

(c)    Maintain the Equipment and Furniture and Fixtures in their present order and condition, reasonable wear and use (and normal mileage) excepted, and maintain all material policies of insurance covering the Acquired Assets in amounts and on terms substantially equivalent to those in effect on the date hereof;

(d)    Comply in all material respects with all laws applicable to the conduct of the business and the ownership of the Inventory, Equipment, and Furniture and Fixtures; and

(e)    Not to take any action that would otherwise materially impair the Acquired Assets.

### ARTICLE VI
### BANKRUPTCY RELATED PROVISIONS

**6.01    Bankruptcy Court Approval.**

(a)    Pursuant to the Motion of the Debtor filed on or about March 4, 2010 (the "Sale Motion"), Seller shall obtain authorization to sell the Acquired Assets, free and clear of all encumbrances, to Purchaser through an order of the Bankruptcy Court (the "Approval Order"). The Approval Order shall contain a finding that Purchaser has acted in "good faith" within the

meaning of Section 363(m) of the Bankruptcy Code, shall contain a provision waiving any stay of the Approval Order required under Bankruptcy Rule 6004(h) or otherwise, and shall be in form and substance reasonably satisfactory to Seller and Purchaser.

(b)     In the event an appeal is taken, or a stay pending appeal is requested, from the Approval Order, Seller shall immediately notify Purchaser of such appeal or stay request and shall provide to Purchaser promptly a copy of the related notice of appeal or order of stay. Seller shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from either of such orders.

(c)     From and after the date hereof, Seller shall not take any action which is intended, or fail to take any action the intent of which failure to act would result in the reversal, voiding, modification or staying of the Approval Order.

## ARTICLE VII
## DELIVERY OF DOCUMENTS

**7.01    Delivery of Documents.** At the Closing or at Purchaser's option, at such later time, the parties shall exchange all duly executed documents and other instruments required to consummate the transactions contemplated by this Agreement, including, but not limited to The Approval Order.

## ARTICLE VIII
## CONDITIONS PRECEDENT

**8.01    Conditions Precedent to Purchaser's Obligations.** The obligation of Purchaser to consummate the transactions provided for in this Agreement is subject to the satisfaction of each of the following conditions on or before the Closing, any of which may be waived by Purchaser in its sole discretion:

(a)     Seller shall have duly performed in all material respects all of the covenants, agreements and conditions contained in the Agreements to be performed or satisfied by Seller on or prior to the Closing Date, and Purchaser shall have received a certificate dated as of the Closing Date, executed by a duly authorized officer of Seller, to such effect.

(b)     The Approval Order shall have been entered by the Bankruptcy Court and shall not be stayed pending appeal or reversed.

(c)     The representations and warranties in the Agreements are true and correct in all material respects.

**8.02    Conditions Precedent to Seller's Obligations.** The obligation of Seller to consummate the transactions provided for in this Agreement is subject to the satisfaction of each of the following conditions on or before the Closing, any of which may be waived by Seller in its sole discretion:

(a)     The Approval Order shall have been entered by the Bankruptcy Court and shall not be stayed pending appeal or reversed.

- 7 -

**ARTICLE IX**
**TERMINATION**

**9.01    Method of Termination.** This Agreement may be terminated at any time prior to the Closing Date:

(a)    by the mutual consent of Seller and Purchaser; or

(b)    if the Approval Order is not entered by March 29, 2010, unless such time is extended by mutual agreement of Seller and Purchaser.

**9.02    Notice of Termination.** Notice of termination of this Agreement shall be given by the party so terminating to the other party hereto in accordance with Section 10.01 of this Agreement.

**9.03    Effect of Termination.** If this Agreement is terminated pursuant to Section 9.01 hereof, this Agreement shall (except as expressly set forth herein) become void and of no further force and effect, and, except as set forth in this Section 9.03, no party (or any of its officers, directors, members, managers, partners, employees, agents, or representatives) shall be liable to any other party for any loss as a result of such termination. If the nonoccurrence of Closing is the direct or indirect result of a default of or breach by any party of its obligations hereunder, such defaulting or breaching party shall be fully liable to the other party hereto for any such breach or default.

**ARTICLE X**
**MISCELLANEOUS**

**10.01    Notices.**

(a)    All notices, requests, demands and other communications hereunder shall be (i) delivered by hand, (ii) mailed by registered or certified mail, return receipt requested, first class postage prepaid and properly addressed, (iii) sent by national overnight courier service, or (iv) sent by facsimile, graphic scanning or other telegraphic communications equipment to the parties or their assignees, addressed as follows:

If to Purchaser:    Hilco Merchant Resources, LLC
Attn:  Joseph A. Malfitano
5 Revere Drive
Northbrook, IL 60062
Fax: (847) 897-0868

With a copy to:    John W. Mills
Barnes & Thornburg LLP
Atlanta Financial Center
Suite 1150
3343 Peachtree Road, N.E.
Atlanta, Georgia 30326-1428
Fax: (404) 264-4033

If to the Merchant:   Swoozie's, Inc.
         80 West Wieuca Rd, NE
         Suite 302
         Atlanta, Georgia 30342
         Attn: Kelly Plank-Dworkin
         Fax: (404)888-0145

With a copy to:    Clear Thinking Group LLC
         401 Towne Centre Drive
         Hillsborough, NJ 08844
         Attn: Lee Diercks
         Fax: (908) 359-5940

With a copy to:    Alston & Bird, LLP
         One Atlantic Center
         1201 West Peachtree Street
         Atlanta, GA 30309
         Attn:  Dennis J. Connolly
             Wendy R. Reiss
             Sage M. Sigler
         Fax: (404) 253-8791

With a copy to:    Wells Fargo Bank, National Association
         c/o Jay S. Rankin
         Parker Hudson Rainer & Dobbs LLP
         285 Peachtree Center Avenue, NE
         1500 Marquis Two
         Atlanta, GA 30303
         Fax: (404) 522-8409

With a copy to:    Official Committee of Unsecured Creditors
         c/o Darryl S. Laddin
         Michael F. Holbein
         Arnall Golden Gregory LLP
         Suite 2100
         171 17th Street, NW
         Atlanta, GA 30363
         Fax : (404) 873-7013

    (b)  All notices, requests, instructions or documents given to any party in accordance with this Section 10.01 shall be deemed to have been given (i) on the date of receipt if delivered by hand, overnight courier service or if sent by facsimile, graphic scanning or other telegraphic communications equipment or (ii) on the date three (3) business days after depositing with the United States Postal Service if mailed by United States registered or certified mail, return receipt requested, first class postage prepaid and properly addressed.

(c)    Any party hereto may change its address specified for notices herein by designating a new address by notice in accordance with this Section 10.01.

**10.02  Entire Agreement.**  This Agreement, the Schedules and the Exhibits constitute the entire agreement between the parties relating to the subject matter hereof and thereof and supersede all prior oral and written, and all contemporaneous oral negotiations, discussions, writings and agreements relating to the subject matter of this Agreement.  The terms of this Agreement control and supersede any course of performance or usage of the trade that is inconsistent with such terms.

**10.03  Modifications, Amendments and Waivers.**  The failure or delay of any party at any time or times to require performance of any provision of this Agreement shall in no manner affect its right to enforce that provision.  No single or partial waiver by any party of any condition of this Agreement, or the breach of any term, agreement or covenant or the inaccuracy of any representation or warranty of this Agreement, whether by conduct or otherwise, in any one or more instances shall be construed or deemed to be a further or continuing waiver of any such condition, breach or inaccuracy or a waiver of any other condition, breach or inaccuracy.

**10.04  Successors and Assigns.**  This Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the parties hereto, and their respective estates, successors, legal or personal representatives, heirs, distributees, designees and assigns, but no assignment shall relieve any party of the obligations hereunder.  This Agreement cannot be assigned by any party without the prior written consent of the other parties hereto; provided, however, that Purchaser may assign this Agreement to any entity controlling, controlled by or under common control with Purchaser.

**10.05  Severability.**  Should any one or more of the provisions of this Agreement be determined to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions hereof shall not in any way be affected or impaired thereby.

**10.06  Choice of Law.**  This Agreement shall be construed, interpreted and the rights of the parties determined in accordance with the laws of the State of Delaware applicable to contracts made and wholly performed within that state.

**10.07  No Third-Party Beneficiaries.**  Nothing in this Agreement, whether express or implied, is intended or shall be construed to confer upon or give to any person, other than the parties hereto, any rights, remedies or other benefits under or by reason of this Agreement.

**10.08  Counterparts.**  This Agreement may be executed by facsimile signature in any number of counterparts, each of which shall be an original; but all of such counterparts shall together constitute one and the same instrument.

IN WITNESS WHEREOF, Purchaser and Seller have duly executed this Agreement as of the date first above written.

**SELLER:**

**Swoozie's, Inc.**

By: Kelly Plank Dworkin
Title:  Chief Executive Officer

**PURCHASER:**

**Hilco Merchant Resources, LLC**

By:  Joseph A. Malfitano
Title: Vice President, Assistant General Counsel

## SCHEDULE 1.01(A)—INVENTORY (ACQUIRED ASSETS)

**Swoozie's Inc.**

Asset Purchase Agreement

**Schedule 1.01(A) Inventory (as of 3/21/10)**

| DEPT NAME | QUANTITY | Inventory Values Cost | | Inventory Values Retail | |
|---|---|---|---|---|---|
| ACCESSORY GENERAL  GENERAL | 1,543 | $ | 16,457 | $ | 39,069 |
| ACCESSORY HANDBAGS  TOTES | 25,555 | $ | 246,833 | $ | 575,989 |
| ACCESSORY JEWELRY  JEWELRY | 12,444 | $ | 158,066 | $ | 299,840 |
| GEN     GIFT     TENT | 1 | $ | - | $ | - |
| GIFTS     ALBUMS   ALBUMS | 917 | $ | 11,174 | $ | 24,621 |
| GIFTS     BABY       BIBS/BURPS | 6,193 | $ | 47,078 | $ | 107,219 |
| GIFTS     BABY       BLOOMERS | 1,504 | $ | 14,300 | $ | 29,195 |
| GIFTS     BABY       BOY | 8,300 | $ | 72,787 | $ | 157,634 |
| GIFTS     BABY       GIRL | 8,284 | $ | 71,871 | $ | 160,632 |
| GIFTS     BABY       ONESIES | 876 | $ | 9,381 | $ | 21,985 |
| GIFTS     BABY       SOCKS | 8,223 | $ | 37,244 | $ | 101,078 |
| GIFTS     BABY       TODDLER | 9,364 | $ | 68,460 | $ | 143,618 |
| GIFTS     BABY       UNISEX | 5,657 | $ | 40,029 | $ | 92,509 |
| GIFTS     BIRTHDAY CANDLES | 7,292 | $ | 7,859 | $ | 21,438 |
| GIFTS     BIRTHDAY GENERAL | 13,413 | $ | 49,849 | $ | 101,969 |
| GIFTS     BIRTHDAY HATS | 664 | $ | 2,484 | $ | 6,626 |
| GIFTS     BOOKS     BABY | 683 | $ | 5,850 | $ | 10,886 |
| GIFTS     BOOKS     COOKBOOK | 772 | $ | 8,504 | $ | 14,571 |
| GIFTS     BOOKS     GENERAL | 4,740 | $ | 35,604 | $ | 70,496 |
| GIFTS     BOOKS     GRADEBOOK | 358 | $ | 3,898 | $ | 7,987 |
| GIFTS     BOOKS     WEDDING | 1,071 | $ | 12,115 | $ | 22,128 |
| GIFTS     FOOD       CANDYGUM | 24,930 | $ | 34,598 | $ | 76,380 |
| GIFTS     FOOD       COOKIECRAC | 5,426 | $ | 23,867 | $ | 59,722 |
| GIFTS     FOOD       DRNKCOCKTL | 1,132 | $ | 4,893 | $ | 12,147 |
| GIFTS     FOOD       GENERAL | 334 | $ | 1,550 | $ | 3,149 |
| GIFTS     FOOD       MEXICAN | 3 | $ | 17 | $ | 45 |
| GIFTS     FOOD       X | 337 | $ | 22 | $ | 862 |
| GIFTS     FRAMES   FRAMES | 10,636 | $ | 73,884 | $ | 183,742 |
| GIFTS     GENERAL  TENT SALES | 27 | $ | 89 | $ | 162 |
| GIFTS     GENERALGFTGENERAL | 80,452 | $ | 571,207 | $ | 1,322,209 |
| GIFTS     GENERALGFTINITIALS | 405 | $ | 9,218 | $ | 18,587 |
| GIFTS     GENERALGFTMUGS | 3,044 | $ | 16,389 | $ | 45,256 |
| GIFTS     GENERALGFTPILOGSTTOW | 1,209 | $ | 4,873 | $ | 12,399 |
| GIFTS     GENERALGFTSIGNPLAQUE | 3,012 | $ | 11,637 | $ | 37,896 |
| GIFTS     GENERALGFTWEDDING | 8,475 | $ | 29,785 | $ | 76,744 |
| GIFTS     GENERALGFTX | 9 | $ | - | $ | 32 |
| GIFTS     JUNIORS  GEN GIFT | 13,397 | $ | 58,559 | $ | 124,364 |
| GIFTS     JUNIORS  HANDBAGS | 840 | $ | 6,476 | $ | 13,388 |
| GIFTS     JUNIORS  JEWELRY | 23,162 | $ | 117,705 | $ | 318,295 |
| GIFTS     PETS       CATS | 9 | $ | 59 | $ | 151 |

**Swoozie's Inc.**

Asset Purchase Agreement

### Schedule 1.01(A) Inventory (as of 3/21/10)

| DEPT NAME | | | QUANTITY | Inventory Values Cost | Inventory Values Retail |
|---|---|---|---|---|---|
| GIFTS | PETS | DOGS | 119 | $ 663 | $ 1,552 |
| GIFTS | SEASONAL | CAMP | 770 | $ 6,683 | $ 14,067 |
| GIFTS | SEASONAL | DADS DAY | 587 | $ 5,178 | $ 8,895 |
| GIFTS | SEASONAL | EASTER TBL | 9,709 | $ 37,216 | $ 79,805 |
| GIFTS | SEASONAL | EASTERFOOD | 2,669 | $ 5,810 | $ 11,562 |
| GIFTS | SEASONAL | EASTERGEN | 5,461 | $ 16,516 | $ 40,811 |
| GIFTS | SEASONAL | GRAD | 544 | $ 3,335 | $ 7,510 |
| GIFTS | SEASONAL | HANNUKAH | 2,507 | $ 13,706 | $ 30,146 |
| GIFTS | SEASONAL | HWEEN FOOD | 2,183 | $ 6,506 | $ 14,078 |
| GIFTS | SEASONAL | HWEEN GEN | 7,473 | $ 32,262 | $ 64,158 |
| GIFTS | SEASONAL | HWEEN TBL | 12,881 | $ 37,166 | $ 101,711 |
| GIFTS | SEASONAL | JULY4TH | 5,973 | $ 22,671 | $ 49,264 |
| GIFTS | SEASONAL | KRINKLES | 2,762 | $ 58,702 | $ 112,669 |
| GIFTS | SEASONAL | MOMS DAY | 726 | $ 7,476 | $ 14,331 |
| GIFTS | SEASONAL | NEW YEARS | 444 | $ 2,258 | $ 5,935 |
| GIFTS | SEASONAL | PASSOVER | 24 | $ 66 | $ 107 |
| GIFTS | SEASONAL | ST.PATTYS | 907 | $ 2,063 | $ 5,792 |
| GIFTS | SEASONAL | TEACHER | 1,672 | $ 13,873 | $ 27,934 |
| GIFTS | SEASONAL | TGIVNG GEN | 289 | $ 1,792 | $ 4,057 |
| GIFTS | SEASONAL | TGIVNG TBL | 8,198 | $ 55,948 | $ 126,705 |
| GIFTS | SEASONAL | TGIVNGFOOD | 903 | $ 2,972 | $ 6,960 |
| GIFTS | SEASONAL | VAL FOOD | 4,708 | $ 10,830 | $ 25,288 |
| GIFTS | SEASONAL | VAL GEN | 2,438 | $ 7,820 | $ 19,380 |
| GIFTS | SEASONAL | VAL TBLTOP | 1,583 | $ 6,234 | $ 13,206 |
| GIFTS | SEASONAL | XMAS FOOD | 7,107 | $ 29,341 | $ 64,773 |
| GIFTS | SEASONAL | XMAS GEN | 21,559 | $ 83,974 | $ 225,877 |
| GIFTS | SEASONAL | XMAS TBL | 19,441 | $ 95,104 | $ 248,905 |
| GIFTS | TABLETOP | ACCESSORY | 17,726 | $ 66,163 | $ 187,520 |
| GIFTS | TABLETOP | BOWLPLATES | 9,724 | $ 56,367 | $ 131,608 |
| GIFTS | TABLETOP | CLTHPMNAP | 1,405 | $ 5,879 | $ 12,781 |
| GIFTS | TABLETOP | DOORMAT | 54 | $ 522 | $ 1,062 |
| GIFTS | TABLETOP | GENERAL | 18,225 | $ 115,848 | $ 284,492 |
| GIFTS | TABLETOP | GLASSES | 39,807 | $ 186,804 | $ 490,383 |
| GIFTS | TABLETOP | PLATTERS | 7,764 | $ 77,001 | $ 175,476 |
| GIFTS | TABLETOP | X | 160 | $ 872 | $ 1,658 |
| GIFTS | TWEEN | BOYS | 5,589 | $ 20,514 | $ 52,122 |
| GIFTS | TWEEN | CRAFT | 7,681 | $ 58,951 | $ 132,775 |
| GIFTS | TWEEN | DOLLFURNAC | 1,157 | $ 10,681 | $ 22,621 |
| GIFTS | TWEEN | FRAMES | 1,230 | $ 9,393 | $ 21,374 |
| GIFTS | TWEEN | GEN GIFT | 62,755 | $ 223,271 | $ 546,193 |

**Swoozie's Inc.**

Asset Purchase Agreement

**Schedule 1.01(A) Inventory (as of 3/21/10)**

| DEPT NAME | | | QUANTITY | Inventory Values Cost | | Inventory Values Retail | |
|---|---|---|---|---|---|---|---|
| GIFTS | TWEEN | JEWELRY | 43,715 | $ | 71,109 | $ | 210,042 |
| GIFTS | TWEEN | LAP DESKS | 1,686 | $ | 24,708 | $ | 50,631 |
| GIFTS | TWEEN | MAKEUPBATH | 28,149 | $ | 49,677 | $ | 137,598 |
| GIFTS | TWEEN | PENS | 10,254 | $ | 19,441 | $ | 53,575 |
| GIFTS | TWEEN | PLUSH | 3,911 | $ | 31,505 | $ | 75,714 |
| GIFTS | TWEEN | ROOM DECOR | 1,734 | $ | 18,942 | $ | 44,822 |
| PAPER | ADDRESS BOOKS | | 1,485 | $ | 13,969 | $ | 30,294 |
| PAPER | BABY/ALB JOURNAL | | 1,639 | $ | 16,177 | $ | 36,901 |
| PAPER | CARDS | CRANE | 2,502 | $ | 5,424 | $ | 12,138 |
| PAPER | CARDS | DESIGNDESI | 188,773 | $ | 321,948 | $ | 639,917 |
| PAPER | CARDS | HELLO LUCK | 5,629 | $ | 8,098 | $ | 15,303 |
| PAPER | CARDS | LIFESIGHS | 42,783 | $ | 40,463 | $ | 75,322 |
| PAPER | CARDS | MARIAN HEA | 17,634 | $ | 29,424 | $ | 53,376 |
| PAPER | CARDS | MERI MERI | 24,626 | $ | 58,770 | $ | 110,156 |
| PAPER | CARDS | MIKWRIGHT | 6,307 | $ | 9,420 | $ | 17,873 |
| PAPER | CARDS | PAPYRUS | 72,570 | $ | 167,635 | $ | 308,978 |
| PAPER | CARDS | PEACEABLE | 4,519 | $ | 7,589 | $ | 13,798 |
| PAPER | CARDS | PINKERTON | 338 | $ | 392 | $ | 889 |
| PAPER | CARDS | RECYCLED | 97,397 | $ | 170,396 | $ | 310,253 |
| PAPER | CARDS | SHANNON | 333 | $ | 542 | $ | 927 |
| PAPER | CARDS | SMUDGE INK | 60 | $ | 70 | $ | 127 |
| PAPER | CARDS | VERA WANG | 5,831 | $ | 18,845 | $ | 34,206 |
| PAPER | COASTER COASTER | | 2,196 | $ | 9,059 | $ | 21,850 |
| PAPER | DATED JOURNALS | | 671 | $ | 10,346 | $ | 22,169 |
| PAPER | EVERY DAY ALB/JOURNL | | 5,159 | $ | 33,838 | $ | 78,919 |
| PAPER | FILE FOLDERS | | 650 | $ | 4,702 | $ | 10,160 |
| PAPER | GIFTBAG BOXTISSUE | | 331,215 | $ | 52,111 | $ | 160,893 |
| PAPER | GIFTBAGBOXALLOCCASN | | 22,154 | $ | 32,150 | $ | 75,233 |
| PAPER | GIFTBAGBOXBABY | | 739 | $ | 1,347 | $ | 2,707 |
| PAPER | GIFTBAGBOXBIRTHDAY | | 5,679 | $ | 11,047 | $ | 23,777 |
| PAPER | GIFTBAGBOXWEDDING | | 979 | $ | 2,610 | $ | 4,980 |
| PAPER | GIFTBAGBOXWINEBAGS | | 3,121 | $ | 6,985 | $ | 15,849 |
| PAPER | GRIMAGE GENERAL | | 282 | $ | 6,152 | $ | 7,673 |
| PAPER | GRIMAGE JRL-AL | | 143 | $ | 4,057 | $ | 4,070 |
| PAPER | INVITE ALLOCCAS | | 73,576 | $ | 264,895 | $ | 622,986 |
| PAPER | INVITE BABY | | 16,084 | $ | 130,096 | $ | 306,601 |
| PAPER | INVITE BIRTHDAY | | 10,672 | $ | 89,626 | $ | 204,194 |
| PAPER | INVITE FOODCOCKTL | | 6,078 | $ | 53,044 | $ | 125,275 |
| PAPER | INVITE KIDS | | 20,553 | $ | 108,784 | $ | 260,810 |
| PAPER | INVITE MOVING | | 927 | $ | 8,307 | $ | 18,963 |

**Swoozie's Inc.**

Asset Purchase Agreement

**Schedule 1.01(A) Inventory (as of 3/21/10)**

| DEPT NAME | | | QUANTITY | Inventory Values Cost | Inventory Values Retail |
|---|---|---|---|---|---|
| PAPER | INVITE | SPCIAL ORD | 868 | $            - | $            - |
| PAPER | INVITE | WEDDING | 15,158 | $      144,880 | $      347,711 |
| PAPER | MISC | ENVELOPES | 47 | $          247 | $          703 |
| PAPER | MOUSE | PADS | 1,002 | $        5,204 | $       13,872 |
| PAPER | NAPKIN | HOLDERS | 429 | $        1,803 | $        4,959 |
| PAPER | PBTP | ALLOCCASN | 324,341 | $       71,715 | $      163,386 |
| PAPER | PBTP | BABY | 171,020 | $       33,003 | $       78,209 |
| PAPER | PBTP | BDAY | 8,405 | $        1,832 | $        4,167 |
| PAPER | PBTP | EASTER | 113 | $           19 | $           57 |
| PAPER | PBTP | ENV | 309,503 | $       66,426 | $      146,734 |
| PAPER | PBTP | FALL | 122 | $           20 | $           61 |
| PAPER | PBTP | FIESTA | 846 | $          194 | $          415 |
| PAPER | PBTP | GENERAL | 33,948 | $        6,328 | $       14,708 |
| PAPER | PBTP | HALLOWEEN | 406 | $          216 | $          409 |
| PAPER | PBTP | HOLIDAY | 129 | $           21 | $           65 |
| PAPER | PBTP | JUL4TH | 94 | $           17 | $           46 |
| PAPER | PBTP | KIDS | 1,002 | $          170 | $          490 |
| PAPER | PBTP | SPECORDER | 52,966 | $        7,263 | $       21,494 |
| PAPER | PBTP | SUMMER | 15,314 | $        3,259 | $        7,643 |
| PAPER | PBTP | THKSGIVING | 7 | $            1 | $            4 |
| PAPER | PBTP | VALENTINES | 451 | $           77 | $          226 |
| PAPER | PBTP | WEDDING | 11,601 | $        2,621 | $        5,793 |
| PAPER | PBTP | WINEENT | 1,479 | $          379 | $          819 |
| PAPER | PBTP | WINTER | 243 | $           69 | $          182 |
| PAPER | PBTP | X-MAS | 5,228 | $          932 | $        2,554 |
| PAPER | PLATENAPK BWLPLTE | | 710 | $        2,078 | $        5,258 |
| PAPER | PLATENAPKNCKTAILNAPK | | 110,029 | $      273,240 | $      666,661 |
| PAPER | PLATENAPKNDINNERNAPK | | 18,560 | $       52,712 | $      128,639 |
| PAPER | PLATENAPKNDINNERPLAT | | 15,394 | $       44,106 | $      105,458 |
| PAPER | PLATENAPKNGUESTTOWEL | | 10,009 | $       43,261 | $       96,077 |
| PAPER | PLATENAPKNKOOZIES | | 18,391 | $       32,414 | $      119,367 |
| PAPER | PLATENAPKNPLCMATTBLC | | 1,108 | $        5,451 | $       14,196 |
| PAPER | PLATENAPKNSALADLATE | | 14,975 | $       31,694 | $       76,835 |
| PAPER | PLATENAPKNSNIFFS | | 14,778 | $       14,164 | $       43,175 |
| PAPER | PLATENAPKNSTYROCUPS | | 23,938 | $       91,251 | $      229,112 |
| PAPER | PLATENAPKNX | | 588 | $        1,717 | $        4,054 |
| PAPER | RECIPE BOX | | 3,493 | $       16,595 | $       35,357 |
| PAPER | SEASONAL 4TH OF JUL | | 4,241 | $       15,500 | $       35,697 |
| PAPER | SEASONAL BOXEDCARDS | | 9,447 | $       84,575 | $      170,142 |
| PAPER | SEASONAL CAMP | | 7,582 | $       25,289 | $       58,693 |

**Swoozie's Inc.**

Asset Purchase Agreement

**Schedule 1.01(A) Inventory (as of 3/21/10)**

| DEPT NAME | | QUANTITY | Inventory Values Cost | | Inventory Values Retail | |
|---|---|---|---|---|---|---|
| PAPER | SEASONAL CHRISTMAS | 8,243 | $ | 32,989 | $ | 76,092 |
| PAPER | SEASONAL EASTER | 2,662 | $ | 9,656 | $ | 19,195 |
| PAPER | SEASONAL FATHER DAY | 832 | $ | 1,210 | $ | 5,112 |
| PAPER | SEASONAL GIFTBAGBOX | 3,438 | $ | 6,585 | $ | 13,610 |
| PAPER | SEASONAL GRAD/TEACH | 13,028 | $ | 67,618 | $ | 178,590 |
| PAPER | SEASONAL HALLOWEEN | 10,671 | $ | 29,079 | $ | 67,768 |
| PAPER | SEASONAL HANUKKAH | 280 | $ | 1,096 | $ | 2,373 |
| PAPER | SEASONAL INVITATION | 6,038 | $ | 58,617 | $ | 131,262 |
| PAPER | SEASONAL MOTHERSDAY | 1,695 | $ | 3,419 | $ | 14,395 |
| PAPER | SEASONAL NEW YEARS | 585 | $ | 552 | $ | 1,208 |
| PAPER | SEASONAL PAPBYPIECE | 2,221 | $ | 522 | $ | 1,307 |
| PAPER | SEASONAL PAPPLTNAP | 19,035 | $ | 51,098 | $ | 123,970 |
| PAPER | SEASONAL PHOTOCARDS | 9,681 | $ | 83,433 | $ | 183,576 |
| PAPER | SEASONAL ST. PATS/E | 57 | $ | 429 | $ | 863 |
| PAPER | SEASONAL STICKERS | 48 | $ | 144 | $ | 320 |
| PAPER | SEASONAL THANKSGIVI | 5,476 | $ | 18,392 | $ | 44,335 |
| PAPER | SEASONAL VALENTINE | 10,674 | $ | 30,559 | $ | 70,185 |
| PAPER | SEASONAL WRAPACCESS | 5,180 | $ | 12,341 | $ | 27,031 |
| PAPER | SEASONAL WRAPPAPER | 4,161 | $ | 16,417 | $ | 35,251 |
| PAPER | SIGN     YARDDOOR | 556 | $ | 960 | $ | 4,420 |
| PAPER | SPECIAL GIFTS | 1 | $ | 16 | $ | 29 |
| PAPER | STATIONARYBRIDGE PAD | 293 | $ | 1,055 | $ | 2,434 |
| PAPER | STATIONARYENCLOSURE | 8,741 | $ | 1,549 | $ | 9,434 |
| PAPER | STATIONARYENVELOPES | 8,970 | $ | 59,628 | $ | 122,564 |
| PAPER | STATIONARYINITALNOTE | 10,677 | $ | 79,496 | $ | 174,926 |
| PAPER | STATIONARYNOTECARDS | 73,631 | $ | 491,298 | $ | 1,088,697 |
| PAPER | STATIONARYNOTEPADS | 49,481 | $ | 226,081 | $ | 577,849 |
| PAPER | STATIONARYPENS | 569 | $ | 695 | $ | 1,787 |
| PAPER | STATIONARYPHOTOCDS | 41 | $ | 158 | $ | 408 |
| PAPER | STATIONARYPLCCARD | 6,350 | $ | 29,342 | $ | 62,081 |
| PAPER | STATIONARYRSPNC CDS | 1,904 | $ | 10,179 | $ | 22,733 |
| PAPER | STATIONARYSEALSTICKR | 46,697 | $ | 45,205 | $ | 213,481 |
| PAPER | STATIONARYSTATNRYSET | 3,021 | $ | 30,447 | $ | 63,271 |
| PAPER | STATIONARYTHNKYOUNOT | 26,807 | $ | 139,358 | $ | 302,823 |
| PAPER | WRAP     ALLOCCAS | 7,046 | $ | 16,925 | $ | 37,887 |
| PAPER | WRAP     BABY | 1,382 | $ | 2,913 | $ | 6,443 |
| PAPER | WRAP     BIRTHDAY | 1,429 | $ | 3,031 | $ | 6,414 |
| PAPER | WRAP     WEDDING | 2,236 | $ | 4,779 | $ | 10,749 |
| PAPER | WRAPACC GENERAL | 2,643 | $ | 4,091 | $ | 9,202 |
| PAPER | WRAPACC RIBBON | 10,648 | $ | 33,883 | $ | 68,424 |

**Swoozie's Inc.**
Asset Purchase Agreement

**Schedule 1.01(A) Inventory (as of 3/21/10)**

| DEPT NAME | QUANTITY | Inventory Values Cost | | Inventory Values Retail | |
|---|---|---|---|---|---|
| PAPER   WRAPACC  TISSUE | 6,217 | $ | 7,460 | $ | 17,129 |
| SERVICES  GIFT  TAGS | 8 | $ | - | $ | 4 |
| SERVICES  MONOGRAM  ALL | 16 | $ | - | $ | 160 |
| SERVICES  PRINTING  LASER | 181 | $ | - | $ | 142 |
| SPCLORD   GENERAL   ALL | 1,161 | $ | 110 | $ | 231 |
| (blank) | 8,077 | $ | 46,458 | $ | 105,181 |
| **TOTALS** | **3,245,113** | **$** | **7,936,821** | **$** | **18,409,283** |

## SCHEDULE 1.01(B)—EQUIPMENT (ACQUIRED ASSETS)

**Swoozie's Inc.**
Asset Purchase Agreement

**Schedule 1.01(B) Equipment**

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---|---|---|---|
| 152100 | 001 | Computer PC's and Laptop | $73,060 |
| 152100 | 001 | Computer PC's and Laptop | $1,735 |
| 152100 | 001 | Computer PC's and Laptop | $156 |
| 152300 | 001 | Computer Printers | $284 |
| 152300 | 001 | Computer Printers | $117 |
| 152300 | 001 | Computer Printers | $117 |
| 152300 | 001 | Computer Printers | $117 |
| 152300 | 001 | Computer Printers | $117 |
| 152300 | 001 | Computer Printers | $117 |
| 152300 | 001 | Computer Printers | $117 |
| 152300 | 001 | Computer Printers | $118 |
| 152300 | 001 | Computer Printers | $147 |
| 152300 | 001 | Computer Printers | $147 |
| 152300 | 001 | Computer Printers | $22 |
| 152300 | 001 | Computer Printers | $2,551 |
| 152300 | 001 | Computer Printers | $302 |
| 152400 | 001 | Computer Software | $106 |
| 153000 | 001 | Office Equipment | $270 |
| 153000 | 001 | Office Equipment | $1,000 |
| 153000 | 001 | Office Equipment | $104 |
| 153000 | 001 | Office Equipment | $5,104 |
| 154000 | 001 | Telephone Equipment | $97 |
| 152100 | 002 | Computer PC's and Laptop | $5,000 |
| 152100 | 002 | Computer PC's and Laptop | $2,185 |
| 152100 | 002 | Computer PC's and Laptop | $1,017 |
| 152100 | 002 | Computer PC's and Laptop | $1,093 |
| 152300 | 002 | Computer Printers | $1,070 |
| 153000 | 002 | Office Equipment | $4,930 |
| 153000 | 002 | Office Equipment | $4,930 |
| 153000 | 002 | Office Equipment | $1,000 |
| 153000 | 002 | Office Equipment | $13 |
| 152100 | 003 | Computer PC's and Laptop | $5,000 |
| 152100 | 003 | Computer PC's and Laptop | $2,185 |
| 152300 | 003 | Computer Printers | $1,007 |
| 153000 | 003 | Office Equipment | $1,000 |
| 153000 | 003 | Office Equipment | $7,349 |
| 152100 | 004 | Computer PC's and Laptop | $2,185 |
| 152100 | 004 | Computer PC's and Laptop | $107 |
| 152100 | 004 | Computer PC's and Laptop | $360 |
| 152100 | 004 | Computer PC's and Laptop | $0 |

**Swoozie's Inc.**
Asset Purchase Agreement

**Schedule 1.01(B) Equipment**

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---|---|---|---|
| 153000 | 004 | Office Equipment | $1,000 |
| 152100 | 005 | Computer PC's and Laptop | $161 |
| 152400 | 005 | Computer Software | $500 |
| 153000 | 005 | Office Equipment | $180 |
| 153000 | 005 | Office Equipment | $1,000 |
| 153000 | 005 | Office Equipment | $2,447 |
| 153000 | 005 | Office Equipment | $2,496 |
| 152100 | 006 | Computer PC's and Laptop | $329 |
| 152100 | 006 | Computer PC's and Laptop | $0 |
| 152100 | 006 | Computer PC's and Laptop | $0 |
| 152100 | 006 | Computer PC's and Laptop | $0 |
| 152100 | 006 | Computer PC's and Laptop | $0 |
| 152100 | 006 | Computer PC's and Laptop | $0 |
| 152100 | 006 | Computer PC's and Laptop | $0 |
| 152100 | 006 | Computer PC's and Laptop | $0 |
| 152100 | 006 | Computer PC's and Laptop | $0 |
| 152100 | 006 | Computer PC's and Laptop | $0 |
| 152100 | 006 | Computer PC's and Laptop | $0 |
| 152100 | 006 | Computer PC's and Laptop | $0 |
| 152100 | 006 | Computer PC's and Laptop | $0 |
| 152100 | 006 | Computer PC's and Laptop | $0 |
| 152100 | 006 | Computer PC's and Laptop | $0 |
| 152100 | 006 | Computer PC's and Laptop | $0 |
| 152100 | 006 | Computer PC's and Laptop | $0 |
| 152100 | 006 | Computer PC's and Laptop | $0 |
| 153000 | 006 | Office Equipment | $1,000 |
| 153000 | 006 | Office Equipment | $2,481 |
| 153000 | 006 | Office Equipment | $2,326 |
| 152100 | 007 | Computer PC's and Laptop | $801 |
| 152100 | 007 | Computer PC's and Laptop | $180 |
| 152400 | 007 | Computer Software | $351 |
| 153000 | 007 | Office Equipment | $1,000 |
| 153000 | 007 | Office Equipment | $3,273 |
| 152100 | 008 | Computer PC's and Laptop | $4,818 |
| 153000 | 008 | Office Equipment | $2,102 |
| 153000 | 008 | Office Equipment | $1,000 |
| 153000 | 008 | Office Equipment | $724 |
| 152100 | 009 | Computer PC's and Laptop | $5,068 |
| 152100 | 009 | Computer PC's and Laptop | $418 |
| 152300 | 009 | Computer Printers | $1,000 |

**Swoozie's Inc.**
Asset Purchase Agreement

**Schedule 1.01(B) Equipment**

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---|---|---|---|
| 152400 | 009 | Computer Software | $169 |
| 152400 | 009 | Computer Software | $225 |
| 153000 | 009 | Office Equipment | $1,000 |
| 153000 | 009 | Office Equipment | $2,260 |
| 153000 | 010 | Office Equipment | $1,000 |
| 153000 | 010 | Office Equipment | $2,828 |
| 152100 | 011 | Computer PC's and Laptop | $1,707 |
| 152300 | 011 | Computer Printers | $1,070 |
| 153000 | 011 | Office Equipment | $1,000 |
| 153000 | 011 | Office Equipment | $3,273 |
| 153000 | 012 | Office Equipment | $1,000 |
| 153000 | 012 | Office Equipment | $2,440 |
| 152100 | 013 | Computer PC's and Laptop | $10,915 |
| 152100 | 013 | Computer PC's and Laptop | $809 |
| 152100 | 013 | Computer PC's and Laptop | $0 |
| 152300 | 013 | Computer Printers | $1,070 |
| 153000 | 013 | Office Equipment | $2,793 |
| 152100 | 014 | Computer PC's and Laptop | $875 |
| 152100 | 014 | Computer PC's and Laptop | $1,750 |
| 152100 | 014 | Computer PC's and Laptop | $3,563 |
| 153000 | 014 | Office Equipment | $2,957 |
| 153000 | 014 | Office Equipment | $1,000 |
| 154000 | 014 | Telephone Equipment | $514 |
| 152100 | 015 | Computer PC's and Laptop | $11,598 |
| 152100 | 015 | Computer PC's and Laptop | $11,598 |
| 152100 | 015 | Computer PC's and Laptop | $3,121 |
| 152300 | 015 | Computer Printers | $1,559 |
| 152300 | 015 | Computer Printers | $1,800 |
| 152300 | 015 | Computer Printers | $1,203 |
| 152300 | 015 | Computer Printers | -$1,200 |
| 152300 | 015 | Computer Printers | $550 |
| 153000 | 015 | Office Equipment | $2,482 |
| 153000 | 015 | Office Equipment | $1,000 |
| 152100 | 016 | Computer PC's and Laptop | $6,581 |
| 152100 | 016 | Computer PC's and Laptop | $42 |
| 152100 | 016 | Computer PC's and Laptop | $42 |
| 153000 | 016 | Office Equipment | $2,891 |
| 153000 | 016 | Office Equipment | $1,000 |
| 152100 | 017 | Computer PC's and Laptop | $6,702 |
| 153000 | 017 | Office Equipment | $2,163 |

**Swoozie's Inc.**
Asset Purchase Agreement

**Schedule 1.01(B) Equipment**

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---|---|---|---|
| 153000 | 017 | Office Equipment | $1,000 |
| 152400 | 018 | Computer Software | $2,168 |
| 153000 | 018 | Office Equipment | $1,000 |
| 154000 | 018 | Telephone Equipment | $3,128 |
| 152400 | 019 | Computer Software | $2,100 |
| 152400 | 019 | Computer Software | $1,755 |
| 153000 | 019 | Office Equipment | $1,000 |
| 153000 | 019 | Office Equipment | $2,200 |
| 154000 | 019 | Telephone Equipment | $5,220 |
| 152100 | 020 | Computer PC's and Laptop | $1,581 |
| 153000 | 020 | Office Equipment | $1,000 |
| 153000 | 020 | Office Equipment | $2,483 |
| 154000 | 020 | Telephone Equipment | $4,954 |
| 152100 | 021 | Computer PC's and Laptop | $2,096 |
| 152300 | 021 | Computer Printers | $1,000 |
| 152400 | 021 | Computer Software | $2,100 |
| 152400 | 021 | Computer Software | $4,125 |
| 153000 | 021 | Office Equipment | $1,000 |
| 153000 | 021 | Office Equipment | -$2,760 |
| 154000 | 021 | Telephone Equipment | $4,948 |
| 152100 | 022 | Computer PC's and Laptop | $1,191 |
| 152400 | 022 | Computer Software | $1,080 |
| 152400 | 022 | Computer Software | $648 |
| 152400 | 022 | Computer Software | $432 |
| 152400 | 022 | Computer Software | $270 |
| 153000 | 022 | Office Equipment | $4,865 |
| 153000 | 022 | Office Equipment | $1,000 |
| 154000 | 022 | Telephone Equipment | $2,500 |
| 154000 | 022 | Telephone Equipment | $3,328 |
| 152100 | 023 | Computer PC's and Laptop | $449 |
| 152400 | 023 | Computer Software | $1,080 |
| 152400 | 023 | Computer Software | $648 |
| 152400 | 023 | Computer Software | $432 |
| 152400 | 023 | Computer Software | $270 |
| 153000 | 023 | Office Equipment | $1,000 |
| 153000 | 023 | Office Equipment | $2,488 |
| 154000 | 023 | Telephone Equipment | $2,752 |
| 154000 | 023 | Telephone Equipment | $4,498 |
| 152100 | 024 | Computer PC's and Laptop | $2,500 |
| 152100 | 024 | Computer PC's and Laptop | $552 |

**Swoozie's Inc.**

Asset Purchase Agreement

### Schedule 1.01(B) Equipment

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---|---|---|---|
| 152300 | 024 | Computer Printers | $1,000 |
| 152400 | 024 | Computer Software | $1,080 |
| 152400 | 024 | Computer Software | $648 |
| 152400 | 024 | Computer Software | $432 |
| 153000 | 024 | Office Equipment | $1,000 |
| 153000 | 024 | Office Equipment | $2,855 |
| 154000 | 024 | Telephone Equipment | $5,214 |
| 152100 | 025 | Computer PC's and Laptop | $1,010 |
| 152100 | 025 | Computer PC's and Laptop | $1,566 |
| 152100 | 025 | Computer PC's and Laptop | $252 |
| 153000 | 025 | Office Equipment | $1,000 |
| 153000 | 025 | Office Equipment | $2,483 |
| 153000 | 025 | Office Equipment | $2,483 |
| 154000 | 025 | Telephone Equipment | $4,300 |
| 152100 | 026 | Computer PC's and Laptop | $3,000 |
| 152100 | 026 | Computer PC's and Laptop | $900 |
| 152400 | 026 | Computer Software | $4,122 |
| 152400 | 026 | Computer Software | $4,122 |
| 152400 | 026 | Computer Software | $230 |
| 153000 | 026 | Office Equipment | $1,000 |
| 153000 | 026 | Office Equipment | $2,526 |
| 154000 | 026 | Telephone Equipment | $150 |
| 152100 | 027 | Computer PC's and Laptop | $3,900 |
| 152400 | 027 | Computer Software | $5,122 |
| 152400 | 027 | Computer Software | $5,122 |
| 153000 | 027 | Office Equipment | $1,000 |
| 152100 | 028 | Computer PC's and Laptop | $3,000 |
| 152100 | 028 | Computer PC's and Laptop | $900 |
| 152400 | 028 | Computer Software | $4,122 |
| 152400 | 028 | Computer Software | $4,122 |
| 152400 | 028 | Computer Software | $1,182 |
| 152400 | 028 | Computer Software | $1,182 |
| 152400 | 028 | Computer Software | $230 |
| 153000 | 028 | Office Equipment | $1,000 |
| 153000 | 028 | Office Equipment | $2,268 |
| 154000 | 028 | Telephone Equipment | $127 |
| 153000 | 029 | Office Equipment | $1,000 |
| 153000 | 029 | Office Equipment | $4,911 |
| 154000 | 029 | Telephone Equipment | $3,900 |
| 152100 | 030 | Computer PC's and Laptop | $1,590 |

**Swoozie's Inc.**
Asset Purchase Agreement

## Schedule 1.01(B) Equipment

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---|---|---|---|
| 152100 | 030 | Computer PC's and Laptop | $847 |
| 152100 | 030 | Computer PC's and Laptop | $828 |
| 152400 | 030 | Computer Software | $1,800 |
| 152400 | 030 | Computer Software | $0 |
| 152400 | 030 | Computer Software | $0 |
| 152400 | 030 | Computer Software | $0 |
| 152400 | 030 | Computer Software | $0 |
| 152400 | 030 | Computer Software | $0 |
| 152400 | 030 | Computer Software | $0 |
| 152400 | 030 | Computer Software | $0 |
| 152400 | 030 | Computer Software | $0 |
| 152400 | 030 | Computer Software | $0 |
| 152400 | 030 | Computer Software | $0 |
| 152400 | 030 | Computer Software | $0 |
| 152400 | 030 | Computer Software | -$2,500 |
| 153000 | 030 | Office Equipment | $1,000 |
| 153000 | 030 | Office Equipment | $2,398 |
| 153000 | 030 | Office Equipment. | $1,050 |
| 154000 | 030 | Telephone Equipment | $2,500 |
| 154000 | 030 | Telephone Equipment | $0 |
| 154000 | 030 | Telephone Equipment | $0 |
| 154000 | 030 | Telephone Equipment | $0 |
| 154000 | 030 | Telephone Equipment | $0 |
| 154000 | 030 | Telephone Equipment | $0 |
| 152100 | 031 | Computer PC's and Laptop | $4,311 |
| 152100 | 031 | Computer PC's and Laptop | $512 |
| 152400 | 031 | Computer Software | $845 |
| 152400 | 031 | Computer Software | -$2,500 |
| 153000 | 031 | Office Equipment | $1,000 |
| 153000 | 031 | Office Equipment | $1,460 |
| 153000 | 031 | Office Equipment | $2,204 |
| 152100 | 032 | Computer PC's and Laptop | $110 |
| 152100 | 032 | Computer PC's and Laptop | $41 |
| 152100 | 032 | Computer PC's and Laptop | $326 |
| 152100 | 032 | Computer PC's and Laptop | $1,183 |
| 152100 | 032 | Computer PC's and Laptop | $143 |
| 152100 | 032 | Computer PC's and Laptop | $4,208 |
| 152400 | 032 | Computer Software | $3,378 |
| 152400 | 032 | Computer Software | $3,378 |
| 153000 | 032 | Office Equipment | $360 |
| 153000 | 032 | Office Equipment | $35 |

**Swoozie's Inc.**
Asset Purchase Agreement

**Schedule 1.01(B) Equipment**

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---|---|---|---|
| 153000 | 032 | Office Equipment | $35 |
| 153000 | 032 | Office Equipment | $35 |
| 152100 | 033 | Computer PC's and Laptop | $110 |
| 152100 | 033 | Computer PC's and Laptop | $19 |
| 152100 | 033 | Computer PC's and Laptop | $31 |
| 152100 | 033 | Computer PC's and Laptop | $271 |
| 152100 | 033 | Computer PC's and Laptop | $4,509 |
| 152100 | 033 | Computer PC's and Laptop | $111 |
| 152100 | 033 | Computer PC's and Laptop | $132 |
| 152400 | 033 | Computer Software | $3,378 |
| 152400 | 033 | Computer Software | $3,378 |
| 153000 | 033 | Office Equipment | $498 |
| 153000 | 033 | Office Equipment | $360 |
| 153000 | 033 | Office Equipment | $35 |
| 153000 | 033 | Office Equipment | $35 |
| 153000 | 033 | Office Equipment | $35 |
| 152100 | 034 | Computer PC's and Laptop | $110 |
| 152100 | 034 | Computer PC's and Laptop | $41 |
| 152100 | 034 | Computer PC's and Laptop | $326 |
| 152100 | 034 | Computer PC's and Laptop | $1,183 |
| 152100 | 034 | Computer PC's and Laptop | $143 |
| 152100 | 034 | Computer PC's and Laptop | $4,322 |
| 152100 | 034 | Computer PC's and Laptop | $5 |
| 152100 | 034 | Computer PC's and Laptop | $98 |
| 152400 | 034 | Computer Software | $3,378 |
| 152400 | 034 | Computer Software | $3,378 |
| 153000 | 034 | Office Equipment | $424 |
| 153000 | 034 | Office Equipment | $360 |
| 153000 | 034 | Office Equipment | $35 |
| 153000 | 034 | Office Equipment | $35 |
| 153000 | 034 | Office Equipment | $35 |
| 152100 | 035 | Computer PC's and Laptop | $110 |
| 152100 | 035 | Computer PC's and Laptop | $41 |
| 152100 | 035 | Computer PC's and Laptop | $326 |
| 152100 | 035 | Computer PC's and Laptop | $1,183 |
| 152100 | 035 | Computer PC's and Laptop | $4,189 |
| 152100 | 035 | Computer PC's and Laptop | $57 |
| 152100 | 035 | Computer PC's and Laptop | $9 |
| 152400 | 035 | Computer Software | $3,378 |
| 152400 | 035 | Computer Software | $3,378 |

**Swoozie's Inc.**
Asset Purchase Agreement

**Schedule 1.01(B) Equipment**

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---|---|---|---|
| 153000 | 035 | Office Equipment | $360 |
| 153000 | 035 | Office Equipment | $35 |
| 153000 | 035 | Office Equipment | $35 |
| 153000 | 035 | Office Equipment | $35 |
| 152100 | 036 | Computer PC's and Laptop | $110 |
| 152100 | 036 | Computer PC's and Laptop | $40 |
| 152100 | 036 | Computer PC's and Laptop | $167 |
| 152100 | 036 | Computer PC's and Laptop | $323 |
| 152100 | 036 | Computer PC's and Laptop | $163 |
| 152100 | 036 | Computer PC's and Laptop | $3,646 |
| 152100 | 036 | Computer PC's and Laptop | $453 |
| 152400 | 036 | Computer Software | $3,378 |
| 152400 | 036 | Computer Software | $3,378 |
| 153000 | 036 | Office Equipment | $628 |
| 153000 | 036 | Office Equipment | $360 |
| 153000 | 036 | Office Equipment | $35 |
| 153000 | 036 | Office Equipment | $35 |
| 153000 | 036 | Office Equipment | $35 |
| 152100 | 037 | Computer PC's and Laptop | $110 |
| 152100 | 037 | Computer PC's and Laptop | $41 |
| 152100 | 037 | Computer PC's and Laptop | $329 |
| 152100 | 037 | Computer PC's and Laptop | $143 |
| 152100 | 037 | Computer PC's and Laptop | $4,607 |
| 152100 | 037 | Computer PC's and Laptop | $29 |
| 152400 | 037 | Computer Software | $3,378 |
| 152400 | 037 | Computer Software | $3,378 |
| 153000 | 037 | Office Equipment | $593 |
| 153000 | 037 | Office Equipment | $360 |
| 153000 | 037 | Office Equipment | $35 |
| 153000 | 037 | Office Equipment | $35 |
| 153000 | 037 | Office Equipment | $35 |
| 152100 | 038 | Computer PC's and Laptop | $110 |
| 152100 | 038 | Computer PC's and Laptop | $30 |
| 152100 | 038 | Computer PC's and Laptop | $19 |
| 152100 | 038 | Computer PC's and Laptop | $208 |
| 152100 | 038 | Computer PC's and Laptop | $4,333 |
| 152100 | 038 | Computer PC's and Laptop | $175 |
| 152100 | 038 | Computer PC's and Laptop | $59 |
| 152400 | 038 | Computer Software | $3,378 |
| 152400 | 038 | Computer Software | $3,378 |

**Swoozie's Inc.**
Asset Purchase Agreement

**Schedule 1.01(B) Equipment**

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---------|------|---------------------|-----------:|
| 153000 | 038 | Office Equipment | $680 |
| 153000 | 038 | Office Equipment | $360 |
| 153000 | 038 | Office Equipment | $35 |
| 153000 | 038 | Office Equipment | $35 |
| 153000 | 038 | Office Equipment | $35 |
| 152100 | 039 | Computer PC's and Laptop | $110 |
| 152100 | 039 | Computer PC's and Laptop | $19 |
| 152100 | 039 | Computer PC's and Laptop | $30 |
| 152100 | 039 | Computer PC's and Laptop | $143 |
| 152100 | 039 | Computer PC's and Laptop | $4,504 |
| 152100 | 039 | Computer PC's and Laptop | $94 |
| 152100 | 039 | Computer PC's and Laptop | $94 |
| 152400 | 039 | Computer Software | $3,378 |
| 152400 | 039 | Computer Software | $3,378 |
| 153000 | 039 | Office Equipment | $694 |
| 153000 | 039 | Office Equipment | $360 |
| 153000 | 039 | Office Equipment | $35 |
| 153000 | 039 | Office Equipment | $35 |
| 153000 | 039 | Office Equipment | $35 |
| 152100 | 040 | Computer PC's and Laptop | $110 |
| 152100 | 040 | Computer PC's and Laptop | $41 |
| 152100 | 040 | Computer PC's and Laptop | $329 |
| 152100 | 040 | Computer PC's and Laptop | $208 |
| 152100 | 040 | Computer PC's and Laptop | $4,234 |
| 152100 | 040 | Computer PC's and Laptop | $358 |
| 152100 | 040 | Computer PC's and Laptop | $158 |
| 152400 | 040 | Computer Software | $3,378 |
| 152400 | 040 | Computer Software | $3,378 |
| 153000 | 040 | Office Equipment | $482 |
| 153000 | 040 | Office Equipment | $360 |
| 153000 | 040 | Office Equipment | $77 |
| 153000 | 040 | Office Equipment | $35 |
| 153000 | 040 | Office Equipment | $35 |
| 153000 | 040 | Office Equipment | $35 |
| 152100 | 041 | Computer PC's and Laptop | $110 |
| 152100 | 041 | Computer PC's and Laptop | $44 |
| 152100 | 041 | Computer PC's and Laptop | $329 |
| 152100 | 041 | Computer PC's and Laptop | $143 |
| 152100 | 041 | Computer PC's and Laptop | $5,895 |
| 152100 | 041 | Computer PC's and Laptop | $30 |

**Swoozie's Inc.**
Asset Purchase Agreement

## Schedule 1.01(B) Equipment

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---|---|---|---|
| 152400 | 041 | Computer Software | $3,378 |
| 152400 | 041 | Computer Software | $3,378 |
| 153000 | 041 | Office Equipment | $531 |
| 153000 | 041 | Office Equipment | $117 |
| 153000 | 041 | Office Equipment | $360 |
| 153000 | 041 | Office Equipment | $35 |
| 153000 | 041 | Office Equipment | $35 |
| 153000 | 041 | Office Equipment | $35 |
| 152100 | 042 | Computer PC's and Laptop | $110 |
| 152100 | 042 | Computer PC's and Laptop | $30 |
| 152100 | 042 | Computer PC's and Laptop | $19 |
| 152100 | 042 | Computer PC's and Laptop | $208 |
| 152100 | 042 | Computer PC's and Laptop | $4,652 |
| 152100 | 042 | Computer PC's and Laptop | $11 |
| 152400 | 042 | Computer Software | $3,378 |
| 152400 | 042 | Computer Software | $3,378 |
| 153000 | 042 | Office Equipment | $683 |
| 153000 | 042 | Office Equipment | $35 |
| 153000 | 042 | Office Equipment | $35 |
| 153000 | 042 | Office Equipment | $35 |
| 152100 | 043 | Computer PC's and Laptop | $110 |
| 152100 | 043 | Computer PC's and Laptop | $19 |
| 152100 | 043 | Computer PC's and Laptop | $30 |
| 152100 | 043 | Computer PC's and Laptop | $228 |
| 152100 | 043 | Computer PC's and Laptop | $4,157 |
| 152100 | 043 | Computer PC's and Laptop | $235 |
| 152100 | 043 | Computer PC's and Laptop | $101 |
| 152400 | 043 | Computer Software | $3,378 |
| 152400 | 043 | Computer Software | $3,378 |
| 153000 | 043 | Office Equipment | $588 |
| 153000 | 043 | Office Equipment | $360 |
| 153000 | 043 | Office Equipment | $35 |
| 153000 | 043 | Office Equipment | $35 |
| 153000 | 043 | Office Equipment | $35 |
| 152100 | 044 | Computer PC's and Laptop | $110 |
| 152100 | 044 | Computer PC's and Laptop | $19 |
| 152100 | 044 | Computer PC's and Laptop | $30 |
| 152100 | 044 | Computer PC's and Laptop | $228 |
| 152100 | 044 | Computer PC's and Laptop | $4,399 |
| 152100 | 044 | Computer PC's and Laptop | $236 |

**Swoozie's Inc.**
Asset Purchase Agreement

**Schedule 1.01(B) Equipment**

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---|---|---|---|
| 152100 | 044 | Computer PC's and Laptop | $30 |
| 152400 | 044 | Computer Software | $3,378 |
| 152400 | 044 | Computer Software | $3,378 |
| 153000 | 044 | Office Equipment | $360 |
| 153000 | 044 | Office Equipment | $35 |
| 153000 | 044 | Office Equipment | $35 |
| 153000 | 044 | Office Equipment | $35 |
| 152100 | 700 | Computer PC's and Laptop | $4,064 |
| 152100 | 700 | Computer PC's and Laptop | $2,451 |
| 152100 | 700 | Computer PC's and Laptop | $1,656 |
| 152100 | 700 | Computer PC's and Laptop | $1,960 |
| 152100 | 700 | Computer PC's and Laptop | $6,184 |
| 152100 | 700 | Computer PC's and Laptop | $1,885 |
| 152100 | 700 | Computer PC's and Laptop | $5,775 |
| 152100 | 700 | Computer PC's and Laptop | $289 |
| 152100 | 700 | Computer PC's and Laptop | $4,703 |
| 152100 | 700 | Computer PC's and Laptop | $4,084 |
| 152100 | 700 | Computer PC's and Laptop | $3,424 |
| 152100 | 700 | Computer PC's and Laptop | $2,945 |
| 152100 | 700 | Computer PC's and Laptop | $1,691 |
| 152100 | 700 | Computer PC's and Laptop | $4,847 |
| 152100 | 700 | Computer PC's and Laptop | $6,500 |
| 152100 | 700 | Computer PC's and Laptop | $160 |
| 152100 | 700 | Computer PC's and Laptop | $75 |
| 152100 | 700 | Computer PC's and Laptop | $75 |
| 152100 | 700 | Computer PC's and Laptop | $289 |
| 152100 | 700 | Computer PC's and Laptop | $4,468 |
| 152100 | 700 | Computer PC's and Laptop | $206 |
| 152100 | 700 | Computer PC's and Laptop | $132 |
| 152100 | 700 | Computer PC's and Laptop | $302 |
| 152100 | 700 | Computer PC's and Laptop | $5,070 |
| 152100 | 700 | Computer PC's and Laptop | $2,004 |
| 152100 | 700 | Computer PC's and Laptop | $206 |
| 152100 | 700 | Computer PC's and Laptop | $619 |
| 152100 | 700 | Computer PC's and Laptop | $3,440 |
| 152100 | 700 | Computer PC's and Laptop | $2,681 |
| 152100 | 700 | Computer PC's and Laptop | $1,108 |
| 152100 | 700 | Computer PC's and Laptop | $248 |
| 152100 | 700 | Computer PC's and Laptop | $1,334 |
| 152100 | 700 | Computer PC's and Laptop | $1,372 |

**Swoozie's Inc.**
Asset Purchase Agreement

**Schedule 1.01(B) Equipment**

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---|---|---|---|
| 152100 | 700 | Computer PC's and Laptop | $1,436 |
| 152100 | 700 | Computer PC's and Laptop | $989 |
| 152100 | 700 | Computer PC's and Laptop | $1,271 |
| 152100 | 700 | Computer PC's and Laptop | $1,322 |
| 152100 | 700 | Computer PC's and Laptop | $751 |
| 152100 | 700 | Computer PC's and Laptop | $1,992 |
| 152100 | 700 | Computer PC's and Laptop | $1,329 |
| 152100 | 700 | Computer PC's and Laptop | $1,329 |
| 152100 | 700 | Computer PC's and Laptop | $1,392 |
| 152100 | 700 | Computer PC's and Laptop | $2,784 |
| 152100 | 700 | Computer PC's and Laptop | $600 |
| 152100 | 700 | Computer PC's and Laptop | $600 |
| 152100 | 700 | Computer PC's and Laptop | $4,000 |
| 152100 | 700 | Computer PC's and Laptop | $4,000 |
| 152100 | 700 | Computer PC's and Laptop | $1,540 |
| 152100 | 700 | Computer PC's and Laptop | $660 |
| 152100 | 700 | Computer PC's and Laptop | $660 |
| 152100 | 700 | Computer PC's and Laptop | $1,240 |
| 152100 | 700 | Computer PC's and Laptop | $70,250 |
| 152100 | 700 | Computer PC's and Laptop | $8,000 |
| 152100 | 700 | Computer PC's and Laptop | $2,800 |
| 152100 | 700 | Computer PC's and Laptop | $6,000 |
| 152100 | 700 | Computer PC's and Laptop | $1,166 |
| 152100 | 700 | Computer PC's and Laptop | $1,166 |
| 152100 | 700 | Computer PC's and Laptop | $1,166 |
| 152100 | 700 | Computer PC's and Laptop | $1,166 |
| 152100 | 700 | Computer PC's and Laptop | $1,166 |
| 152100 | 700 | Computer PC's and Laptop | $25 |
| 152100 | 700 | Computer PC's and Laptop | $2,856 |
| 152100 | 700 | Computer PC's and Laptop | $1,216 |
| 152100 | 700 | Computer PC's and Laptop | $1,216 |
| 152100 | 700 | Computer PC's and Laptop | $1,216 |
| 152100 | 700 | Computer PC's and Laptop | $1,216 |
| 152100 | 700 | Computer PC's and Laptop | $1,216 |
| 152100 | 700 | Computer PC's and Laptop | $1,265 |
| 152100 | 700 | Computer PC's and Laptop | $3,361 |
| 152100 | 700 | Computer PC's and Laptop | $1,446 |
| 152100 | 700 | Computer PC's and Laptop | $1,240 |
| 152100 | 700 | Computer PC's and Laptop | $4,163 |
| 152100 | 700 | Computer PC's and Laptop | $1,789 |

**Swoozie's Inc.**
Asset Purchase Agreement

## Schedule 1.01(B) Equipment

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---|---|---|---|
| 152100 | 700 | Computer PC's and Laptop | $1,688 |
| 152100 | 700 | Computer PC's and Laptop | $4,161 |
| 152100 | 700 | Computer PC's and Laptop | $1,835 |
| 152100 | 700 | Computer PC's and Laptop | $267 |
| 152100 | 700 | Computer PC's and Laptop | $3,344 |
| 152100 | 700 | Computer PC's and Laptop | $2,325 |
| 152100 | 700 | Computer PC's and Laptop | $1,272 |
| 152100 | 700 | Computer PC's and Laptop | $334 |
| 152100 | 700 | Computer PC's and Laptop | $75 |
| 152100 | 700 | Computer PC's and Laptop | $82 |
| 152100 | 700 | Computer PC's and Laptop | $1,125 |
| 152100 | 700 | Computer PC's and Laptop | $39 |
| 152100 | 700 | Computer PC's and Laptop | $3,753 |
| 152100 | 700 | Computer PC's and Laptop | $75 |
| 152100 | 700 | Computer PC's and Laptop | $39 |
| 152100 | 700 | Computer PC's and Laptop | $53 |
| 152100 | 700 | Computer PC's and Laptop | $53 |
| 152100 | 700 | Computer PC's and Laptop | $358 |
| 152100 | 700 | Computer PC's and Laptop | $82 |
| 152100 | 700 | Computer PC's and Laptop | $104 |
| 152100 | 700 | Computer PC's and Laptop | $875 |
| 152100 | 700 | Computer PC's and Laptop | $78 |
| 152100 | 700 | Computer PC's and Laptop | $78 |
| 152100 | 700 | Computer PC's and Laptop | $1,250 |
| 152100 | 700 | Computer PC's and Laptop | $134 |
| 152100 | 700 | Computer PC's and Laptop | $178 |
| 152100 | 700 | Computer PC's and Laptop | $82 |
| 152100 | 700 | Computer PC's and Laptop | $104 |
| 152100 | 700 | Computer PC's and Laptop | $371 |
| 152100 | 700 | Computer PC's and Laptop | $78 |
| 152100 | 700 | Computer PC's and Laptop | $156 |
| 152100 | 700 | Computer PC's and Laptop | $69 |
| 152100 | 700 | Computer PC's and Laptop | $104 |
| 152100 | 700 | Computer PC's and Laptop | $82 |
| 152100 | 700 | Computer PC's and Laptop | $371 |
| 152100 | 700 | Computer PC's and Laptop | $69 |
| 152100 | 700 | Computer PC's and Laptop | $127 |
| 152100 | 700 | Computer PC's and Laptop | $5,065 |
| 152100 | 700 | Computer PC's and Laptop | $371 |
| 152100 | 700 | Computer PC's and Laptop | $371 |

**Swoozie's Inc.**

Asset Purchase Agreement

**Schedule 1.01(B) Equipment**

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---|---|---|---|
| 152100 | 700 | Computer PC's and Laptop | $357 |
| 152100 | 700 | Computer PC's and Laptop | $213 |
| 152100 | 700 | Computer PC's and Laptop | $69 |
| 152100 | 700 | Computer PC's and Laptop | $42 |
| 152100 | 700 | Computer PC's and Laptop | $106 |
| 152100 | 700 | Computer PC's and Laptop | -$2,389 |
| 152100 | 700 | Computer PC's and Laptop | $20,844 |
| 152100 | 700 | Computer PC's and Laptop | $2,389 |
| 152100 | 700 | Computer PC's and Laptop | $151 |
| 152100 | 700 | Computer PC's and Laptop | $2,540 |
| 152100 | 700 | Computer PC's and Laptop | $1,374 |
| 152100 | 700 | Computer PC's and Laptop | $1,926 |
| 152100 | 700 | Computer PC's and Laptop | $524 |
| 152100 | 700 | Computer PC's and Laptop | $5,508 |
| 152100 | 700 | Computer PC's and Laptop | $1,727 |
| 152100 | 700 | Computer PC's and Laptop | $3,202 |
| 152100 | 700 | Computer PC's and Laptop | $568 |
| 152100 | 700 | Computer PC's and Laptop | $11,287 |
| 152100 | 700 | Computer PC's and Laptop | $2,430 |
| 152100 | 700 | Computer PC's and Laptop | $9,313 |
| 152100 | 700 | Computer PC's and Laptop | $360 |
| 152100 | 700 | Computer PC's and Laptop | $277 |
| 152100 | 700 | Computer PC's and Laptop | $6,906 |
| 152100 | 700 | Computer PC's and Laptop | $1,210 |
| 152100 | 700 | Computer PC's and Laptop | $0 |
| 152100 | 700 | Computer PC's and Laptop | $0 |
| 152100 | 700 | Computer PC's and Laptop | $0 |
| 152300 | 700 | Computer Printers | $118 |
| 152300 | 700 | Computer Printers | $118 |
| 152300 | 700 | Computer Printers | $118 |
| 152300 | 700 | Computer Printers | $118 |
| 152300 | 700 | Computer Printers | $118 |
| 152300 | 700 | Computer Printers | $118 |
| 152300 | 700 | Computer Printers | $140 |
| 152300 | 700 | Computer Printers | $140 |
| 152300 | 700 | Computer Printers | $140 |
| 152300 | 700 | Computer Printers | $118 |
| 152300 | 700 | Computer Printers | $125 |
| 152300 | 700 | Computer Printers | $32 |
| 152300 | 700 | Computer Printers | $125 |

**Swoozie's Inc.**

Asset Purchase Agreement

**Schedule 1.01(B) Equipment**

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---|---|---|---|
| 152300 | 700 | Computer Printers | $125 |
| 152300 | 700 | Computer Printers | $125 |
| 152300 | 700 | Computer Printers | $125 |
| 152300 | 700 | Computer Printers | $147 |
| 152300 | 700 | Computer Printers | $125 |
| 152300 | 700 | Computer Printers | $125 |
| 152300 | 700 | Computer Printers | $140 |
| 152300 | 700 | Computer Printers | $175 |
| 152400 | 700 | Computer Software | $4,024 |
| 152400 | 700 | Computer Software | $1,230 |
| 152400 | 700 | Computer Software | $799 |
| 152400 | 700 | Computer Software | $20 |
| 152400 | 700 | Computer Software | $4,170 |
| 152400 | 700 | Computer Software | $82 |
| 152400 | 700 | Computer Software | $351 |
| 152400 | 700 | Computer Software | $351 |
| 152400 | 700 | Computer Software | $351 |
| 152400 | 700 | Computer Software | $20 |
| 152400 | 700 | Computer Software | $338 |
| 152400 | 700 | Computer Software | $2,727 |
| 152400 | 700 | Computer Software | $1,871 |
| 152400 | 700 | Computer Software | $659 |
| 152400 | 700 | Computer Software | $351 |
| 152400 | 700 | Computer Software | $756 |
| 152400 | 700 | Computer Software | $2,100 |
| 152400 | 700 | Computer Software | $2,100 |
| 152400 | 700 | Computer Software | $4,400 |
| 152400 | 700 | Computer Software | $4,400 |
| 152400 | 700 | Computer Software | $1,590 |
| 152400 | 700 | Computer Software | $1,650 |
| 152400 | 700 | Computer Software | $4,620 |
| 152400 | 700 | Computer Software | $5,000 |
| 152400 | 700 | Computer Software | $5,000 |
| 152400 | 700 | Computer Software | $2,000 |
| 152400 | 700 | Computer Software | $19,174 |
| 152400 | 700 | Computer Software | $1,498 |
| 152400 | 700 | Computer Software | $2,131 |
| 152400 | 700 | Computer Software | -$138 |
| 152400 | 700 | Computer Software | $1,885 |
| 152400 | 700 | Computer Software | $1,233 |

**Swoozie's Inc.**
Asset Purchase Agreement

### Schedule 1.01(B) Equipment

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---|---|---|---|
| 152400 | 700 | Computer Software | $4,024 |
| 153000 | 700 | Office Equipment | $2,945 |
| 153000 | 700 | Office Equipment | $1,908 |
| 153000 | 700 | Office Equipment | $1,961 |
| 153000 | 700 | Office Equipment | $1,961 |
| 153000 | 700 | Office Equipment | $1,961 |
| 153000 | 700 | Office Equipment | $1,908 |
| 153000 | 700 | Office Equipment | $1,908 |
| 153000 | 700 | Office Equipment | $1,124 |
| 153000 | 700 | Office Equipment | $1,908 |
| 153000 | 700 | Office Equipment | $97 |
| 153000 | 700 | Office Equipment | $1,000 |
| 153000 | 700 | Office Equipment | $97 |
| 153000 | 700 | Office Equipment | -$61,442 |
| 153000 | 700 | Office Equipment | $5,000 |
| 153000 | 700 | Office Equipment | $5,000 |
| 153000 | 700 | Office Equipment | $5,000 |
| 153000 | 700 | Office Equipment | $5,000 |
| 153000 | 700 | Office Equipment | $5,000 |
| 153000 | 700 | Office Equipment | $5,000 |
| 153000 | 700 | Office Equipment | $5,000 |
| 153000 | 700 | Office Equipment | $5,000 |
| 153000 | 700 | Office Equipment | $5,000 |
| 153000 | 700 | Office Equipment | $5,000 |
| 153000 | 700 | Office Equipment | $6,442 |
| 153000 | 700 | Office Equipment | $5,000 |
| 153000 | 700 | Office Equipment | $3,791 |
| 153000 | 700 | Office Equipment | $97 |
| 153000 | 700 | Office Equipment | $1,068 |
| 153000 | 700 | Office Equipment | $401 |
| 153000 | 700 | Office Equipment | $6,431 |
| 153000 | 700 | Office Equipment | $11,156 |
| 154000 | 700 | Telephone Equipment | $3,695 |
| 154000 | 700 | Telephone Equipment | -$840 |
| 152100 | | Computer PC's and Laptop | $2,657 |
| 152100 | | Computer PC's and Laptop | $2,186 |
| 152100 | | Computer PC's and Laptop | $3,092 |
| 152300 | | Computer Printers | $120 |
| 152300 | | Computer Printers | $360 |
| 152300 | | Computer Printers | $56 |

**Swoozie's Inc.**
Asset Purchase Agreement

**Schedule 1.01(B) Equipment**

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---|---|---|---|
| | | TOTAL | $1,061,788 |

## SCHEDULE 1.01(C)—FURNITURE AND FIXTURES (ACQUIRED ASSETS)

**Swoozie's Inc.**

Asset Purchase Agreement

**Schedule 1.01(C) Furniture & Fixtures**

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---|---|---|---|
| 151100 | 001 | Store & Office Signage | $1,770 |
| 151100 | 001 | Store & Office Signage | $1,404 |
| 151200 | 001 | Store & Office Fixtures | $90 |
| 151200 | 001 | Store & Office Fixtures | $73,389 |
| 151200 | 001 | Store & Office Fixtures | $2,360 |
| 151200 | 001 | Store & Office Fixtures | $3,552 |
| 151200 | 001 | Store & Office Fixtures | $1,070 |
| 151200 | 001 | Store & Office Fixtures | $1,557 |
| 151200 | 001 | Store & Office Fixtures | $2,234 |
| 151200 | 001 | Store & Office Fixtures | $59 |
| 151200 | 001 | Store & Office Fixtures | $171 |
| 151200 | 001 | Store & Office Fixtures | $6 |
| 151200 | 001 | Store & Office Fixtures | $499 |
| 151400 | 001 | Store Lighting  Fixtures | $194 |
| 151400 | 001 | Store Lighting  Fixtures | $361 |
| 151400 | 001 | Store Lighting  Fixtures | $662 |
| 151400 | 001 | Store Lighting  Fixtures | $1,008 |
| 151400 | 001 | Store Lighting  Fixtures | $2,065 |
| 151400 | 001 | Store Lighting  Fixtures | -$2,125 |
| 151400 | 001 | Store Lighting  Fixtures | $1,649 |
| 151400 | 001 | Store Lighting  Fixtures | $265 |
| 151400 | 001 | Store Lighting  Fixtures | $8 |
| 151100 | 002 | Store & Office Signage | $1,269 |
| 151200 | 002 | Store & Office Fixtures | $90 |
| 151200 | 002 | Store & Office Fixtures | $24,823 |
| 151200 | 002 | Store & Office Fixtures | $3,480 |
| 151200 | 002 | Store & Office Fixtures | $55 |
| 151200 | 002 | Store & Office Fixtures | $499 |
| 151100 | 003 | Store & Office Signage | $1,269 |
| 151100 | 003 | Store & Office Signage | $1,450 |
| 151200 | 003 | Store & Office Fixtures | $90 |
| 151200 | 003 | Store & Office Fixtures | $24,823 |
| 151200 | 003 | Store & Office Fixtures | $1,070 |
| 151200 | 003 | Store & Office Fixtures | $2,827 |
| 151200 | 003 | Store & Office Fixtures | $12 |
| 151200 | 003 | Store & Office Fixtures | $960 |
| 151200 | 003 | Store & Office Fixtures | $56 |
| 151200 | 003 | Store & Office Fixtures | $171 |
| 151200 | 003 | Store & Office Fixtures | $6 |
| 151200 | 003 | Store & Office Fixtures | -$1,250 |

**Swoozie's Inc.**

Asset Purchase Agreement

**Schedule 1.01(C) Furniture & Fixtures**

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---------|------|---------------------|------------|
| 151300 | 003 | Store/Office Furniture | $61 |
| 151100 | 004 | Store & Office Signage | $67 |
| 151200 | 004 | Store & Office Fixtures | $90 |
| 151200 | 004 | Store & Office Fixtures | $90 |
| 151200 | 004 | Store & Office Fixtures | $2,594 |
| 151200 | 004 | Store & Office Fixtures | $2,876 |
| 151200 | 004 | Store & Office Fixtures | $1,563 |
| 151200 | 004 | Store & Office Fixtures | $2,360 |
| 151200 | 004 | Store & Office Fixtures | $272 |
| 151200 | 004 | Store & Office Fixtures | -$2,197 |
| 151200 | 004 | Store & Office Fixtures | $2,197 |
| 151200 | 004 | Store & Office Fixtures | $499 |
| 151400 | 004 | Store Lighting  Fixtures | $217 |
| 151400 | 004 | Store Lighting  Fixtures | $15 |
| 151400 | 004 | Store Lighting  Fixtures | $375 |
| 151400 | 004 | Store Lighting  Fixtures | $296 |
| 151100 | 005 | Store & Office Signage | $2,586 |
| 151100 | 005 | Store & Office Signage | $2,586 |
| 151100 | 005 | Store & Office Signage | $8,744 |
| 151100 | 005 | Store & Office Signage | $8,744 |
| 151100 | 005 | Store & Office Signage | $81 |
| 151200 | 005 | Store & Office Fixtures | $32,358 |
| 151200 | 005 | Store & Office Fixtures | $503 |
| 151200 | 005 | Store & Office Fixtures | $2,249 |
| 151200 | 005 | Store & Office Fixtures | $1,291 |
| 151200 | 005 | Store & Office Fixtures | $300 |
| 151200 | 005 | Store & Office Fixtures | $764 |
| 151200 | 005 | Store & Office Fixtures | -$279 |
| 151200 | 005 | Store & Office Fixtures | $615 |
| 151200 | 005 | Store & Office Fixtures | $675 |
| 151200 | 005 | Store & Office Fixtures | $224 |
| 151200 | 005 | Store & Office Fixtures | $499 |
| 151200 | 005 | Store & Office Fixtures | $499 |
| 151200 | 005 | Store & Office Fixtures | $3,450 |
| 151100 | 006 | Store & Office Signage | $2,410 |
| 151100 | 006 | Store & Office Signage | $2,410 |
| 151100 | 006 | Store & Office Signage | $26 |
| 151200 | 006 | Store & Office Fixtures | $90 |
| 151200 | 006 | Store & Office Fixtures | $10,000 |
| 151200 | 006 | Store & Office Fixtures | $29,497 |

**Swoozie's Inc.**

Asset Purchase Agreement

**Schedule 1.01(C) Furniture & Fixtures**

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---------|------|---------------------|------------|
| 151200 | 006 | Store & Office Fixtures | $25,000 |
| 151200 | 006 | Store & Office Fixtures | $4,820 |
| 151200 | 006 | Store & Office Fixtures | $2,001 |
| 151200 | 006 | Store & Office Fixtures | $12 |
| 151200 | 006 | Store & Office Fixtures | $2,360 |
| 151200 | 006 | Store & Office Fixtures | $219 |
| 151200 | 006 | Store & Office Fixtures | $499 |
| 151400 | 006 | Store Lighting  Fixtures | $157 |
| 151400 | 006 | Store Lighting  Fixtures | $15 |
| 151100 | 007 | Store & Office Signage | $4,093 |
| 151100 | 007 | Store & Office Signage | $5,220 |
| 151100 | 007 | Store & Office Signage | $5,220 |
| 151100 | 007 | Store & Office Signage | $5,220 |
| 151100 | 007 | Store & Office Signage | $4,093 |
| 151100 | 007 | Store & Office Signage | $8,554 |
| 151200 | 007 | Store & Office Fixtures | $90 |
| 151200 | 007 | Store & Office Fixtures | -$3,709 |
| 151200 | 007 | Store & Office Fixtures | $10,000 |
| 151200 | 007 | Store & Office Fixtures | $2,164 |
| 151200 | 007 | Store & Office Fixtures | $21,216 |
| 151200 | 007 | Store & Office Fixtures | $283 |
| 151200 | 007 | Store & Office Fixtures | $1,128 |
| 151200 | 007 | Store & Office Fixtures | $254 |
| 151200 | 007 | Store & Office Fixtures | $301 |
| 151200 | 007 | Store & Office Fixtures | $7 |
| 151200 | 007 | Store & Office Fixtures | $3,709 |
| 151200 | 007 | Store & Office Fixtures | $499 |
| 151200 | 007 | Store & Office Fixtures | $3,709 |
| 151300 | 007 | Store/Office Furniture | $2,360 |
| 151300 | 007 | Store/Office Furniture | $465 |
| 151400 | 007 | Store Lighting  Fixtures | $368 |
| 151400 | 007 | Store Lighting  Fixtures | $39 |
| 151100 | 008 | Store & Office Signage | $1,758 |
| 151100 | 008 | Store & Office Signage | $1,500 |
| 151100 | 008 | Store & Office Signage | $1,575 |
| 151100 | 008 | Store & Office Signage | $42 |
| 151200 | 008 | Store & Office Fixtures | $90 |
| 151200 | 008 | Store & Office Fixtures | $931 |
| 151200 | 008 | Store & Office Fixtures | $250 |
| 151200 | 008 | Store & Office Fixtures | $301 |

**Swoozie's Inc.**

Asset Purchase Agreement

**Schedule 1.01(C) Furniture & Fixtures**

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---|---|---|---|
| 151200 | 008 | Store & Office Fixtures | $7 |
| 151200 | 008 | Store & Office Fixtures | $499 |
| 151400 | 008 | Store Lighting  Fixtures | $349 |
| 151400 | 008 | Store Lighting  Fixtures | $28 |
| 151100 | 009 | Store & Office Signage | $5,376 |
| 151200 | 009 | Store & Office Fixtures | $90 |
| 151200 | 009 | Store & Office Fixtures | $82,869 |
| 151200 | 009 | Store & Office Fixtures | $1,187 |
| 151200 | 009 | Store & Office Fixtures | $267 |
| 151200 | 009 | Store & Office Fixtures | $301 |
| 151200 | 009 | Store & Office Fixtures | $8 |
| 151200 | 009 | Store & Office Fixtures | $499 |
| 151400 | 009 | Store Lighting  Fixtures | $144 |
| 151400 | 009 | Store Lighting  Fixtures | $1,427 |
| 151400 | 009 | Store Lighting  Fixtures | $899 |
| 151400 | 009 | Store Lighting  Fixtures | $96 |
| 151400 | 009 | Store Lighting  Fixtures | $372 |
| 151400 | 009 | Store Lighting  Fixtures | $48 |
| 151400 | 009 | Store Lighting  Fixtures | $231 |
| 151200 | 010 | Store & Office Fixtures | $90 |
| 151200 | 010 | Store & Office Fixtures | $2,073 |
| 151200 | 010 | Store & Office Fixtures | $1,919 |
| 151200 | 010 | Store & Office Fixtures | $217 |
| 151200 | 010 | Store & Office Fixtures | $499 |
| 151400 | 010 | Store Lighting  Fixtures | $2,065 |
| 151400 | 010 | Store Lighting  Fixtures | $1,008 |
| 151400 | 010 | Store Lighting  Fixtures | $1,649 |
| 151400 | 010 | Store Lighting  Fixtures | -$573 |
| 151400 | 010 | Store Lighting  Fixtures | $59 |
| 151400 | 010 | Store Lighting  Fixtures | $11 |
| 151400 | 010 | Store Lighting  Fixtures | $325 |
| 151400 | 010 | Store Lighting  Fixtures | $38 |
| 151400 | 010 | Store Lighting  Fixtures | $1,401 |
| 151400 | 010 | Store Lighting  Fixtures | $89 |
| 151200 | 011 | Store & Office Fixtures | $158 |
| 151200 | 011 | Store & Office Fixtures | $90 |
| 151200 | 011 | Store & Office Fixtures | $2,040 |
| 151200 | 011 | Store & Office Fixtures | $95,659 |
| 151200 | 011 | Store & Office Fixtures | $229 |
| 151200 | 011 | Store & Office Fixtures | $499 |

**Swoozie's Inc.**
Asset Purchase Agreement

**Schedule 1.01(C) Furniture & Fixtures**

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---|---|---|---|
| 151400 | 011 | Store Lighting  Fixtures | $74 |
| 151400 | 011 | Store Lighting  Fixtures | $14 |
| 151100 | 012 | Store & Office Signage | $8,388 |
| 151100 | 012 | Store & Office Signage | $1,876 |
| 151100 | 012 | Store & Office Signage | $2,309 |
| 151200 | 012 | Store & Office Fixtures | $90 |
| 151200 | 012 | Store & Office Fixtures | -$151 |
| 151200 | 012 | Store & Office Fixtures | -$1,248 |
| 151200 | 012 | Store & Office Fixtures | $10,370 |
| 151200 | 012 | Store & Office Fixtures | $76,637 |
| 151200 | 012 | Store & Office Fixtures | $238 |
| 151200 | 012 | Store & Office Fixtures | $12 |
| 151200 | 012 | Store & Office Fixtures | $215 |
| 151200 | 012 | Store & Office Fixtures | $1,248 |
| 151200 | 012 | Store & Office Fixtures | $499 |
| 151200 | 012 | Store & Office Fixtures | $1,248 |
| 151200 | 012 | Store & Office Fixtures | $151 |
| 151200 | 012 | Store & Office Fixtures | $151 |
| 151400 | 012 | Store Lighting  Fixtures | $52 |
| 151400 | 012 | Store Lighting  Fixtures | $15 |
| 151400 | 012 | Store Lighting  Fixtures | $1,737 |
| 151100 | 013 | Store & Office Signage | $6,983 |
| 151200 | 013 | Store & Office Fixtures | $25,000 |
| 151200 | 013 | Store & Office Fixtures | $3,450 |
| 151200 | 013 | Store & Office Fixtures | $73,911 |
| 151200 | 013 | Store & Office Fixtures | $5,350 |
| 151200 | 013 | Store & Office Fixtures | $196 |
| 151200 | 013 | Store & Office Fixtures | $196 |
| 151200 | 013 | Store & Office Fixtures | $225 |
| 151200 | 013 | Store & Office Fixtures | -$1,000 |
| 151200 | 013 | Store & Office Fixtures | $499 |
| 151400 | 013 | Store Lighting  Fixtures | $6,304 |
| 151400 | 013 | Store Lighting  Fixtures | $171 |
| 151200 | 014 | Store & Office Fixtures | $2,360 |
| 151200 | 014 | Store & Office Fixtures | $25,000 |
| 151200 | 014 | Store & Office Fixtures | $56,636 |
| 151200 | 014 | Store & Office Fixtures | $1,994 |
| 151200 | 014 | Store & Office Fixtures | $1,157 |
| 151200 | 014 | Store & Office Fixtures | $2,499 |
| 151200 | 014 | Store & Office Fixtures | $28,910 |

**Swoozie's Inc.**

Asset Purchase Agreement

**Schedule 1.01(C) Furniture & Fixtures**

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---|---|---|---|
| 151200 | 014 | Store & Office Fixtures | $12 |
| 151200 | 014 | Store & Office Fixtures | $7 |
| 151200 | 014 | Store & Office Fixtures | $25 |
| 151200 | 014 | Store & Office Fixtures | $171 |
| 151200 | 014 | Store & Office Fixtures | $7 |
| 151200 | 014 | Store & Office Fixtures | -$1,000 |
| 151200 | 014 | Store & Office Fixtures | $499 |
| 151300 | 014 | Store/Office Furniture | -$996 |
| 151300 | 014 | Store/Office Furniture | $996 |
| 151300 | 014 | Store/Office Furniture | $996 |
| 151400 | 014 | Store Lighting  Fixtures | $331 |
| 151400 | 014 | Store Lighting  Fixtures | $479 |
| 151400 | 014 | Store Lighting  Fixtures | $14 |
| 151400 | 014 | Store Lighting  Fixtures | $226 |
| 151400 | 014 | Store Lighting  Fixtures | $16 |
| 151400 | 014 | Store Lighting  Fixtures | $129 |
| 151400 | 014 | Store Lighting  Fixtures | $111 |
| 151400 | 014 | Store Lighting  Fixtures | $20 |
| 151400 | 014 | Store Lighting  Fixtures | $14 |
| 151400 | 014 | Store Lighting  Fixtures | $479 |
| 151400 | 014 | Store Lighting  Fixtures | $73 |
| 151100 | 015 | Store & Office Signage | $4,340 |
| 151100 | 015 | Store & Office Signage | $6,710 |
| 151100 | 015 | Store & Office Signage | $9,225 |
| 151200 | 015 | Store & Office Fixtures | $1,802 |
| 151200 | 015 | Store & Office Fixtures | $90 |
| 151200 | 015 | Store & Office Fixtures | $2,360 |
| 151200 | 015 | Store & Office Fixtures | $37,301 |
| 151200 | 015 | Store & Office Fixtures | $1,848 |
| 151200 | 015 | Store & Office Fixtures | $551 |
| 151200 | 015 | Store & Office Fixtures | $25 |
| 151200 | 015 | Store & Office Fixtures | $488 |
| 151200 | 015 | Store & Office Fixtures | -$2,000 |
| 151200 | 015 | Store & Office Fixtures | $499 |
| 151300 | 015 | Store/Office Furniture | -$1,010 |
| 151300 | 015 | Store/Office Furniture | $1,010 |
| 151300 | 015 | Store/Office Furniture | $1,010 |
| 151300 | 015 | Store/Office Furniture | $465 |
| 151400 | 015 | Store Lighting  Fixtures | $19,827 |
| 151400 | 015 | Store Lighting  Fixtures | $346 |

**Swoozie's Inc.**

Asset Purchase Agreement

**Schedule 1.01(C) Furniture & Fixtures**

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---|---|---|---|
| 151400 | 015 | Store Lighting  Fixtures | $25 |
| 151400 | 015 | Store Lighting  Fixtures | $131 |
| 151400 | 015 | Store Lighting  Fixtures | $8 |
| 151100 | 016 | Store & Office Signage | $3,147 |
| 151100 | 016 | Store & Office Signage | $7,243 |
| 151100 | 016 | Store & Office Signage | $6,389 |
| 151200 | 016 | Store & Office Fixtures | $3,124 |
| 151200 | 016 | Store & Office Fixtures | $1,492 |
| 151200 | 016 | Store & Office Fixtures | $20,383 |
| 151200 | 016 | Store & Office Fixtures | $1,152 |
| 151200 | 016 | Store & Office Fixtures | $31 |
| 151200 | 016 | Store & Office Fixtures | -$1,750 |
| 151200 | 016 | Store & Office Fixtures | $499 |
| 151400 | 016 | Store Lighting  Fixtures | $6,547 |
| 151400 | 016 | Store Lighting  Fixtures | $100 |
| 151400 | 016 | Store Lighting  Fixtures | $12,989 |
| 151400 | 016 | Store Lighting  Fixtures | $400 |
| 151400 | 016 | Store Lighting  Fixtures | $360 |
| 151400 | 016 | Store Lighting  Fixtures | $31 |
| 151400 | 016 | Store Lighting  Fixtures | $280 |
| 151400 | 016 | Store Lighting  Fixtures | $29 |
| 151400 | 016 | Store Lighting  Fixtures | $560 |
| 151400 | 016 | Store Lighting  Fixtures | $49 |
| 151400 | 016 | Store Lighting  Fixtures | $140 |
| 151400 | 016 | Store Lighting  Fixtures | $13 |
| 151400 | 016 | Store Lighting  Fixtures | $107 |
| 151400 | 016 | Store Lighting  Fixtures | $17 |
| 151400 | 016 | Store Lighting  Fixtures | $350 |
| 151400 | 016 | Store Lighting  Fixtures | $8 |
| 151400 | 016 | Store Lighting  Fixtures | $243 |
| 151400 | 016 | Store Lighting  Fixtures | $14 |
| 151400 | 016 | Store Lighting  Fixtures | $280 |
| 151400 | 016 | Store Lighting  Fixtures | $201 |
| 151400 | 016 | Store Lighting  Fixtures | $454 |
| 151400 | 016 | Store Lighting  Fixtures | $48 |
| 151400 | 016 | Store Lighting  Fixtures | $219 |
| 151400 | 016 | Store Lighting  Fixtures | $14 |
| 151400 | 016 | Store Lighting  Fixtures | $357 |
| 151400 | 016 | Store Lighting  Fixtures | $11 |
| 151400 | 016 | Store Lighting  Fixtures | -$1,436 |

**Swoozie's Inc.**

Asset Purchase Agreement

### Schedule 1.01(C) Furniture & Fixtures

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---|---|---|---|
| 151100 | 017 | Store & Office Signage | $2,898 |
| 151100 | 017 | Store & Office Signage | $6,723 |
| 151100 | 017 | Store & Office Signage | $6,747 |
| 151200 | 017 | Store & Office Fixtures | $2,360 |
| 151200 | 017 | Store & Office Fixtures | $91,552 |
| 151200 | 017 | Store & Office Fixtures | $1,244 |
| 151200 | 017 | Store & Office Fixtures | $829 |
| 151200 | 017 | Store & Office Fixtures | $3,446 |
| 151200 | 017 | Store & Office Fixtures | $162 |
| 151200 | 017 | Store & Office Fixtures | $2,159 |
| 151200 | 017 | Store & Office Fixtures | $3,250 |
| 151200 | 017 | Store & Office Fixtures | $20,428 |
| 151200 | 017 | Store & Office Fixtures | $1,957 |
| 151200 | 017 | Store & Office Fixtures | $1,728 |
| 151200 | 017 | Store & Office Fixtures | $60 |
| 151200 | 017 | Store & Office Fixtures | $1,406 |
| 151200 | 017 | Store & Office Fixtures | -$2,000 |
| 151200 | 017 | Store & Office Fixtures | $499 |
| 151300 | 017 | Store/Office Furniture | $465 |
| 151400 | 017 | Store Lighting  Fixtures | $24,947 |
| 151400 | 017 | Store Lighting  Fixtures | $257 |
| 151400 | 017 | Store Lighting  Fixtures | $12 |
| 151400 | 017 | Store Lighting  Fixtures | $1,310 |
| 151400 | 017 | Store Lighting  Fixtures | $20 |
| 151400 | 017 | Store Lighting  Fixtures | $709 |
| 151400 | 017 | Store Lighting  Fixtures | $31 |
| 151400 | 017 | Store Lighting  Fixtures | $194 |
| 151400 | 017 | Store Lighting  Fixtures | $83 |
| 151100 | 018 | Store & Office Signage | $278 |
| 151100 | 018 | Store & Office Signage | $7,533 |
| 151200 | 018 | Store & Office Fixtures | $90 |
| 151200 | 018 | Store & Office Fixtures | $17,300 |
| 151200 | 018 | Store & Office Fixtures | $2,360 |
| 151200 | 018 | Store & Office Fixtures | $22,076 |
| 151200 | 018 | Store & Office Fixtures | $9,459 |
| 151200 | 018 | Store & Office Fixtures | $26,828 |
| 151200 | 018 | Store & Office Fixtures | $536 |
| 151200 | 018 | Store & Office Fixtures | $1,555 |
| 151200 | 018 | Store & Office Fixtures | $420 |
| 151200 | 018 | Store & Office Fixtures | $178 |

**Swoozie's Inc.**

Asset Purchase Agreement

**Schedule 1.01(C) Furniture & Fixtures**

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---|---|---|---|
| 151200 | 018 | Store & Office Fixtures | $7 |
| 151200 | 018 | Store & Office Fixtures | $499 |
| 151200 | 018 | Store & Office Fixtures | -$1,000 |
| 151400 | 018 | Store Lighting  Fixtures | $252 |
| 151400 | 018 | Store Lighting  Fixtures | $3,413 |
| 151400 | 018 | Store Lighting  Fixtures | $400 |
| 151100 | 019 | Store & Office Signage | $3,810 |
| 151100 | 019 | Store & Office Signage | $8,046 |
| 151100 | 019 | Store & Office Signage | $6,683 |
| 151200 | 019 | Store & Office Fixtures | $19,041 |
| 151200 | 019 | Store & Office Fixtures | $2,360 |
| 151200 | 019 | Store & Office Fixtures | $1,089 |
| 151200 | 019 | Store & Office Fixtures | $16 |
| 151200 | 019 | Store & Office Fixtures | $727 |
| 151200 | 019 | Store & Office Fixtures | $195 |
| 151200 | 019 | Store & Office Fixtures | $1,141 |
| 151200 | 019 | Store & Office Fixtures | $1,883 |
| 151200 | 019 | Store & Office Fixtures | $231 |
| 151200 | 019 | Store & Office Fixtures | $499 |
| 151200 | 019 | Store & Office Fixtures | -$1,200 |
| 151400 | 019 | Store Lighting  Fixtures | $252 |
| 151400 | 019 | Store Lighting  Fixtures | $16 |
| 151400 | 019 | Store Lighting  Fixtures | $480 |
| 151400 | 019 | Store Lighting  Fixtures | $714 |
| 151400 | 019 | Store Lighting  Fixtures | $714 |
| 151100 | 020 | Store & Office Signage | $7,023 |
| 151100 | 020 | Store & Office Signage | $14,280 |
| 151200 | 020 | Store & Office Fixtures | $90 |
| 151200 | 020 | Store & Office Fixtures | $90 |
| 151200 | 020 | Store & Office Fixtures | $1,213 |
| 151200 | 020 | Store & Office Fixtures | $2,443 |
| 151200 | 020 | Store & Office Fixtures | $1,891 |
| 151200 | 020 | Store & Office Fixtures | $16,655 |
| 151200 | 020 | Store & Office Fixtures | $93 |
| 151200 | 020 | Store & Office Fixtures | $2,360 |
| 151200 | 020 | Store & Office Fixtures | $1,174 |
| 151200 | 020 | Store & Office Fixtures | $1,082 |
| 151200 | 020 | Store & Office Fixtures | $213 |
| 151200 | 020 | Store & Office Fixtures | $178 |
| 151200 | 020 | Store & Office Fixtures | $7 |

**Swoozie's Inc.**

Asset Purchase Agreement

**Schedule 1.01(C) Furniture & Fixtures**

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---------|------|---------------------|------------|
| 151200 | 020 | Store & Office Fixtures | $499 |
| 151200 | 020 | Store & Office Fixtures | -$1,500 |
| 151100 | 021 | Store & Office Signage | $2,201 |
| 151100 | 021 | Store & Office Signage | $2,201 |
| 151100 | 021 | Store & Office Signage | $6,564 |
| 151200 | 021 | Store & Office Fixtures | $0 |
| 151200 | 021 | Store & Office Fixtures | $278 |
| 151200 | 021 | Store & Office Fixtures | $499 |
| 151300 | 021 | Store/Office Furniture | $2,360 |
| 151100 | 022 | Store & Office Signage | $2,860 |
| 151100 | 022 | Store & Office Signage | $400 |
| 151200 | 022 | Store & Office Fixtures | $90 |
| 151200 | 022 | Store & Office Fixtures | $5,535 |
| 151200 | 022 | Store & Office Fixtures | $2,304 |
| 151200 | 022 | Store & Office Fixtures | $1,567 |
| 151200 | 022 | Store & Office Fixtures | $190 |
| 151200 | 022 | Store & Office Fixtures | $5,535 |
| 151200 | 022 | Store & Office Fixtures | $254 |
| 151200 | 022 | Store & Office Fixtures | $2,112 |
| 151200 | 022 | Store & Office Fixtures | $499 |
| 151300 | 022 | Store/Office Furniture | $2,360 |
| 151300 | 022 | Store/Office Furniture | $546 |
| 151400 | 022 | Store Lighting  Fixtures | $6,415 |
| 151400 | 022 | Store Lighting  Fixtures | $178 |
| 151400 | 022 | Store Lighting  Fixtures | $8,621 |
| 151100 | 023 | Store & Office Signage | $3,235 |
| 151100 | 023 | Store & Office Signage | $1,935 |
| 151100 | 023 | Store & Office Signage | $3,235 |
| 151200 | 023 | Store & Office Fixtures | $90 |
| 151200 | 023 | Store & Office Fixtures | $1,245 |
| 151200 | 023 | Store & Office Fixtures | $224 |
| 151200 | 023 | Store & Office Fixtures | $499 |
| 151300 | 023 | Store/Office Furniture | $2,360 |
| 151400 | 023 | Store Lighting  Fixtures | $6,142 |
| 151400 | 023 | Store Lighting  Fixtures | $80 |
| 151400 | 023 | Store Lighting  Fixtures | $11,005 |
| 151400 | 023 | Store Lighting  Fixtures | $254 |
| 151400 | 023 | Store Lighting  Fixtures | $857 |
| 151400 | 023 | Store Lighting  Fixtures | $72 |
| 151100 | 024 | Store & Office Signage | $4,296 |

**Swoozie's Inc.**

Asset Purchase Agreement

**Schedule 1.01(C) Furniture & Fixtures**

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---|---|---|---|
| 151100 | 024 | Store & Office Signage | $1,935 |
| 151100 | 024 | Store & Office Signage | $4,296 |
| 151200 | 024 | Store & Office Fixtures | $90 |
| 151200 | 024 | Store & Office Fixtures | $1,000 |
| 151200 | 024 | Store & Office Fixtures | $258 |
| 151200 | 024 | Store & Office Fixtures | $499 |
| 151300 | 024 | Store/Office Furniture | $2,360 |
| 151400 | 024 | Store Lighting  Fixtures | $5,706 |
| 151400 | 024 | Store Lighting  Fixtures | $300 |
| 151400 | 024 | Store Lighting  Fixtures | $496 |
| 151400 | 024 | Store Lighting  Fixtures | $573 |
| 151400 | 024 | Store Lighting  Fixtures | $9,515 |
| 151400 | 024 | Store Lighting  Fixtures | $101 |
| 151400 | 024 | Store Lighting  Fixtures | $373 |
| 151100 | 025 | Store & Office Signage | $7,744 |
| 151100 | 025 | Store & Office Signage | $7,744 |
| 151100 | 025 | Store & Office Signage | $2,259 |
| 151100 | 025 | Store & Office Signage | $1,320 |
| 151100 | 025 | Store & Office Signage | $1,320 |
| 151100 | 025 | Store & Office Signage | $1,202 |
| 151100 | 025 | Store & Office Signage | $690 |
| 151100 | 025 | Store & Office Signage | $9,006 |
| 151200 | 025 | Store & Office Fixtures | $90 |
| 151200 | 025 | Store & Office Fixtures | $3,450 |
| 151200 | 025 | Store & Office Fixtures | $1,273 |
| 151200 | 025 | Store & Office Fixtures | $279 |
| 151200 | 025 | Store & Office Fixtures | $0 |
| 151200 | 025 | Store & Office Fixtures | $499 |
| 151300 | 025 | Store/Office Furniture | $49,270 |
| 151300 | 025 | Store/Office Furniture | $34,390 |
| 151400 | 025 | Store Lighting  Fixtures | $2,792 |
| 151400 | 025 | Store Lighting  Fixtures | $3,660 |
| 151400 | 025 | Store Lighting  Fixtures | $67 |
| 151400 | 025 | Store Lighting  Fixtures | $350 |
| 151400 | 025 | Store Lighting  Fixtures | $2,893 |
| 151400 | 025 | Store Lighting  Fixtures | $120 |
| 151400 | 025 | Store Lighting  Fixtures | $9,025 |
| 151400 | 025 | Store Lighting  Fixtures | $56 |
| 151400 | 025 | Store Lighting  Fixtures | $359 |
| 151100 | 026 | Store & Office Signage | $10,213 |

**Swoozie's Inc.**

Asset Purchase Agreement

**Schedule 1.01(C) Furniture & Fixtures**

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---|---|---|---|
| 151100 | 026 | Store & Office Signage | $1,985 |
| 151100 | 026 | Store & Office Signage | $10,213 |
| 151100 | 026 | Store & Office Signage | $889 |
| 151100 | 026 | Store & Office Signage | $235 |
| 151100 | 026 | Store & Office Signage | $2,104 |
| 151100 | 026 | Store & Office Signage | -$1,970 |
| 151200 | 026 | Store & Office Fixtures | $90 |
| 151200 | 026 | Store & Office Fixtures | $616 |
| 151200 | 026 | Store & Office Fixtures | $1,000 |
| 151200 | 026 | Store & Office Fixtures | $499 |
| 151300 | 026 | Store/Office Furniture | $2,360 |
| 151300 | 026 | Store/Office Furniture | $194 |
| 151300 | 026 | Store/Office Furniture | $551 |
| 151300 | 026 | Store/Office Furniture | $1,735 |
| 151400 | 026 | Store Lighting  Fixtures | $6,479 |
| 151400 | 026 | Store Lighting  Fixtures | $2,456 |
| 151400 | 026 | Store Lighting  Fixtures | $9,789 |
| 151400 | 026 | Store Lighting  Fixtures | $309 |
| 151400 | 026 | Store Lighting  Fixtures | $153 |
| 151400 | 026 | Store Lighting  Fixtures | $84 |
| 151400 | 026 | Store Lighting  Fixtures | $43 |
| 151400 | 026 | Store Lighting  Fixtures | $163 |
| 151100 | 027 | Store & Office Signage | $6,258 |
| 151100 | 027 | Store & Office Signage | $6,258 |
| 151200 | 027 | Store & Office Fixtures | $90 |
| 151200 | 027 | Store & Office Fixtures | $842 |
| 151200 | 027 | Store & Office Fixtures | $499 |
| 151300 | 027 | Store/Office Furniture | $2,360 |
| 151300 | 027 | Store/Office Furniture | $572 |
| 151400 | 027 | Store Lighting  Fixtures | $6,481 |
| 151400 | 027 | Store Lighting  Fixtures | $320 |
| 151400 | 027 | Store Lighting  Fixtures | $234 |
| 151400 | 027 | Store Lighting  Fixtures | $2,733 |
| 151400 | 027 | Store Lighting  Fixtures | $776 |
| 151400 | 027 | Store Lighting  Fixtures | $8,311 |
| 151100 | 028 | Store & Office Signage | $9,942 |
| 151100 | 028 | Store & Office Signage | $1,985 |
| 151200 | 028 | Store & Office Fixtures | $90 |
| 151200 | 028 | Store & Office Fixtures | $100 |
| 151200 | 028 | Store & Office Fixtures | $726 |

**Swoozie's Inc.**

Asset Purchase Agreement

**Schedule 1.01(C) Furniture & Fixtures**

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---------|------|---------------------|-----------|
| 151200 | 028 | Store & Office Fixtures | $1,245 |
| 151200 | 028 | Store & Office Fixtures | $499 |
| 151300 | 028 | Store/Office Furniture | $2,360 |
| 151300 | 028 | Store/Office Furniture | $536 |
| 151400 | 028 | Store Lighting  Fixtures | $3,963 |
| 151400 | 028 | Store Lighting  Fixtures | $450 |
| 151400 | 028 | Store Lighting  Fixtures | $24 |
| 151100 | 029 | Store & Office Signage | $4,778 |
| 151100 | 029 | Store & Office Signage | $2,184 |
| 151100 | 029 | Store & Office Signage | $124 |
| 151100 | 029 | Store & Office Signage | $7,146 |
| 151200 | 029 | Store & Office Fixtures | $90 |
| 151200 | 029 | Store & Office Fixtures | $3,450 |
| 151200 | 029 | Store & Office Fixtures | $52,141 |
| 151200 | 029 | Store & Office Fixtures | $37,040 |
| 151200 | 029 | Store & Office Fixtures | $1,303 |
| 151200 | 029 | Store & Office Fixtures | $0 |
| 151400 | 029 | Store Lighting  Fixtures | $4,772 |
| 151400 | 029 | Store Lighting  Fixtures | $2,468 |
| 151400 | 029 | Store Lighting  Fixtures | $10,046 |
| 151400 | 029 | Store Lighting  Fixtures | $3,262 |
| 151400 | 029 | Store Lighting  Fixtures | $538 |
| 151400 | 029 | Store Lighting  Fixtures | $111 |
| 151100 | 030 | Store & Office Signage | $1,375 |
| 151100 | 030 | Store & Office Signage | $4,996 |
| 151100 | 030 | Store & Office Signage | $4,996 |
| 151100 | 030 | Store & Office Signage | $1,906 |
| 151100 | 030 | Store & Office Signage | $573 |
| 151200 | 030 | Store & Office Fixtures | $90 |
| 151200 | 030 | Store & Office Fixtures | $675 |
| 151200 | 030 | Store & Office Fixtures | $89,328 |
| 151200 | 030 | Store & Office Fixtures | $561 |
| 151400 | 030 | Store Lighting  Fixtures | $17,653 |
| 151400 | 030 | Store Lighting  Fixtures | $238 |
| 151400 | 030 | Store Lighting  Fixtures | $850 |
| 151100 | 031 | Store & Office Signage | $20,481 |
| 151100 | 031 | Store & Office Signage | $7,000 |
| 151100 | 031 | Store & Office Signage | $6,916 |
| 151100 | 031 | Store & Office Signage | $643 |
| 151100 | 031 | Store & Office Signage | -$20,481 |

**Swoozie's Inc.**

Asset Purchase Agreement

**Schedule 1.01(C) Furniture & Fixtures**

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---|---|---|---|
| 151100 | 031 | Store & Office Signage | $729 |
| 151100 | 031 | Store & Office Signage | $2,137 |
| 151100 | 031 | Store & Office Signage | $206 |
| 151100 | 031 | Store & Office Signage | $95 |
| 151200 | 031 | Store & Office Fixtures | $90 |
| 151200 | 031 | Store & Office Fixtures | $91,819 |
| 151200 | 031 | Store & Office Fixtures | $3,450 |
| 151200 | 031 | Store & Office Fixtures | $3,450 |
| 151200 | 031 | Store & Office Fixtures | $561 |
| 151400 | 031 | Store Lighting  Fixtures | $18,438 |
| 151400 | 031 | Store Lighting  Fixtures | $680 |
| 151100 | 032 | Store & Office Signage | $228 |
| 151100 | 032 | Store & Office Signage | $432 |
| 151100 | 032 | Store & Office Signage | $6,154 |
| 151100 | 032 | Store & Office Signage | $42 |
| 151200 | 032 | Store & Office Fixtures | $2,308 |
| 151200 | 032 | Store & Office Fixtures | $517 |
| 151200 | 032 | Store & Office Fixtures | $1,380 |
| 151200 | 032 | Store & Office Fixtures | $158 |
| 151200 | 032 | Store & Office Fixtures | $232 |
| 151200 | 032 | Store & Office Fixtures | $90 |
| 151200 | 032 | Store & Office Fixtures | $48 |
| 151200 | 032 | Store & Office Fixtures | $441 |
| 151200 | 032 | Store & Office Fixtures | $79 |
| 151300 | 032 | Store/Office Furniture | $58 |
| 151300 | 032 | Store/Office Furniture | $58 |
| 151300 | 032 | Store/Office Furniture | $58 |
| 151100 | 033 | Store & Office Signage | $228 |
| 151100 | 033 | Store & Office Signage | $432 |
| 151100 | 033 | Store & Office Signage | $6,154 |
| 151100 | 033 | Store & Office Signage | $42 |
| 151200 | 033 | Store & Office Fixtures | $2,308 |
| 151200 | 033 | Store & Office Fixtures | $517 |
| 151200 | 033 | Store & Office Fixtures | $1,380 |
| 151200 | 033 | Store & Office Fixtures | $48 |
| 151200 | 033 | Store & Office Fixtures | $441 |
| 151200 | 033 | Store & Office Fixtures | $80 |
| 151300 | 033 | Store/Office Furniture | $55 |
| 151300 | 033 | Store/Office Furniture | $55 |
| 151300 | 033 | Store/Office Furniture | $55 |

**Swoozie's Inc.**

Asset Purchase Agreement

**Schedule 1.01(C) Furniture & Fixtures**

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---|---|---|---|
| 151100 | 034 | Store & Office Signage | $228 |
| 151100 | 034 | Store & Office Signage | $432 |
| 151100 | 034 | Store & Office Signage | $6,154 |
| 151100 | 034 | Store & Office Signage | $42 |
| 151200 | 034 | Store & Office Fixtures | $2,308 |
| 151200 | 034 | Store & Office Fixtures | $1,380 |
| 151200 | 034 | Store & Office Fixtures | $158 |
| 151200 | 034 | Store & Office Fixtures | $344 |
| 151200 | 034 | Store & Office Fixtures | $48 |
| 151200 | 034 | Store & Office Fixtures | $90 |
| 151200 | 034 | Store & Office Fixtures | $441 |
| 151200 | 034 | Store & Office Fixtures | $79 |
| 151300 | 034 | Store/Office Furniture | $58 |
| 151300 | 034 | Store/Office Furniture | $58 |
| 151300 | 034 | Store/Office Furniture | $58 |
| 151100 | 035 | Store & Office Signage | $228 |
| 151100 | 035 | Store & Office Signage | $432 |
| 151100 | 035 | Store & Office Signage | $6,154 |
| 151100 | 035 | Store & Office Signage | $42 |
| 151200 | 035 | Store & Office Fixtures | $2,308 |
| 151200 | 035 | Store & Office Fixtures | $517 |
| 151200 | 035 | Store & Office Fixtures | $1,380 |
| 151200 | 035 | Store & Office Fixtures | $1,380 |
| 151200 | 035 | Store & Office Fixtures | $158 |
| 151200 | 035 | Store & Office Fixtures | $232 |
| 151200 | 035 | Store & Office Fixtures | $90 |
| 151200 | 035 | Store & Office Fixtures | $48 |
| 151200 | 035 | Store & Office Fixtures | $79 |
| 151300 | 035 | Store/Office Furniture | $58 |
| 151300 | 035 | Store/Office Furniture | $58 |
| 151300 | 035 | Store/Office Furniture | $58 |
| 151100 | 036 | Store & Office Signage | $228 |
| 151100 | 036 | Store & Office Signage | $432 |
| 151100 | 036 | Store & Office Signage | $6,154 |
| 151100 | 036 | Store & Office Signage | $42 |
| 151200 | 036 | Store & Office Fixtures | $2,308 |
| 151200 | 036 | Store & Office Fixtures | $185 |
| 151200 | 036 | Store & Office Fixtures | $158 |
| 151200 | 036 | Store & Office Fixtures | $517 |
| 151200 | 036 | Store & Office Fixtures | $90 |

**Swoozie's Inc.**

Asset Purchase Agreement

**Schedule 1.01(C) Furniture & Fixtures**

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---------|------|---------------------|-----------:|
| 151200 | 036 | Store & Office Fixtures | $601 |
| 151200 | 036 | Store & Office Fixtures | $441 |
| 151200 | 036 | Store & Office Fixtures | $77 |
| 151300 | 036 | Store/Office Furniture | $58 |
| 151300 | 036 | Store/Office Furniture | $58 |
| 151300 | 036 | Store/Office Furniture | $58 |
| 151100 | 037 | Store & Office Signage | $432 |
| 151100 | 037 | Store & Office Signage | $6,154 |
| 151100 | 037 | Store & Office Signage | $42 |
| 151200 | 037 | Store & Office Fixtures | $2,308 |
| 151200 | 037 | Store & Office Fixtures | $1,380 |
| 151200 | 037 | Store & Office Fixtures | $185 |
| 151200 | 037 | Store & Office Fixtures | $158 |
| 151200 | 037 | Store & Office Fixtures | $517 |
| 151200 | 037 | Store & Office Fixtures | $48 |
| 151200 | 037 | Store & Office Fixtures | $649 |
| 151200 | 037 | Store & Office Fixtures | $90 |
| 151200 | 037 | Store & Office Fixtures | $441 |
| 151200 | 037 | Store & Office Fixtures | $79 |
| 151300 | 037 | Store/Office Furniture | $58 |
| 151300 | 037 | Store/Office Furniture | $59 |
| 151300 | 037 | Store/Office Furniture | $59 |
| 151300 | 037 | Store/Office Furniture | $81 |
| 151100 | 038 | Store & Office Signage | $432 |
| 151100 | 038 | Store & Office Signage | $6,154 |
| 151100 | 038 | Store & Office Signage | $42 |
| 151200 | 038 | Store & Office Fixtures | $2,308 |
| 151200 | 038 | Store & Office Fixtures | $1,380 |
| 151200 | 038 | Store & Office Fixtures | $185 |
| 151200 | 038 | Store & Office Fixtures | $158 |
| 151200 | 038 | Store & Office Fixtures | $517 |
| 151200 | 038 | Store & Office Fixtures | $48 |
| 151200 | 038 | Store & Office Fixtures | $492 |
| 151200 | 038 | Store & Office Fixtures | $90 |
| 151200 | 038 | Store & Office Fixtures | $441 |
| 151200 | 038 | Store & Office Fixtures | $79 |
| 151300 | 038 | Store/Office Furniture | $58 |
| 151300 | 038 | Store/Office Furniture | $59 |
| 151300 | 038 | Store/Office Furniture | $59 |
| 151100 | 039 | Store & Office Signage | $228 |

**Swoozie's Inc.**

Asset Purchase Agreement

**Schedule 1.01(C) Furniture & Fixtures**

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---------|------|---------------------|-----------:|
| 151100 | 039 | Store & Office Signage | $432 |
| 151100 | 039 | Store & Office Signage | $6,154 |
| 151100 | 039 | Store & Office Signage | $42 |
| 151200 | 039 | Store & Office Fixtures | $2,308 |
| 151200 | 039 | Store & Office Fixtures | $180 |
| 151200 | 039 | Store & Office Fixtures | $158 |
| 151200 | 039 | Store & Office Fixtures | $517 |
| 151200 | 039 | Store & Office Fixtures | $541 |
| 151200 | 039 | Store & Office Fixtures | $90 |
| 151200 | 039 | Store & Office Fixtures | $48 |
| 151200 | 039 | Store & Office Fixtures | $441 |
| 151200 | 039 | Store & Office Fixtures | $79 |
| 151200 | 039 | Store & Office Fixtures | $9 |
| 151300 | 039 | Store/Office Furniture | $58 |
| 151300 | 039 | Store/Office Furniture | $59 |
| 151300 | 039 | Store/Office Furniture | $59 |
| 151100 | 040 | Store & Office Signage | $228 |
| 151100 | 040 | Store & Office Signage | $432 |
| 151100 | 040 | Store & Office Signage | $6,154 |
| 151100 | 040 | Store & Office Signage | $42 |
| 151200 | 040 | Store & Office Fixtures | $2,308 |
| 151200 | 040 | Store & Office Fixtures | $1,380 |
| 151200 | 040 | Store & Office Fixtures | $185 |
| 151200 | 040 | Store & Office Fixtures | $1,380 |
| 151200 | 040 | Store & Office Fixtures | $158 |
| 151200 | 040 | Store & Office Fixtures | $517 |
| 151200 | 040 | Store & Office Fixtures | $48 |
| 151200 | 040 | Store & Office Fixtures | $348 |
| 151200 | 040 | Store & Office Fixtures | $90 |
| 151200 | 040 | Store & Office Fixtures | $441 |
| 151200 | 040 | Store & Office Fixtures | $79 |
| 151300 | 040 | Store/Office Furniture | $58 |
| 151300 | 040 | Store/Office Furniture | $59 |
| 151300 | 040 | Store/Office Furniture | $59 |
| 151100 | 041 | Store & Office Signage | $303 |
| 151100 | 041 | Store & Office Signage | $432 |
| 151100 | 041 | Store & Office Signage | $6,154 |
| 151100 | 041 | Store & Office Signage | $42 |
| 151200 | 041 | Store & Office Fixtures | $2,308 |
| 151200 | 041 | Store & Office Fixtures | $185 |

**Swoozie's Inc.**

Asset Purchase Agreement

**Schedule 1.01(C) Furniture & Fixtures**

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---|---|---|---|
| 151200 | 041 | Store & Office Fixtures | $1,380 |
| 151200 | 041 | Store & Office Fixtures | $158 |
| 151200 | 041 | Store & Office Fixtures | $517 |
| 151200 | 041 | Store & Office Fixtures | $348 |
| 151200 | 041 | Store & Office Fixtures | $48 |
| 151200 | 041 | Store & Office Fixtures | $441 |
| 151200 | 041 | Store & Office Fixtures | $79 |
| 151300 | 041 | Store/Office Furniture | $61 |
| 151300 | 041 | Store/Office Furniture | $59 |
| 151300 | 041 | Store/Office Furniture | $59 |
| 151100 | 042 | Store & Office Signage | $228 |
| 151100 | 042 | Store & Office Signage | $432 |
| 151100 | 042 | Store & Office Signage | $6,154 |
| 151100 | 042 | Store & Office Signage | $42 |
| 151200 | 042 | Store & Office Fixtures | $2,308 |
| 151200 | 042 | Store & Office Fixtures | $158 |
| 151200 | 042 | Store & Office Fixtures | $1,380 |
| 151200 | 042 | Store & Office Fixtures | $185 |
| 151200 | 042 | Store & Office Fixtures | $717 |
| 151200 | 042 | Store & Office Fixtures | $517 |
| 151200 | 042 | Store & Office Fixtures | $90 |
| 151200 | 042 | Store & Office Fixtures | $441 |
| 151200 | 042 | Store & Office Fixtures | $79 |
| 151300 | 042 | Store/Office Furniture | $55 |
| 151300 | 042 | Store/Office Furniture | $55 |
| 151300 | 042 | Store/Office Furniture | $55 |
| 151100 | 043 | Store & Office Signage | $432 |
| 151100 | 043 | Store & Office Signage | $6,154 |
| 151100 | 043 | Store & Office Signage | $42 |
| 151200 | 043 | Store & Office Fixtures | $2,308 |
| 151200 | 043 | Store & Office Fixtures | $158 |
| 151200 | 043 | Store & Office Fixtures | $1,380 |
| 151200 | 043 | Store & Office Fixtures | $185 |
| 151200 | 043 | Store & Office Fixtures | $517 |
| 151200 | 043 | Store & Office Fixtures | $232 |
| 151200 | 043 | Store & Office Fixtures | $48 |
| 151200 | 043 | Store & Office Fixtures | $90 |
| 151200 | 043 | Store & Office Fixtures | $441 |
| 151200 | 043 | Store & Office Fixtures | $79 |
| 151300 | 043 | Store/Office Furniture | $55 |

**Swoozie's Inc.**

Asset Purchase Agreement

**Schedule 1.01(C) Furniture & Fixtures**

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---------|------|---------------------|------------|
| 151300 | 043 | Store/Office Furniture | $55 |
| 151300 | 043 | Store/Office Furniture | $55 |
| 151100 | 044 | Store & Office Signage | $432 |
| 151100 | 044 | Store & Office Signage | $6,154 |
| 151100 | 044 | Store & Office Signage | $42 |
| 151200 | 044 | Store & Office Fixtures | $2,308 |
| 151200 | 044 | Store & Office Fixtures | $158 |
| 151200 | 044 | Store & Office Fixtures | $1,380 |
| 151200 | 044 | Store & Office Fixtures | $185 |
| 151200 | 044 | Store & Office Fixtures | $517 |
| 151200 | 044 | Store & Office Fixtures | $90 |
| 151200 | 044 | Store & Office Fixtures | $48 |
| 151200 | 044 | Store & Office Fixtures | $492 |
| 151200 | 044 | Store & Office Fixtures | $441 |
| 151200 | 044 | Store & Office Fixtures | $79 |
| 151300 | 044 | Store/Office Furniture | $55 |
| 151300 | 044 | Store/Office Furniture | $55 |
| 151300 | 044 | Store/Office Furniture | $55 |
| 151100 | 700 | Store & Office Signage | $25 |
| 151100 | 700 | Store & Office Signage | $350 |
| 151100 | 700 | Store & Office Signage | $988 |
| 151100 | 700 | Store & Office Signage | $3,769 |
| 151100 | 700 | Store & Office Signage | $1,792 |
| 151100 | 700 | Store & Office Signage | $391 |
| 151100 | 700 | Store & Office Signage | $1,292 |
| 151100 | 700 | Store & Office Signage | $2,354 |
| 151100 | 700 | Store & Office Signage | $416 |
| 151100 | 700 | Store & Office Signage | $1,231 |
| 151100 | 700 | Store & Office Signage | $4,145 |
| 151100 | 700 | Store & Office Signage | $9,072 |
| 151100 | 700 | Store & Office Signage | $3,715 |
| 151100 | 700 | Store & Office Signage | $767 |
| 151100 | 700 | Store & Office Signage | $1,601 |
| 151100 | 700 | Store & Office Signage | $2,330 |
| 151100 | 700 | Store & Office Signage | $4,085 |
| 151100 | 700 | Store & Office Signage | $130 |
| 151100 | 700 | Store & Office Signage | $3,715 |
| 151100 | 700 | Store & Office Signage | $567 |
| 151100 | 700 | Store & Office Signage | $3,873 |
| 151100 | 700 | Store & Office Signage | $997 |

**Swoozie's Inc.**

Asset Purchase Agreement

**Schedule 1.01(C) Furniture & Fixtures**

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---|---|---|---|
| 151100 | 700 | Store & Office Signage | $212 |
| 151100 | 700 | Store & Office Signage | $255 |
| 151100 | 700 | Store & Office Signage | $2,229 |
| 151100 | 700 | Store & Office Signage | $2,826 |
| 151100 | 700 | Store & Office Signage | $2,926 |
| 151100 | 700 | Store & Office Signage | $2,279 |
| 151100 | 700 | Store & Office Signage | $1,676 |
| 151100 | 700 | Store & Office Signage | $10,580 |
| 151100 | 700 | Store & Office Signage | $550 |
| 151100 | 700 | Store & Office Signage | -$10,000 |
| 151100 | 700 | Store & Office Signage | $1,450 |
| 151100 | 700 | Store & Office Signage | $2,905 |
| 151100 | 700 | Store & Office Signage | -$3,810 |
| 151100 | 700 | Store & Office Signage | $170 |
| 151100 | 700 | Store & Office Signage | $3,910 |
| 151100 | 700 | Store & Office Signage | $415 |
| 151100 | 700 | Store & Office Signage | $2,210 |
| 151100 | 700 | Store & Office Signage | $4,104 |
| 151100 | 700 | Store & Office Signage | $2,578 |
| 151100 | 700 | Store & Office Signage | $2,916 |
| 151100 | 700 | Store & Office Signage | $83,660 |
| 151100 | 700 | Store & Office Signage | $1,305 |
| 151100 | 700 | Store & Office Signage | $5,838 |
| 151100 | 700 | Store & Office Signage | $27,108 |
| 151100 | 700 | Store & Office Signage | $7,807 |
| 151200 | 700 | Store & Office Fixtures | -$12,360 |
| 151200 | 700 | Store & Office Fixtures | $705 |
| 151200 | 700 | Store & Office Fixtures | $620 |
| 151200 | 700 | Store & Office Fixtures | $1,398 |
| 151200 | 700 | Store & Office Fixtures | -$800 |
| 151200 | 700 | Store & Office Fixtures | $7,613 |
| 151200 | 700 | Store & Office Fixtures | $1,402 |
| 151200 | 700 | Store & Office Fixtures | $1,020 |
| 151200 | 700 | Store & Office Fixtures | $1,551 |
| 151200 | 700 | Store & Office Fixtures | $6,480 |
| 151200 | 700 | Store & Office Fixtures | $3,023 |
| 151200 | 700 | Store & Office Fixtures | $1,488 |
| 151200 | 700 | Store & Office Fixtures | $8,531 |
| 151200 | 700 | Store & Office Fixtures | $885 |
| 151200 | 700 | Store & Office Fixtures | $200 |

**Swoozie's Inc.**

Asset Purchase Agreement

**Schedule 1.01(C) Furniture & Fixtures**

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---------|------|--------------------|-----------:|
| 151200 | 700 | Store & Office Fixtures | $1,083 |
| 151200 | 700 | Store & Office Fixtures | $1,935 |
| 151200 | 700 | Store & Office Fixtures | $6,256 |
| 151200 | 700 | Store & Office Fixtures | $1,266 |
| 151200 | 700 | Store & Office Fixtures | $1,305 |
| 151200 | 700 | Store & Office Fixtures | $1,623 |
| 151300 | 700 | Store/Office Furniture | $393 |
| 151300 | 700 | Store/Office Furniture | $37 |
| 151300 | 700 | Store/Office Furniture | $800 |
| 151300 | 700 | Store/Office Furniture | $320 |
| 151300 | 700 | Store/Office Furniture | $17 |
| 151300 | 700 | Store/Office Furniture | $2,540 |
| 151300 | 700 | Store/Office Furniture | $835 |
| 151300 | 700 | Store/Office Furniture | -$97 |
| 151300 | 700 | Store/Office Furniture | $6,974 |
| 151300 | 700 | Store/Office Furniture | $1,497 |
| 151300 | 700 | Store/Office Furniture | -$269 |
| 151300 | 700 | Store/Office Furniture | $610 |
| 151300 | 700 | Store/Office Furniture | -$133 |
| 151300 | 700 | Store/Office Furniture | $3,754 |
| 151300 | 700 | Store/Office Furniture | $1,561 |
| 151300 | 700 | Store/Office Furniture | -$83,660 |
| 151400 | 700 | Store Lighting  Fixtures | -$4,334 |
| 151400 | 700 | Store Lighting  Fixtures | $4,234 |
| 151400 | 700 | Store Lighting  Fixtures | -$6,868 |
| 151400 | 700 | Store Lighting  Fixtures | $6,868 |
| 151100 |  | Store & Office Signage | $3,367 |
| 151100 |  | Store & Office Signage | $123 |
| 151200 |  | Store & Office Fixtures | $469 |
| 151200 |  | Store & Office Fixtures | $528 |
| 151200 |  | Store & Office Fixtures | $107 |
| 151200 |  | Store & Office Fixtures | $209 |
| 151200 |  | Store & Office Fixtures | $243 |
| 151200 |  | Store & Office Fixtures | $322 |
| 151200 |  | Store & Office Fixtures | $154 |
| 151200 |  | Store & Office Fixtures | $163 |
| 151200 |  | Store & Office Fixtures | $109 |
| 151200 |  | Store & Office Fixtures | $165 |
| 151200 |  | Store & Office Fixtures | -$107 |
| 151200 |  | Store & Office Fixtures | $128 |

**Swoozie's Inc.**

Asset Purchase Agreement

**Schedule 1.01(C) Furniture & Fixtures**

| ACCOUNT | UNIT | ACCOUNT DESCRIPTION | NET AMOUNT |
|---------|------|---------------------|-----------:|
| 151200 | | Store & Office Fixtures | $383 |
| 151200 | | Store & Office Fixtures | $1,188 |
| 151200 | | Store & Office Fixtures | $212 |
| 151200 | | Store & Office Fixtures | $161 |
| 151200 | | Store & Office Fixtures | $108 |
| 151200 | | Store & Office Fixtures | $178 |
| 151300 | | Store/Office Furniture | $107 |
| | | **TOTAL** | **$2,549,265** |

## SCHEDULE 1.04—EXCLUDED ASSETS

## SCHEDULE 1.04---EXCLUDED ASSETS

### Leased Equipment

| | | |
|---|---|---|
| BB &T | Capital Lease - POS System | Orland Park  #25<br>Morrison #28 |
| CFC Investment Co | Capital Lease - POS System | Dallas #9<br>Memphis #11 |
| Cisco System Capital | Capital Lease - Telephone System | Corporate Office |
| Dell Financial Services | Capital Lease - POS System | Dallas #9<br>Blakeney #22<br>Durham #23<br>Nashville #24<br>Burr Ridge #27<br>Boca Raton #28<br>South Barrington #31<br>Various - Not Specified |
| Evans National Leasing | Capital Lease - POS System | Greenville #10<br>Houston #12 |
| Financial Pacific Leasing | Capital Lease - POS System | West Cobb #4 |
| GE Capital | Capital Lease - POS System | Oakbrook #20<br>Raleigh #21 |
| Graybar Financial Services | Capital Lease - Telephone System | Jacksonville #7 |
| Heritage Pacific Leasing | Capital Lease - POS System | Jacksonville #7 |
| Main Street Banking | Capital Lease - POS System | Sugar Land #14 |
| Primary  Financial Corp | Capital Lease - Retail Pro | Corporate Office |
| Royal Bank America Leasing , LP | Capital Lease - POS System | Greensboro #16<br>Bonita Springs #17 |
| Susquehanna Commercial Financial , Inc | Capital Lease - POS System | Southlake #18<br>Manhatten Beach #19 |
| The Leasing Expert/Marlin Leasing | Capital Lease - POS System | Norcross #3<br>Birmingham #8 |
| VAR Resourses | Capital Lease - POS System | Allen #30<br>S Barrington #31 |

## Intellectual Property

| Word Mark | Goods and Services | Serial Number | Filing Date | Registration Number | Registration Date | Owner |
|---|---|---|---|---|---|---|
| SWOOZIE'S (Typed Drawing) | IC 035. US 100 101 102. G & S: retail store services in the field of printed invitations, announcements, stationery and gift items. FIRST USE: 20010210. FIRST USE IN COMMERCE: 20010210 IC 042. US 100 101. G & S: printing services, namely, printing of invitations, announcements and stationery. FIRST USE: 20010210. FIRST USE IN COMMERCE: 20010210 | 76242075 | 4/18/2001 | 2651394 | 11/19/2002 | (REGISTRANT) SWOOZIE'S LLC CORPORATION GEORGIA 4285 Roswell Road, Suite 10 Atlanta GEORGIA 30342 (LAST LISTED OWNER) SWOOZIE'S, INC. CORPORATION DELAWARE 80 West Wieuca Road Suite 302 Atlanta GEORGIA 30342 |

| Domain Name | Account No. | Expiration Date | Account Holder |
|---|---|---|---|
| swoozies.com | 1558563 | 11/16/2014 | Swoozie's Inc. |

| Customer Lists | NO OF NAMES OPTED IN |
|---|---|
| MAILING ADDRESS DATABASE | 235,604 |
| E-MAIL ADDRESS DATABASE | 102,834 |

## Copyright, Original Registration:

| | |
|---|---|
| Type of Work: | Visual Material |
| Registration Number / Date: | VAu000973323 / 2008-10-04 |
| Application Title: | Swoozie's Logo Project. |
| Title: | Swoozie's Logo Project. |
| Description: | Electronic file (eService) |
| Copyright Claimant: | Kathy Huie. Address: 300 East 34th Street, Apt. 14B, New York, NY, 10016, United States. |
| Date of Creation: | 2000 |
| Authorship on Application: | Kathy Huie; Domicile: United States; Citizenship: United States. Authorship: 2-D artwork. |
| Copyright Note: | C.O. correspondence. |
| Names: | Huie, Kathy |

## COPYRIGHT ASSIGNMENT:

| | |
|---|---|
| Type of Work: | Recorded Document |
| Document Number: | V3578D604 |
| Date of Recordation: | 5/29/2009 |
| Entire Copyright Document: | V3578 D604 P1 |
| Date of Execution: | 13-May-09 |
| Registration Number Not Verified: | VAu 973-323. |
| Title: | Swoozie's logo project. VAu 973-323. |
| Notes: | Copyright assignment. |
| Party 1: | Kathy Huie. |
| Party 2: | Swoozie's, Inc. |
| Names: | Huie, Kathy |
| | Swoozie's, Inc. |

# **Exhibit B**

## AGENCY AGREEMENT

This Agency Agreement (this "Agreement"), dated as of the 26th day of March 2010, is made and entered into by and among **SWOOZIE's, INC.,** (the "Merchant") and Hilco Merchant Resources, LLC (the "Agent").

## RECITALS

WHEREAS, on March 2, 2010 (the "Petition Date"), Merchant filed a voluntary petition for relief under Title 11 of the United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court"), and Merchant is managing its affairs as a debtor and debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code in case No. 10-66316-CRM (the "Chapter 11 Case");

WHEREAS, Merchant desires that Agent act as Merchant's exclusive agent for the limited purpose of:  (a) selling all of the Merchandise (defined below) located or to be located in Merchant's stores as each are identified in Exhibit A (collectively, the "Stores" or "Closing Locations"), by conducting "going out of business", "store closing," "bankruptcy liquidation," or similar themed sales at the Stores, subject in all respects to the terms and conditions contained herein (the "Sale"); and (b) disposing of Merchant's owned FF&E (defined below) located at the Closing Locations, subject to the terms and conditions set forth herein;

WHEREAS, except as expressly provided for herein, this Agreement shall govern the conduct of the Sale at the Closing Locations, together with the parties' respective rights and obligations with respect thereto;

WHEREAS, Agent is willing to serve as Merchant's exclusive agent to conduct the Sale at the Closing Locations and dispose of the FF&E (as defined below) in the Closing Locations in accordance with the terms and conditions of this Agreement;

WHEREAS, agent and Merchant are contemporaneously entering into the Agreements (as defined below) as part of a single, global transaction (the "Transaction");

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Agent and Merchant hereby agree as follows:

Section 1.    Defined Terms: Exhibits

1.1    Defined Terms.  The terms set forth below are defined in the Sections referenced of this Agreement:

| Defined Term | Section |
|---|---|
| Additional Merchandise | Section 3.5(a) |
| Agency Accounts | Section 3.3(c) |
| Agency Documents | Section 10.1(b) |
| Agent | Preamble |

| | |
|---|---|
| Agent Claim | Section 11.5 |
| Agent Indemnified Parties | Section 12.1 |
| Agreement | Preamble |
| Approval Order | Section 2.3 |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Benefits Cap | Section 4.1(c) |
| Central Services Expenses | Section 4.1 |
| Closing Locations | Recitals |
| Cost Value | Section 5.3 |
| Customer Returned Goods | Section 7.5 |
| Defective Merchandise | Section 5.2(b)(ii) |
| Event of Default | Section 13 |
| Excluded Benefits | Section 4.1 |
| Expenses | Section 4.1 |
| Expense L/C | Section 4.2(b) |
| Final Inventory Report | Section 3.3(a) |
| Final Reconciliation | Section 3.4(a) |
| FF&E | Section 14 |
| GOB Laws | Section 2.3(e) |
| Guaranteed Amount | Section 3.1 |
| Guaranty L/C | Section 3.3(b) |
| Gross Rings | Section 6.3 |
| Initial Guaranty Payment | Section 3.3(a) |
| Inventory Date | Section 5.1 |
| Inventory Taking | Section 5.1 |
| Inventory Taking Instructions | Section 5.1 |
| Inventory Taking Service | Section 5.1 |
| Lenders | Section 5.1 |
| Merchandise | Section 5.2(a) |
| Merchant | Preamble |
| Occupancy Expenses | Section 4.1 |
| Proceeds | Section 6.4 |
| Remaining Merchandise | Section 3.2 |
| Retained Employee | Section 8.1 |
| Sale | Recitals |
| Sale Commencement Date | Section 6.1 |
| Sale Guidelines | Section 7.1 |
| Sale Term | Section 6.1 |
| Sale Termination Date | Section 6.1 |
| Sales Taxes | Section 7.3 |
| Third Party | Section 4.1 |

- 2 -

     1.2    <u>Exhibits</u>.  The Exhibits and Schedules annexed to this Agreement, as listed below, are an integral part of this Agreement:

| Exhibit | Section | Description |
|---------|---------|-------------|
| Exhibit A | Recitals | Closing Locations |
| Exhibit 3.3(b) | Section 3.3(b) | Form of Guaranty L/C |
| Exhibit 4.1(a) | Section 4.1(a) | Occupancy Expense Schedule |
| Exhibit 4.2(b) | Section 4.2(b) | Form of Expense L/C |
| Exhibit 5.1(a) | Section 5.1 | Inventory Taking Instructions |
| Exhibit 7.1 | Section 7.1 | Sale Guidelines |
| Exhibit 9 | Section 9 | Form of Approval Order |
| Exhibit 10.1(c) | Section 10.1(c) | Pre-Existing Liens |
| Exhibit 10.1(k) | Section 10.1(k) | Merchandise Threshold |
| Exhibit 10.1(n) | Section 10.1(n) | Cost Factor |

     1.3    <u>Currency</u>.  Unless otherwise specified, all references to monetary amounts refer to United States dollars.

**Section 2.**    <u>Appointment of Agent</u>

     2.1    Merchant hereby appoints Agent, and Agent hereby agrees to serve, as Merchant's exclusive agent for the limited purpose of conducting the Sale in accordance with the terms and conditions of this Agreement.  Merchant's and Agent's obligations hereunder are subject to the approval of this Agreement by the Bankruptcy Court, and this Agreement shall be of no force or effect in the event that the Approval Order is not obtained.

     2.2    Except for incurring Expenses in connection with the Sale and as otherwise specifically provided in this Agreement, Agent shall have no authority to enter into any contract, agreement or other arrangement or to take any other action, by or on behalf of Merchant, that would have the effect of creating any obligation or liability, present or contingent, on behalf of or for the account of Merchant without Merchant's prior written consent.

     2.3    On March 4, 2010, Merchant filed a motion with the Bankruptcy Court for entry of an order approving this Agreement and authorizing Merchant and Agent to conduct the Sale at the Closing Locations, in accordance with the terms hereof, subject to Merchant's solicitation and receipt of higher and/or better offers (the "<u>Sale Motion</u>").  The order approving the Sale Motion (the "<u>Approval Order</u>") shall provide, in a form reasonably satisfactory to the Merchant and Agent, attached hereto, which provides for among other things, that:

          (a)    the terms of this Agreement (and each of the transactions contemplated hereby) are approved;

          (b)    Merchant and Agent shall be authorized to continue to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby;

(c)    Agent shall be entitled to sell all Merchandise and FF&E hereunder free and clear of all liens, claims and encumbrances thereon (collectively, "Liens"), with any presently existing Liens encumbering all or any portion of the Merchandise, FF&E or the Proceeds attaching only to the Guaranteed Amount and other amounts to be received by Merchant under this Agreement;

(d)    Subject to Agent's obligations to pay Expenses pursuant to Section 4 hereof, Agent shall have the right to use the Closing Locations and all related store services, furniture, fixtures, equipment and other assets of Merchant as designated hereunder for the purpose of conducting the Sale, free of any interference from any entity or person;

(e)    Agent, as agent for Merchant, is authorized to conduct, advertise, post signs and otherwise promote the Sale without further consent of any person, in accordance with the terms and conditions of this Agreement and the Sale Guidelines (as the same may be modified and approved by the Bankruptcy Court in the Approval Order), and without further compliance with applicable federal, state or local laws governing, inter alia, the conduct of store closing sales (the "GOB Laws"), other than those designed to protect public health and safety and tax, labor, employment, environmental and consumer protection laws (including consumer laws relating to deceptive practices and false advertising);

(f)    Agent shall be granted a limited license and right to use until the Sale Termination Date the trade names, logos, and customer lists (mailing and e-mail) relating to and used in connection with the operation of the Closing Locations, solely for the purpose of advertising the Sale in accordance with the terms of the Agreement; provided, however that the utilization of the customer lists shall be provided solely through Merchant or Merchant's outside advertising services and Agent shall not have direct access to any personally identifiable information that may be contained therein;

(g)    the Court shall retain jurisdiction over the parties to enforce this Agreement;

(h)    Agent shall not be liable for any claims against the Merchant other than as expressly provided for in this Agreement, and Agent shall have no successorship liabilities whatsoever;

(i)    Agent shall have, subject to Agent's obligations to pay the Guaranteed Amount, Expenses and any other amounts due Merchant hereunder, a valid, duly perfected first priority lien and security interest in the Merchandise, FF&E and any Proceeds to which Agent is entitled in accordance with the terms of this Agreement; and

(j)    Agent shall have the right to include Additional Merchandise in the Sale in accordance with this Agreement.

Section 3.    <u>Guaranteed Amount and Other Payments</u>

    3.1    <u>Payments to Merchant</u>

        (a)    As a guaranty of Agent's performance hereunder and under the contemporaneously entered Asset Purchase Agreement (the "<u>Asset Purchase Agreement</u>," together with this Agency Agreement, the "<u>Agreements</u>"), in addition to the payment of Expenses as provided for in Section 4 hereof, but subject to the potential adjustments in the Agreements, Agent guarantees that Merchant shall receive the sum of: $7,425,000 (the "<u>Guaranteed Amount</u>").

        (b)    To the extent that Proceeds exceed the sum of (x) the Guaranteed Amount, and (y) the Expenses of the Sale, the Agent shall be entitled to retain the balance of the Proceeds up to five percent (5%) of the aggregate Cost Value of the Merchandise (the "<u>Agent's Fee</u>") (the sum of (x), (y) and the Agent's Fee, the "<u>Sharing Threshold</u>").  All remaining Proceeds of the Sale above the Sharing Threshold shall be shared fifty percent (50%) to Merchant and fifty percent (50%) to Agent.  All amounts, if any to be received by Merchant from Agent in excess of the Guaranteed Amount shall be referred to as the "<u>Recovery Amount</u>."  Agent shall pay to Merchant the Guaranteed Amount, unreimbursed Expenses due to Merchant, and the Recovery Amount, if any, in the manner and at the times specified in Sections 3.3 and 3.4.  The Guaranteed Amount and the Recovery Amount will be calculated based upon the aggregate Cost Value of the Merchandise as determined by (A) the Final Inventory Report, and (B) the aggregate amount of Gross Rings (as adjusted for shrinkage per this Agreement).  To the extent that Merchant is entitled to receive any Recovery Amount from Proceeds, Agent shall pay such Recovery Amount as part of the weekly Sale Reconciliation commencing on the first week after the Proceeds reach the Sharing Threshold, but in no event later than the first business day following the completion of the Final Reconciliation under Section 3.4 below.

        (c)    Agent shall pay to Merchant the Guaranteed Amount, as adjusted, in part, to reflect the values calculated through: (A) the Final Inventory Report, and (B) the aggregate amount of Gross Rings (as adjusted for shrinkage per this Agreement), in the manner and at the times specified in Section 3.3 below.

        (d)    If and to the extent that Agent over-funds any amounts due hereunder, then Merchant agrees to promptly reimburse such undisputed overpayment amounts to Agent.  To the extent that any over-funded amounts have been transferred by Merchant to Wells Fargo Bank, National Association ("<u>Wells Fargo</u>") and have not been reimbursed by Merchant, Agent may inform Wells Fargo of such overpayment (and in such event shall provide Wells Fargo with reasonable proof of such overpayment) no later than fourteen (14) days after the issuance of the Final Inventory Report and Wells Fargo agrees to disgorge such overpayment to Agent within two (2) business days of such notice.  If Agent fails to give any such notice during such fourteen (14) day period, Agent waives the right to seek any such claim from Wells Fargo.

        (e)    Merchant agrees that any amounts due Merchant pursuant to this Section 3.1 may in Agent's discretion be offset by Agent against the undisputed amount of any overpayment by Agent as described in Section 3.1(d).

(f)      Agent agrees to pay Merchant fifty-percent (50%) of the net proceeds of service income from in store printing and other services sold during the Sale.

3.2      Remaining Merchandise.  All Merchandise remaining at the Sale Termination Date shall become the property of Agent, free and clear of all Liens ("Remaining Merchandise").

3.3      Time of Payments and Control of Proceeds

(a)      Payment of Guaranteed Amount.  Upon entry of the Approval Order and satisfaction of the conditions precedent set forth in Section 9, but prior to the transfer of any assets to Agent pursuant to the Asset Purchase Agreement or the appointment of Agent hereunder, Agent shall pay Merchant (i)  eighty (80%) of the Guaranteed Amount (the "Initial Guaranty Payment"), by wire transfer to such account(s) as Wells Fargo may designate in writing.  It is understood that the Guaranteed Amount has been calculated based upon the represented, estimated aggregate Cost Value of the Merchandise to be included in the Sale, of $7,500,000 (the "Estimated Merchandise Amount").  The unpaid portion of the Guaranteed Amount shall be paid by Agent to Merchant on the first business day following the issuance of the final report of the aggregate Cost Value of the Merchandise by the Inventory Taking Service, after verification and reconciliation thereof by Agent and Merchant (the "Final Inventory Report").  Agent's failure to pay such unpaid portion of the Guaranteed Amount shall entitle Merchant to draw upon the Guaranty L/C to the extent of such balance; provided, however, that the Inventory Taking shall be reconciled within fourteen (14) days after its completion (and the Agent and Merchant shall use their commercially reasonable efforts to accomplish such reconciliation within such within fourteen (14) day period).  In the event that the Final Inventory Report shows that the Initial Guaranty Payment results in an overpayment of the Guaranty Amount, the Merchant or, pursuant to 3.1(d), Wells Fargo, as the case may be, shall, within two (2) business days after the Final Inventory Report has been issued, pay, dollar for dollar, to the Agent the amount (the "Adjustment Amount") by which the actual, aggregate Cost Value of the Merchandise is less than the Estimated Merchandise Amount.  In the event there is any dispute with respect to the reconciliation of the aggregate Cost Value of the Merchandise following the Inventory Taking, then any such dispute shall be resolved in the manner and at the times set forth in Section 3.4(b) hereof.

(b)      Guaranty L/C.  To secure payment of the balance of any unpaid portion of the Guaranteed Amount (subject to the adjustments set forth herein and in the Related Agreements) and any other amounts due from Agent to Merchant hereunder, Agent shall deliver to Merchant an irrevocable standby letter of credit in the original face amount equal to twenty percent (20%) of the Guaranteed Amount, naming Merchant, as the beneficiary, and Wells Fargo as additional beneficiary, substantially in the form of Exhibit 3.3(b) attached hereto (the "Guaranty L/C").  The Guaranty L/C shall be delivered to Merchant one (1) business day following the Sale Commencement Date, and shall be issued by a U.S. national bank selected by Agent and reasonably acceptable to Merchant and Wells Fargo.  In the event that Agent shall fail to pay to Merchant any amount required to be paid hereunder, or fail to perform any obligation hereunder, Merchant shall be entitled to draw on the Guaranty L/C to fund such amount or obligation following five (5) days written notice to Agent of Merchant's intention to do so.  The Guaranty L/C shall expire no earlier than sixty (60) days after the Sale Termination Date; provided, that, in the event that at the scheduled expiration date of the Guaranty L/C there

- 6 -

remains any unresolved dispute as to the amount of the Guaranteed Amount, Merchant may, in its discretion, exercise the right to require Agent to have the expiration date of the Guaranty L/C extended for thirty (30) day intervals (or such other longer duration as Merchant and Agent may agree) until such time as the subject dispute has been resolved and any additional amounts due hereunder have been paid to Merchant, it being agreed that if Agent has for any reason not so extended the expiry date of the Guaranty L/C after a request by Merchant, by the date which is five (5) days prior to the then expiry date, Merchant shall have the right to make a drawing under the Guaranty L/C in an amount equal to the amounts Merchant asserts are then owing to Merchant; provided further, that, in the event that Agent shall have paid to Merchant all amounts due with respect to the unpaid portion of the Guaranteed Amount prior to such date, Merchant agrees to surrender the original Guaranty L/C to the issuer thereof together with written notification that the Guaranty L/C may be terminated.  Merchant and Agent agree that, after payment of the unpaid portion of the Guaranteed Amount (determined based upon the Guaranteed Amount calculated pursuant to the Final Inventory Report), the Guaranty L/C shall be returned by Merchant to Agent.

(c)    Control of Proceeds.    Within twenty-one (21) days after the Sale Commencement Date, Agent may establish agency accounts, dedicated solely for the deposit of the Proceeds and the disbursement of amounts payable to Agent hereunder (the "Agency Accounts"), and Merchant shall promptly upon Agent's request execute and deliver all necessary documents to open and maintain the Agency Accounts.  Agent shall exercise sole signatory authority and control with respect to the Agency Accounts; provided, however, upon request, Agent shall deliver to Merchant copies of all bank statements and other information relating to such accounts.  Merchant shall not be responsible for and Agent shall pay as an Expense hereunder, all bank fees and charges, including wire transfer charges, related to the Agency Accounts, whether received during or after the Sale Term.  Upon Agent's designation of the Agency Accounts, all Proceeds of the Sale (including credit card proceeds) shall be deposited into the Agency Accounts.

(d)    Designated Deposit Accounts.  During the period, if any, between the Sale Commencement Date and the date Agent designates the Agency Accounts, all Proceeds of the Sale (including credit card proceeds) shall be collected by Agent and deposited on a daily basis into depository accounts designated by Merchant for the Closing Locations, which accounts shall be designated solely for the deposit of Proceeds of the Sale (including credit card proceeds) and the disbursement of amounts payable by Agent hereunder (the "Designated Deposit Accounts").  Commencing on the first business day following the payment of the Initial Guaranty Payment and the posting of the Guaranty L/C, and on each business day thereafter (or as soon thereafter as is practicable), Merchant shall promptly pay to Agent by wire funds transfer all collected funds constituting Proceeds deposited into the Designated Deposit Accounts (but not any other funds, including, without limitation, any proceeds of Merchant's inventory sold prior to the Sale Commencement Date).

3.4    Final Reconciliation.

(a) Within thirty (30) days after the Sale Termination Date, Agent and Merchant shall jointly prepare a final reconciliation of the Sale including, without limitation, a summary of Proceeds, taxes, Expenses, and any other accountings required hereunder (the "Final

Reconciliation"). Within five (5) days of completion of the Final Reconciliation, any undisputed and unpaid Expenses shall be paid by Agent. In the absence of an order of the Bankruptcy Court, no such disputed amount(s) shall be paid until the dispute has been resolved by agreement of the parties or as determined in the manner prescribed in Section 3.4(b) hereof. During the Sale Term, and until all of Agent's obligations under this Agreement have been satisfied, Merchant and Agent shall have reasonable access to Merchant's and Agent's records with respect to Proceeds, sales of Additional Merchandise, taxes and Expenses to review and audit such records.

(b)    In the event that there is any dispute with respect to either (i) the determination of the aggregate Cost Value of the Merchandise as reflected in the Final Inventory Report and/or (ii) the Final Reconciliation, such dispute shall be promptly (and in no event later than the third business day following the request by either Merchant or Agent) submitted to the Bankruptcy Court for resolution. In the event of a dispute as to (i) or (ii) above, Agent shall take such steps as are necessary or appropriate to extend the Guaranty L/C and Expense L/C, as the case may be, until the date that is not less than thirty (30) days after the resolution of the subject dispute. If Agent has for any reason not so extended the expiry date of the Guaranty L/C and/or the Expense L/C by the date which is five (5) days prior to the then applicable expiry date after a request by Merchant, Merchant shall have the right to make a drawing under the Guaranty L/C and/or the Expense L/C, as appropriate, in an amount equal to the amounts Merchant asserts are then owing to Merchant.

3.5    Additional Merchandise

(a)    Agent shall be entitled to include in the Sale at the Stores additional merchandise up to an aggregate cost of $2,000,000.00 (Two Million Dollars), which is of like kind and quality as the Merchandise located in the Stores ("Additional Merchandise"); provided, however, that no more than 25% of the Additional Merchandise may be obtained from sources other than Merchant's existing vendors and Agent shall not deliver any Additional Merchandise to the Closing Locations until after the completion of the Inventory Taking at such location(s) unless the parties otherwise agree on an appropriate method to segregate such goods.(b)    Subject to subsection (d) of this Section 3.5, at all times and for all purposes, the Additional Merchandise and its proceeds shall be the exclusive property of Agent. The transactions relating to the Additional Merchandise are, and shall be construed as, a true consignment from Agent to Merchant. The Additional Merchandise shall be at all times subject to the control of Agent. If requested by Agent, Merchant shall, at Agent's expense, insure the Additional Merchandise and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers.

(c)    In order to distinguish the Additional Merchandise from the Merchandise located in the Closing Locations, Agent shall ascribe a unique or "dummy" SKU to such Additional Merchandise, which shall enable Merchant and Agent to distinguish the sales of the Additional Merchandise from the sale of the Merchandise presently included in the Sale.

(d)    Within five (5) days of completion of the Final Reconciliation, Agent shall pay to Merchant five percent (5%) of the gross proceeds, net only of sales taxes, realized from the sales of Additional Merchandise.

Section 4.       Expenses of the Sale

4.1       Expenses.  Agent shall be unconditionally responsible for all Expenses incurred in conducting the Sale during the Sale Term, which expenses shall be paid by Agent in accordance with Section 4.2 below.  As used herein, "Expenses" shall mean all Store-level operating expenses of the Sale which arise during the Sale Term at the Closing Locations, limited to the following:

(a)       Occupancy Expenses for the Closing Locations on a per location and per diem basis in an amount *equal to* the aggregate per diem totals set forth on Exhibit 4.1(a) hereto, plus the portion of any percentage rent obligations allocable to the Sale (as determined in the manner described in the definition of "Occupancy Expenses" below) incurred by Merchant under applicable leases or occupancy agreements;

(b)       payroll and commissions, if applicable, for all Closing Location-level Retained Employees used in conducting the Sale as well as payroll for any of Merchant's former employees hired by Agent for the Sale or other personnel as independent contractors;

(c)       any amounts payable by Merchant for benefits for Retained Employees (including, but not limited to, FICA, unemployment taxes, workers' compensation and health care insurance benefits, but excluding Excluded Benefits) used in the Sale, in an amount equal to 6.9% of base payroll for each Retained Employee in the Closing Locations (the "Benefits Cap");

(d)       actual costs of Agent's on-site supervision, supervisor travel and supervisor bonuses per an agreed upon budget with the Merchant.

(e)       banners and in-store signs which are produced for the Sale;

(f)       promotional costs including, without limitation, advertising and direct mail;

(g)       the costs and expenses of obtaining additional supplies as may be required by Agent in the conduct of the Sale;

(h)       all utility, base telephone, long distance telephone, data communication lines, postage/overnight delivery/courier charges;

(i)       credit card and bank card fees, chargebacks and discounts;

(j)       costs of moving, transferring, or consolidating Merchandise between the Closing Locations;

(k)       costs of the Merchant's casualty, property, and general liability insurance premiums attributable to the Merchandise for the Sale Term, sale locations.

(l)       third party payroll processing fees;

(m)    armored car service, security personnel, store security, and monthly alarm services;

(n)    actual cost of Agent's capital and letter of credit fees;

(o)    reasonable fees of Agent's legal counsel incurred in implementing the transactions contemplated by this Agreement (for the avoidance of doubt, not including any attorneys' fees incurred by Agent in connection with any dispute with Merchant);

(p)    trash removal and ordinary course third party cleanings;

(q)    bank fees and charges associated with agent accounts or merchant accounts during the sale period, including wire transfer expenses.

(r)    Agent's 50% of cost of the Inventory Taking by the Inventory Taking Service;

(s)    costs and expenses of delivery and assembly services;

(t)    Central Service Expenses in an amount equal to $250 per store, per week during the Sale Term for each store that remains open during the Sale Term;

(u)    cash shortfalls in registers; and

(v)    routine repair and maintenance costs.

"Expenses" shall not include:  (i) Central Service Expenses in excess of the $250 per store per week figure included in subsection (v), above; (ii) Excluded Benefits; (iii) any rent or other occupancy expenses of the corporate office other than Occupancy Expenses in accordance with Section 4.1(a) hereof; (iv) any costs, expenses or liabilities arising during the Sale Term in connection with the Sale of Merchandise, other than the Expenses listed above, all of which shall be paid by Merchant promptly when due during the Sale Term.  Notwithstanding anything herein to the contrary, to the extent that any Expense listed in Section 4.1 is also included on Exhibit 4.1(a), then Exhibit 4.1(a) shall control and such Expense shall not be double counted.

As used herein, the following terms have the following respective meanings:

"Central Services Expenses" means costs and expenses for Merchant's central administrative services necessary for the Sale including, but not limited to (a) Merchant's inventory control system; (b) payroll system; and (c) accounting system.

"Excluded Benefits" means vacation days or vacation pay, sick days or sick leave, maternity leave or other leaves of absence, termination or severance pay, and benefits in excess of the Benefits Cap percentage limitation provided in Section 4.1(c) above.

"Occupancy Expenses" means rent, CAM, real estate and use taxes, and all other categories of expenses at the Closing Locations as set forth on Exhibit 4.1(a) attached hereto, and in the specific amounts set forth on Exhibit 4.1(a) attached hereto, and the pro rata portion of

percentage and/or overage rent attributable to Agent based on sales generated during the Sale Term as a proportion of sales generated by Merchant and Agent for the applicable percentage rent measurement period under each lease which contains a provision for percentage or overage rent.  Third party" means, with reference to any Expenses to be paid to a "third party", a party that is not affiliated with or related to Merchant.

4.2    Payment of Expenses; Security

(a)    All Expenses incurred during each week of the Sale (i.e., Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant, or offset from Proceeds held by Merchant, immediately following the weekly Sale reconciliation by Merchant and Agent pursuant to Section 7.7 below, based upon invoices and other documentation reasonably satisfactory to Agent.

(b)    To secure Agent's obligations to pay Expenses, Agent shall deliver to Merchant an irrevocable and unconditional standby letter of credit ("Expense L/C") in an original face amount representing an amount equal to three (3) weeks' estimated Expenses, naming Merchant as beneficiary (substantially in the form of Exhibit 4.2(b)), and issued by a U.S. national bank selected by Agent and reasonably acceptable to Merchant.  The Expense L/C shall be delivered to Merchant no later than two (2) business days after the Sale Commencement Date.  Merchant and Agent agree that at the point where there is less than three (3) weeks remaining in the Sale Term, the face amount of the Expense L/C shall be reduced in amount(s) to be agreed upon by Merchant and Agent.

(c)    In the event that Agent fails to pay any Expense(s) when due, or within three (3) business days after Merchant notifies Agent that any Expense(s) are unpaid and past due, or in the event the Expense L/C will expire within five (5) business days and certain Expenses are unpaid, Merchant shall be entitled to draw on the Expense L/C to fund such unpaid amount.  The Expense L/C shall expire not earlier than the date that is sixty (60) days after the Sale Termination Date; provided that, in the event that at the scheduled expiration date of the Expense L/C there remains any unresolved dispute as to the amount of any unpaid Expense hereunder, Merchant may, in its discretion, exercise the right to cause Agent to have the expiration date of the Expense L/C extended for thirty (30) day intervals (or such other longer duration as Merchant and Agent may agree) until such time as the subject dispute has been resolved and any additional amounts due hereunder have been paid to Merchant.  If Merchant draws on the Expense L/C at any time that is thirty days prior to the Sale Termination date, then unless otherwise agreed by Merchant, Agent shall, within two (2) business days after the draw, deliver to Merchant a replacement irrevocable standby letter of credit in an original face amount representing the original face amount of the Expense L/C.

Section 5.    Inventory Valuation: Merchandise

5.1    Inventory Taking.  Commencing on the Sale Commencement Date, Merchant and Agent shall cause to be taken a SKU level physical inventory of the Merchandise located in the Closing Locations (collectively, the "Inventory Taking"), which Inventory Taking shall be completed in each of the Closing Locations no later than fourteen (14) days after the Sale Commencement Date (Inventory Taking at each Closing Location being the "Inventory Date" for

- 11 -

each such Closing Location). Merchant and Agent shall jointly employ RGIS or another mutually acceptable independent inventory taking service (the "Inventory Taking Service") to conduct the Inventory Taking. The Inventory Taking shall be conducted in accordance with the procedures and instructions to be mutually agreed by Merchant and Agent and made a part of this Agreement as Exhibit 5.1(a) (the "Inventory Taking Instructions"). As an Expense, Agent shall be responsible for 50% of the fees and expenses of the Inventory Taking Service. The balance of such fees and expenses, if applicable, shall be paid by Merchant. Merchant, Agent and Merchant's senior secured post-petition lenders (the "Lenders") shall each have the right to have representatives present during the Inventory Taking, and shall each have the right to review and verify the listing and tabulation of the Inventory Taking Service. Merchant agrees that during the conduct of the Inventory Taking in each of the Closing Locations, the applicable location shall be closed to the public and no sales or other transactions shall be conducted until the Inventory Taking at such location has been completed, as agreed by Merchant and Agent.

       5.2    <u>Merchandise Subject to this Agreement</u>.

       (a)    For purposes of this Agreement, including, without limitation, the calculation of the Adjustment Amount, "Merchandise" shall mean (i) all finished goods inventory that is owned by Merchant and located in the Closing Locations on the Sale Commencement Date (including, but not limited to, (A) Defective Merchandise and (B) Merchandise subject to Gross Rings; and (ii) Returned Merchandise. Notwithstanding the foregoing, "Merchandise" shall not include: (1) goods which belong to sublessees, licensees or concessionaires of Merchant; (2) goods held by Merchant on memo, on consignment, or as bailee; (3) Customer Ordered Merchandise; (4) furnishings, trade fixtures, furniture and equipment and improvements to real property which are located in the Closing Locations; or (5) Additional Merchandise; or (6) Merchant Consignment Goods under Section 5.5 below.

       (b)    As used herein, the following terms shall have the respective meanings set forth below:

       (i)    "Customer Ordered Merchandise" means those items of Merchandise located in the Closing Locations that had previously been earmarked and/or reserved by Merchant from available merchandise and designated by Merchant for satisfaction of customer orders (whether in respect of a fully sold order or a partially reserved order), including custom or monogrammed goods, that were received prior to the Sale Commencement Date.

       (ii)    "Defective Merchandise" means such items of inventory that are non-first quality inventory, such as parts, inventory that may or may not be unsaleable in its current physical condition (specifically excluding, among other things, incomplete sets of inventory intended to be sold as a set, and mismatched sets), and used or previously owned, damaged, shopworn or soiled inventory.

       (iii)    "Returned Merchandise" means (a) Customer Returned Goods (subject to Section 8.5 hereof); and (b) Customer Ordered Merchandise, for which the order has been cancelled by either the customer or Merchant, prior to March 2, 2010.

(iv) "Out of Season Merchandise" and "Out of Season Greeting Cards" means those items of inventory that relate to a holiday falling outside the Sale Term or to a season other than Spring, which in the ordinary course Merchant either packs away, returns to its vendors or discounts at 50% off or greater to clear.

5.3    <u>Valuation</u>

(a)    Subject to the Global Inventory Adjustment, for purposes of this Agreement, "<u>Cost Value</u>" shall mean with respect to each item of Merchandise other than Out of Season Merchandise and Out of Season Greeting Cards the original cost for such item of Merchandise inclusive of inbound freight as reflected in Merchant's master cost file "Inventory by SKU as of 100223" (the "<u>Cost File</u>").  "Retail Value" shall mean with respect to each item of Merchandise other than Out of Season Merchandise and Out of Season Greeting Cards the lower of the ticketed retail price of such Merchandise or the retail price of such Merchandise as reflected in the Merchant's master cost file.  Merchant and Agent agree that the Cost File does not account for any volume discounts, advertising co-op discounts, rebates or discounts associated with expedited payment terms offered by any vendor, and further that the Cost Value of any item of Merchandise shall not be adjusted for any such amounts.

(b)    For purposes of determining the "Cost Value" of any item of Out of Season Merchandise, and in turn the Guaranteed Amount attributable thereto, the Cost Value of each such item shall be determined in accordance with Section 5.3(a) with such value multiplied by 0.50.

(c)    For purposes of determining the "Cost Value" of any item of Merchandise that constitutes an Out of Season Greeting Card, and in turn the Guaranteed Amount attributable thereto, the Cost Value of each such item shall be determined in accordance with Section 5.3(a) with such value multiplied by 0.25.

(d)    In lieu of any other adjustment to the "Cost Value" of the Merchandise, including, but not limited to, any adjustment for Defective Merchandise, incomplete sets of inventory intended to be sold as a set, mismatched sets, or Merchandise having a selling price below the applicable "Cost Value" (collectively, "<u>Pricing Adjustments</u>"), Merchant and Agent shall account for any Pricing Adjustments by means of a single global downward adjustment (i.e., reduction) to the aggregate Cost Value of the Merchandise, equal to one percent (1.0%) of the aggregate Cost Value of the Merchandise as reflected in the Final Inventory Report (the "<u>Global Inventory Adjustment</u>").

5.4    <u>Delivery of Customer Ordered Goods</u>.  Agent shall cooperate with Merchant to facilitate the delivery of Customer Ordered Merchandise.  Merchant shall retain responsibility for the processing and delivery of such merchandise to customers, including retaining responsibility for the costs and expenses of processing, handling and delivery of such goods. Agent shall provide Merchant with access to the Closing Locations for purposes of processing Customer Ordered Merchandise.

5.5    <u>Excluded Goods</u>.  Merchant shall retain all rights and responsibility for any goods not included as "Merchandise" hereunder and shall remove such goods (other than FF&E)

- 13 -

from the Closing Locations prior to the Sale Commencement Date, or as soon thereafter as reasonably practicable.  If Merchant elects at the beginning of the Sale Term, Agent, at its option, may accept those goods not included as "Merchandise" hereunder and as identified by Merchant for sale as "Merchant Consignment Goods".  Agent shall retain 10% of the sale price (less Sales Taxes) for all sales of Merchant Consignment Goods, and Merchant shall receive 90% of the sale price (less Sales Taxes) in respect of such sales.  Merchant shall receive its share of the receipts of sales of Merchant Consignment Goods on a weekly basis, immediately following the weekly Sale reconciliation by Merchant and Agent pursuant to Section 8.7 below. If Merchant does not elect to have Agent sell such goods not included as Merchandise, then all such items will be removed by Merchant from the Closing Locations at its expense.  Except as expressly provided in this Section 5.5, Agent shall have no cost, expense or responsibility in connection with any goods not included in Merchandise.

Section 6.    Sale Term.

6.1    Term.  Subject to the terms of the Approval Order, the Sale shall commence at the Closing Locations on the first calendar day after entry of the Approval Order by the Court (the "Sale Commencement Date"), which Approval Order shall be entered no later than March 29, 2010.  The Agent shall complete the Sale, and shall vacate each Closing Location's premises in favor of Merchant or its representative or assignee on or before May 31, 2010 (the "Sale Termination Date"); provided, however that Agent shall, at its option, be entitled to extend the Sale Termination Date through and including June 15, 2010.  The period from the Sale Commencement Date to the Sale Termination Date shall be referred to herein as the "Sale Term."  In the event that Agent extends the Sale Term past May 31, 2010, Agent shall be required to pay to Merchant, in addition to the Expenses set forth in Section 4 above, $1,667 for each day the Sale Term is extended past May 31, 2010; provided, however that Agent's obligation to pay Occupancy Expenses per Section 4.1(a) of this Agreement shall be limited to the per diem amounts and not subject to the 15 day minimum set forth in Section 6.2 below.  The Sale Termination Date may be: (a) extended by mutual written agreement of Agent and Merchant, following approval of the Bankruptcy Court on notice to interested parties; or (b) accelerated by Agent, in which case Agent shall provide Merchant with not less than seven (7) days' advance written notice of any such planned accelerated Sale Termination Date.

6.2    Vacating the Closing Locations.  (a)  Agent shall: (i) vacate each of the Closing Locations no later than the Sale Termination Date, as provided for in Section 6.1 hereof, and (ii) provide Merchant with not less than seven (7) days' advance written notice of its intention to vacate any Closing Location (as to each, the "Vacate Date").  On the Vacate Date, Agent shall vacate the applicable Closing Location in favor of Merchant or its representatives or assignee, remove all Remaining Merchandise and leave the Closing Location in "broom clean" condition (ordinary wear and tear excepted), subject to the right to abandon, neatly in place, the remaining FF&E (as defined below).  Agent's obligations to pay Occupancy Expenses for each Closing Location subject to vacate notice shall continue until the later of (a) the applicable Vacate Date for such Closing Location, and (b) the fifteenth (15th) day of the calendar month in which the Vacate Date for such Closing Location occurs.  All assets of Merchant used by Agent in the conduct of the Sale (e.g., FF&E, supplies, etc.) shall be returned by Agent to Merchant or left at the Closing Locations to the extent same have not been used in the conduct of the Sale or have not been otherwise disposed of in the Sale or through no fault of the Agent.  Where reference is

- 14 -

made in this Section 6 to vacating the Closing Locations, such shall mean vacating the Closing Locations, in favor of Merchant, its representatives or assignee and shall not mean vacating possession or disclaimer of lease in favor of the landlord or owner of the Closing Location premises. Agent agrees that it shall be obligated to repair any damage caused by Agent (or any representative, agent or licensee thereof) to any Closing Location during the Sale Term, ordinary wear and tear excepted.

6.3    Gross Rings. In the event that the Sale commences prior to the completion of the Inventory Taking at any Closing Location, then for the period from the Sale Commencement Date until the Inventory Date for such Closing Location, Agent and Merchant shall keep a strict count of register receipts and reports ("Gross Rings") to determine the actual Cost Value of the Merchandise sold by SKU. All such records and reports shall be made available to Agent and Merchant during regular business hours upon reasonable notice. Any Merchandise included in the Sale using this Gross Rings method shall be included in Merchandise using the actual Cost Value of the Merchandise sold plus a 1.0% shrink provision.

6.4    Proceeds. For purposes of this Agreement, "Proceeds" shall mean the total amount (in dollars) of all sales of Merchandise made under this Agreement, exclusive of (i) Sales Taxes; (ii) charges to customers for service income from in store printing, engraving, delivery services and assembly services; and (iii) returns, allowances and customer credits. All proceeds of Merchant's insurance (net of any deductible) directly attributable to loss or damage to Merchandise or loss of cash arising from events occurring during the Sale Term shall constitute Proceeds under this Agreement. After the issuance of the Final Inventory Report, Agent is not required to use Merchant's point of sale system during the Sale Term for Merchandise.

6.5    Credit Card Proceeds. Agent shall be entitled to use Merchant's credit card systems and servicing arrangements for credit card Proceeds relating solely to the Sale, including Merchant's credit card terminates and processor(s), credit card processor coding, merchant identification number(s), and existing bank accounts. Agent shall process credit card transactions, applying customary practices and procedures. Agent shall deposit the net settlement received from any credit card sales receipts into the Designated Agency Accounts. Agent shall prepare a weekly reconciliation of the amounts deposited with respect to the sales of Merchandise by credit plus Sales Taxes, less credit card and bank card fees, chargebacks and service charge adjustments, returns allowances and customer credits. Merchant shall not be responsible for paying and Agent shall pay as an Expense hereunder, all credit card fees, charges and chargebacks related to the Sale, whether received during or after the Sale Term.

Section 7.    Conduct of the Sale

7.1    Rights of Agent. Subject to entry of the Approval Order, Agent shall be permitted to conduct a "store closing," "going-out-of-business," "bankruptcy liquidation" or similar theme sale at the Stores throughout the Sale Term in a manner consistent with the "Sale Guidelines" annexed hereto as Exhibit 7.1, whether by in-store or media advertising or promotional materials. In addition to any other rights granted to Agent hereunder, in conducting the Sale, Agent, in the exercise of its sole discretion, shall have the right:

- 15 -

(a)    to establish Stores' hours, which are consistent with the terms of applicable leases, mortgages or other occupancy agreements and local laws or regulations, including, without limitation, Sunday closing laws;

(b)    to use without charge (except where designated as an Expense pursuant to Section 4.1 hereof) during the Sale Term all FF&E, bank accounts (other than Agent's obligation to pay bank fees and charges pursuant to Section 3.3(c) hereof), Store-level (and to the extent available, corporate), customer lists (mail and e-mail, subject to the restrictions set forth in Section 2.3(f)), computer hardware and software, existing supplies located at the Closing Locations, intangible assets (including Merchant's names, logos and tax identification numbers), keys, case keys, security codes, and safe and lock combinations required to gain access to and operate the Closing Locations, and any other assets of Merchant located at the Closing Locations (whether owned, leased, or licensed) consistent with applicable terms of leases or licenses. Agent shall exercise due care and return to the Merchant immediately at the end of the Sale all materials and supplies except materials or supplies expended;

(c)    to establish sales prices and implement advertising, signage (including exterior banners and signs), and promotion programs consistent with the sale theme described herein, and as otherwise provided in the Approval Order and the Sale Guidelines, as and where applicable (including, without limitation, by means of media advertising, A-frame, and similar signage, and use of sign walkers, in Agent's discretion);

(d)    to transfer Merchandise between the Stores only after the Inventory Taking is completed at the each of Stores;

(e)    to close the Stores to the public for brief periods during regular business hours, if necessary, commencing on the Sale Commencement Date and continuing through the date of the issuance of the Final Inventory Report for the purposes of preparing the Stores for the Sale; provided however, Agent shall assist Merchant in, and shall provide Merchant with access to the Closing Locations for purposes of, processing Customer Ordered Merchandise.

7.2    Terms of Sales to Customers.  Subject to Agent's compliance with applicable law, all sales of Merchandise will be "final sales" and "as is" and all advertisements and sales receipts will reflect the same.  Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  All sales will be made only for cash, nationally recognized bank credit cards, and, in Agent's discretion, personal checks, provided, however, if Agent determines to accept personal checks, Agent shall bear the risk of loss therefor.

7.3    Sales Taxes.  During the Sale Term, all sales, excise, gross receipts and other taxes attributable to sales of Merchandise as indicated on Merchant's point of sale equipment payable to any taxing authority having jurisdiction (collectively, "Sales Taxes") shall be added to the sales price of Merchandise and collected on Merchant's behalf, and provided to Merchant on no less than a bi-weekly basis for deposit in Merchant's existing accounts, trust accounts or other accounts, as designated by Merchant.  Provided that Agent has collected all Sales Taxes during the Sale and remitted the proceeds thereof to Merchant, Merchant shall promptly pay or cause to be paid all Sales Taxes and file all applicable reports and documents required by the applicable

taxing authorities; provided, however, notwithstanding anything to the contrary herein, in the event that Agent uses any system other than Merchant's point of sale system to compute Sales Taxes relating to the Sale, Agent shall reimburse Merchant for any additional Sales Taxes, interest, fines, penalties, and the like payable to any taxing authority as the result of a Sales Tax audit conducted by or on behalf of such authority which discloses that the Sales Taxes collected by Agent and paid over to Merchant for any period during the Sale were less than those mandated by applicable law (any such additional Sales Taxes and other amounts are collectively referred to herein as "Additional Taxes and Penalties").  Merchant will be given access to the computation of gross receipts for verification of all such Sales Tax collections.  Provided Agent performs its responsibilities in strict compliance with this Section 7.3, Merchant shall indemnify and hold harmless Agent from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Agent sustains or incurs as a result or consequence of the failure by Merchant to promptly pay such taxes to the proper taxing authorities and/or the failure by Merchant to promptly file with such taxing authorities all reports and other documents required, by applicable law, to be filed with or delivered to such taxing authorities.  Agent shall add Sales Tax to the sales price of Additional Merchandise and Agent shall collect Sales Taxes attributable to the sales of Additional Merchandise and deposit such amounts into existing accounts, trust accounts or other accounts designated by Agent, for remittance by Merchant, on behalf of Agent, to the appropriate taxing authority.  If Agent fails to perform its responsibilities in accordance with this Section 7.3, and provided Merchant complies with its obligations in accordance with this Section 7.3, Agent shall indemnify and hold harmless Merchant from and against any and all costs including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes, remit Sales Taxes to Merchant, and/or, to the extent Agent is required hereunder to prepare reports and other documents, the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities.

7.4    Supplies.  Agent shall have the right to use all existing supplies necessary to conduct the Sale (e.g., boxes, bags, twine, but not gift certificates, rain checks, merchandise credits or the like) located at the Closing Locations at no charge to Agent.  In the event that additional supplies are required in any of the Closing Locations during the Sale, the acquisition of such additional supplies shall be the responsibility of Agent as an Expense; provided, however, that Merchant shall assist Agent in obtaining supplies from Merchant's vendors at Merchant's cost.  Supplies have not been, since March 2, 2010, and shall not be, prior to the Sale Commencement Date, transferred by Merchant to or from the Closing Locations so as to alter the mix or quantity of supplies at the Closing Locations from that existing on such date, other than in the ordinary course of business.

7.5    Returns of Merchandise.  Throughout the Sale Term Agent shall accept for return items of merchandise that were sold and delivered prior to the Sale Commencement Date, to the extent such return is accompanied by a receipt and otherwise consistent with Merchant's customary policies (each item a "Customer Returned Good," and collectively the "Customer Returned Goods").  Customer Returned Goods that Merchant and Agent agree are saleable as first quality merchandise shall be included in Merchandise, and for purposes of the calculation of the Guaranteed Amount shall be valued at the Cost Value applicable to such item multiplied by the reciprocal of the prevailing discount on the day such Customer Returned Goods are received

- 17 -

in the Store. If Merchant and Agent agree that a Customer Returned Good is not saleable as first quality merchandise, Merchant and Agent shall negotiate in good faith to determine an appropriate Cost Value applicable to such merchandise for purposes of determining the Guaranteed Amount payable with respect thereto. However if either (i) Merchant and Agent are unable to agree that a Customer Returned Good is not saleable as first quality merchandise, or (ii) if Merchant and Agent are unable to agree upon an appropriate Cost Value applicable to a Customer Returned Good that they agree is not saleable as first quality merchandise, then such Customer Returned Good shall be excluded from Merchandise and at Merchant's election shall be treated either as Merchant Consignment Goods or removed by Merchant at its cost and expense. Any increases in payment on account of the Guaranteed Amount as a result of Customer Returned Goods shall be paid by Agent pursuant to Section 3.1 hereof. Agent shall be obligated to maintain and deliver to Merchant a detailed returned merchandise log, including copies of all relevant merchandise receipts and credits, as well as mark the affected merchandise in such a fashion so as to render such merchandise readily identifiable by Merchant and Agent.

(b)    All customer requests for cash refunds or merchandise credits with regard to Customer Returned Goods and/or cancellation of Customer Ordered Merchandise shall be processed by Agent at the Store-level. Merchant shall reimburse Agent in cash for any returns or store merchandise credits during the weekly sale reconciliation provided for in Section 7.7 hereof.

7.6    <u>Gift Cards</u>. Through the end of the Sale Term, Agent shall accept Merchant's gift cards issued by Merchant prior to the Sale Commencement Date. Merchant shall reimburse Agent in cash for such amounts during the weekly sale reconciliation provided for in Section 7.7.

7.7    <u>Sale Reconciliation</u>. On each Wednesday during the Sale Term, commencing on the second Wednesday after the Sale Commencement Date, Agent and Merchant shall cooperate to reconcile Expenses, Gross Rings, and such other Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (*i.e.*, Sunday through Saturday), all pursuant to procedures agreed upon by Merchant and Agent. On a weekly basis, Agent shall provide Merchant with a true and correct summary of sales of Merchandise and Additional Merchandise at each Closing Location (in each case for the prior week). On a bimonthly basis, Agent shall provide to Merchant (at Agent's sole cost and expense) true and correct copies of all records and source documents evidencing sales of Merchandise or Additional Merchandise (in each case for the prior two-week period). Within thirty (30) days after the end of the Sale Term, Agent and Merchant shall complete a final reconciliation of the Sale, the written results of which shall be certified by representatives of each of Merchant and Agent as a final settlement of accounts between Merchant and Agent.

7.8    <u>Force Majeure</u>. If any casualty, work stoppage or act of God prevents the conduct of business in the ordinary course at any Closing Location for a period in excess of five (5) consecutive days, such Closing Location and the Merchandise located at such Closing Location shall be eliminated from the Sale and considered to be deleted from this Agreement as of the last date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; provided, however, that (i) the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder, and (ii) the Guaranteed Amount shall be reduced to account for any Merchandise eliminated from the Sale which is not the subject of insurance proceeds or consolidated by Agent (as an Expense) into another Closing Location(s),

and Merchant to the extent actually received shall reimburse Agent for the amount the Guaranteed Amount is so reduced prior to the end of the Sale Term. As noted in the proceeding sentence, Agent will use its best efforts to consolidate and transfer all Merchandise which is not the subject of insurance proceeds and include said Merchandise in the Sale in other Stores.

Section 8.    <u>Employee Matters</u>

8.1    <u>Merchant's Employees</u>.  Subject to the applicable provisions of the Approval Order and any other provisions in this Agreement relating to employees, Agent may use Merchant's employees in the conduct of the Sale to the extent Agent in its sole discretion deems expedient, and Agent may select and, with Merchant, schedule the number and type of Merchant's employees required for the Sale.  Agent shall identify any such employees to be used in connection with the Sale (each such employee, a "<u>Retained Employee</u>") prior to the Sale Commencement Date.  Retained Employees shall at all times remain employees of Merchant, and shall not be considered or deemed to be employees of Agent.  Merchant and Agent agree that except to the extent that wages and benefits of Retained Employees constitute Expenses hereunder and except as otherwise expressly provided in this Agreement, nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Excluded Benefits, Worker Adjustment Retraining Notification Act ("<u>WARN Act</u>") claims and other termination type claims and obligations, or any other amounts required to be paid by statute or law (except to the extent such items are amounts for which Merchant is entitled to indemnification pursuant hereto); nor shall Agent become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees.  Merchant shall not, without Agent's prior written consent, raise the salary or wages or increase the benefits for, or pay any bonuses or make any other extraordinary payments to, any of the Retained Employees, except as otherwise provided in this Agreement.

8.2    <u>Termination of Employees By Merchant</u>.  Agent may in its discretion stop using any Retained Employee at any time during the Sale.  In the event Agent determines to discontinue its use of any Retained Employee in connection with the conduct of the Sale, Agent will provide written notice to Merchant at least seven (7) days prior thereto, except for termination "for cause" (such as dishonesty, fraud or breach of employee duties), in which event no prior notice to Merchant shall be required, provided Agent shall notify Merchant as soon as practicable after such termination.  From and after the date of this Agreement and until the Sale Termination Date, Merchant shall not transfer or dismiss employees of any Closing Location except "for cause" without Agent's prior consent (which consent shall not be unreasonably withheld).  Notwithstanding any other provision hereof, Agent will indemnify Merchant with respect to any claims by Retained Employees arising from Agent's treatment of such Retained Employees.

8.3    <u>Payroll Matters</u>.  During the Sale Term, Merchant shall process and pay the base payroll and all related payroll taxes, worker's compensation, employment and unemployment insurance, and benefits for all Retained Employees (except for independent contractors hired by Agent) in accordance with its usual and customary procedures.

- 19 -

Section 9.      <u>Conditions Precedent.</u>

The willingness of Agent and Merchant to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by the applicable party:

(a)      All representations and warranties of Merchant and Agent hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and as of the Sale Commencement Date;

(b)      Agent hereby acknowledges that prior to the execution of this Agreement, Merchant has provided Agent reasonable access to all pricing and cost files, computer hardware, software and data files, inter-Stores transfer logs, markdown schedules, invoices, style runs and all other documents relative to the price, mix and quantities of inventory located at the Closing Locations;

(c)      Agent hereby acknowledges that prior to the execution of the Agreement, and on the date immediately preceding the Inventory Date, Agent has had and shall have had the opportunity to inspect the Closing Locations and the Merchandise; and

(d)      On or before March 29, 2010, the Bankruptcy Court shall have entered the Approval Order in a form reasonably acceptable to Merchant and Agent.

Section 10.      <u>Representations. Warranties and Covenants</u>

10.1      <u>Merchant's Representations, Warranties and Covenants</u>.      Merchant hereby represents, warrants and covenants in favor of Agent as follows:

(a)      Merchant: (i) is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation; (ii) has all requisite corporate power and authority to own, lease and operate its assets and properties and to carry on its business as presently conducted; and (iii) is and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Closing Locations are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)      Subject to the entry of the Approval Order in the Chapter 11 Case, Merchant has the right, power and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this Agreement, the "<u>Agency Documents</u>") and to perform fully its obligations thereunder.  Subject to the entry of the Approval Order in the Chapter 11 Case, Merchant has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval on the part of Merchant is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale.  Subject

- 20 -

to the entry of the Approval Order in the Chapter 11 Case, each of the Agency Documents has been duly executed and delivered by Merchant and constitutes the legal, valid and binding obligation of Merchant enforceable in accordance with its terms.  Subject to the entry of the Approval Order in the Chapter 11 Case, no court order or decree of any federal, state, local, or provincial governmental authority or regulatory body is in effect that would prevent or materially impair, or is required for the Merchant's consummation of, the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefore, other than as shall be obtained prior to the Sale Commencement Date, except for any such consent the failure of which to be obtained could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.  Other than for any consent as shall be obtained prior to the Sale Commencement Date, and those contracts or agreements identified by Merchant to Agent on or prior to the Sale Commencement Date, if any, no contract or other agreement to which the Merchant is a party or by which the Merchant is otherwise bound will prevent or materially impair the consummation of the Sale and the other transactions contemplated by this Agreement.

(c)     Merchant: (i) owns and will own at all times during the Sale Term, good and marketable title to all of the Merchandise free and clear of all liens, claims and encumbrances of any nature, and (ii) shall not create, incur, assume or suffer to exist any security interest, lien or other charge or encumbrance upon or with respect to any of the Merchandise or the Proceeds, in each case, except for such pre-existing liens and security interests as shall have been disclosed by Merchant to Agent and identified in Exhibit 10.1(c) hereof.

(d)     Merchant has maintained its pricing files (including, but not limited to, the Cost File) in the ordinary course of business, and prices charged to the public for goods (whether in-store, by advertisement or otherwise) are the same in all material respects as set forth in such pricing files for the periods indicated therein (without consideration of any point of sale markdowns).  All pricing files and records relative to the Merchandise have been made available to Agent.

(e)     Merchant has not since February 24, 2010, and shall not up to the Sale Commencement Date, marked up or raised the price of any items of Merchandise, or removed or altered any tickets or any indicia of clearance merchandise, except in the ordinary course of business and except for the effects of the termination of promotional events.

(f)     Merchant shall ticket or mark all items of inventory received at the Closing Locations prior to the Sale Commencement Date in a manner consistent with similar Merchandise located at the Closing Locations and in accordance with Merchant's past practices and policies relative to pricing and marking inventory.

(g)     To the best of Merchant's knowledge, all Merchandise is in material compliance with all applicable federal, state or local product safety laws, rules and standards. Merchant shall provide Agent with its historic policies and practices, if any, regarding product recalls prior to the Sale Commencement Date.

(h)     Subject to the terms of this Agreement, Agent shall have the right to the unencumbered use and occupancy of, and peaceful and quiet possession of, each of the Closing

- 21 -

Locations, the assets currently located at the Closing Locations to the extent Merchant is entitled to use the same, and the services provided at the Closing Locations to the extent Merchant is entitled to such services.  As an Expense (Occupancy Expense or otherwise), Merchant shall throughout the Sale Term maintain in a manner consistent with its customary and historic practices, all cash registers, heating systems, air conditioning systems, elevators, escalators, alarm systems, and all other mechanical devices used in the ordinary course of operation of the Closing Locations or, if applicable, use reasonable efforts to cause any applicable landlord to comply with its obligations under applicable lease and occupancy agreements with respect to any such matter.

(i)    Merchant has paid all employee benefit programs for Closing Location employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

(j)    Since February 24, 2010, Merchant has not transferred and shall not transfer merchandise, FF&E or supplies to or from the Closing Locations outside the ordinary course of business, and shall not transfer Merchandise to the Closing Locations other than in the ordinary course of business with the exception of transfers of any and all Merchandise from Merchant's warehouse to Closing Locations prior to Sale Commencement Date.

(k)    As of the Sale Commencement Date, the minimum aggregate Cost Value of the Merchandise, without taking into account the Global Inventory Adjustment, shall be no less than Seven Million Four Hundred Thousand Dollars ($7,400,000.00) (the "Minimum Inventory Threshold") and the maximum aggregate Cost Value of the Merchandise shall be no more than Seven Million Six Hundred Thousand Dollars ($7,600,000.00) (the "Maximum Inventory Threshold").  In the event the Cost Value of the Merchandise is below the Minimum Inventory Threshold or in excess of the Maximum Inventory Threshold, the Guaranteed Amount shall be adjusted in accordance with Exhibit 10.1(k). .

(l)    From and after the date of this Agreement, Merchant will not fill customer orders from "floor inventory" except in the ordinary course of business.

(m)    As of the Sale Commencement Date, Merchant's Merchandise shall have a mix of inventory reasonably consistent with the mix level disclosed in Merchant's due diligence materials as in file "Inventory by Department Class as of 2 20 10"

(n)    As of the Sale Commencement Date, the Cost Value of the Merchandise shall not, as a percentage of the aggregate Retail Value of the Merchandise (the "Cost Factor") be more than 43.1(%).  To the extent the Cost Factor exceeds 43.1(%) the Guaranteed Amount shall be adjusted in accordance with Exhibit 10.1(n).

(o)    To the best of Merchant's knowledge, the Cost File represents the actual cost to Merchant as set forth on the original vendor invoices charged to Merchant inclusive of inbound freight.

10.2    <u>Agent's Representations, Warranties and Covenants</u>.  Agent hereby represents, warrants and covenants in favor of Merchant as follows:

(a)     The Agent:  (i) is a corporation, partnership, or limited liability company, as the case may be, duly and validly existing and in good standing under the laws of the State of its organization; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; and (iii) is and during the Sale Term will continue to be duly authorized and qualified as a foreign company to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification.

(b)     Agent has the right, power and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder.  Agent has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale.  Each of the Agency Documents has been duly executed and delivered by the Agent and constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms.  No court order or decree of any federal, provincial, state or local governmental authority or regulatory body is in effect that would prevent or impair or is required for Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor other than as provided herein.  No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)     No action, arbitration, suit, notice, or legal administrative or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved, or to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement, or which if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

Section 11.    <u>Insurance</u>

11.1    <u>Merchant's Liability Insurance</u>.    Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, all of its liability insurance policies including, but not limited to, products liability, comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with Merchant's operation of the Closing Locations, and shall cause Agent to be named an additional named insured with respect to all such policies.  Prior to the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days prior notice to Agent of cancellation, non-renewal or material change.  In the event of a claim under any such policies Merchant shall be responsible for the payment of all deductibles, retentions or self-insured amounts to the extent said claim arises from or relates to the alleged acts or omissions of Merchant or its employees, agents (other than Agent's employees), or independent contractors (other than Agent and independent contractors hired by Agent in conjunction with the Sale).

11.2    <u>Merchant's Casualty Insurance</u>.    Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, fire, flood, theft and extended coverage casualty insurance covering the Merchandise in a total amount equal to no less than the Cost Value thereof, which coverage shall be reduced from time to time to take into account the sale of Merchandise.    In the event of a loss to the Merchandise on or after the date of this Agreement, the proceeds of such insurance attributable to the Merchandise (net of any deductible) shall constitute Proceeds.    Prior to the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof, in form and substance reasonably satisfactory to Agent.    All such policies shall require at least thirty (30) days prior notice to Agent of cancellation, non-renewal or material change.    Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date, without Agent's prior written consent.

11.3    <u>Worker's Compensation Insurance</u>.    Merchant shall continue until the Sale Termination Date, in such amounts as it currently has in effect, worker's compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements.    Prior to the Sale Commencement Date, Merchant shall deliver to Agent a certificate of its insurance broker or carrier evidencing such insurance.

11.4    <u>Agent's Insurance</u>.    Agent shall maintain at Agent's cost and expense throughout the Sale Term, in such amounts as it currently has in effect, comprehensive public liability and automobile liability insurance policies covering injuries to persons and property in or in connection with Agent's agency at the Closing Locations, and shall cause Merchant to be named an additional insured with respect to such policies.    Prior to the Sale Commencement Date, Agent shall deliver to Merchant certificates evidencing such insurance policies, setting forth the duration thereof and naming Merchant as an additional insured, in form and substance reasonable satisfactory to Merchant.    In the event of a claim under such policies Agent shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, to the extent said claim arises from or relates to the alleged acts or omissions of Agent or Agent's employees, agents or independent contractors.

11.5    <u>Risk of Loss</u>.    Without limiting any other provision of this Agreement, Merchant acknowledges that Agent is conducting the Sale on behalf of Merchant solely in the capacity of an agent, and that in such capacity (i) Agent shall not be deemed to be in possession or control of the Closing Locations or the assets located therein or associated therewith, or of Merchant's employees located at the Closing Locations, and (ii) except as expressly provided in this Agreement, Agent does not assume any of Merchant's obligations or liabilities with respect to any of the foregoing.    Agent shall not be deemed to be a successor employer.    Merchant and Agent agree that, subject to the terms of this Agreement, Merchant shall bear all responsibility for liability claims of customers, employees and other persons arising from events occurring at the Closing Locations during and after the Sale Term, except to the extent any such claim arises directly from the acts or omissions of Agent, or its supervisors, agents, independent contractors, or employees located at the Closing Locations (an "<u>Agent Claim</u>").    In the event of any liability claim other than an Agent Claim, Merchant shall administer such claim and shall present such claim to Merchant's liability insurance carrier in accordance with Merchant's policies and procedures existing immediately prior to the Sale Commencement Date, and shall provide a copy of the initial documentation relating to such claim to Agent at the address listed in this

- 24 -

Agreement.  To the extent that Merchant and Agent agree that a claim constitutes an Agent Claim, Agent shall administer such claim and shall present such claim to its liability insurance carrier, and shall provide copies of the initial documentation relating to such claim to Merchant. In the event that Merchant and Agent cannot agree whether a claim constitutes an Agent Claim, each party shall present the claim to its own liability insurance carrier, and a copy of the initial claim documentation shall be delivered to the other party to the foregoing address.

Section 12.      Indemnification

12.1      Merchant Indemnification.  Merchant shall indemnify and hold Agent and its officers, directors, employees, agents and independent contractors (collectively, "Agent Indemnified Parties") harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against Agent resulting from, or related to:

(a)      Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document;

(b)      subject to Agent's performance and compliance with its obligations pursuant to Sections 4.1(b) and 4.1(c) and Section 9 hereof, any failure of Merchant to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term or other claims asserted against Agent by Merchant's employees resulting from Merchant's (and not Agent's) treatment of its employees;

(c)      subject to Agent's compliance with its obligations under Section 7.3 hereof, any failure by Merchant to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof;

(d)      any consumer warranty or products liability claims except to the extent such claims arise from representations made by the Agent relating to the Merchandise;

(e)      the gross negligence or willful misconduct of Merchant or any of its officers, directors, employees, agents (other than Agent) or representatives.

12.2      Agent Indemnification.  Agent shall indemnify and hold Merchant and its officers, directors, employees, agents and representatives harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, asserted directly or indirectly against, Merchant resulting from, or related to (including acts or omissions of persons or entities affiliated with or acting on behalf of the Agent):

(a)      Agent's material breach of or failure to comply with any local, state, or federal laws or regulations, or any of its agreements, covenants, representations or warranties contained in any Agency Document;

(b)      any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortious or otherwise actionable treatment of any employees or agents of

- 25 -

Merchant by Agent or any of its employees, agents, independent contractors or other officers, directors or representatives of Agent;

        (c)    any claims by any party engaged by Agent as an employee or independent contractor arising out of such engagement;

        (d)    any Agent Claims;

        (e)    in the event that Agent uses any system other than Merchant's point of sale system to compute Sales Taxes relating to the Sale, any Additional Taxes and Penalties; and

        (f)    the negligence or willful misconduct of Agent or any of its officers, directors, employees, agents or representatives.

Section 13.    <u>Defaults</u>.  The following shall constitute "<u>Events of Default</u>" hereunder:

        (a)    Merchant's or Agent's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured seven (7) days after receipt of written notice thereof to the defaulting party; or

        (b)    Any representation or warranty made by Merchant or Agent proves untrue in any material respect as of the date made or at any time and throughout the Sale Term; or

        (c)    Subject to Section 7.8 hereof, the termination or material interruption or impairment of the Sale at any Closing Location for any reason other than (i) an Event of Default by Agent, or (ii) any other material breach or action by Agent not authorized hereunder.

In the event of an Event of Default, the non-defaulting party may, in its discretion, elect to terminate this Agreement upon seven (7) business days' written notice to the other party and pursue any and all rights and remedies and damages resulting from such default hereunder in the event such cure is not affected by the defaulting party.

Section 14.    <u>Fixtures</u>

With respect to furniture, fixtures and equipment (other than artwork and visuals) owned by Merchant and located at the Closing Locations (collectively, the "<u>FF&E</u>"), Agent may sell the FF&E in any such Closing Locations.  As with sales of Merchandise, subject to Agent's compliance with applicable law, all sales of FF&E will be "final sales" and "as is" and all advertisements and sales receipts will reflect the same.  Agent shall not warrant the FF&E in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  All sales will be made only for cash, nationally recognized bank credit cards, and, in Agent's discretion, personal checks, provided, however, if Agent determines to accept personal checks, Agent shall bear the risk of loss therefor.  As of the Sale Termination Date, Agent may abandon in place in a neat and orderly manner any unsold FF&E at the Closing Locations.  All proceeds from the disposition of the FF&E shall remain the property of the Agent.

Section 15.    <u>Miscellaneous</u>

15.1    <u>Notices</u>.    All notices and communications provided for pursuant to this Agreement shall be in writing, and sent by hand, by facsimile, or a recognized overnight delivery service, as follows:

If to Agent:            Hilco Merchant Resources, LLC
                        Attn:  Joseph A. Malfitano
                        5 Revere Drive
                        Northbrook, IL 60062
                        Fax: (847) 897-0868


With a copy to:         John W. Mills
                        Barnes & Thornburg LLP
                        Atlanta Financial Center
                        Suite 1150
                        3343 Peachtree Road, N.E.
                        Atlanta, Georgia  30326-1428
                        Fax: (404) 264-4033


If to the Merchant:     Swoozie's, Inc.
                        80 West Wieuca Rd, NE
                        Suite 302
                        Atlanta, Georgia 30342
                        Attn: Kelly Plank-Dworkin
                        Fax: (404)888-0145


With a copy to:         Clear Thinking Group LLC
                        401 Towne Centre Drive
                        Hillsborough, NJ 08844
                        Attn: Lee Diercks
                        Fax: (908) 359-5940


With a copy to:         Alston & Bird, LLP
                        One Atlantic Center
                        1201 West Peachtree Street
                        Atlanta, GA 30309
                        Attn:    Dennis J. Connolly
                                 Wendy R. Reiss
                                 Sage M. Sigler
                        Fax: (404) 253-8791

- 27 -

With a copy to:          Wells Fargo Bank, National Association
                         c/o Jay S. Rankin
                         Parker Hudson Rainer & Dobbs LLP
                         285 Peachtree Center Avenue, NE
                         1500 Marquis Two
                         Atlanta, GA  30303
                         Fax: (404) 522-8409

With a copy to:          Official Committee of Unsecured Creditors
                         c/o Darryl S. Laddin
                         Michael F. Holbein
                         Arnall Golden Gregory LLP
                         Suite 2100
                         171 17th Street, NW
                         Atlanta, GA 30363
                         Fax : (404) 873-7013


15.2    Governing Law; Consent to Jurisdiction.  This Agreement shall be governed and construed in accordance with the laws of the State of Delaware, without regard to conflicts of laws principles thereof.  The parties hereto agree that the Bankruptcy Court shall retain exclusive jurisdiction to hear and finally determine any disputes arising from or under this Agreement, and by execution of this Agreement each party hereby irrevocably accepts and submits to the jurisdiction of such court with respect to any such action or proceeding and to service of process by certified mail, return receipt requested to the address listed above for each party.

15.3    Entire Agreement.  This Agreement and the Related Agreements contain the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.

15.4    Amendments.  This Agreement may not be modified except in a written instrument executed by each of the parties hereto; provided, however, that the provisions of Sections 3.1, 3.3 and 3.4 (and exhibits referred to therein) may not be amended without the consent of Wells Fargo.

15.5    No Waiver.  No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

15.6    Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon Agent and Merchant, including, but not limited to, any chapter 11 or chapter 7 trustee.  Agent shall not be permitted to assign its obligations under this Agreement.

- 28 -

15.7     Execution in Counterparts.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one agreement.  This Agreement may be executed by facsimile, and such facsimile signature shall be treated as an original signature hereunder.

15.8     Section Headings.  The headings of Sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

15.9     Survival.   All representations, warranties, covenants and agreements made herein, by the parties hereto, shall be continuing, shall be considered to have been relied upon by the parties and shall survive the execution, delivery and performance of this Agreement.

15.10    Termination.  This Agreement shall remain in full force and effect until the first to occur of:  (i) receipt by Merchant of written notice from Agent that any of the conditions specified in Section 10 hereof have not been satisfied within 5 days of the anticipated Sale Commencement Date set forth in Section 6.1; or (ii) the expiration of the Sale Term and completion and certification by Merchant and Agent of the final Sale reconciliation pursuant to Section 7.7 above.   Notwithstanding the foregoing, (a) the representations, warranties and indemnities of Merchant and Agent contained herein and the provisions of Section 11 above, and (b) any claim arising from a breach of this Agreement prior to its termination, shall survive the termination of this Agreement.

15.11    Subcontractors.  Agent may utilize the services of subcontractors and or licensees in connection with the performance of its obligations hereunder other than the payment of money.

**[REMAINDER OF PAGE INTENTIONALLY BLANK]**

IN WITNESS WHEREOF, Agent and Merchant hereby execute this Agency Agreement as of the day and year first written above.

**HILCO MERCHANT RESOURCES, LLC**

By: Joseph A. Malfitano
Title: Vice President, Assistant General Counsel    *Member*

**SWOOZIE'S, INC.**

By: _____
Name: Kelly Plank Dworkin
Title: Chief Executive Officer

**WELLS FARGO BANK,
NATIONAL ASSOCIATION**

By: _____
Name: John L. Palermo
Title: Vice President
*with respect to Sections 3.1(d) and 3.3(a)*

# **EXHIBIT A**

## **CLOSING LOCATIONS**

**Swoozie's Inc.**
**Agency Agreement**

**Exhibit A - Closing Locations**

| | Store # | Location Name | Address | City | State |
|---|---|---|---|---|---|
| 1 | 1 | Buckhead | 4285 Roswell Road | Atlanta | GA |
| 2 | 2 | Brookwood | 1745 Peachtree Street | Atlanta | GA |
| 3 | 3 | Forum | 5131 Peachtree Parkway | Norcross | GA |
| 4 | 4 | West Cobb | 3625 Dallas Highway | Marietta | GA |
| 5 | 5 | Raleigh | 3761 Sumner Blvd | Raleigh | NC |
| 6 | 6 | Peachtree City | 504 Circle Gate | Peach Tree | GA |
| 7 | 7 | Jacksonville | 4751 River City Drive | Jacksonville | FL |
| 8 | 8 | Birmingham | 214 Summit Blvd | Birmingham | AL |
| 9 | 9 | Dallas | 8417 Preston Center Plaza Drive | Dallas | TX |
| 10 | 10 | Greenville | 1125 Woodruff Road | Greenville | SC |
| 11 | 11 | Memphis | 4630 Merchants Park Circle | Collerville | TN |
| 12 | 12 | Houston | 9595 Six Pines | The Woodlands | TX |
| 13 | 14 | Sugarland | 2210 Lone Star Drive | Sugar Land | TX |
| 14 | 15 | Palm Beach | 11701 Lake Victoria Gardens Ave | Palm Beach Gardens | FL |
| 15 | 16 | Greensboro | 3334 West Friendly Ave | Greenboro | NC |
| 16 | 17 | Bonita Springs | 23910 Fashion Drive | Southlake | FL |
| 17 | 18 | Southlake | 1431 E. Southlake Blvd. | Southlake | TX |
| 18 | 19 | Manhattan Beach | 2005-B E. Park Place | El Segundo | CA |
| 19 | 20 | Oakbrook | 3041 Butterfield Road | Oakbrook | IL |
| 20 | 21 | Cameron Vlg | 420 Woodburn Rd. | Raleigh | NC |
| 21 | 22 | Blakeney | 9816 Rea Rd. | Charlotte | NC |
| 22 | 23 | Durham | 7001 Fayetteville Rd. | Durham | NC |
| 23 | 24 | Nashville | 4015 Hillsboro Pike | Nashville | TN |
| 24 | 25 | Orland Park | 14225 95th Ave. | Orland Park | IL |
| 25 | 26 | Wilmington | 6814 Main Street | Wilmington | NC |
| 26 | 27 | Burr Ridge | 440 Village Center Dr. | Burr Ridge | IL |
| 27 | 28 | Boca Raton | 1400 Glades Rd. | Boca Raton | FL |
| 28 | 29 | Morrison | 532 Governor Morrison St. | Charlotte | NC |
| 29 | 30 | Allen | 913 Garden Park Dr/ | Allen | TX |
| 30 | 31 | Barrington | 100 West Higgins Rd | South Barrington | IL |
| 31 | 32 | Fairfield | 2250 Black Rock TPK | Fairfield | CT |
| 32 | 33 | Bronxville | 1160 Pondfield Rd. | Bronxville | NY |
| 33 | 34 | Darien | 25 Old Kings HWY N | Darien | CT |
| 34 | 35 | Wilton | 5 River Rd. | Wilton | CT |
| 35 | 36 | Burlington | 6 Wayside Rd. #1 | Burlington | MA |
| 36 | 37 | Closter | 270 Closter Dock Rd | Closter | NJ |
| 37 | 38 | Princeton | 3495 US HWY 1 South | Princeton | NJ |
| 38 | 39 | Marlton | 500 Rt. 73 South | Marlton | NJ |
| 39 | 40 | Middletown | 459 Rt. 35 | Red Bnk | NJ |
| 40 | 41 | Florham Park | 187 Columbia Tpke #6 | Florham Park | NJ |
| 41 | 42 | Paoli | 19 Leopard Rd. | Paoli | PA |
| 42 | 43 | Ardmore | 65 St. James Place | Ardmore | PA |
| 43 | 44 | Warrington | 1520 Main St. | Warrington | PA |

### EXHIBIT 3.3(b)

### FORM OF GUARANTY L/C

[NAME OF ISSUING BANK]

[ADDRESS]

Date: _____, 2010

Irrevocable Standby Letter of Credit Number: _____

BENEFICIARY:    Swoozie's, Inc.
80 West Wieuca Rd, NE
Suite 302
Atlanta, Georgia 30342
Attn: Kelly Plank-Dworkin

Wells Fargo Bank, National Association
171 17th Street, N.E., 4th Floor
Atlanta, Georgia 30363
Attn: Swoozie's Loan Administration

Credit Number:
Opener's Reference No:

Gentlemen:

BY ORDER OF:        **{Agent's Name}**

We hereby open in your favor our Irrevocable Standby Letter of Credit (the "Letter of Credit") for the account of **{Agent's Name}** for a sum or sums not exceeding a total of $_____ U.S. Dollars (_____) available by your draft(s) at SIGHT on OURSELVES effective immediately and expiring at OUR COUNTERS on _____, 2010, or such earlier date on which the beneficiary shall notify us in writing that this Letter of Credit shall be terminated accompanied by the original Letter of Credit (the "Expiry Date").

Draft(s) must be accompanied by the original of this Letter of Credit and a signed statement in the form attached hereto as **Exhibit A** signed by SWOOZIE'S, INC.. (the "Merchant").

This Letter of Credit may be reduced from time to time when accompanied by a signed statement from beneficiary in the form attached as **Exhibit B**.

Partial and/or multiple drawings are permitted.

Each draft must bear upon its face the clause "Drawn under Letter of Credit No. _____ dated _____ of [NAME AND ADDRESS OF ISSUING BANK]."

Except so far as otherwise expressly stated herein, this Letter of Credit is subject to the "Uniform Customs and Practices for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 500".

We hereby agree that drafts drawn under and in compliance with the terms of this Letter of Credit will be duly honored if presented to the above mentioned drawee bank on or before the Expiry Date.

Kindly address all correspondence regarding this Letter of Credit to the attention of our Letter of Credit Operations, [ADDRESS OF L/C DEPARTMENT OF ISSUING BANK] attention _____, mention our reference number as it appears above.  Telephone inquiries can be made to _____ at _____.

Very truly yours,


Authorized official

<u>EXHIBIT A</u>

TO IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____

Re: Drawing for Amounts Due to:

Swoozie's, Inc.
80 West Wieuca Rd, NE
Suite 302
Atlanta, Georgia 30342
Attn: Kelly Plank-Dworkin

Wells Fargo Bank, National Association
171 17th Street, N.E., 4th Floor
Atlanta, Georgia 30363
Attn: Swoozie's Loan Administration

Ladies and Gentlemen:

I refer to your Letter of Credit No. _____ (the "Letter of Credit"). The undersigned, duly authorized officer of Swoozie's, Inc., a debtor and debtor-in-possession (the "Merchant" and the "Beneficiary"), and the Beneficiary of the Letter of Credit hereby certifies to you that:

(i)    {Agent's Name} (the "Agent") has not made a payment when due of or for Guaranteed Amount or other amounts due by Agent to Merchant pursuant to, and as such term is defined in that certain Agency Agreement dated as of _____, 2010 among the Merchant, on the one hand, and Agent, on the other.

(ii)    The amount to be drawn is $_____ (the "Amount Owing").

(iii)    Payment is hereby demanded in an amount equal to the lesser of (a) the Amount Owing and (b) the face amount of the Letter of Credit as of the date hereof .

(iv)    The Letter of Credit has not expired prior to the delivery of this letter and the accompanying sight draft.

(v)    The payment hereby demanded is requested to be made no later than two (2) business days after the date of delivery of this certificate, by wire transfer to the following account:

[_____]
[_____]
[_____]
Further Credit to: [Account Title]
[Account No.]

IN WITNESS WHEREOF, I have executed and delivered this certificate as of this _____ day of _____, 2010.

Very truly yours,

SWOOZIE'S, INC.

By: _____

        Name:
        Title:

WELLS FARGO BANK, NATIONAL ASSOCIATION

By: _____

        Name:
        Title:

## **EXHIBIT B**

IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____

Re: Reduction of Face Amount:

Swoozie's, Inc.
80 West Wieuca Rd, NE
Suite 302
Atlanta, Georgia 30342
Attn: Kelly Plank-Dworkin

Ladies and Gentlemen:

We refer to your Letter of Credit No. _____ (the "Letter of Credit"). The undersigned, duly authorized officers of SWOOZIE'S, INC. and WELLS FARGO BANK, NATIONAL ASSOCIATION (collectively, the "Beneficiaries"), hereby confirm to you that the face amount of the Letter of Credit No. _____ shall be reduced from its original face amount to a new face amount of $_____.

IN WITNESS WHEREOF, I have executed and delivered this certificate as of this _____ day of _____, 2010.

Very truly yours,

SWOOZIE'S, INC.

By: _____
       Name:
       Title:

WELLS FARGO BANK, NATIONAL ASSOCIATION

By: _____
       Name:
       Title:

## EXHIBIT 4.1(a)

## OCCUPANCY EXPENSE SCHEDULE

Swozzie's Inc.
Agency Agreement

Exhibit 4.1(a) - Occupancy Expense Schedule

| Store # | Store Name | Address | City | ST | % Rent in lieu of monthly total rent | Base Rent | Common Area Maintenance (CAM) | Tax | Ins/Other LL | Deferred Rent | Rent Abatement | Total Pass Through | Total Rent | Utilities | Total Monthly Occupancy | Per Head |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Buckhead | 4295 Roswell Road | Atlanta | GA | | 15,520 | 1,623 | 1,031 | 193 | | | 2,847 | 18,367 | 1,456 | 19,823 | 662 |
| 2 | Brookwood | 1745 Peachtree Street | Atlanta | GA | | 16,082 | 1,488 | 1,699 | 143 | | | 3,330 | 19,412 | 1,456 | 20,868 | 686 |
| 3 | Forum | 5151 Peachtree Parkway | Norcross | GA | | 13,317 | 1,572 | 1,501 | 823 | | | 3,896 | 17,213 | | 17,213 | 622 |
| 4 | West Cobb | 3625 Dallas Highway | Marietta | GA | | 11,132 | 1,599 | 1,103 | 429 | | | 3,041 | 14,173 | | 14,173 | 472 |
| 5 | Raleigh | 3701 Sumner Blvd | Raleigh | NC | | 9,387 | 968 | 1,289 | 510 | | | 2,767 | 12,154 | 774 | 12,928 | 451 |
| 6 | Peachtree City | 504 Circle Gate | Peachtree | GA | | 12,333 | 2,442 | 2,525 | 710 | | | 5,777 | 18,110 | 1,456 | 19,566 | 770 |
| 7 | Jacksonville | 4751 River City Dr | Jacksonville | FL | | 13,625 | 2,076 | 1,045 | | | | 9,772 | 23,110 | | 23,110 | 635 |
| 8 | Birmingham | 214 Summit Blvd | Birmingham | AL | | 15,625 | 1,695 | 791 | 1,045 | | | 3,531 | 19,156 | 729 | 19,156 | 635 |
| 9 | Dallas | 8437 Preston Center Plaza Drive | Dallas | TX | | 14,480 | 1,697 | 520 | 520 | | | 5,258 | 19,738 | | 19,738 | 659 |
| 10 | Greenville | 1125 Woodruff Road | Greenville | SC | | 15,372 | 700 | 905 | 919 | | | 2,524 | 17,896 | 729 | 18,624 | 621 |
| 11 | Memphis | 4650 Merchants Park Circle | Collierville | TN | | 13,245 | 2,546 | 2,493 | 1,084 | | | 6,123 | 19,369 | | 19,369 | 620 |
| 12 | Houston | 9595 Six Pines | The Woodlands | TX | | 13,324 | 2,804 | 2,483 | 520 | | | 5,520 | 18,583 | 815 | 19,698 | 562 |
| 13 | Sugarland | 2210 Lone Star Drive | Sugar Land | TX | | 13,254 | 1,937 | 3,070 | 203 | | | 4,610 | 18,863 | | 18,863 | 562 |
| 14 | Palm Beach | 11701 Lake Victoria Gardens Ave | Palm Beach Gardens | FL | | 15,577 | | 4,354 | 2,066 | | | 6,420 | 22,097 | | 22,097 | 636 |
| 15 | Greensboro | 3334 West Friendly Ave | Greensboro | NC | | 12,524 | 2,146 | 590 | 766 | | | 3,502 | 16,026 | | 16,026 | 534 |
| 16 | Bonita Springs | 34909 | Bonita Springs | FL | | 14,809 | 3,172 | 2,295 | | | | 11,276 | 26,085 | | 26,085 | 870 |
| 17 | Southlake | 1431 E. Southlake Blvd. | Southlake | TX | | 15,423 | 1,188 | 2,286 | 375 | | | 3,858 | 19,181 | | 19,181 | 650 |
| 18 | El Segundo | 2005 E. Park Place | El Segundo | CA | | 23,681 | 1,384 | 2,647 | 544 | | | 4,575 | 28,607 | | 26,607 | 684 |
| 19 | Oakbrook | 300 Butterfield Road | Oakbrook | IL | | 21,769 | 2,380 | 1,646 | 120 | | | 4,146 | 25,915 | | 25,915 | 607 |
| 20 | Raleigh | 420 Woodburn Rd | Raleigh | NC | | 15,176 | 1,458 | 927 | 181 | | | 2,566 | 17,742 | 774 | 18,516 | 607 |
| 21 | Cameron Vlg | 9856 Rea Rd | Charlotte | NC | | 12,663 | 961 | 661 | 190 | | | 1,812 | 14,476 | 729 | 15,204 | 468 |
| 22 | Blakeney | 7001 Fayetteville Rd. | Durham | NC | | 10,285 | 1,639 | 1,291 | 117 | | | 3,027 | 13,311 | 729 | 14,040 | 468 |
| 23 | Durham | 12910 Fashion Drive | Nashville | TN | | 10,558 | 1,858 | 1,944 | 532 | | | 4,133 | 14,691 | | 15,991 | 464 |
| 24 | Nashville | 4015 Hillsboro Pike | Orland Park | IL | | 13,525 | 1,677 | 2,644 | 386 | | | 4,183 | 17,708 | (1,100) | 15,991 | 464 |
| 25 | Orland Park | 14215 95th Ave | Orland Park | IL | | 11,252 | 1,225 | 1,504 | 521 | | (5,765) | 2,983 | 12,522 | 774 | 13,549 | 452 |
| 26 | Wilmington | 6824 Main Street | Wilmington | NC | | 9,792 | 1,837 | 625 | 521 | | | 2,983 | 12,775 | 774 | 13,549 | 452 |
| 27 | Burr Ridge | 440 Village Center Dr. | Burr Ridge | IL | 1/1/2010-12/31/2010 | 14,556 | 5,066 | 3,256 | 921 | | | 8,841 | 23,697 | | 23,697 | 790 |
| 28 | Boca Raton | 1400 Glades Rd. | Boca Raton | FL | | 21,624 | 3,865 | | 4,000 | | | 8,929 | 30,553 | | 30,553 | 1,018 |
| 29 | Morrison | 532 Governor Morrison St. | Charlotte | NC | | 15,190 | 1,281 | 610 | 280 | | | 2,171 | 17,361 | 729 | 18,089 | 603 |
| 30 | Allen | 913 Garden Park Dr/ | Allen | TX | | 13,065 | 2,340 | 1,584 | 515 | | | 4,438 | 17,503 | | 17,503 | 583 |
| 31 | Barrington | 100 West Higgins Rd | South Barrington | IL | | 10,816 | 1,872 | 3,536 | 208 | | | 5,616 | 16,432 | | 16,432 | 548 |
| 32 | Fairfield | 2250 Black Rock Tpk | Fairfield | CT | | 12,687 | 885 | 3,113 | | | | 3,007 | 15,694 | | 15,694 | 503 |
| 33 | Bronxville | 1160 Fordfield Rd | Bronxville | NY | | 13,047 | | 2,644 | 386 | | | 2,980 | 16,027 | 2,663 | 18,690 | 503 |
| 34 | Darien | 25 Old Kings HWY N | Darien | CT | | 11,060 | 1,641 | 832 | 398 | | | 2,870 | 13,930 | | 13,930 | 464 |
| 35 | Wilton | 5 River Rd. | Wilton | CT | | 12,993 | 3,217 | | | | | 3,217 | 16,210 | | 16,210 | 540 |
| 36 | Burlington | 6 Wayside Rd. #1 | Burlington | MA | | 10,877 | 1,866 | 2,747 | 246 | | | 4,860 | 15,737 | | 15,737 | 525 |
| 37 | Closter | 270 Closter Dock Rd | Closter | NJ | | 8,831 | 1,507 | 1,294 | 210 | | | 3,245 | 12,048 | 1,204 | 13,251 | 468 |
| 38 | Princeton | 3535 US HWY 1 South | Princeton | NJ | | 10,283 | 1,290 | 1,830 | | | | 3,120 | 13,402 | 1,204 | 14,606 | 467 |
| 39 | Marlton | 500 Rt. 73 South | Marlton | NJ | | 10,233 | 1,629 | 1,987 | 952 | | | 4,548 | 14,781 | 1,204 | 15,985 | 488 |
| 40 | Middletown | 459 Rt. 35 | Red Bnk | NJ | | 13,200 | 1,900 | 1,795 | | | | 3,695 | 16,895 | 1,004 | 17,899 | 597 |
| 41 | Florham Park | 187 Columbia Tpke #6 | Florham Park | NJ | | 8,439 | 1,925 | 1,235 | | | | 3,160 | 11,599 | 1,004 | 12,603 | 420 |
| 42 | Paoli | 459 Leopard Rd. | Paoli | PA | | 8,385 | 1,238 | 490 | 218 | | | 1,946 | 10,332 | 943 | 11,275 | 376 |
| 43 | Ardmore | 65 St. James Place | Ardmore | PA | | 11,020 | 1,284 | 1,807 | 648 | | | 5,607 | 12,775 | 943 | 12,702 | 453 |
| 44 | Warrington | 1520 Main St. | Warrington | PA | | 10,565 | 2,767 | 943 | 94 | | | 3,765 | 14,350 | 943 | 15,293 | 510 |
| | Totals | | | | | 565,282 | 80,493 | 72,156 | 25,885 | | 6,282 | 179,090 | 744,312 | 22,987 | 767,298 | 25,577 |

NOTE: Excludes Corporate Office & Warehouse

## EXHIBIT 4.2(b)

## FORM OF EXPENSE L/C

[NAME OF ISSUING BANK]

[ADDRESS]

Date: _____, 2010

Irrevocable Standby Letter of Credit Number: _____

BENEFICIARY:     Swoozie's, Inc.
                 80 West Wieuca Rd, NE
                 Suite 302
                 Atlanta, Georgia 30342
                 Attn: Kelly Plank-Dworkin

Credit Number:
Opener's Reference No:

BY ORDER OF:     **{Agent's Name}**

We hereby open in your favor our Irrevocable Standby Letter of Credit (the "Letter of Credit") for the account of **{Agent's Name}** for a sum or sums not exceeding a total of $ _____ U.S. Dollars (_____) available by your draft(s) at SIGHT on OURSELVES effective immediately and expiring at OUR COUNTERS on _____, 2010 or such earlier date on which the beneficiary shall notify us in writing that this Letter of Credit shall be terminated accompanied by the original Letter of Credit (the "Expiry Date").

Draft(s) must be accompanied by the original of this Letter of Credit and a signed statement in the form attached hereto as **Exhibit A** signed by SWOOZIE'S, INC. (the "Merchant").

This Letter of Credit may be reduced from time to time when accompanied by a signed statement from Beneficiary in the fowl attached as **Exhibit B**.

Partial and/or multiple drawings are permitted.

Each draft must bear upon its face the clause "Drawn under Letter of Credit No. _____ dated _____ of [NAME AND ADDRESS OF ISSUING BANK]."

Except so far as otherwise expressly stated herein, this Letter of Credit is subject to the "Uniform Customs and Practices for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 500".

We hereby agree that drafts drawn under and in compliance with the terms of this Letter of Credit will be duly honored if presented to the above mentioned drawee bank on or before the Expiry Date.

Kindly address all correspondence regarding this Letter of Credit to the attention of our Letter of Credit Operations, [ADDRESS OF L/C DEPARTMENT OF ISSUING BANK] attention _____, mention our reference number as it appears above.  Telephone inquiries can be made to _____ at _____.

Very truly yours,

Authorized official

<u>EXHIBIT A</u>

TO IRREVOCABLE STANDBY LETTER OF CREDIT NO. _____

Re: Drawing for Amounts Due to:

Swoozie's, Inc.
80 West Wieuca Rd, NE
Suite 302
Atlanta, Georgia 30342
Attn: Kelly Plank-Dworkin

Ladies and Gentlemen:

I refer to your Letter of Credit No. _____ (the "Letter of Credit"). The undersigned, duly authorized officer of SWOOZIE'S, INC., a debtor and debtor-in-possession (the "Merchant" and the "Beneficiary"), and the Beneficiary of the Letter of Credit hereby certifies to you that:

(i)     {Agent's Name} (the "Agent") has not made a payment when due of or for Expenses or other amounts due by Agent to Merchant pursuant to, and as such term is defined in that certain Agency Agreement dated as of _____, 2010 among the Merchant, on the one hand, and Agent, on the other.

(ii)    The amount to be drawn is $_____ (the "Amount Owing").

(iii)   Payment is hereby demanded in an amount equal to the lesser of (a) the Amount Owing and (b) the face amount of the Letter of Credit as of the date hereof.

(iv)    The Letter of Credit has not expired prior to the delivery of this letter and the accompanying sight draft.

(v)     The payment hereby demanded is requested to be made no later than two (2) business days after the date of delivery of this certificate, by wire transfer to the following account:

[_____]
[_____]
[_____]
Further Credit to:  [Account Title]
[Account No.]

IN WITNESS WHEREOF, I have executed and delivered this certificate as of this _____ day of _____, 2010.

Very truly yours,

SWOOZIE'S, INC.

By: _____
      Name:
      Title:

<u>EXHIBIT B</u>

IRREVOCABLE STANDBY LETTER OF CREDIT NO. _ _____

Re: Reduction of Face Amount::

Swoozie's, Inc.
80 West Wieuca Rd, NE
Suite 302
Atlanta, Georgia 30342
Attn: Kelly Plank-Dworkin

Ladies and Gentlemen:

We refer to your Letter of Credit No. _____ (the "Letter of Credit"). The undersigned, duly authorized officer of SWOOZIE'S, INC. (the "Beneficiary"), hereby confirms to you that the face amount of the Letter of Credit No. _____ shall be reduced from its original face amount to a new face amount of $ _____.

IN WITNESS WHEREOF, I have executed and delivered this certificate as of this _____ day of _____, 2010.

Very truly yours,

SWOOZIE'S, INC.

By: _____
        Name:
        Title:

## EXHIBIT 5.1(a)

## INVENTORY TAKING INSTRUCTIONS

# Exhibit 5.1 ( a ) Inventory Taking Instructions

## Swoozie's Inc.
## (Merchant )

## Hilco Merchant Resources, LLC
## (Agent)

# INVENTORY INSTRUCTION COVER SHEET

**STORE#_____**          **DATE: _____**

**Starting Section #_____**          **Ending Section #_____**

**Starting Pre-List #_____**          **Ending Pre List#_____**

**# WIS Employees Scheduled:_____   Start Time_____**

**# WIS Employees Actual:_____   End Time_____**

**# SWOOZIE'S Retail EE's _____**

**Name of SWOOZIE'S Retail Auditor:_____**

# Objective

The objectives of the Inventory are to ensure that:

1. The inventory process is **accurate** and reflects the true on-hand inventory
2. The inventory is taken in **accordance** with the Agency Agreement.
3. The issues that may cause discrepancies are **investigated** on the day of inventory.

At least one qualified representative of both Agent and Merchant must be present throughout the Inventory Taking at each location

# GENERAL INFORMATION

WIS will be conducting the Inventory

The following information will be captured at the point of counting
1. Store location and number
2. Date and Time of the Physical Inventory
3. Section Number
4. Validated Product Barcode or Key Swoozie's SKU
5. Product Quantity
6. All **NOF** conditions will be directed to a designated "Trouble Table" section 9999 to determine the correct Product identification.
7. No overrides are allowed, each entry must be validated.

**Data Capture will occur in the following sequence**
1. Scan Section Tag
2. Scan the Swoozie's ticket or manufacturer's UPC barcode. The Item will be validated against a Master file and accepted if matched.
3. Any Not On File Item will be moved to the Trouble Table Section 9999 for additional research. All items on the trouble table must be validated in order for the inventory process to be completed.
4. Multiple quantity entries are allowed, some areas may be counted using auto quantity one recording.

**Cash on hand and Register funds**. The store's cash on hand will be jointly counted by the Merchant and Agent. Utilize the form attached.  Only actual cash on hand will be included in the count, open receipts or other forms of disbursement vouchers are not to be included in the cash count.  This should be completed during the first hour of the process. This will allow WIS to complete an initial range of Sections, for the auditing process to begin.

*Gift Cards* or Gift Certificates or card stock for Gift Certificates, should be packaged for return to your Home Office.

*Do Not Count*
1. *Supplies*
2. *Store Fixtures and equipment*
3. *Custom order merchandise or special order samples not normally sold*
4. *Complimentary gift boxes*
5. *Complimentary pink and orange ribbon*
6. *Merchandise bags and tissue*

# Pre-Inventory Preparation

1.  Ensure all merchandise is well organized:

    For all areas, but especially in the areas listed below, make sure the merchandise is sorted and separated by style (Item #).

    - **Greeting cards** – in all racks and all spinners group the same style together and ensure each pocket has one style. Flip the front card so the barcode is facing forward. This will make it fast for the counters and provide a system for making sure everything is accounted for.  Bring all back-stock of greeting cards from your stockroom onto the floor next to your Greeting Card section. WIS will be able to scan the barcode on the outside of each bundle of greeting cards and key in the quantity.
    - **Wrapping paper** – bundle it by style in rubber bands and lay it all down in the gift wrap wall bins. Counters will stand them back up as each style is counted.
    - **Ribbon**
    - **Invitations** – make sure all styles are together and all the same invitations are in the right places. Turn the front box of invites over so the price tag is facing forward. The counters will flip back over once counted.
    - **Crane Basics** – make sure **SAME** envelopes and **SAME** card stock are in the right rows. There are very subtle differences between styles so it is very important that this area is well organized.
    - **Individually sold paper stock**
    - **INITIALS!** - Have initials sorted by letter and reiterate to the counting service that there is a different item number for each letter
    - **Luggage Tags** – Ensure separate styles are physically separated so they are counted under the correct SKUs. Again, reiterate to WIS that in most cases there is a different item number by letter and/or style

2.  Examine Each Store Area

    - Check for missing tickets.  Ensure every item has a readable price tag and/or has a barcode that scans.
    - Make sure items that visually are the same style, are all tagged with the same price tag.
    - If the price, description, or any aspect of the tag does not seem to correspond to that specific product, check RetailPro to determine if it matches.
        - All merchandise that is classified defective must be inventoried at the full retail price (any necessary adjustments will be made later by the back office).  Display merchandise should also be inventoried at full retail.
    - Feature tables vary by store so alter your plan to make sure all areas of your store get checked.

3.  Clean and Organize the Stock Room and Office(s):

    - Bring everything in stock room down to "eye level" so that it can be scanned.  Every item must have a scanable price ticket.
    - All merchandise should be cleared out of the manager and print offices.
    - Print offices may have partial packs of paper & envelopes. These can remain in the office and SHOULD BE counted as part of inventory (you will receive a list of SKUs to count individual pieces).
    - Any remaining merchandise should be consolidated by like items on the shelves.
    - Do not neglect any merchandise! Every piece of merchandise needs to be tagged, on the floor, and/or neatly organized in your stockroom.
    - Once everything is thoroughly cleaned out and organized, start to pre-count.
    - When you have finished a section of your stockroom, mark the section as "INVENTORIED" and post the inventory sheet above the shelf.
    - If any items are taken from an Inventoried section of your stockroom to your sales floor, adjust the quantity for that item.

- Contact your local monogrammer (if applicable) and get an inventory of all bags they have in stock. Put on a pre-count sheet to give WIS the day of your inventory.

4. Check for commonly missed items:

   - Merchandise tucked away in stockrooms, offices, drawers, cars – EVERYTHING must get counted
   - Items that may be mistaken as displays (e.g., Halloween & Christmas tables in bathrooms, Woozits above baby)
   - Merchandise tucked back in cubes or under skirted tables
   - Stock in print offices
   - Greeting cards in stockroom
   - Tervis straws and lids
   - Ream wrap and cello

5. Do not ship (or scan out) any transfers after March ___, 2010.

6. Schedule staff for Inventory – approximately __ people to do audit verifications.

7. Create a blueprint of your store. You need to show every rack, all shelves, and any fixtures that hold merchandise. Keep your fixture areas fairly small. Make sure that WIS numbers and counts all areas on your map.

8. All In-bound freight must be processed prior to beginning the physical inventory process. This includes all transfers.

9. The store is not to open for business until the count has been completed, and both Debtor and Purchaser have agreed that the count is complete. Please contact your DM prior to opening the store for business.

# Day of Inventory

- Notify your Alarm Company of your extended Closing if necessary.
- All inbound inter-store transfers **MUST** be processed and placed in a section to be inventoried.
- **Manager walk with WIS Supervisor** – The WIS supervisor will walk the store and put section tags on each fixture. You need to walk with the supervisor and the blueprint of the store. As he/she places a section tag, write that section tag on the blueprint so we can reference where each section tag is located.
- **WIS EE's are instructed to scan each individual ticket.** Bulk scanning is not allowed unless it is authorized by the Debtor and Purchaser representatives on items that have only one SKU. Be sure that the SKU does not change with size or color changes. If in doubt call your DM. Bulk scanning can only be done on an ____ # range section sheets.
- Items that are **"Re-ticketed"** during the inventory must be inventoried in a separate Section #_____.
- All merchandise that is classified defective must be inventoried at the full retail price (any necessary adjustments will be made later by the back office). Display merchandise should also be inventoried at full retail.
- Make sure at least one person from the counting service starts in the Greeting Card section. This will take them the longest!
- At the start, give the WIS supervisor copies of all the pre-count sheets from the stockroom and offices (make sure they put a section tag on EACH PAGE).
- Station a Swoozie's associate at the Tween table, with a register book, to assist the counter.
- Make sure all pre-count sheets have a section tag assigned to them.
- Do not move anything or remove section tags until you review the final report.
- Have them print you a report by section tag.

- The section tags should be a complete sequence. Check to make sure that no numbers are missing.
- Verify that the total hand written on each section tag, matches what is on the report.
- Pay close attention to sections with very low (10-20) and very high (>600) quantities listed. Make sure that those unit totals look correct.
- On any section that says "duplicate" verify that the total on the report is the same total written on the section tag.
- If there are any missing section counts or discrepancies that have been explained, for a valid reason, document the reason on the report for our records.
- Have them print you an override report
- The only items that should be on the override report are greeting cards.
- The UPCs will be listed on the report. You can tell if they are greeting card items by UPCs with numbers beginning in:
  - o  "428230" – Recycled
  - o  "63699" – Meri Meri
  - o  "7" – Design Design
  - o  "978" – Papyrus
- UPCs starting with any other number should be reviewed and those items should be replaced with the actual Swoozie's item.
- When the store closes, walk the store with the Supervisor from the Inventory Service as he/she places "Section" number tags on each fixture and/or wall section.  Be sure all merchandise is included in a Section.
- Record the "**Beginning**" and "**Ending**" inventory **Section number** on your Instruction Cover Sheet.  This will enable you to account for each section's inclusion at completion of the inventory.  Record how many people WIS was "scheduled" to arrive and how many "actually showed"
- Record the "**Starting Time**" on the Instruction Cover Sheet when beginning and the "**Completion Time**" when the inventory is completed.
- Have one person assigned to making new tickets for "problem" merchandise.  <u>Note that defective or damaged merchandise should be counted at full retail (any necessary adjustments will be made later by the back office)</u>.
  a.  Create a rolling rack and table for this merchandise and give it its own section number. Keeping adding to it throughout the inventory and tagging.  You can inventory this section last when there is no more to add. Section #9999.


**Manager Comments:**

# AUDITING

## We will complete a 100% unit audit of all Sections counted!

**When an error is found and adjustments are made to the inventory count on a Section Tag, ensure the original count is deleted. Notify the Count Service Supervisor to avoid duplication.**

**PRODUCT BARCODE verification check: (SKU/PRODUCT BARCODE and Quantity Check)**
Used to validate the accuracy of the Inventory Specialist within the first 30–60 minutes of the inventory.
This method is used to ensure the accuracy of the Inventory Specialist by identifying problems during the beginning of the counting process (30-60 minutes into the inventory), which can reduce the likelihood of additional errors from this person.
Conduct a SKU/PRODUCT BARCODE and quantity check of an Inventory Specialist by verifying his or her accuracy from a Section printout within the first 30-60 minutes of starting the inventory. **(These do not include your Section Recount Checks).**
Do not interrupt the counter in the middle of their Section count; wait until they are completed.
A Section printout will be requested from the Inventory Supervisor to ensure the Inventory Specialist is accurate in scanning and counting.
Verify the accuracy of the count by PRODUCT BARCODE /SKU and quantity of the rack to what was just scanned by WIS using the printout.
If errors are detected, continue spot checking the Inventory Specialist using the same process.
If after a second Section you are still seeing errors, notify the WIS Supervisor of your findings. The WIS Inventory Supervisor will address the performance issue with the Inventory Specialist who could potentially be removed from the inventory if similar issues recur later in the inventory.
Errors must be immediately corrected. Make sure the WIS Supervisor makes the appropriate corrections before allowing or assigning another Specialist to this Section.
If no errors are detected, move on to the next Specialist until all Inventory Specialists have been verified.

**Post count check: (Quantity Check)**
This method will be used to validate the accuracy of the Inventory Service's piece count in all Sections on 100% of all Section Tags.
Compare the quantity scanned by the Inventory Specialist, as written on the front of the Section Tag, to the actual quantity (pieces) of merchandise.
Post counts should be conducted for every Section Tag, and completed as each Inventory Specialist completes a Section.
Errors – immediately notify your Store Manager who will request a second count of the Section by another store associate before contacting the Inventory Supervisor to see that the appropriate corrections are made. When adjustments are made to the inventory count on a Section Tag, ensure the Inventory Service's first count is deleted.

| Store # | | Store Manager: | |
|---|---|---|---|
| Location: | | SHEET NUMBER: | _____Of_____ |

## Marked Down Item Listing

| UPC / SKU | Quantity | Mark Down Price | Listed By: Initials |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

# CLOSE-OUT

- When all sections have been Inventoried and Audited you will ask the Inventory Service Supervisor for a print out of the section numbers and units.  Walk the sales floor, stock room, and any other sections to ensure all fixtures have been inventoried.

- Instruct the inventory service to run the following reports to ensure all merchandise is accounted for.

### *In Store Final WIS Reports:*
The following reports are to be left with the Merchant **AND** the Agent.
- Standard Section Summary Report  ( Verify that it is in a "Final" Status )
- Items Not On File Report  **- This should be Blank**
- Missing  or Out Of Range Section Report
- Worksheet showing Time In, Time Out, and Total Man Hours

The above reports must be reviewed by both the Merchant Representative, and the Agent representative.

### *Electronic Report Distribution*
WIS will post specifically formatted data files to the Agent's FTP folder within 24 Hours of completion.
A custom communication Report 8357 will be distributed daily via e-mail.

### *Distribution of Physical Reports and Documentation*

1) Fax Cash Count form to the fax number illustrated on the form.
2) Fax Summary of Count form to the fax number illustrated on the form
3) Package the following Reports and send to :

Hilco Merchant Resources, LLC
Attn: Mark Whitley
Reference: Swoozie's  XXXX
5 Revere Dr Suite 206
Northbrook, IL 60062
(847)849-2996

- Original Cash Count Form
- Original Summary of Count Form
- "Final" Section Report
- WIS Hours worksheet
- Marked Down Item Listing

**Hilco Merchant Resources, LLC / Swoozie's Inc.**
**Cash Count Form**

| Store Number | |
|---|---|
| Store Location | |
| Date | |
| Consultant | |
| Merchant Representative | |

| | Change Funds | Register Funds | Petty Cash Fund | Total |
|---|---|---|---|---|
| One Hundreds | $ | $ | $ | |
| Fifties | $ | $ | $ | |
| Twenties | $ | $ | $ | |
| Tens | $ | $ | $ | |
| Fives | $ | $ | $ | |
| Ones | $ | $ | $ | |
| Fifty Cents | $ | $ | $ | |
| Quarters | $ | $ | $ | |
| Dimes | $ | $ | $ | |
| Nickels | $ | $ | $ | |
| Pennies | $ | $ | $ | |
| Other | $ | $ | $ | |
| | | | | |
| TOTALS | $ | $ | $ | |

**Number of Registers**

| Total Cash Register 1 | |
|---|---|
| Total Cash Register 2 | |
| Total Cash Register 3 | |
| Total Cash Register 4 | |
| Total ALL Registers | |

Agent  Representative:_____

Merchant Representative:_____

## Fax to Attn : Mark Whitley
## 847 -897-0761

# Agency Agreement Definitions

"**Merchandise**" shall mean (i) all finished goods inventory that is owned by Merchant and located in the Closing Locations on the Sale Commencement Date (including, but not limited to, (A) Defective Merchandise and (B) Merchandise subject to Gross Rings; and (ii) Returned Merchandise. Notwithstanding the foregoing, "Merchandise" shall not include: (1) goods which belong to sublessees, licensees or concessionaires of Merchant; (2) goods held by Merchant on memo, on consignment, or as bailee; (3) Customer Ordered Merchandise; (4) furnishings, trade fixtures, furniture and equipment and improvements to real property which are located in the Closing Locations; or (5) Additional Merchandise..

"**Customer Ordered Merchandise**" means those items of Merchandise located in the Closing Locations that had previously been earmarked and/or reserved by Merchant from available merchandise and designated by Merchant for satisfaction of customer orders (whether in respect of a fully sold order or a partially reserved order) that were received prior to the Sale Commencement Date.

"**Defective Merchandise**" means such items of inventory that are non-first quality inventory, such as parts, inventory that may or may not be unsaleable in its current physical condition (specifically excluding, among other things, incomplete sets of inventory intended to be sold as a set, and mismatched sets), and used or previously owned, damaged, shopworn or soiled inventory.

"**Returned Merchandise**" means (a) Customer Returned Goods (subject to Section 8.5 hereof); and (b) Customer Ordered Merchandise, for which the order has been cancelled by either the customer or Merchant, prior to March 2, 2010.

"**Out of Season Merchandise**" and "Out of Season Greeting Cards" means those items of inventory that relate to a holiday falling outside the Sale Term or to a season other than Spring which in the ordinary course, Merchant either packs away, returns to its vendors or discounts at 50% off or greater to clear.

**EXHIBIT 7.1**

**SALE GUIDELINES**

## EXHIBIT 7.1

## SALE GUIDELINES

## (CLOSING LOCATIONS)

The following procedures shall apply to store closing sales ("Sales") to be held at the Closing Locations:[1]

1.      The Sales shall be conducted so that the Stores in which sales are to occur remain open no longer than the normal hours of operation provided for in the respective leases for the Stores.

2.      The Sales shall be conducted in accordance with applicable state and local "Blue Laws," and thus, where applicable, no Sales shall be conducted on Sunday unless the Merchant had been operating such Stores on a Sunday.

3.      The Merchant and the Agent shall be permitted to augment or otherwise bring new merchandise into the Stores in order to maintain a desired mix of merchandise; provided, however, that such merchandise is of the same type or quality as the Merchandise currently or previously sold in the Stores and that no more than 25% of the augmented merchandise is obtained from sources other than Merchant's existing vendors.

4.      All display and hanging signs used by the Merchant and the Agent in connection with Sales shall be professionally produced and all hanging signs shall be hung in a professional manner.  The Agent may use the terms "bankruptcy court authorized," "bankruptcy" in advertisements for the Sales.    To the extent authorized by the Bankruptcy Court, the Merchant and the Agent may advertise the Sale as a "store closing," "going out of business," "bankruptcy liquidation" or similar theme sale at the Stores as provided by the Agency Agreement.  The Merchant and the Agent shall not use neon or day-glo signs.  Furthermore, with respect to enclosed mall locations no exterior signs or signs in common areas of a mall shall be used.  Nothing contained herein shall be construed to create or impose upon the Merchant and the Agent any additional restrictions not contained in the applicable lease.  In addition, the Merchant and the Agent shall be permitted to utilize exterior banners at non-enclosed mall stores; provided, however, that such banners shall be located or hung so as to make clear that the Sale is being conducted only at the affected Store and shall not be wider than the storefront of the Store.   In addition, the Merchant and the Agent shall be permitted to utilize sign walkers and customary street signage.

---

[1] Capitalized terms used but not defined shall have the meanings ascribed to such terms in the Agency Agreement.

5.  Conspicuous signs shall be posted in the cash register areas of each affected Store to the effect that all sales are "final" and that customers with any questions or complaints subsequent to the conclusion of the Sales may contact a named representative of the Merchant or the Agent at a specified telephone number.

6.  The Agent shall not distribute handbills, leaflets or other written materials to customers outside of any of the Stores, unless permitted by the applicable lease or, if distribution is customary in the shopping center in which the Store is located. Otherwise, the Agent may solicit customers in the Stores themselves. The Agent shall not use any flashing lights or amplified sound to advertise the Sales or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

7.  At the conclusion of the Sales, Agent shall vacate the Stores in "broom-clean" condition, and shall otherwise leave the Stores in the same condition as on the commencement of the Sales, ordinary wear and tear excepted; provided however that the Merchant and/or the Agent shall be authorized to leave any Abandoned Property (as that term is defined herein) in the Stores; provided, further, that the Merchant hereby does not undertake any greater obligation than as set forth in an applicable lease with respect to a Store. The Merchant may abandon any FF&E or other materials of *de minimus* value (the "Abandoned Property") not sold in the Sales at the Store premises at the conclusion of the Sales. Any Abandoned Property left in a Store after a lease is rejected shall be deemed abandoned with the landlord having the right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord and without waiver of any damage claims against the Merchant.

8.  The Merchant and/or the Agent may sell FF&E owned by the Merchant and located in the Stores during the Sales. The Merchant or the Agent, as the case may be, may advertise the sale of FF&E. Additionally, the purchasers of any FF&E sold during the Sales shall only be permitted to remove the FF&E either through the back shipping areas or through other areas after store business hours.

9.  Landlords will be provided with the name and telephone number of a representative of the Merchant to notify of any problem arising during the Sales.

10. The Agent shall not make any alterations to interior or exterior Store lighting. No property of any landlord of a Store shall be removed or sold during the Sales. The hanging of exterior banners or other signage shall not constitute an alteration to a Store.

11. At the conclusion of the Sale at each Store, pending assumption or rejection of applicable leases, the landlords of the Stores shall have

reasonable access to the Store premises asset forth in the applicable leases. The Merchant, the Agent and their agents and representatives shall continue to have exclusive and unfettered access to the Stores.

12.    Post-petition rents shall be paid and other lease obligations shall be performed by the Merchant as required by the Bankruptcy Code, except as modified pursuant to the Approval Order, until the rejection or assumption and assignment of each lease.

13.    The rights of the landlords for any damages to the Stores shall be reserved in accordance with the applicable leases.

14.    The Merchant shall notify a representative of the relevant landlord of the date on which the Sale is scheduled to conclude at a given Store, within three business days of the Merchant's receipt of such notice from the Agent.

## **EXHIBIT 9**

## **APPROVAL ORDER**

**IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SWOOZIE'S, INC.,[1] | ) | Case No. 10-66316-CRM |
| | ) | |
| Debtor. | ) | |

**ORDER PURSUANT TO SECTION 363 OF THE BANKRUPTCY
CODE AUTHORIZING AND APPROVING (I) DEBTOR'S ENTRY INTO
THE ASSET PURCHASE AND AGENCY AGREEMENTS WITH HILCO
MERCHANT RESOURCES, LLC, (II) AUTHORIZING THE SALE OF
CERTAIN OF THE DEBTOR'S ASSETS, FREE AND CLEAR OF ALL
LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS,
(III) AUTHORIZING DEBTOR TO CONSUMMATE ALL TRANSACTIONS
<u>RELATED TO THE ABOVE, AND (IV) GRANTING OTHER RELIEF</u>**

This matter having come before the Court upon the motion (the "**Motion**") of

Swoozie's, Inc. ("**Debtor**") pursuant to Section 363 of the Bankruptcy Code for an order

(I) authorizing and approving Debtor's entry into an asset purchase agreement

(the "**APA**," attached hereto as <u>Exhibit A</u>) and an agency agreement (the "**Agency**

---

[1] The last four digits of Debtor's taxpayer identification number are 5738 and Debtor's mailing address is
80 W. Wieuca Road, Suite 302, Atlanta, GA 30342.

**Agreement**," attached hereto as <u>Exhibit B</u> and together with the APA, the "**Agreements**") with Hilco Merchant Resources, LLC ("**Hilco**" or "**Purchaser**"); (II) authorizing the sale of substantially all of Debtor's assets free and clear of all liens, claims, encumbrances, and other interests; (III) authorizing Debtor to consummate all transactions related to the above; and (IV) granting other relief; the Court having subject matter jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334; consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and upon evidence presented at the hearing held on March 29, 2010 (the "**Sale Hearing**"); and it appearing that the relief requested in the Motion is in the best interests of Debtor, its estate, creditors and parties in interest; and upon the record at the Sale Hearing, including the decision of the Court to approve the Motion as reflected on the record of the Sale Hearing; and any objections filed to the Motion having been resolved, withdrawn, or otherwise overruled by this Order; and after due deliberation and good and sufficient cause appearing therefore,

IT IS HEREBY FURTHER FOUND AND DETERMINED AS FOLLOWS:

A.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.    To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.    Notice of the Motion and of the Sale Hearing was given in accordance

with the directive of the Court and as otherwise required by applicable law, as evidenced by the affidavits of service on file with the Clerk of the Court.

D.      Notice of the Sale Motion and of the Sale Hearing was adequate and sufficient under the circumstances.

E.      Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Motion or the Agreements.

F.      The Agreements were negotiated and proposed, and have been entered into by the parties in good faith within the meaning of Section 363(m) of the Bankruptcy Code, at arm's length bargaining positions, and without collusion; the Purchaser is a good faith purchaser of the Acquired Assets (as defined in the APA) within the meaning of Section 363(m) of the Bankruptcy Code and entitled to the protections thereof; the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and the relief granted herein is in the best interests of Debtor and its estate.

G.      The highest and best offer to perform the transactions contemplated by the Agreements was submitted by Hilco pursuant to the terms of the Agreements and in accordance with the bid procedures previously approved by the Court.

H.      The closing of Debtor's retail store locations identified in Exhibit C annexed hereto and incorporated herein (collectively, the "**Closing Locations**") is in the best interest of Debtor's estate.

I.      Debtor's agreement, permitting Hilco, in its capacity as Debtor's agent (the "**Agent**"), to operate "going out of business" sales (the "**Sales**") at the Closing Locations will provide an efficient means for Debtor to dispose of the merchandise and other assets located at the Closing Locations in accordance with the terms of the

Agreements.

IT IS HEREBY ORDERED AS FOLLOWS:

1.      The Motion is granted to the extent provided herein.  All objections to the
Motion that have not been withdrawn, waived, settled, or specifically addressed in this
Order, and all reservations of rights included in such objections, are overruled in all
respects on the merits and denied.

2.      Debtor, through Agent, is hereby authorized, pursuant to Sections 105(a)
and 363(b)(1) of the Bankruptcy Code, to conduct the Sales at the Closing Locations in
accordance with the Agreements, and to sell or otherwise dispose of Debtor's inventory
and merchandise, as well as all equipment, trade fixtures and other personal property
used to facilitate day-to-day operations (collectively, but excluding the property subject
to the liens and lease claims described in Schedule 1 to the bid procedures order (Docket
No. 62), the "**FF&E**") at the Closing Locations.  No bulk sale or similar law shall
prohibit Debtor or the Agent from taking any action contemplated by the Agreements.

3.      Debtor is hereby authorized and empowered to enter into the Agreements
and the Agreements are hereby approved in their entirety and incorporated herein by
reference, and it is further ordered that all amounts payable to the Agent under the
Agreements shall be payable to the Agent without the need for any application of the
Agent therefor or a further order of the Court.

4.      Pursuant to Section 363(f) of the Bankruptcy Code, all Merchandise and
Additional Merchandise shall be sold free and clear of any and all mortgages, security
interests, conditional sales or title retention agreements, pledges, hypothecations, liens,
judgments, encumbrances or claims of any kind or nature (including, without limitation,

- 4 -

any and all "claims" as defined in section 101(5) of the Bankruptcy Code), including, without limitation, the liens of Wells Fargo Bank, National Association ("**Wells Fargo**"), whether arising by agreement, any statute or otherwise and whether arising before, on or after the date on which this Chapter 11 case was commenced (collectively, the "**Liens**"), with such Liens to attach to the Guaranteed Amount, letter of credit rights and any other amounts and consideration (whether in the form of cash or otherwise) payable to or at any time received by Debtor under the Agreements with the same validity, force and effect as the same had with respect to the assets at issue, subject to any and all defenses, claims and/or counterclaims or setoffs that may exist.

5.    At Closing, the Initial Guaranty Payment to be paid by Agent to Debtor shall be distributed as follows:

(a)    First, to Hudson Capital Partners, LLC ("**Hudson**"), for the Breakup Fee in the amount of $75,000, as contemplated by the Bidding Procedures previously approved by this Court by its Order dated March 10, 2010 (Docket No. 62), in full and final satisfaction of Debtor's obligations with respect to the Breakup Fee owed to Hudson;

(b)    Second, pursuant to the final order authorizing post-petition financing from Wells Fargo (Doc. No. 97) (the "**Financing Order**"), including, without limitation, paragraph 9 thereof, $470,000 shall be deposited in trust with Debtor's counsel to fund the Carve-Out under (and as defined in) the Financing Order and in full and final satisfaction of any obligations of Wells Fargo in respect of such Carve-Out;

(c)    Third, the aggregate amount of known outstanding non-contingent and liquidated obligations owed by Debtor to Wells Fargo (collectively, the "**Wells Obligations**"), as shown in a written statement provided by Wells Fargo, shall be paid directly to Wells Fargo in cash.  Unless otherwise expressly provided by subsequent order of the Court, such payment to Wells Fargo (i) shall be without prejudice to the right of Debtor, the Committee or any other party in interest to request an accounting from Wells Fargo and to review and contest any such accounting, (ii) shall not constitute a waiver of any rights or claims Debtor, or the Committee, may have against Wells Fargo with respect to the Wells Obligations, and (iii) shall not constitute a release of the liens or claims of Wells Fargo, which claims and liens shall continue to encumber the property of Debtor's estate existing after Closing.   Notwithstanding such payment, the final calculation, amount and payment of the Wells Obligations shall be determined by further order of the Court at a later date; and

(d)    Fourth, the remaining cash proceeds of the Initial Guaranty Payment shall be remitted to Debtor, subject to the Liens that attach thereto at Closing. Pursuant to 11 U.S.C. § 363(c)(2)(A), after Closing, Debtor shall be entitled to use cash collateral of Wells Fargo through June 5, 2010, pursuant to the budget, subject to a permitted negative variance not to exceed 10%, that has been agreed upon by Debtor and Wells Fargo (the "**Budget**"), which Budget is attached hereto as <u>Exhibit D</u> and may be amended or extended from time to time by written agreement of Debtor

and Wells Fargo.

6.      Debtor and the Agent are hereby authorized to take such actions necessary and appropriate to implement the Agreements and to conduct the Sales without the necessity of a further order of this Court as provided by the Agreements, including, but not limited to, advertising the Sales through the posting of signs (including the use of exterior banners in non-enclosed malls), use of sign walkers and street signage, in accordance with the Agreements and as otherwise provided in the sale guidelines attached to the Agency Agreement (the "**Sale Guidelines**"), which Sale Guidelines are hereby approved in the form annexed hereto as <u>Exhibit E</u>; provided that written agreements between the Agent and any landlord of the Closing Locations (collectively, the "**Landlords**") modifying the terms of the Sale Guidelines at applicable locations shall govern the conduct of the Sale at such Closing Locations.

7.      Agent is hereby granted a limited license and right to use until the Sale Termination Date the trade names, logos, and customer lists (mailing and e-mail) relating to and used in connection with the operation of the Closing Locations, solely for the purpose of advertising the Sale in accordance with the terms of the Agreement; <u>provided</u>, <u>however</u> that the utilization of the customer lists shall be provided solely through Merchant or Merchant's outside advertising services and Agent shall not have direct access to any personally identifiable information that may be contained therein.

8.      Except as expressly provided for in the Agreements, nothing in this Order or the Agreements, and none of Hilco's actions taken in respect of the Sales, shall be deemed to constitute an assumption by Hilco of any of Debtor's obligations relating to any of Debtor's employees, except as specifically set forth in the Agreements, nor shall

Hilco become liable under any employment agreement or be deemed a joint or successor employer with respect to such employees.

9.     All the transactions contemplated by the Agreements and all sales of, among other things, the Acquired Assets, the Additional Merchandise, Merchandise and FF&E by Hilco shall be protected by Section 363(m) of the Bankruptcy Code in the event that this Order is reversed or modified on appeal.

10.     The provisions of this Order shall be self-executing notwithstanding any restrictions in the Agreements on the Agent's ability to conduct the Sales in compliance with applicable laws or Closing Location leases.  All Landlords are directed to accept this Order as binding authority so as to authorize Debtor and the Agent to consummate the Agreements and to conduct the Sales at the Closing Locations, including, without limitation, conducting the Sales in accordance with the Agreements, the Sale Guidelines and this Order; and no further approval, license or permits of any governmental authority shall be required.

11.     If any parties or persons, including but not limited to Landlords, subtenants, utility companies, governmental agencies (except to the extent provided otherwise in this Order), sheriffs, marshals or other public officers, creditors and all those acting for or on their behalf, believe that cause exists to: (a) prohibit the Agent from advertising the Sales, to the extent same is consistent with the Agreements; (b) in any way interfere with or otherwise impede the conduct of the Sales at the Closing Locations or the use or maintenance of the Merchandise and FF&E thereat; or (c) institute any action or proceeding in any court or other administrative body having as its objective the obtaining of an order or judgment against Debtor, the Agent or a Landlord which might

- 8 -

in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Sales at the Closing Locations or corporate headquarters and/or seek to recover damages for breach(es) of covenants or provisions in any lease or sublease based upon any relief authorized herein, this Court shall retain exclusive jurisdiction to resolve such dispute, and such parties or persons shall take no action against Debtor, the Agent, the Landlord or the Sales until this Court has resolved such dispute. This Court shall hear the request of such persons or parties with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances.

12.     The Sales at the Closing Locations and the sale of the FF&E shall be conducted by Debtor and the Agent without the necessity of compliance with any federal, state or local statute or ordinance, lease provision or licensing requirement affecting store closing, "going out of business", liquidation or auction sales, or affecting advertising, including signs, sign walkers, banners, and posting of signage, other than those relating to public health and safety, except to the extent set forth in the Sale Guidelines.

13.     Other than otherwise expressly provided for in the Agreements, the Sales at the Closing Locations and the sale of the FF&E shall be conducted by Debtor and the Agent notwithstanding any restrictive provision of any lease, sublease or other agreement relative to occupancy affecting or purporting to restrict the conduct of the Sales, provided, however, that nothing in this Order shall impact any objection a Landlord may have to assumption, assignment or rejection of their respective lease or to any proposed cure amount or rejection damages claim in association with such assumption, assignment or rejection.

14.     Debtor and/or the Agent (as the case may be), are authorized and

empowered to transfer Merchandise and FF&E among the Closing Locations in accordance with the Agreements.

15.    Provided that the Sales are conducted in accordance with the terms of this Order, the Agreements and the Sale Guidelines, Debtor, its Landlords and the Agent are presumed to be in compliance with the requirements of any applicable "going out of business," "store closing," similar inventory liquidation sales, or bulk sale laws, including laws restricting safe, professional and non-deceptive, customary advertising of GOB Sales such as signs, banners, posting of signage, and use of sign walkers, and including ordinances establishing licensing or permitting requirements, waiting periods, time limits or bulk sale restrictions that would otherwise apply (the "**GOB Laws**").  To the extent there is a dispute arising from or relating to the Sales, this Order, the Agreements, or the Sale Guidelines, which dispute relates to any GOB Law (a "**Reserved Dispute**"), the Court shall retain exclusive jurisdiction to resolve the Reserved Dispute.

16.    Except as otherwise set forth in this Order, this Court shall retain exclusive jurisdiction with regard to all issues on disputes in connection with this Order and the relief provided for herein, including, without limitation, to protect Debtor, the Landlords and/or the Agent from interference with the Sale, and to resolve any disputes related to the Sale or arising under the Agreements or the implementation thereof.

17.    Hilco shall not be liable for any claims against Debtor other than as expressly provided for in the Agreements.

18.    Debtor and the Agent are hereby authorized to conduct the Sale pursuant to the Agreements and the Sale Guidelines, and take all actions reasonably related thereto or arising in connection therewith.  Debtor, the Agent and each of their respective

officers, employees and agents are hereby authorized to execute such documents and to do such acts as are necessary or desirable to carry out the Sale and effectuate the Agreements and the related actions set forth therein.

19.    Upon payment of the Initial Guaranty Payment as provided in Section 3.3(a) of the Agency Agreement, Hilco shall have a first priority security interest in and lien upon the Merchandise, FF&E and Proceeds to secure all obligations of Debtor to Hilco under the Agreements.  Upon entry of this Order, the security interest granted hereby shall be properly perfected without the need for further filings or further documentation.

20.    The provisions of this Order and the Agreements and any actions taken pursuant hereto or thereto shall survive entry of any order which may be entered confirming or consummating any plan of reorganization of Debtor, or which may be entered converting Debtor's case from Chapter 11 to Chapter 7, and the terms and provisions of the Agreements as well as the rights and interests granted pursuant to this Order and the Agreements shall continue in this or any superseding case and shall be binding upon Debtor, Hilco and their respective successors and permitted assigns, including any trustee or other fiduciary hereafter appointed as a legal representative of Debtor under Chapter 7 or 11 of the Bankruptcy Code.  Any trustee appointed in the case shall be and hereby is authorized and directed to operate the business of Debtor to the fullest extent necessary to permit compliance with the terms of this Order and the Agreements and Hilco and the trustee shall be and hereby are authorized to perform under the Agreements upon the appointment of a trustee with the need for further order of this Court.

21.     Pursuant to and in accordance with the terms of the Agreements and the Sale Guidelines, the Agent may, but is not required to, supplement Merchandise in Debtor's Closing Locations only with additional goods procured by Agent, at its expense, which are of like kind and quality to the Merchandise located in the Closing Locations ("**Additional Merchandise**"); provided, however, that no more than 25% of the Additional Merchandise may be obtained from sources other than Merchant's existing vendors.  In order to distinguish the Additional Merchandise from the Merchandise located in the Closing Locations, Agent shall ascribe a unique or "dummy" SKU to such Additional Merchandise, which shall enable Debtor and Agent to distinguish the sales of the Additional Merchandise from the sale of the Merchandise presently included in the Sale at the Closing Locations.  To the extent Agent complies with the foregoing procedures, Agent shall be deemed to be in compliance with GOB Laws and consumer protection laws including consumer laws relating to deceptive practices and false advertising.

22.     This Order constitutes an authorization of conduct by Debtor and nothing contained herein shall be deemed to constitute a ruling with regard to the sovereign immunity of any state, and the failure of any state to object to the entry of this Order shall not operate as a waiver with respect thereto.

23.     To the extent, if any, anything contained in this Order conflicts with a provision in the Agreements or the Sale Guidelines, this Order shall govern and control. The Court shall retain jurisdiction with respect to any matters, claims, rights, or disputes arising from or related to the implementation of this Order.

24.     Debtor shall be, and hereby is, authorized and empowered to sell, transfer

and convey the Acquired Assets to Hilco pursuant to the Agreements.

25.     This Order shall be binding on all creditors (whether known or unknown) of Debtor, all successors and assigns of Hilco, Debtor, its affiliates and any subsequent trustee(s) appointed in Debtor's Chapter 11 case or upon a conversion to Chapter 7 under the Bankruptcy Code and shall not be subject to rejection or revocation.

26.     Nothing in this Order shall alter any statutory priorities respecting the tax claims of governmental entities to the extent such claims are valid, senior, due and owing and become allowed claims under applicable law.

27.     To the extent the Guaranteed Amount constitutes cash collateral, Debtor is authorized to use such Guaranteed Amount for the purposes of performing all its obligations under the Agreements, subject to compliance with the Budget.

28.     Hilco is a party in interest and shall have the ability to appear and be heard on all issues related to or otherwise connected to the Agreements and related transactions.

29.     In the event that Hilco fails to consummate the Sale in accordance with this Order and the Agreements, Debtor and Gordon Brothers Retail Partners, LLC, ("**GBRP**") may consummate a sale in accordance with the terms and conditions of GBRP's Second Place Bid without further notice or order of the Court.

30.     The provisions of Bankruptcy Rule 6004(h) staying the effectiveness of this Order for fourteen (14) days are hereby waived, and this Order shall be effective immediately upon entry thereof.

**\*\*\*END OF DOCUMENT\*\*\***

**EXHIBIT 10.1(c)**

**PRE-EXISTING LIENS**

**Swoozie's Inc.**
**Agency Agreement**

**Exhibit 10.1(c) - Pre-Existing Liens**

| ENTITY | DESCRIPTION | LOCATION OF EQUIPMENT |
|---|---|---|
| Wells Fargo Bank, National Association | Credit & Security Agreement | N/A |
| Crane and Company, Inc. | Inventory | Various - Not Specified |

## EXHIBIT 10.1(k)

## MERCHANDISE THRESHOLD

**Swoozie's Inc.**
**Agency Agreement**

**Exhibit 10.1(k) - Inventory Adjustment**

| Incremental Dollars in Merchandise | Cost Value of Merchandise | Guarantee $ | Guarantee Increase / (Decrease) | Cumulative Increase / (Decrease) |
|---|---|---|---|---|
| 100,000 | 8,000,000 | 7,555,000 | 10,000 | 130,000 |
| 100,000 | 7,900,000 | 7,545,000 | 30,000 | 120,000 |
| 100,000 | 7,800,000 | 7,515,000 | 40,000 | 90,000 |
| 100,000 | 7,700,000 | 7,475,000 | 50,000 | 50,000 |
| - | 7,600,000 | 7,425,000 | | |
| - | 7,400,000 | 7,425,000 | | |

Adjustments for inventory amounts between $7,000,000 and $7,399,000 will reduce on a pro-rata basis, based on a guarantee amount of $0.99 on the cost value of the merchandise.

Adjustment for inventory amounts above $8,000,000 or below $7,000,000 will be mutually agreed to by parties.

Adjustment for inventory at $7,300,000 and below shall be on a *pro rata* basis.

# **EXHIBIT 10.1(n)**

# **COST FACTOR**

**Exhibit 10.1 (n)**
**Cost Factor Adjustment**

| Cost Factor | Guarantee $ | Guarantee Increase / (Decrease) | Cumulative Increase/ (Decrease) |
|---|---|---|---|
| 43.1% | 7,425,000 | - | - |
| 43.3% | 7,385,000 | (40,000) | (40,000) |
| 43.5% | 7,345,000 | (40,000) | (80,000) |
| 43.7% | 7,305,000 | (40,000) | (120,000) |
| 43.9% | 7,255,000 | (50,000) | (170,000) |
| 44.1% | 7,195,000 | (60,000) | (230,000) |

Adjustment for Cost Factor higher than 44.1% will be mutually agreed to.

# **Exhibit C**

**Closing Locations**

| | Store # | Location Name | Address | City | State |
|---|---|---|---|---|---|
| 1 | 1 | Buckhead | 4285 Roswell Road | Atlanta | GA |
| 2 | 2 | Brookwood | 1745 Peachtree Street | Atlanta | GA |
| 3 | 3 | Forum | 5131 Peachtree Parkway | Norcross | GA |
| 4 | 4 | West Cobb | 3625 Dallas Highway | Marietta | GA |
| 5 | 5 | Raleigh | 3761 Sumner Blvd | Raleigh | NC |
| 6 | 6 | Peachtree City | 504 Circle Gate | Peach Tree | GA |
| 7 | 7 | Jacksonville | 4751 River City Drive | Jacksonville | FL |
| 8 | 8 | Birmingham | 214 Summit Blvd | Birmingham | AL |
| 9 | 9 | Dallas | 8417 Preston Center Plaza Drive | Dallas | TX |
| 10 | 10 | Greenville | 1125 Woodruff Road | Greenville | SC |
| 11 | 11 | Memphis | 4630 Merchants Park Circle | Collerville | TN |
| 12 | 12 | Houston | 9595 Six Pines | The Woodlands | TX |
| 13 | 14 | Sugarland | 2210 Lone Star Drive | Sugar Land | TX |
| 14 | 15 | Palm Beach | 11701 Lake Victoria Gardens Ave | Palm Beach Gardens | FL |
| 15 | 16 | Greensboro | 3334 West Friendly Ave | Greenboro | NC |
| 16 | 17 | Bonita Springs | 23910 Fashion Drive | Southlake | FL |
| 17 | 18 | Southlake | 1431 E. Southlake Blvd. | Southlake | TX |
| 18 | 19 | Manhattan Beach | 2005-B E. Park Place | El Segundo | CA |
| 19 | 20 | Oakbrook | 3041 Butterfield Road | Oakbrook | IL |
| 20 | 21 | Cameron Vlg | 420 Woodburn Rd. | Raleigh | NC |
| 21 | 22 | Blakeney | 9816 Rea Rd. | Charlotte | NC |
| 22 | 23 | Durham | 7001 Fayetteville Rd. | Durham | NC |
| 23 | 24 | Nashville | 4015 Hillsboro Pike | Nashville | TN |
| 24 | 25 | Orland Park | 14225 95th Ave. | Orland Park | IL |
| 25 | 26 | Wilmington | 6814 Main Street | Wilmington | NC |
| 26 | 27 | Burr Ridge | 440 Village Center Dr. | Burr Ridge | IL |
| 27 | 28 | Boca Raton | 1400 Glades Rd. | Boca Raton | FL |
| 28 | 29 | Morrison | 532 Governor Morrison St. | Charlotte | NC |
| 29 | 30 | Allen | 913 Garden Park Dr/ | Allen | TX |
| 30 | 31 | Barrington | 100 West Higgins Rd | South Barrington | IL |
| 31 | 32 | Fairfield | 2250 Black Rock TPK | Fairfield | CT |
| 32 | 33 | Bronxville | 1160 Pondfield Rd. | Bronxville | NY |
| 33 | 34 | Darien | 25 Old Kings HWY N | Darien | CT |
| 34 | 35 | Wilton | 5 River Rd. | Wilton | CT |
| 35 | 36 | Burlington | 6 Wayside Rd. #1 | Burlington | MA |
| 36 | 37 | Closter | 270 Closter Dock Rd | Closter | NJ |
| 37 | 38 | Princeton | 3495 US HWY 1 South | Princeton | NJ |
| 38 | 39 | Marlton | 500 Rt. 73 South | Marlton | NJ |
| 39 | 40 | Middletown | 459 Rt. 35 | Red Bnk | NJ |
| 40 | 41 | Florham Park | 187 Columbia Tpke #6 | Florham Park | NJ |
| 41 | 42 | Paoli | 19 Leopard Rd. | Paoli | PA |
| 42 | 43 | Ardmore | 65 St. James Place | Ardmore | PA |
| 43 | 44 | Warrington | 1520 Main St. | Warrington | PA |

# **Exhibit D**

**Swoozies, Inc.**
Weekly Cash Budget (DIP)

| | Filing Date | | | | Auction/Closing | | | | | | | | | | |
| | 03/02/10 | | | | Sale of Assets | | | | | | | | | | |

| Week #------> | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | |
| | Actual | Actual | Actual | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Forecast | Forecast | |
| For the week ending, Saturday | 3/2/10 - 3/6/10 | 3/13/2010 | 3/20/2010 | 3/27/2010 | 4/3/2010 | 4/10/2010 | 4/17/2010 | 4/24/2010 | 5/1/2010 | 5/8/2010 | 5/15/2010 | 5/22/2010 | 5/29/2010 | 6/5/2010 | Total |
| **RECEIPTS:** | | | | | | | | | | | | | | | |
| Net Sales Receipts Credit | 208,895.7 | 247,453.5 | 244,861.5 | 257,558.6 | 169,415.3 | - | - | - | - | - | - | - | - | - | 1,128,184.6 |
| Net Sales Receipts Cash | 16,802.0 | 59,193.9 | 52,647.7 | 44,916.7 | - | - | - | - | - | - | - | - | - | - | 173,560.3 |
| Sales Receipts - store liquidations | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Forecasted Sales Tax Collections | 18,055.8 | 24,531.8 | 23,800.7 | 24,198.0 | 13,553.2 | - | - | - | - | - | - | - | - | - | 104,139.5 |
| Customer Deposits | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Gift Certificate redemptions | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Credit Card Company Holdbacks | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Asset sale buyer reimbursements | - | - | - | - | 10,750.0 | 10,750.0 | 10,750.0 | 10,750.0 | 10,750.0 | 10,750.0 | 5,375.0 | 2,687.5 | 1,343.8 | - | 73,906.3 |
| Proceeds from sale Company Assets | - | - | - | - | 5,980,000.0 | - | 461,841.0 | - | - | 50,000.0 | - | - | - | - | 6,491,841.0 |
| **Forecasted Receipts** | 243,753.5 | 331,179.2 | 321,309.9 | 326,673.3 | 6,173,718.5 | 10,750.0 | 472,591.0 | 10,750.0 | 10,750.0 | 60,750.0 | 5,375.0 | 2,687.5 | 1,343.8 | - | 7,971,631.6 |
| | | | | | | | | | | | | | | | |
| **DISBURSEMENTS:** | | | | | | | | | | | | | | | |
| **Sales Taxes:** | | | | | | | | | | | | | | | |
| Pre-Petition | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Post-Petition | - | - | - | - | - | - | 104,139.5 | - | - | - | - | - | - | - | 104,139.5 |
| **Total Sales Tax** | - | - | - | - | - | - | 104,139.5 | - | - | - | - | - | - | - | 104,139.5 |
| | | | | | | | | | | | | | | | |
| **Outstanding Checks:** | | | | | | | | | | | | | | | |
| Outstanding Checks - (Cleared) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Outstanding Checks - Current Week (Not Cleared) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Oustanding Checks, net** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | | | | |
| **Occupancy Costs:** | | | | | | | | | | | | | | | |
| Rent | - | - | - | - | 736,000.0 | - | - | - | - | - | - | - | - | - | 736,000.0 |
| Utilities, R & M | - | - | - | - | 20,000.0 | 20,000.0 | 20,000.0 | - | - | - | - | - | - | - | 60,000.0 |
| **Total Occupancy Costs** | - | - | - | - | 756,000.0 | 20,000.0 | 20,000.0 | - | - | - | - | - | - | - | 796,000.0 |
| | | | | | | | | | | | | | | | |
| **Vendors** | | | | | | | | | | | | | | | |
| Vendor payments for Custom orders | 28,698.8 | 4,357.2 | 7,800.7 | 186.6 | - | - | - | - | - | - | - | - | - | - | 41,043.2 |
| Inbound Duty & Freight | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Outbound Shipping | 3,470.3 | 2,000.0 | 2,000.0 | 2,200.0 | - | - | - | - | - | - | - | - | - | - | 9,670.3 |
| **Total Vendor Payments** | 32,169.1 | 6,357.2 | 9,800.7 | 2,386.6 | - | - | - | - | - | - | - | - | - | - | 50,713.5 |
| | | | | | | | | | | | | | | | |
| **Other Overhead:** | | | | | | | | | | | | | | | |
| Ops Payroll (Bi-Weekly) | - | 266,826.6 | 375.2 | 259,762.8 | - | 151,428.6 | - | - | - | - | - | - | - | - | 678,393.1 |
| Ops Liquidation management & costs | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ops Supplies / Postage | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ops Costs for sale of FFE | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ops Equipment Leases | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ops Credit Card Fees 4.5% | 13,924.6 | - | - | - | 31,000.0 | - | - | - | - | - | - | - | - | - | 44,924.6 |
| Ops Other AP | 924.7 | 2,722.9 | 1,000.0 | 1,974.3 | 5,000.0 | - | - | - | - | - | - | - | - | - | 11,621.8 |
| **Subtotal Other Operating overheads** | 14,849.3 | 269,549.5 | 1,375.2 | 261,737.0 | 36,000.0 | 151,428.6 | - | - | - | - | - | - | - | - | 734,939.5 |
| **Total Operating overheads** | 47,018.3 | 275,906.7 | 11,175.9 | 264,123.6 | 792,000.0 | 171,428.6 | 124,139.5 | - | - | - | - | - | - | - | 1,685,792.5 |
| | | | | | | | | | | | | | | | |
| Est Windndown Personnel - Payroll | - | - | - | - | 40,000.0 | - | 40,000.0 | - | 40,000.0 | - | 40,000.0 | - | 30,000.0 | 190,000.0 | |
| Est Accrued Vacation | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Est 401k Plans | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Est Employee Benefits / Insurance | 5,000.0 | 72,094.6 | 16,089.8 | - | 16,667.0 | - | - | 16,667.0 | - | - | - | 16,667.0 | - | - | 143,185.4 |
| Est Garnishments/T&E payments | - | - | - | 10,721.4 | - | - | - | - | - | - | - | - | - | - | 10,721.4 |
| Est Commercial Insurance (Auto, GL, Crime, Prop, etc) | - | - | - | - | 24,000.0 | - | - | - | 22,000.0 | - | - | - | - | - | 46,000.0 |
| Est Liquidator Fee | - | - | - | - | 75,000.0 | - | - | - | - | - | - | - | - | - | 75,000.0 |
| Est Interest | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Est Bank Fees | 150,000.0 | - | - | - | 3,800.0 | - | - | - | - | - | - | - | - | - | 153,600.0 |
| Est Court Ordered Utility Deposits | - | - | - | - | 43,810.1 | - | - | - | - | - | - | - | - | - | 43,810.1 |
| Est Record Retention -- Off-Site Storage | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Est Record Destruction | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Est Other AP - Estate | - | - | - | - | 200,000.0 | 4,000.0 | 4,000.0 | 4,000.0 | 4,000.0 | 4,000.0 | 4,000.0 | 3,000.0 | 3,000.0 | 2,000.0 | 232,000.0 |
| Est Lease Cure Costs | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Est Inventory Count - Asset Sale (Estate portion) | - | - | - | - | - | - | - | 50,000.0 | - | - | - | - | - | - | 50,000.0 |
| Est Bankruptcy Filing Fee + Qtrly Admin Fees | - | - | - | - | - | - | - | 13,000.0 | - | - | - | - | - | - | 13,000.0 |
| Est Repayment of WFBC Revolving Loan | - | - | - | - | 2,611,409.8 | - | - | - | - | - | - | - | - | - | 2,611,409.8 |
| Est DIP Fee | 50,000.0 | - | - | (25,000.0) | (25,000.0) | - | - | - | - | - | - | - | - | - | - |
| **Subtotal Other overheads** | 205,000.0 | 72,094.6 | 16,089.8 | (14,278.6) | 2,949,486.9 | 4,000.0 | 4,000.0 | 107,000.0 | 42,667.0 | 44,000.0 | 4,000.0 | 43,000.0 | 19,667.0 | 32,000.0 | 3,568,726.7 |
| **Total Other Overhead (Operating & Estate)** | 219,849.3 | 341,644.1 | 17,465.0 | 247,458.4 | 2,985,486.9 | 195,428.6 | 128,139.5 | 107,000.0 | 42,667.0 | 44,000.0 | 4,000.0 | 43,000.0 | 19,667.0 | 32,000.0 | 4,303,666.2 |
| | | | | | | | | | | | | | | | |
| **Professional Fees:** | | | | | | | | | | | | | | | |
| Debtor Professionals | - | - | - | - | 430,000.0 | 45,250.0 | 45,250.0 | 45,250.0 | 45,250.0 | 30,250.0 | 25,250.0 | 25,250.0 | 13,600.0 | - | 730,600.0 |
| Lender Professionals | - | - | - | - | 75,000.0 | 6,250.0 | 6,250.0 | 6,250.0 | 6,250.0 | - | - | - | - | - | 100,000.0 |
| Committee Professionals | - | - | - | - | 150,000.0 | 18,750.0 | 18,750.0 | 18,750.0 | 18,750.0 | 18,750.0 | 18,750.0 | 18,750.0 | 18,750.0 | - | 310,000.0 |
| Noticing Agent/Other | - | - | - | - | 20,000.0 | 2,500.0 | 2,500.0 | 2,500.0 | 2,500.0 | - | - | - | - | 2,000.0 | 32,000.0 |
| **Total Professional Fees** | - | - | - | - | 675,000.0 | 72,750.0 | 72,750.0 | 72,750.0 | 72,750.0 | 49,000.0 | 44,000.0 | 44,000.0 | 44,000.0 | 25,600.0 | 1,172,600.0 |

| | | | | | | | | | | | | | | | |
|---|--:|--:|--:|--:|--:|--:|--:|--:|--:|--:|--:|--:|--:|--:|--:|
| **Total Cash Disbursements** | 252,018.3 | 348,001.3 | 27,265.7 | 249,845.0 | 4,416,486.9 | 288,178.6 | 200,889.5 | 179,750.0 | 115,417.0 | 93,000.0 | 48,000.0 | 87,000.0 | 63,667.0 | 57,600.0 | 6,427,119.2 |
| | | | | | | | | | | | | | | | |
| **NET CASH FLOW** | (8,264.8) | (16,822.1) | 294,044.3 | 76,828.4 | 1,757,231.6 | (277,428.6) | 271,701.5 | (169,000.0) | (104,667.0) | (32,250.0) | (42,625.0) | (84,312.5) | (62,323.3) | (57,600.0) | 1,544,512.4 |
| **CUMULATIVE NET CASH FLOW (post petition)** | (8,264.8) | (25,086.9) | 268,957.3 | 345,785.7 | 2,103,017.3 | 1,825,588.7 | 2,097,290.2 | 1,928,290.2 | 1,823,623.2 | 1,791,373.2 | 1,748,748.2 | 1,664,435.7 | 1,602,112.4 | 1,544,512.4 | 1,544,512.4 |
| **LOAN BALANCE** | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| **Loan Summary** | | | | | | | | | | | | | | | |
| Beginning Loan Balance | 2,938,762.8 | 2,959,883.9 | 2,978,024.1 | 2,683,979.9 | 2,611,409.8 | - | - | - | - | - | - | - | - | - | 2,938,762.8 |
| Less: Collections/Deposits | (243,753.5) | (331,179.2) | (321,309.9) | (326,673.3) | (6,173,718.5) | - | - | - | - | - | - | - | - | - | (7,396,634.4) |
| Advances | 252,018.3 | 348,001.3 | 27,265.7 | 249,845.0 | 1,805,077.1 | - | - | - | - | - | - | - | - | - | 2,682,207.3 |
| Interest, Fees, Other  8.25% | 160.0 | | | 4,258.2 | 4,143.1 | - | - | - | - | - | - | - | - | - | 8,561.3 |
| Ending Loan Balance | 2,947,187.6 | 2,976,706.0 | 2,683,979.9 | 2,611,409.8 | (1,753,088.5) | - | - | - | - | - | - | - | - | - | (1,767,102.9) |
| | | | | | | | | | | | | | | | |
| **Total Cash Collateral in Bank** | | | | | | | | | | | | | | | |
| Beginning Balance | | | | | | 1,753,088.5 | 1,464,909.9 | 1,736,611.4 | 1,567,611.4 | 1,462,944.4 | 1,430,694.4 | 1,388,069.4 | 1,303,756.9 | 1,241,433.6 | 1,753,088.5 |
| Receipts | | | | | | - | 472,591.0 | 10,750.0 | 10,750.0 | 60,750.0 | 5,375.0 | 2,687.5 | 1,343.8 | - | 564,247.3 |
| Disbursements | | | | | | 288,178.6 | 200,889.5 | 179,750.0 | 115,417.0 | 93,000.0 | 48,000.0 | 87,000.0 | 63,667.0 | 57,600.0 | 1,133,502.1 |
| Ending Balance | | | | - | 1,753,088.5 | 1,464,909.9 | 1,736,611.4 | 1,567,611.4 | 1,462,944.4 | 1,430,694.4 | 1,388,069.4 | 1,303,756.9 | 1,241,433.6 | 1,183,833.6 | 1,183,833.6 |
| | | | | | | | | | | | | | | | |
| **Total Cash Availability** | | | | | 1,753,088.5 | 1,464,909.9 | 1,736,611.4 | 1,567,611.4 | 1,462,944.4 | 1,430,694.4 | 1,388,069.4 | 1,303,756.9 | 1,241,433.6 | 1,183,833.6 | |

| **Availability Estimates** | | | | |
|---|--:|--:|--:|--:|
| Net change in AR Collateral | - | | | |
| Previous AR Collateral Balance | 593,809.3 | 42,889.0 | 189,801.0 | 189,801.0 |
| Ending AR Collateral Balance | 42,889.0 | 189,801.0 | 189,801.0 | 189,801.0 |
| AR Advance Rate | 85% | 85% | 85% | 85% |
| **AR Availability** | 36,455.7 | 161,330.9 | 161,330.9 | 161,330.9 |
| Total Inventory | 8,378,255.8 | 8,045,375.2 | 7,895,375.2 | 7,742,597.4 |
| Ineligible Inventory | (767,000.0) | (648,038.7) | (767,000.0) | (767,000.0) |
| Eligible Inventory | 7,611,255.8 | 7,397,336.4 | 7,128,375.2 | 6,975,597.4 |
| Inventory Advance Rate | 42% | 42% | 42% | 42% |
| **Inventory Availability** | 3,196,727.4 | 3,106,881.3 | 2,993,917.6 | 2,929,750.9 |
| **Total Collateral** | 3,233,183.1 | 3,268,212.1 | 3,155,248.4 | 3,091,081.7 |
| Less: | | | | |
| Availability Block | - | | | |
| Pro Fees Reserve | (400,000.0) | (470,000.0) | (470,000.0) | (470,000.0) |
| Gift Card Reserve | (105,074.4) | (113,210.0) | (113,210.0) | (113,210.0) |
| Adjusted Collateral Balance | 2,728,108.8 | 2,685,002.1 | 2,572,038.4 | 2,507,871.7 |
| Loan Balance | (2,947,187.6) | (2,976,706.0) | (2,683,979.9) | (2,611,409.8) |
| **Total Availability** | (219,078.8) | (291,703.8) | (111,941.5) | (103,538.0) |
| Less:  Outstanding Checks | | | | |
| **Unrestricted Availability** | (219,078.8) | (291,703.8) | (111,941.5) | (103,538.0) |

**The accompanying financial information is based on information provided by Swoozies, Inc
Clear Thinking Group has not audited or otherwise verified the information provided to us, nor will we provide any assurances
as concerning the reliability, accuracy, or completeness of any materials provided by or on behalf of Swoozies, Inc

## EXHIBIT E

## SALE GUIDELINES

## (CLOSING LOCATIONS)

The following procedures shall apply to store closing sales ("Sales") to be held at the Closing Locations:[1]

1.    The Sales shall be conducted so that the Stores in which sales are to occur remain open no longer than the normal hours of operation provided for in the respective leases for the Stores.

2.    The Sales shall be conducted in accordance with applicable state and local "Blue Laws," and thus, where applicable, no Sales shall be conducted on Sunday unless the Merchant had been operating such Stores on a Sunday.

3.    The Merchant and the Agent shall be permitted to augment or otherwise bring new merchandise into the Stores in order to maintain a desired mix of merchandise; provided, however, that such merchandise is of the same type or quality as the Merchandise currently or previously sold in the Stores and that no more than 25% of the augmented merchandise is obtained from sources other than Merchant's existing vendors.

4.    All display and hanging signs used by the Merchant and the Agent in connection with Sales shall be professionally produced and all hanging signs shall be hung in a professional manner.  The Agent may use the terms "bankruptcy court authorized," "bankruptcy" in advertisements for the Sales.  To the extent authorized by the Bankruptcy Court, the Merchant and the Agent may advertise the Sale as a "store closing," "going out of business," "bankruptcy liquidation" or similar theme sale at the Stores as provided by the Agency Agreement.  The Merchant and the Agent shall not use neon or day-glo signs.  Furthermore, with respect to enclosed mall locations no exterior signs or signs in common areas of a mall shall be used.  Nothing contained herein shall be construed to create or impose upon the Merchant and the Agent any additional restrictions not contained in the applicable lease.  In addition, the Merchant and the Agent shall be permitted to utilize exterior banners at non-enclosed mall stores; provided, however, that such banners shall be located or hung so as to make clear that the Sale is being conducted only at the affected Store and shall not be wider than the storefront of the Store.  In addition, the Merchant and the Agent shall be permitted to utilize sign walkers and customary street signage.

---

[1] Capitalized terms used but not defined shall have the meanings ascribed to such terms in the Agency Agreement.

5.    Conspicuous signs shall be posted in the cash register areas of each affected Store to the effect that all sales are "final" and that customers with any questions or complaints subsequent to the conclusion of the Sales may contact a named representative of the Merchant or the Agent at a specified telephone number.

6.    The Agent shall not distribute handbills, leaflets or other written materials to customers outside of any of the Stores, unless permitted by the applicable lease or, if distribution is customary in the shopping center in which the Store is located. Otherwise, the Agent may solicit customers in the Stores themselves. The Agent shall not use any flashing lights or amplified sound to advertise the Sales or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

7.    At the conclusion of the Sales, Agent shall vacate the Stores in "broom-clean" condition, and shall otherwise leave the Stores in the same condition as on the commencement of the Sales, ordinary wear and tear excepted; provided however that the Merchant and/or the Agent shall be authorized to leave any Abandoned Property (as that term is defined herein) in the Stores; provided, further, that the Merchant hereby does not undertake any greater obligation than as set forth in an applicable lease with respect to a Store. The Merchant may abandon any FF&E or other materials of *de minimus* value (the "Abandoned Property") not sold in the Sales at the Store premises at the conclusion of the Sales. Any Abandoned Property left in a Store after a lease is rejected shall be deemed abandoned with the landlord having the right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord and without waiver of any damage claims against the Merchant.

8.    The Merchant and/or the Agent may sell FF&E owned by the Merchant and located in the Stores during the Sales. The Merchant or the Agent, as the case may be, may advertise the sale of FF&E. Additionally, the purchasers of any FF&E sold during the Sales shall only be permitted to remove the FF&E either through the back shipping areas or through other areas after store business hours.

9.    Landlords will be provided with the name and telephone number of a representative of the Merchant to notify of any problem arising during the Sales.

10.    The Agent shall not make any alterations to interior or exterior Store lighting. No property of any landlord of a Store shall be removed or sold during the Sales. The hanging of exterior banners or other signage shall not constitute an alteration to a Store.

11.    At the conclusion of the Sale at each Store, pending assumption or rejection of applicable leases, the landlords of the Stores shall have

reasonable access to the Store premises asset forth in the applicable leases. The Merchant, the Agent and their agents and representatives shall continue to have exclusive and unfettered access to the Stores.

12. Post-petition rents shall be paid and other lease obligations shall be performed by the Merchant as required by the Bankruptcy Code, except as modified pursuant to the Approval Order, until the rejection or assumption and assignment of each lease.

13. The rights of the landlords for any damages to the Stores shall be reserved in accordance with the applicable leases.

14. The Merchant shall notify a representative of the relevant landlord of the date on which the Sale is scheduled to conclude at a given Store, within three business days of the Merchant's receipt of such notice from the Agent.